# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

AURACLE HOMES, LLC; FD
MANAGEMENT, LLC; BUCKLEY FARMS,
LLC; ORANGE CAPITOL, LLC; 216 EAST
MAIN STREET MERIDEN, LLC; BD
PROPERTY HOLDINGS, LLC; PRIME
MANAGEMENT, LLC; AND, HABERFELD
ENTERPRISES, LLC,

        Plaintiffs,

v.

NED LAMONT

        Defendant.

**Case No. _____**



JUNE 16, 2020


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE, ISSUANCE OF A PRELIMINARY INJUNCTION


**ORAL ARGUMENT REQUESTED**

# I.   TABLE OF CONTENTS

I.   TABLE OF CONTENTS.................................................................................... i

II.   TABLE OF AUTHORITIES ......................................................................... ii

III.   INTRODUCTION ........................................................................................1

IV.   STATEMENT OF FACTS ............................................................................ 4

  A.  PLAINTIFF AURACLE HOMES, LLC ...........................................................4

  B.  PLAINTIFF BUCKLEY FARMS, LLC .............................................................5

  C.  PLAINTIFF ORANGE CAPITOL, LLC ..........................................................5

  D.  PLAINTIFF 216 EAST MAIN STREET MERIDEN, LLC ...........................6

  E.  PLAINTIFF BD PROPERTY HOLDINGS, LLC ............................................9

  F.  PLAINTIFF HABERFELD ENTERPRISES, LLC.........................................10

  G.  DEFENDANT NED LAMONT ......................................................................11

V.   ARGUMENT ...............................................................................................12

  A.  STANDARD FOR ISSUING A TEMPORARY RESTRAINING  ORDER AND
      PRELIMINARY INJUNCTION .......................................................................12

  B.  PLAINTIFFS ARE BEING IRREPARABLY HARMED..................................13

  C.  PLAINTIFFS WILL SUCCEED ON THE MERITS.........................................14

    a) RIGHTS TO DUE PROCESS OF LAW .........................................................15

      i)  Plaintiffs' Cognizable Liberty Interests Are Being Harmed ................16

      ii) Plaintiffs Were NOT Afforded the Process They Were Due ...............18

    b) RIGHTS UNDER THE CONTRACTS CLAUSE.......................................20

      i)  The Order Substantially Impaired Plaintiffs' Contract Rights ...........22

      ii) Does the Order Serve a Significant Public Purpose? ..........................23

      iii) Means Chosen to Accomplish Purpose Are Unreasonable and Inappropriate.23

    c) THE ORDER VIOLATES THE TAKINGS CLAUSE ...........................................26

  D.  EMERGENCY DOES NOT SAVE EXECUTIVE ORDERS ................................27

    a) THERE IS NO JUSTIFIABLE BASIS FOR THE ORDERS................................32

    a) DEFENDANT'S ORDERS ARE *ULTRA VIRES* ....................................32

  E.  SERIOUS CONSTITUTIONAL QUESTIONS MAKE THEM FAIR GROUND
      FOR LITIGATION, PLUS A BALANCE OF THE HARDSHIPS TIP
      DECIDEDLY IN PLAINTIFFS' FAVOR.......................................................36

VI.   CONCLUSION............................................................................................37

## II.   <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 926 (6th Cir. 2020) ........................................ 30, 31

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 235 (1978) .................................................. 17

*Ambrose v. City of White Plains*, No. 10-CV-4946 (CS), at *20 (S.D.N.Y. Apr. 2, 2018) ........... 22

*Bateman v. Purdue*, 881 F.Supp.2d 709 (E.D.N.C. 2012) ................................................................. 30

*Bery v. City of New York*, 97 F.3d 689 (2d Cir.1996) ....................................................................... 15

*Borgner v. Brooks*, 284 F.3d 1204 (11th Cir.2002) ........................................................................... 33

*Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) ................................................... 17

*Cnty. of Nassau v. Leavitt*, 524 F.3d 408 (2d Cir.2008) .............................................................. 13, 36

*Connecticut Citizens Defense League, Inc. v. Governor Ned Lamont*, No. 3:20-cv-00646 (JAM)
        D.Conn., June 8, 2020) ........................................................................................................ 31

*Donohue v. Mangano*, 886 F.Supp.2d 126 (E.D.N.Y. 2012) ........................................................... 14

*Edenfield v. Fane*, 507 U.S. 761 (1993) ..................................................................................... 24, 32

*Eklecco Newco LLC v. Town of Clarkstown*, No. 16-CV-6492 (NSR), 2018 WL 3023159
        (S.D.N.Y. June 18, 2018) .................................................................................................... 26

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................................... 13

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) ...................... 22

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) .................................... 13

*Frillici v. Westport*, 231 Conn. 418, 437-38, 650 A.2d 557 (1994) .................................................. 16

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ............................................................................................. 19

*Ganci v. New York City Transit Authority*, 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005) ................... 27

*Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) ................................................................. 21

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) ........................ 32, 33

*Hewitt v. Helms*, 459 U.S. 460, 466 (1983) ..................................................................................... 16

*IMS Health Inc. v. Sorrell*, 630 F.3d 263, 275 (2d Cir.2010) .................................................... 28, 31

*Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) ....................................................... 32

*Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905) ........................................................... 28, 29, 31

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir.1996) ................................................................................... 13

*Keystone Bituminous Coal Ass'n v. DeBendicitis*, 480 U.S. 470, 503 n.30 (1987) ........................... 21

*Knick v. Township of Scott*, _U.S._, 139 S.Ct. 2162, 2170 (2019) ................................................... 26

*Larson v. Domestic & Foreign Corp.*, 337 U.S. 682 (1949) ............................................................. 35

*Lingle v. Chevron*, 544 U.S. 528 (2005) ........................................................................................... 26

*Littlefield v. Forney Independent School District*, 268 F.3d 275, 288 & n. 18 (5th Cir.2001) ........... 38

*Lynch v. City of New York*, 589 F.3d 94 (2d Cir.2009) ............................................................... 13, 36

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) ............................................................................. 16

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................................... 28, 32

*McCulloch v. State*, 17 U.S. 316 (1819) ......................................................................................... 37

*McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001) ............................................ 18

*Meachum v. Fano*, 427 U.S. 215, 223-227 (1976) .......................................................................... 16

*MedImmune v. Genentech, Inc.*, 549 U.S. 118 (2007) ..................................................................... 14

*Metro. Taxicab Board of Trade v. City of New York*, 615 F.3d 152 (2d Cir.2010) .................... 12, 36

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir.1984)..................................................................13
*Murr v. Wisconsin*, 137 S.Ct. 1933, 1942 (2017)...............................................................27
*New York Times Co. v. United States*, 403 U.S. 713 (1971).............................................13
*Newton v. City of New York*, 779 F.3d 140 (2dCir. 2015)..................................................16
*Obergefell v. Hodges*, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015).....................................32
*Ogden v. Saunders*, 25 U.S. 213, 354-55 (1827)...............................................................21
*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014)
.....................................................................................................................................12
*Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001).......................................................27
*Paykina v. Lewin*, 387 F.Supp.3d 225 (N.D.N.Y. 2019)....................................................13
*Planned Parenthood v. Casey*, 505 U.S. 833, 857 (1992)..................................................29
*Rehman v. State Univ. of NY. at Stony Brook*, 596 F.Supp.2d 642 (S.D.N.Y. 2009)...........18
*Reich v. Beharry*, 883 F.2d 239, 242-43 (3d Cir. 1989)....................................................17
*Reno v. Flores,* 507 U.S. 292 (1993)...........................................................................17, 28
*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir.1990)..................................20
*Rivoli Trucking Corp. v. Scanlon*, 162 F. Supp. 53, 54–55 (E.D.N.Y. 1958)........................35
*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ........................................................13
*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995)............................................................33
*S & R Dev. Estates, LLC v. Town of Greenburgh*, 336 F.Supp.3d 300 (S.D.N.Y. 2018)..............27
*San Diego Gas & Elec. Co. v. San Diego*, 450 U.S. 621, 654 (1981)..................................26
*Sanitation & Recycling Indus., Inc. v. City of NY*, 107 F.3d 985, 993 (2d Cir. 1997) ..............22
*Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir.2000)...........................................................28
*Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317 (2d Cir.1999) .................13
*Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018)...................................................................20
*Transport Workers Union, Local 290 v. Se. Pa. Transp. Auth.*, 145 F.3d 619, 621 (3d Cir. 1998) .21
*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997).......................................................31
*U. S. Trust Co. v. New Jersey*, 431 U.S. 1 (1977) ........................................................17, 22
*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981).............................................................12
*Ward v. Rock Against Racism*, 491 U.S. 781 (1989).........................................................32
*Washington v. Glucksberg*, 521 U.S. 702 (1997)..................................................19, 20, 28
*Weinstein v Albright*, 261 F.3d 127 (2dCir. 2001).............................................................19
*Yang v. Kellner*, No. 20 Civ. 3325 (AT), S.D.N.Y. May 5, 2020.......................................14

**Statutes**

CGS § 19a-131a ............................................................................................................34, 35
CGS § 28-9 ...................................................................................................................34, 35
CGS § 47a-23 ....................................................................................................................18
CGS § 47a-23a ..................................................................................................................18
CGS § 47a-23b ..................................................................................................................18
CGS § 47a-23c ..................................................................................................................18
CGS § 47a-24 ....................................................................................................................18
CGS § 47a-24a ..................................................................................................................18
CGS § 47a-25 ....................................................................................................................18
CGS § 47a-26 ....................................................................................................................18
CGS § 47a-26a ..................................................................................................................18

CGS § 47a-26b ..................................................................................................18
CGS § 47a-26c ..................................................................................................18
CGS § 47a-26d ..................................................................................................18
CGS § 47a-21 ....................................................................................................22
CGS § 47a-21(b) .................................................................................................1

**Other Authorities**

Executive Order 7G ....................................................................................passim
Executive Order 7X ....................................................................................passim

**Treatises**

11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948 (1973) ..............................13

**Constitutional Provisions**

Connecticut Constitution, Art. 1, § 10 ......................................................... 15, 35
Connecticut Constitution, Art. 4, § 5 .................................................................11
Connecticut Constitution, Art. 4, § 12 ...............................................................11
United States Constitution, Art. I, § 10, cl. 1 .............................................. 20, 35
Contracts Clause of the United States Constitution ......................... 15, 16, 20, 21, 26
Takings Clause of the United States Constitution ....................................15, 26, 27
Second Amendment of the United States Constitution .........................................30
Fifth Amendment of the United States Constitution ..................................... 16, 26
Fourteenth Amendment of the United States Constitution .....................15, 16, 17, 28

III.   **INTRODUCTION**

In Connecticut, those who own real property and contract with tenants who rent those properties for residential purposes, (e.g., "landlords") must follow very specific statutory mandates in the creation and enforcement of those contracts. The statutory scheme requires under penalty of law, for example, that landlords collect and retain not more than two months of rent as security against the possibility that the tenant will fail to pay rent and/or damage the property. CGS § 47a-21(b). State law also requires that, whether the tenant's occupancy of the property is pursuant to a written lease or not, the landlord must follow a prescribed statutory process in order to regain possession of the property from a tenant who fails to pay rent if the tenant does not relinquish possession of the property voluntarily. This process includes serving the tenant with a notice to quit possession, waiting the requisite time after service (typically three days), then initiating a summary process eviction action in housing court by serving the tenant with a summons and complaint. Without a judgment of the court authorizing the landlord to execute an eviction of the tenant, the landlord is unable to regain possession of the property, even if the tenant fails or refuses to pay rent.

State statutes severely limit the ways landlords may regain possession of their property, and in return, give the landlords a reliable expedited process to recover the properties if they follow the statutory process. The process is narrow and exacting, but it is an available process nonetheless. When contracting with tenants to let properties, landlords necessarily rely on the statutory process written in state law to determine the terms under which to lease the properties. Those terms almost invariably include the price of the rent, the

1

amount of the security deposit, the length of the tenancy, etc. When negotiating these and other terms with a prospective tenant, landlords factor in the cost in money and time to recover the property in the event the tenant breaches the contract (lease) terms. Those costs are determined primarily by the statutory process enacted by the state legislature. Changing the statutory eviction process drastically changes the costs and benefits that landlords must factor into the contracts with their tenants, and thus, the terms under which those contracts are entered.

On March 19, 2020, the Defendant issued Executive Order 7G which effectively closed the courts to the adjudication of residential eviction actions. On April 10, 2020, the Defendant issued Executive Order 7X which, among other things, prohibited issuing notices to quit, prohibited filing eviction actions, and prohibited the execution of eviction judgments. Under the Defendant's Executive Orders, landlords – with notable preferential exceptions – are completely foreclosed and prohibited from accessing even the narrow avenue normally provided for them to exercise their rights to regain possession of their properties from tenants who breach the contract terms. The Defendant's newly-imposed Orders have completely eliminated all legal process for the Plaintiffs and other residential landlords like them to legally regain possession of their properties, while continuing to allow State-preferred commercial landlords to continue utilizing Connecticut's the eviction process.

Plaintiffs, owners and landlords of residential properties in Connecticut, and similarly situated individuals and entities who own and lease residential properties, have a fundamental, constitutionally guaranteed right to contract with tenants, to enforce the terms

of those contracts, and to obtain the benefits of those contracts. The Plaintiffs have a constitutional right to protection under the law equal to that afforded commercial landlords. The Plaintiffs have a constitutional right to the statutory process set forth in state law to regain possession of their properties from tenants who breach their contracts by not timely paying rent. The Plaintiffs have a constitutional right not to have their security deposits taken from them for public use without just compensation.

But because of Defendant's actions in enacting the Executive Orders complained of herein, the Plaintiffs have been completely and illegally prevented from exercising these fundamental constitutional rights. Because the Defendant has unilaterally banned, under color of law, the service of all notices to quit by residential landlords, the Plaintiffs cannot now set forth down even the narrow statutory path to regaining possession of their properties from non-paying tenants. Because the Defendant has effectively shut down the State's entire court system to eviction actions, it is now impossible for the Plaintiffs and similarly-situated landlords to obtain a judgement of eviction or to execute a judgment already obtained. Because the Defendant's Orders allows tenants to pay rent with the security held by their landlords, the Plaintiffs have been compelled to relinquish their property rights to security funds rightfully obtained and held under state law. The Defendant's Executive Orders – which exceed the emergency powers given him under the U.S. and Connecticut Constitutions and state statute – have effectively eliminated the constitutional and statutory property rights of the Plaintiffs and other landlords like them. Because the Defendant's conduct prevents the Plaintiffs and others like them from exercising their constitutional rights, the Defendant's conduct must be enjoined.

3

IV.   **STATEMENT OF FACTS**

On March 10, 2020, in response to the outbreak of the Coronavirus (aka COVID-19), the Defendant declared Public Health and Civil Preparedness Emergencies. Defendant Lamont's declaration is attached hereto as Exhibit A.

On March 19, 2020, the Defendant issued Executive Order 7G which, among other things suspended the court adjudication of all residential eviction actions. Executive Order 7G is attached hereto as Exhibit B.

On April 10, 2020, the Defendant issued Executive Order 7X which, among other things prohibited the service of all residential notices to quit, prohibited the filing of all summary process eviction actions, prohibited executing judgments of eviction, and compelled residential landlords to relinquish a portion of any security deposit they held and apply it to the rent of any tenant who requested the landlord do so. Executive Order 7X is attached hereto as Exhibit C.

A.   **PLAINTIFF AURACLE HOMES, LLC**

Auracle Homes LLC owns real property located at 60 Alder Street, Waterbury, CT. *See* Declaration of David Haberfeld Regarding Auracle Homes, LLC ("Auracle Decl.") ¶ 7. On behalf of Auracle Homes LLC, FD Property Management, LLC leases and manages 60 Alder Street, Waterbury, CT.  Auracle Decl. ¶ 8.  FD Property Management, LLC collected a security deposit from its first floor tenants in an amount equivalent to two times the monthly rent. Auracle Decl. ¶¶ 9-10. The tenants are not enrolled in a security deposit guarantee program. Auracle Decl. ¶ 11. The tenants contacted the landlord in writing, requesting that a portion of the security deposit be used to pay rent for May 2020. Auracle Decl. ¶ 12. FD Property

4

Management, LLC was forced to relinquish a portion of its legally retained security deposit. Auracle Decl. ¶ 13.

### B.   PLAINTIFF BUCKLEY FARMS, LLC

Buckley Farms LLC owns real property located at 206 Crown Street, Meriden, Connecticut. *See* Declaration of David Haberfeld Regarding Buckley Farms, LLC ("Buckley Decl.") ¶ 7. On behalf of Buckley Farms LLC, Haberfeld Enterprises, LLC leases and manages 206 Crown Street, 3ʳᵈ Floor**,** Meriden, CT. Buckley Decl. ¶ 8. The landlord has a written lease agreement with tenants, requiring the payment of rent, and providing for penalties for a tenant failing to pay rent on time. Tenants have not paid rent for the months of April and May 2020 due to Executive Order 7X. Buckley Decl. ¶¶ 8-9.

### C.   PLAINTIFF ORANGE CAPITOL, LLC

Orange Capitol LLC owns real property located at 71 Orange Street, Hartford Connecticut.  *See* Declaration of Jay Sheth ("Orange Capitol Decl.") ¶¶ 6. Orange Capitol, LLC has a written lease agreement with a tenant to rent unit #3 of 71 Orange Street, Hartford CT 06106, requiring the payment of rent and providing for penalties for a tenant failing to pay rent on time. Orange Capitol Decl. ¶ 6.a. Orange Capitol LLC collected a security deposit from its  tenant in unit #3 in an amount equivalent to two times the monthly rent. Orange Capitol Decl. ¶ 6.b. and 6.c. The tenant is not enrolled in a security deposit guarantee program. Orange Capitol Decl. ¶ 6.d. The tenant contacted the landlord in writing, requesting that a portion of the security deposit be used to pay rent for May 2020.  Orange Capitol Decl. ¶ 6.e. Orange Capitol LLC was forced to relinquish a portion of its legally retained security deposit. Orange Capitol Decl. ¶ 6.f.

Orange Capitol LLC also owns real property located at 1050 Capitol Avenue, Hartford, Connecticut.  Orange Capitol Decl. ¶ 7. Orange Capitol, LLC has a written lease agreement with tenants to rent Unit #7 of the 1050 Capitol Avenue, Hartford, Connecticut property, requiring the payment of rent, and providing for penalties for a tenant failing to pay rent on time. Orange Capitol Decl. ¶ 7.a. Orange Capitol LLC collected a security deposit from its third-floor tenants in an amount equivalent to two times the monthly rent. Orange Capitol Decl. ¶ 7.b. and 7.c. The tenants are not enrolled in a security deposit guarantee program. Orange Capitol Decl. ¶ 7.d. The tenant contacted the landlord in writing, requesting that a portion of the security deposit be used to pay rent for June 2020.  Orange Capitol Decl. ¶ 7.e. Orange Capitol LLC was forced to relinquish a portion of its legally retained security deposit. Orange Capitol Decl. ¶ 7.f.

### D.     PLAINTIFF 216 EAST MAIN STREET MERIDEN, LLC

216 East Main Street Meriden LLC owns the real property located at 216 East Main Street, Meriden, Connecticut *See* Declaration of Jay Sheth. ("216 E. Main St. Decl.") ¶ 6. The landlord has an oral lease agreement with a tenant to rent Unit #2 of 216 East Main Street, Meriden, Connecticut, requiring the payment of rent. 216 E. Main St. Decl. ¶ 7. The tenant did not pay rent for at least the months of March, April and May 2020. 216 E. Main St. Decl. ¶ 7.a. The tenant was served a Notice to Quit on March 14, 2020. 216 E. Main St. Decl. ¶ 7.b. 216 East Main Street Meriden LLC served a Summons for Summary Process Eviction, Complaint, Return of Service and copy of the Notice to Quit on tenant on March 27, 2020. 216 E. Main St. Decl. ¶ 7.c. Due to the Governor's Executive Order 7X, 216 East Main Street Meriden LLC is prohibited from returning its Summary Process Complaint for Eviction to the

Court, and attempt to regain possession of Unit #2. 216 E. Main St. Decl. ¶ 7.d.

216 East Main Street Meriden LLC has an oral lease agreement with a tenant to rent Unit #3 of 216 East Main Street, Meriden, Connecticut 06450 requiring the payment of rent. 216 E. Main St. Decl. ¶ 8. The tenant failed to pay rent on March 1, 2020 and was served a Notice to Quit on March 14, 2020 for nonpayment of rent. 216 E. Main St. Decl. ¶¶ 8.a., 8.b. A Summons for Summary Process Eviction, Complaint, Return of Service and copy of the Notice to Quit were returned to the Meriden Superior Court, Judicial District of New Haven on April 1, 2020, Case #NNI-CV20-6019833-S. 216 E. Main St. Decl. ¶ 8.c. Due to the Executive Order 7G, suspending all statutory time requirements relating to service of process, court proceedings or court filings, 216 East Main Street Meriden LLC has not been able to pursue a judgment against the tenant and attempt to regain possession of Unit #3. 216 E. Main St. Decl. ¶ 8.d.

216 East Main Street Meriden LLC has a written lease agreement with a tenant to rent Unit #4 of 216 East Main Street, Meriden, Connecticut 06450 requiring the payment of rent and providing for penalties for a tenant failing to pay rent on time. 216 E. Main St. Decl. ¶ 9. The tenant failed to pay rent on February 1, 2020 (and to the present). Tenant was served a Notice to Quit on March 14, 2020. 216 E. Main St. Decl. ¶¶ 9.a., 9.b. On April 1, 2020 Tenant was served a Summons for Summary Process Eviction and complaint. 216 E. Main St. Decl. ¶ 9.c. The summons, complaint, copy of the Notice to Quit, and return of service were returned to Meriden Superior Court, Judicial District of New Haven on April 2, 2020, Case #NNI-CV20-6019833-S. 216 E. Main St. Decl. ¶ 9.d. Due to the Executive Order 7G, suspending all statutory time requirements relating to service of process, court

proceedings or court filings, 216 East Main Street Meriden LLC has not been able to pursue

a judgment against the tenant and attempt to regain possession of Unit #4. 216 E. Main St.

Decl. ¶ 9.e.

216 East Main Street Meriden LLC  has a written lease agreement with tenant to rent

Unit #6 of 216 East Main Street, Meriden, Connecticut 06450 requiring the payment of rent

and providing for penalties for a tenant failing to pay rent on time. 216 E. Main St. Decl. ¶

10. The tenant failed to pay rent, and was served a Notice to Quit on October 31, 2019. 216

E. Main St. Decl. ¶ 10.a. On November 6, 2019 a Summons for Summary Process Eviction,

Complaint and copy of the Notice to Quit were served on the tenant. 216 E. Main St. Decl.

¶ 10.b. The summons, complaint, copy of the Notice to Quit and return of service were filed

with the Meriden Superior Court, Judicial District of New Haven on November 12, 2019,

Case #NNI-CV19-6018416-S. 216 E. Main St. Decl. ¶ 10.c. A Motion for Default for

Failure to Appear and Judgment of Possession was filed by the Plaintiff on March 12, 2020.

216 E. Main St. Decl. ¶ 10.d. Due to the Governor's Executive Order 7G suspending all

statutory time requirements relating to service of process, court proceedings or court filings,

landlord has not been able to pursue a judgment against the tenant, and attempt to regain

possession of Unit #6. 216 E. Main St. Decl. ¶ 10.e.

216 East Main Street Meriden LLC has an oral lease agreement with tenant to rent

Unit #7 of 216 East Main Street, Meriden, Connecticut 06450 requiring the payment of rent.

216 E. Main St. Decl. ¶ 11. The Tenant did not pay rent for the month of March 2020, and

up to the present. 216 E. Main St. Decl. ¶ 11.a. Due to the Governor's Executive Order 7X

this Plaintiff is not permitted to serve a Notice to Quit on the Tenant. 216 E. Main St. Decl.

¶ 11.c. But for Executive Order 7X, 216 East Main Street Meriden LLC would have served a Notice to Quit on the tenant of Unit #7. 216 E. Main St. Decl. ¶ 11.d.

216 East Main Street Meriden LLC  has a written lease agreement with tenant to rent Unit #10 of 216 East Main Street, Meriden, Connecticut 06450 requiring the payment of rent. 216 E. Main St. Decl. ¶ 12. The Tenant did not pay rent for the month of March 2020, and up to the present. 216 E. Main St. Decl. ¶ 12.a. Tenant of Unit #10 told 216 East Main Street Meriden LLC that he did not have to pay rent for the months of April and May of 2020 because of Executive Order 7X. 216 E. Main St. Decl. ¶ 12.b. Due to the Governor's Executive Order 7X this Plaintiff is not permitted to serve a Notice to Quit on the Tenant. 216 E. Main St. Decl. ¶ 12.c. But for Executive Order 7X, 216 East Main Street Meriden LLC would have served a Notice to Quit on the tenant of Unit #10. 216 E. Main St. Decl. ¶ 11.d.

## E.   PLAINTIFF BD PROPERTY HOLDINGS, LLC

BD Property Holdings LLC owns real property located at 191 Sherman Avenue, New Haven, Connecticut. *See* Declaration of David Candelora regarding DB Property Holdings LLC ("BD Property Decl.") ¶ 8. On behalf of BD Property Holdings LLC, Prime Management, LLC leases and manages 191 Sherman Ave., 2nd Floor, New Haven, CT. BD Property Decl. ¶ 9. Prime Management, LLC  has a written lease agreement with tenants to rent the 2nd floor of 191 Sherman Avenue, New Haven CT 06511, requiring the payment of rent and providing for penalties for a tenant failing to pay rent on time. BD Property Decl. ¶ 10. Tenants did not pay rent for the month of March 2020, and to the present. BD Property Decl. ¶ 11. Prime Management, LLC  served a Notice to Quit on the tenants. BD Property

Decl. ¶ 12. Because of Executive Order 7X, Prime Management, LLC is precluded from serving and returning a Summary Process Complaint for Eviction.  BD Property Decl. ¶ 14. But for Executive Order 7X, Prime Management, LLC would have served a Notice to Quit on the tenant of 191 Sherman Ave., 2nd Floor, New Haven, CT. BD Property Decl. ¶ 13.

Prime Management, LLC has a written lease agreement with a tenant to rent the 1st floor of 191 Sherman Avenue, New Haven, CT, requiring the payment of rent and providing for penalties for a tenant failing to pay rent on time. BD Property Decl. ¶ 17. The tenant did not timely pay rent due on May 1, 2020. BD Property Decl. ¶ 18. Due to the Governor's Executive Order 7X Prime Management, LLC was precluded from serving a Notice to Quit on the tenant for nonpayment of rent.  BD Property Decl. ¶ 19. But for Executive Order 7X, Prime Management, LLC would have served a Notice to Quit on the tenant of 191 Sherman Ave., 1st Floor, New Haven, CT. BD Property Decl. ¶ 20.

### E.   PLAINTIFF HABERFELD ENTERPRISES, LLC

Haberfeld Enterprises, LLC owns real property located at 146 Pine Street, Bristol, Connecticut. *See* Declaration of David Haberfeld ("Haberfeld Ent. Decl.") ¶¶ 6. Haberfeld Enterprises, LLC  has a written lease agreement with a tenant to rent the 3rd floor of 146 Pine Street, Bristol, CT, requiring the payment of rent, and providing for penalties for a tenant failing to pay rent on time. Haberfeld Ent. Decl. ¶ 7. Tenant did not pay rent due on February 1, 2020, and to the present. Haberfeld Ent. Decl. ¶ 8. Due to the Governor's Executive Order 7X, landlord is precluded from serving a valid Notice to Quit on the tenant for nonpayment of rent. Haberfeld Ent. Decl. ¶ 9. But for Executive Order 7X, Prime Management, LLC would have served a valid Notice to Quit on the tenant of the 3rd Floor of 146 Pine Street,

10

Bristol, Connecticut. Haberfeld Ent. Decl. ¶ 10.

**F.      DEFENDANT NED LAMONT**

Defendant Ned Lamont is the elected Governor of the State of Connecticut. In such capacity, the Defendant is the State's supreme executive officer. Connecticut Constitution, Art. 4, § 5. As Governor, he is charged with the duty to "take care that the laws be faithfully executed" and he is "the conservator of the peace throughout the state." *Id.* Art. 4, § 12. The Defendant is sued in his official capacity and, for his *ultra vires* acts as described herein, is also sued in his individual capacity.

Although the Defendant, through his Executive Orders, has blocked every avenue for Plaintiffs and similarly situated landlords to regain possession of their properties from non-paying tenants, upon information and belief, the Defendant has not blocked such efforts by landlords leasing to non-residential tenants.

The Plaintiffs can and would exercise their rights to issue notices to quit, initiate summary process actions, seek judgments of possession, dispossess some of their non-paying tenants and regain possession of their properties, and use the funds they hold as security to repair their properties if damaged, but for the reasonable fear and imminent risk of legal sanctions under the State's laws, policies, orders, practices, customs, and enforcement actions imposing criminal sanctions for doing so without a court judgment that the Defendant's orders prevent them from acquiring. *See* Auracle Decl. ¶ 14; Buckley Decl. ¶ 11; Orange Capitol Decl. ¶¶ 6.f. and 7.f.; 216 E. Main St. Decl. ¶¶ 7g., 8.e., 9.f., 10.f., and 11.d.; BD Property Decl. ¶ 13 and 20; Haberfeld Ent. Decl. ¶ 10.

Banning the service of notices to quit, the filing of eviction actions, the adjudication

of summary process claims, and the execution of eviction judgments, has effectively

eliminated the only legal process by which Connecticut residential landlords can obtain

possession of their properties from non-paying tenants. Compelling landlords to relinquish

their lawfully held security deposits puts the Plaintiffs at risk of being insufficiently secured

against damage to the property and effects a taking of personal property for public use

without just compensation.

## V.  ARGUMENT

### A.  STANDARD FOR ISSUING A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

"In the Second Circuit, a single standard is used to evaluate a request for preliminary

injunction and an application for temporary restraining order. For either type of relief,

Plaintiff must demonstrate that he will suffer irreparable harm if the relief is not granted and

meet "one of two related standards: either (a) a likelihood of success on the merits, or (b)

sufficiently serious questions going to the merits of its claim to make them fair ground for

litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.")

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir.

2014) (citations and internal quotation marks omitted). Generally, the purpose of a

preliminary injunction is to preserve the status of the parties until a determination on the

merits of the plaintiffs' claims can be made. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395

(1981). However, "[w]hen, as here, the moving party seeks a preliminary injunction that will

affect government action taken in the public interest pursuant to a statutory or regulatory

scheme, the injunction should be granted only if the moving party meets the more rigorous

likelihood-of-success standard." *Metro. Taxicab Board of Trade v. City of New York*, 615 F.3d

152, 156 (2d Cir.2010) (quoting *Cnty. of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir.2008);

*Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir.2009).) A showing of irreparable harm is

"the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley*

*Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v.*

*DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).  Here, the Plaintiffs clearly show irreparable

harm, and meet the more rigorous likelihood-of-success standard.

### B.     THE PLAINTIFFS ARE BEING IRREPARABLY HARMED

Plaintiffs strongly demonstrate the important factor of irreparable harm. The

deprivation of constitutionally protected individual liberty, even temporarily, constitutes

irreparable injury. "[A]s a general matter, there is a presumption of irreparable harm when

there is an alleged deprivation of constitutional rights." *Paykina v. Lewin*, 387 F.Supp.3d 225,

241 (N.D.N.Y. 2019); see, e.g., *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury.") (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 (1971)).

"Because plaintiffs allege deprivation of a constitutional right, no separate showing of

irreparable harm is necessary." *Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d

317, 322 (2d Cir.1999) (citing *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir.1996));

*Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984) ("When an alleged deprivation of a

constitutional right is involved, most courts hold that no further showing of irreparable

injury is necessary." )(citing 11 C. Wright & A. Miller, Federal Practice and Procedure, §

2948, at 440 (1973)); see also *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ("The district

court ... properly relied on the presumption of irreparable injury that flows from a violation

of constitutional rights."). "In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." *Yang v. Kellner*, No. 20 Civ. 3325 (AT), S.D.N.Y. May 5, 2020 (cites omitted).

Here, the injury is clear, palpable, and irreparable, and will continue to be so long as the Defendant is allowed to threaten enforcement of the State's statutory eviction scheme upon the Plaintiffs and others like them, while completely barring the Plaintiffs all lawful process to obtain possession of their properties. The Plaintiffs and other similarly situated landlords are left in reasonable fear and in realistic risk, of being charged and prosecuted for violating state law should they attempt to regain possession of their properties. A party is not required to first "expose himself to liability before bringing suit to challenge the basis for the threat." *Donohue v. Mangano*, 886 F.Supp.2d 126, 151 (E.D.N.Y. 2012) (quoting *MedImmune v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

Indeed, each day that has passed since the Defendant issued Executive Order 7G and Executive Order 7X has brought significant injury upon the Plaintiffs and every person who has been effectively precluded from exercising their right to initiate the process to regain rightful possession of their properties. Unquestionably, this deprivation of constitutional rights has caused and is continuing to cause "irreparable harm."

## C.   PLAINTIFFS WILL SUCCEED ON THE MERITS

Plaintiffs will succeed on the merits of their claims because the Defendants' Order, issued in excess of his constitutional and statutory power, completely eliminates all process, and thus prohibits owners of residential real property – like the Plaintiffs and all similarly situated landlords – from exercising their constitutionally guaranteed right to liberty and

property, or even from taking any meaningful preparatory steps toward doing so. This total ban violates fundamental rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution. Mandating a judicial judgment to exercise a constitutional right while barring all means and process to obtain such judgment, is a clear violation of the Plaintiffs' Fifth and Fourteenth Amendment right to due process of law. Banning the Plaintiffs from exercising their constitutional rights while allowing landlords renting to commercial tenants to continue serving notices to quit and initiating summary process eviction actions violates the Plaintiff's right to equal protection under the law. Ordering the Plaintiffs and other landlords like them to surrender part of the security for which they negotiated and agreed in a private contract violates the Landlords' constitutional rights under both the Contracts Clause and the Takings Clause of the U.S. Constitution.

The Defendants' Orders are categorically unconstitutional and as such, must be enjoined. That the Defendant issued such sweeping and constitutionally unsupportable Orders without legislative authority, beyond the limits of his executive power, makes it all the worse. The Plaintiffs demonstrate a strong likelihood of success – the only possible outcome under the controlling law absolutely prohibiting such bans – as well a clear case of irreparable injury in the absence of immediate injunctive relief.

### a)   <u>RIGHT TO DUE PROCESS OF LAW</u>

The Fourteenth Amendment to the United States Constitution provides that the State shall not deprive any person of life, liberty, or property, without due process of law. Article First, Sec. 10 of the Connecticut Constitution states: "Right of redress for injuries. All courts shall be open, and every person, for an injury done to him in his person, property or

reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

In order to prevail on a due process claim, a plaintiff must prove that the plaintiff has: (1) "a cognizable liberty or property interest under state or federal law . . .; and (2) if so, whether [he] was afforded the process he was due under the Constitution." *Newton v. City of New York*, 779 F.3d 140 (2dCir. 2015). As a threshold matter, therefore, the Plaintiffs must show that they have a vested liberty interest that is cognizable under the due process clause. *Frillici v. Westport*, 231 Conn. 418, 437-38, 650 A.2d 557 (1994). "Liberty interests protected by the Fourteenth Amendment may arise from two sources – the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)(citing *Meachum v. Fano*, 427 U.S. 215, 223-227 (1976)(Internal quotation marks omitted.). The Plaintiff's liberty interests being violated by the Orders challenged here arise from both sources.

### i) **Plaintiffs' Cognizable Liberty Interests Are Being Harmed**

#### (1)   Plaintiff's Liberty Interest under the U.S. Constitution

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, rather than providing for expeditious resolution of rent issues, the Defendant's Orders actually preclude the Plaintiffs from being heard at any time in any manner, let alone at a meaningful time or in a meaningful manner. Notwithstanding the Plaintiffs' contract rights to their property under the Contracts Clause of the U.S. Constitution and their rights to have their claims for possession of their properties adjudicated under the Due Process Clause of the Fourteenth Amendment, the Defendant's Orders deprive the Plaintiffs of both of those

16

rights.

The Plaintiffs and others like them have a fundamental right to their property under the Fourteenth Amendments. *Reno v. Flores,* 507 U.S. 292 (1993). Thus, the Plaintiffs have a liberty interest arising from the U.S. Constitution itself. Through his Orders, the Defendant is violating the fundamental, constitutionally guaranteed rights of the Plaintiffs and similarly situated landlords – who are otherwise entirely eligible to regain possession of their properties under all applicable federal and state laws – and is applying a prior restraint against the right to obtain the benefits of voluntarily negotiated and entered private contracts. "Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 235 (1978) (quoting *U. S. Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977).

(2)     Plaintiff's Liberty Interest under State Law

The government violates the Fourteenth Amendment's guarantee of procedural due process when it diverges from established procedures in a way that deprives an individual of a property right. *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002); *Reich v. Beharry*, 883 F.2d 239, 242-43 (3d Cir. 1989). The complete ban on all residential eviction proceedings imposed by Defendant's Executive Orders nullifies Connecticut's established statutory eviction procedures and deprives the Plaintiffs of their rights without any available process and no possible opportunity to be heard, meaningful or otherwise. The Defendants' Order is constitutionally untenable.

### ii) **Plaintiffs Were NOT Afforded the Process They Were Due**

#### (1)    Procedural Due Process

A claim for violation of procedural due process requires a showing that the plaintiff "(I) ... possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of NY. at Stony Brook*, 596 F.Supp.2d 642 (S.D.N.Y. 2009), citing, *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001). The lack of any process at all through which the Plaintiffs can legally recover their property violates the Plaintiffs' fundamental right to procedural due process. Where the government conditions the exercise of a fundamental right on following a statutorily-mandated process, the government must provide some process to enable the exercise of that right. Without it, there is no process to justify depriving the Plaintiffs of their liberty interests, and no process for the Plaintiffs to be heard challenging the deprivation.

Here the Court need not consider if the Plaintiffs have a cognizable liberty interest in obtaining actual possession of their property through the judicial process (this Court obviously cannot prejudge if any given summary process eviction action would result in a judgment of possession).  Instead, the Plaintiff's more immediate liberty interest being violated by the Defendant's Order is in their right, under Connecticut law, to issue notices to quit, to submit their cases for adjudication for due consideration, and to have those cases timely and objectively adjudicated – the right to invoke the bureaucracy to determine their eligibility under state law to exercise their fundamental constitutional rights. This liberty interest arises under Connecticut state law. See e.g., CGS §§ 47a-23, 47a-23a, 47a-23b, 47a-23c, 47a-24, 47a-24a, 47a-25, 47a-26, 47a-26a, 47a-26b, 47a-26c, 47a-26d

The procedures now afforded the Plaintiffs and others like them to regain possession of their properties, or even to initiate the process to determine their eligibility to do so – i.e., none whatsoever – "are [in]sufficient to protect [Plaintiffs'] interest." *Weinstein v Albright*, 261 F.3d 127 (2dCir. 2001). One would be hard pressed to identify a more glaring violation of procedural due process than the state conditioning the exercise of a fundamental constitutional right on serving a notice to quit and obtaining a judgement from the state, and then providing no process to issue a notice to quit or to obtain such a judgment.

(2)    Substantive Due Process

Since the state's statutory scheme requires a notice to quit and court judgment to exercise a cognizable liberty interest in recovering possession of a residential property, the Defendant's Order depriving the Plaintiffs of all process to serve such notice or obtain such judgment also violates the Plaintiffs' substantive due process rights. The Supreme Court has concluded that substantive due process is applicable when the government deprives a person of a "fundamental" right. *See Washington v. Glucksberg*, 521 U.S. 702, 719-23 (1997). The right not to be deprived of property without due process is a fundamental right. See *Fuentes v. Shevin*, 407 U.S. 67 (1972).

Substantive due process limits what the government may do in both its legislative and executive capacities. The State cannot then deny an individual's fundamental rights and liberties by simply abolishing the process of adjudicating the individual's claim to his or her property – especially when the State itself created the very process it now refuses to follow.

The Supreme Court has found substantive due process violations where government action has infringed a "fundamental" right without a "compelling" government purpose,

*Glucksberg*, 521 U.S. at 721-722. There can be no dispute that the Defendants' Orders infringed and continues to infringe on the Plaintiffs' fundamental right to liberty and property. For the Plaintiffs, there simply is no legal way for them to regain rightful possession of their property or to even initiate the statutory first steps. The question then becomes: has the government shown a "compelling government purpose" for depriving the Plaintiffs of their constitutional rights? *Id.* That commercial landlords continue to possess the right and ability to issue notices to quit and to initiate eviction proceedings clearly illustrates that the Defendant has not and cannot make such a showing. If the wheels of government can be turned for owners of properties rented to non-residential tenants, those wheels can surely turn to facilitate the only process afforded under state law for the Plaintiffs to legally exercise their fundamental constitutional rights.

Plaintiffs have thus demonstrated both irreparable harm to their fundamental constitutional rights – "the single most important prerequisite for the issuance of a preliminary injunction" (*Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990)) – and a strong likelihood of success on the merits because success is the only conceivable outcome under the controlling principles of constitutional law.

Such a regulatory scheme is categorically unconstitutional and must be enjoined.

### b)   RIGHTS UNDER THE CONTRACTS CLAUSE

Article 1, Section 10 of the United States Constitution, known as the Contracts Clause. "The Contracts Clause restricts the power of the States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).

The Founders included the Contracts Clause in the United States Constitution to

prevent states from picking winners and losers and allowing the hand-picked winners to avoid their contractual obligations.

> The power of changing the relative situation of debtor and creditor, of interfering with contracts … had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man. This mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith. To guard against the continuance of the evil, was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of government.

*Ogden v. Saunders*, 25 U.S. 213, 354-55 (1827); see also *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 n.30 (1987) ("[The Contracts Clause] was made part of the Constitution to remedy a particular social evil—the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts—and thus was intended to prohibit States from adopting as their policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them.") (citations omitted; cleaned up). A state actor violates the Contracts Clause by effecting "a change in state law that has operated as a substantial impairment of a contractual relationship." *Transport Workers Union, Local 290 v. Se. Pa. Transp. Auth.*, 145 F.3d 619, 621 (3d Cir. 1998) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).

> The test for a violation of the Contracts Clause is well settled:

> ... Courts use a three-part test to determine when a state's power is limited by the Contract Clause: "(l) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate."

*Ambrose v. City of White Plains*, No. 10-CV-4946 (CS), at *20 (S.D.N.Y. Apr. 2, 2018)(quoting,

*Sanitation & Recycling Indus., Inc. v. City of NY*, 107 F.3d 985, 993 (2d Cir. 1997).

### i)   <u>The Order Substantially Impaired Plaintiffs' Contract Rights</u>

The Order directly impairs Plaintiffs' rights as regard the use of security deposits

tendered by their tenants, by removing the deposit from its agreed upon purpose, without

the Plaintiffs' consent. In fact, the security deposit is the only known source of funds from

which a landlord can recoup the costs of repairs and unpaid rent from its tenants. The

importance of the security deposit is mirrored by the length to which the State has gone to

police the tender and use of the security by landlords. CGS § 47a-21 contains a highly

detailed structure for the application of security deposits, which includes timetables of

notices and inspections, all of which are required for a landlord to actually use the security

for its intended purposes. Any material change to this structure upon which the private

contracts are based suffices to satisfy this factor. "Total destruction of contractual

expectations is not necessary" for a court to find that the State substantially impaired a

private contract. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)

(citing *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26-27 (1977)).

The eviction moratorium also impairs Plaintiffs' right – forming the very foundational

terms of the contract – to use the housing court system to enforce the contract terms against

those tenants who fail to timely pay their rent. Plaintiffs do not assert that each and every

tenant who is in arrears should be evicted. However, the total ban on such proceedings

keeps the Plaintiffs from even initiating the process and from obtaining conditional relief.

The Defendant cannot seriously contend that the removal of this protection is anything but a substantial impairment of the Plaintiffs' contractual rights.

### ii)  Does the Order Serve a Significant Public Purpose?

Making it easier for people to stay home during a pandemic is concededly a "significant public purpose." However, choosing one small segment of society, i.e., landlords of residential properties, to suffer the entire burden of attempting to remedy this broad societal problem is both unconstitutional and wrong.

### iii) The Means Chosen to Accomplish this Purpose Are Unreasonable and Inappropriate

Defendant's Executive Order 7X purports to offer a justification for curtailing the Plaintiffs' constitutional rights, claiming it is because:

> [M]any residents of Connecticut are experiencing or will experience a significant loss of income as a result of business closures, reduced work hours or wages, or layoffs related to COVID- 19, all of which affect their ability to pay their rent, and thus leave them vulnerable to eviction and increased amounts owed in the form of penalties, interest, and late fees, all of which cause potential risks to public health and safety [and] minimizing evictions during this public health period is critical to controlling and reducing the spread of COVID-19 by allowing all residents to stay home or at their place of residence.

Executive Order 7X at 1-2.[1]

Concededly, controlling and reducing the spread of COVID-19 is an important governmental objective. However, the Defendant's Order completely blocks – for an indefinite period of time – any landlord of residential property from not only completing an

---

[1] Executive Order 7X contains seventeen "Whereas" paragraphs, but the quoted text, contained in the seventh and ninth "Whereas . . ." paragraphs, is the only portion of the Executive Order that purports to put forth any basis for the "Now, Therefore . . ."  paragraphs eliminating the Plaintiff's contractual and statutory rights.

eviction process (e.g., actually levying upon an execution thereby lawfully physically moving out a defaulting tenant) but also from taking even the initial administrative or procedural steps to commence an eviction process (e.g., delivering a notice to quit or filing a summary process action). While amending the timing under which a landlord can execute an eviction judgment to actually remove a tenant from the property may have been a justifiable action to accomplish the stated governmental objective, preventing Landlords from serving notices to quit, and from initiating summary process actions are not. Neither step remove a tenant from the property. They simply allow the Plaintiffs to place their claim for relief before the court, which, under existing state law, has the discretion to afford the tenant a stay of execution until the emergency is over. Further, at the time that Executive Order 7X was issued, no court was open in Connecticut to hear any eviction cases based upon non-payment of rent. The facts on the ground manifest the inability of any landlord to press the non-payment issue to actual dispossession against any tenant. It follows that both the moratorium and the compelled use of security deposits were wholly unnecessary and do nothing to actually remove the threat of eviction or the spread of COVID-19 as regards any tenant.

Thus, even if the Defendant's stated justification is heartfelt and not an intentional violation on the constitutional rights of the Plaintiffs and others like them, the fact that the Defendant's Orders are entirely unnecessary to accomplish the objective of allowing people to stay home during the emergency shows that the Order is not "tailored in a reasonable manner to serve a substantial state interest." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)

Further, that the Defendant's Order compelled Plaintiffs Auracle Homes, LLC and

24

Orange Capitol, LLC to surrender a portion of the funds they rightfully held as security for future property damage pursuant to fairly negotiated private contract, only serves to exemplify the Defendants' constitutional violation(s). Even if the Defendant's "stay at home" reasoning justified the complete ban on serving notices to quit and filing summary process actions – which it clearly does not –  Defendant's Orders provide absolutely no basis or justification for compelling these Plaintiffs to forfeit their constitutional contract rights by surrendering their bargained for security funds.

It is also important to note that while Executive Order 7X prohibits the service of notices to quit and the filing of eviction actions by residential landlords, it continues to allow the service of virtually all other notices and the filing of virtually all other civil actions by virtually all other classes of plaintiff seeking to adjudicate virtually all other claims in Connecticut courts. Thus, the Defendant cannot be heard to argue that the acts of service or filing in any way jeopardizes the public health.

In light of the lack of any symbiosis between the government's objective and the clear harm to the Plaintiff's constitutional rights, the government's interest is not and cannot be a substantial one for constitutional purposes. To be sure, the question is not whether an interest is important at the highest level of generality; rather, the fundamental concern is whether the State is genuinely applying rules about its interest in a consistent manner such that it demonstrates the constitutional importance of the interest. Here, it is not and cannot. Nothing makes such a ban on the Plaintiffs serving notices to quit or initiating summary process actions "necessary" to achieve that interest. The Defendant has disclosed no justification for compelling the Plaintiffs to surrender their contractual security. Such

25

measures are neither narrowly tailored, reasonable, nor appropriate, and they violate the Contracts Clause of the U.S. Constitution.

### c)    THE ORDER VIOLATES THE TAKINGS CLAUSE

A taking under the Fifth Amendment occurs "as soon as a government takes his property for public use without paying for it." *Knick v. Township of Scott*, _U.S._, 139 S.Ct. 2162, 2170 (2019). See, also, *Eklecco Newco LLC v. Town of Clarkstown*, No. 16-CV-6492 (NSR), 2018 WL 3023159 (S.D.N.Y. June 18, 2018). The *Knick* Court continued:

> [The Contracts Clause] does not say: "Nor shall private property be taken for public use, without an available procedure that will result in compensation." If a local government takes private property without paying for it, that government has violated the Fifth Amendment - - just as the Takings Clause says - - without regard to subsequent state court proceedings.

*Knick*, 139 S.Ct. at 2170 "[O]nce there is a taking, compensation must be awarded because as soon as private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has already suffered a constitutional violation." *Id.* (citing *San Diego Gas & Elec. Co. v. San Diego*, 450 U.S. 621, 654 (1981) (Brennan, J. dissenting) (internal quotation marks omitted). In short, the violation occurs at the time of the taking, "regardless of post-taking remedies that may be available to the property owner." *Id.* Regardless of any possible post-taking compensation, the taking still occurred. *Knick*, 139 S.Ct. at 2172. ("A bank robber might give the loot back, but he still robbed the bank.").

Where governmental "regulations of private property ... be so onerous that its effect is tantamount to a direct appropriation or ouster" it constitutes a taking. *Lingle v. Chevron*, 544 U.S. 528 (2005). Such regulatory taking can be found where the government activity "has a

significant economic impact and interferes with legitimate economic expectations or property interests. . . ." *S & R Dev. Estates, LLC v. Town of Greenburgh*, 336 F.Supp.3d 300, 315, fn.7 (S.D.N.Y. 2018).

"Property rights are necessary to preserve freedom, for property ownership empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Murr v. Wisconsin*, 137 S.Ct. 1933, 1942 (2017). The purpose of the Takings Clause "is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* (Citations and internal quotation marks omitted). Here, the Defendant's Order unquestionably forces the Plaintiffs and landlords like them to suffer the public burden of paying rent for the state's non-paying tenants by surrendering the security the landlords bargained for in their private contracts.

Plaintiffs also allege physical takings of their properties. "'The clearest sort of taking,' commonly referred to as a 'physical' taking, 'occurs when the government encroaches upon or occupies private land for its own proposed use.'" *Ganci v. New York City Transit Authority*, 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005)(quoting, *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). By prohibiting the Plaintiffs from asserting their contractual and statutory rights, the Orders effectively create an actual, state-sponsored occupancy of the Plaintiffs' properties.

### D.    EMERGENCY DOES NOT SAVE THE EXECUTIVE ORDERS

The challenged Orders, as imposed on the Plaintiffs and others like them, strike at the very heart of the Plaintiff's due process, equal protection, contract and property rights. As such, they also fail under any level of heightened scrutiny.  Strict scrutiny requires "the

least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 509-10 (2014). "[T]he Fourteenth Amendment forbids the government to infringe ... [on] fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721, (1997) (emphasis in original, internal quotation marks omitted) (quoting *Reno v. Flores*, 507 U.S at 302); see also *Littlefield v. Forney Independent School District*, 268 F.3d 275, 288 & n. 18 (5th Cir.2001) ("Government actions that burden the exercise of [due process] fundamental rights or liberty interests are subject to strict scrutiny and will be upheld only when they are narrowly tailored to a compelling governmental interest."); *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir.2000) (same).

The Plaintiffs maintains that the Defendant's conduct must be reviewed under strict scrutiny, but for the Orders to survive even intermediate scrutiny, "the government must assert a substantial state interest that is directly advanced by the [Orders], and the regulation must not be more extensive than necessary to achieve the government's interest" *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 275 (2ndCir.2010), aff'd 564 U.S. 552 (2011).

The Defendant's burden under this calculus does not change in an emergency, declared or otherwise. See *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905) (public emergencies cannot justify "a plain, palpable invasion of rights secured by the fundamental law"). While the Court in *Jacobson* urges deferential review in times of emergency, it clearly demands that the courts enforce the Constitution. See *id.* at 28. Indeed, the Court explicitly contemplates an important backstop role for the judiciary: "[I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial

28

relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id.* at 30 (emphasis added); see also *Planned Parenthood v. Casey*, 505 U.S. 833, 857 (1992) (citing *Jacobson* for the proposition that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims").

Under *Jacobson*, therefore, a State's emergency response can still be unlawful if it impinges on a fundamental right in a "plain, palpable" way or has "no real or substantial relation" to the public safety concerns at issue. *Jacobson*, 197 U.S. at 31. Accordingly, per *Jacobson*, requiring a vaccination for a disease that is the source of the public emergency is directly related to the government's public safety concerns. The same is not true of the challenged measures imposed by Executive Orders.

Here, The Defendant's Orders leave the Plaintiffs with no process at all to regain possession of their property from tenants who have defaulted on their private contracts or have otherwise breached the terms of their tenancy. Although the law under the Defendant's Orders continues to mandate service of a notice to quit as a prerequisite to beginning the eviction process, Plaintiffs are prohibited from serving notices to quit. Although the law under the Defendant's Orders continues to prohibit evictions of defaulted tenants without bringing a summary process eviction action, Plaintiffs are foreclosed from bringing any such actions. Although the law under the Defendant's Orders continues to provide that obtaining a court judgement of eviction is the Plaintiffs' exclusive process to legally dispossess a defaulted tenant, the Defendant's Orders have now completely shut down even that narrow statutory process. Although the law under the Defendant's Orders continues to require the

29

Plaintiffs  resort exclusively to the courts to exercise their property rights, the Defendant has closed the courts leaving the Plaintiffs with no recourse, no process to follow, no venue to have their rights adjudicated, and nowhere to appeal. As such, the Defendant's Order fails under any level of scrutiny.

Just as the Defendant could not seriously claim the COVID-19 pandemic justified banning the publication of newspapers, or banning all firearms ownership, or quartering soldiers in a house during peacetime without the owner's consent, the Defendant cannot plausibly argue that COVID-19 legally justifies completely barring the Plaintiffs from their rightful property, process, and constitutional protections.

In *Bateman v. Purdue*, 881 F.Supp.2d 709 (E.D.N.C. 2012), for example, the district court evaluated state statutes that authorized various governmental restrictions on the possession, transportation, sale, and purchase of "dangerous weapons" during declared states of emergency. *Id.* at 710-11. The district court evaluated the statutes under a two-part test, and, while finding there was a compelling interest in public safety during a state-of-emergency, the restrictions were not narrowly tailored to serve that interest. "It cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment." *Id.* at 713-14. The court thus invalidated the emergency restrictions which "effectively ban[]" the public "from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest." *Id.* at 716.

In *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 926 (6th Cir. 2020), the court affirmed with slight modification the preliminary injunction against the Tennessee Governor's

Executive Order issued during COVID-19 pandemic requiring health care providers postpone abortions for three weeks. As requested here, the *Slatery* court refused to countenance "the notion that COVID-19 has somehow demoted [the Plaintiffs' constitutional rights] to second-class rights, enforceable against only the most extreme and outlandish violations. Such a notion is incompatible not only with *Jacobson*, but also with American constitutional law writ large." *Slatery*, 956 F.3d at 927.

Given the scope and effect of Defendant's Orders, completely extinguishing the right of property owners like the Plaintiffs to protect their property interests and reap the benefits under private contracts during this pandemic, they cannot survive heightened scrutiny. At issue here is the very sort of categorical elimination of fundamental rights that can never be tolerated, even under the government's broad emergency powers. See *Jacobson* 197 U.S. at 31; *Connecticut Citizens Defense League, Inc. v. Governor Ned Lamont*, No. 3:20-cv-00646 (JAM) D.Conn., June 8, 2020 (Issuing preliminary injunction ordering Governor to modify previous executive order issued under COVID-19 emergency powers, to restore fingerprinting for submission of pistol permit applications); *Slatery*, 956 F.3d at 927.

Even under intermediate scrutiny, the same result must follow. Under intermediate scrutiny review, "the government must assert a substantial state interest that is directly advanced by the [Orders], and the regulation must not be more extensive than necessary to achieve the government's interest" *IMS Health Inc. v. Sorrell*, 630 F.3d at 275.

To carry this burden, the government must present "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997). In the related First Amendment context, the

government typically bears the evidentiary burden of showing that the harms it recites are not only real, but "that [the speech] restriction will in fact alleviate them to a material degree." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1177 (9th Cir. 2018) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). This same evidentiary burden should apply with equal force to due process and equal protection claims, where equally fundamental rights are at stake. *Obergefell v. Hodges*, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015).

In determining whether the Defendant has carried its burden, a court must ensure that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). Thus, in the First Amendment context, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). For example, restrictions on commercial speech must be "tailored in a reasonable manner to serve a substantial state interest." *Edenfield*, 507 U.S. at 770. The Supreme Court has made abundantly clear that "reasonable tailoring" requires a considerably closer fit than mere rational basis scrutiny, as the restriction must directly and materially advance a bona fide state interest. *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183 ("[The Court] must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.").

a)   <u>**THERE IS NO JUSTIFIABLE BASIS FOR THE ORDERS**</u>

As discussed above, preventing the Plaintiffs from serving notices to quit and filing

summary process actions, and compelling them to surrender their bargained for security, are not reasonable and appropriate means to accomplish the state's stated objectives. Here, the challenged Orders entirely cut off the right of landlords – the Plaintiffs and others like them – to enforce and accrue the benefits of freely negotiated private contracts, eliminates their due process and effects a taking of their property without compensation. There necessarily can be no "reasonable fit" nor a "proportional fit" with the stated objective of controlling and reducing the spread of COVID-19 because the effect is an outright and total ban against these Plaintiffs' rights. There cannot even be any question about "reasonable tailoring," (*Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183), because there is no tailoring at all. Every one of these Plaintiffs are completely and indefinitely barred from lawfully exercising their constitutional rights anywhere in the State of Connecticut, period.

And, the Defendant cannot even hope to show, without "mere speculation or conjecture," that his "'restrictions will in fact alleviate … to a *material* degree'" the problems he claims to be addressing. *Borgner v. Brooks*, 284 F.3d 1204, 1211 (11th Cir.2002) (*quoting Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)) (italics added). The restrictions on the Plaintiffs' rights have had no practical impact on the physical removal of any tenant from any property. Under well-settled United States Supreme Court jurisprudence – fully recognized by the Second Circuit – the Defendant's Executive Orders and the enforcement of them, eliminating the only process under which the Plaintiffs and others like them can legally adjudicate their property rights, and compelling the Plaintiffs to relinquish their contractually agreed-to security, woefully fail any conceivable level of constitutional scrutiny.

33

b)      **THE DEFENDANT'S ORDERS ARE *ULTRA VIRES***

The Defendant's Orders were purportedly issued under the legislature's emergency

delegation of power pursuant to CGS §§ 19a-131a[2] and 28-9.[3] These emergency powers are

broad, wide, and deep, vesting enormous legislative powers in the hands of the executive.

However, neither of those statutory provisions empower the Defendant to issue orders not

specifically related to the public health and civil preparedness (which the Orders at issue are

---

[2] Under CGS § 19a-131a, the legislature gave the Defendant the power to: "(1) Order the commissioner to implement all or a portion of the public health emergency response plan developed pursuant to section 19a-131g; (2) authorize the commissioner to isolate or quarantine persons in accordance with section 19a-131b; (3) order the commissioner to vaccinate persons in accordance with section 19a-131e; (4) apply for and receive federal assistance; or (5) order the commissioner to suspend certain license renewal and inspection functions during the period of the emergency and during the six-month period following the date the emergency is declared to be over."

[3] Under CGS § 28-9, the legislature gave the Defendant the power to: (1) Following the Governor's proclamation of a civil preparedness emergency pursuant to subsection (a) of this section or declaration of a public health emergency pursuant to section 19a-131a, the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. . . . .
(2) The Governor may order into action all or any part of the department or local or joint organizations for civil preparedness mobile support units or any other civil preparedness forces.
(3) The Governor shall order and enforce such blackouts and radio silences as are authorized by the United States Army or its duly designated agency and may take any other precautionary measures reasonably necessary in the light of the emergency.
(4) The Governor may designate such vehicles and persons as shall be permitted to move and the routes which they shall follow.
(5) The Governor shall take appropriate measures for protecting the health and safety of inmates of state institutions and children in schools.
(6) The Governor may order the evacuation of all or part of the population of stricken or threatened areas and may take such steps as are necessary for the receipt and care of such evacuees.
(7) The Governor may take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and to minimize the effects of hostile action.
(8) In order to insure the automatic and effective operation of civil preparedness in the event of enemy attack, sabotage or other hostile action, or in the event of the imminence thereof, the Governor may, at the Governor's discretion, at any time prior to actual development of such conditions, issue such proclamations and executive orders as the Governor deems necessary, such proclamations and orders to become effective only under such conditions.

not), nor do they give him the power or authority to negate the Plaintiff's fundamental constitutional rights (which his Orders clearly do).

For example, the Connecticut Constitution guarantees the Plaintiffs the right to access Connecticut's courts: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Connecticut Constitution, Art. First, § 10. The Defendant, as Governor of Connecticut, is not empowered by CGS §§ 19a-131a or 28-9 or any other statutory provision to unilaterally negate the unambiguous terms of the Connecticut Constitution to close the courts to the Plaintiffs in open violation of the Plaintiffs' constitutional rights. Similarly, Constitution of the United States, Art. I, s 10, cl. 1 mandates that: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." Notwithstanding any power conferred on the Defendant by CGS §§ 19a-131a and/or 28-9, he is simply beyond his authority to amend state laws to do exactly what the U.S. Constitution forbids.

When a government official acts without authority, such acts are deemed to be *ultra vires*, and void.  "[T]he only cases recognized in which a restraint may be obtained against the conduct of a government official acting in his official capacity are those (1) in which the official's conduct is *ultra vires* his statutory authority, and (2) in which the statutory powers authorizing the conduct or their exercise in the particular case are constitutionally void." *Rivoli Trucking Corp. v. Scanlon*, 162 F. Supp. 53, 54–55 (E.D.N.Y. 1958) (citing *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682 (1949). The Defendant's Orders violate both.

The Defendant did not, and does not have the legal authority to halt the legal process

of evictions. Defendant Lamont did not, and does not have the legal authority to interfere in private contracts between landlords and tenants. The Defendant's conduct challenged here is outside of the scope of his job as Governor, and beyond the statutory limitations of his powers and authorities as Governor. The Defendant's conduct and the resulting Executive Orders challenged here are *ultra vires* and therefore void.

### E.   SERIOUS CONSTITUTIONAL QUESTIONS MAKE THEM FAIR GROUND FOR LITIGATION, PLUS A BALANCE OF THE HARDSHIPS TIP DECIDEDLY IN PLAINTIFFS' FAVOR

Because Plaintiffs show irreparable harm in the absence of immediate injunctive relief and they meet the more rigorous "likelihood-of-success" standard, an additional showing under the less rigorous "the sufficiently serious questions going to the merits of its claim to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party" standard is unnecessary. *Metro. Taxicab*, 615 F.3d at 156 (quoting *Cnty. of Nassau v. Leavitt*, 524 F.3d at, 414); *Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir.2009)). No amount of hardship-balancing will remove the Plaintiffs' fundamental rights from the U.S. or Connecticut Constitutions; the Plaintiffs readily satisfy this alternative standard as well.

The foregoing analysis already starkly illustrates that the Plaintiffs' claims, challenging the Defendants' Orders, raise serious constitutional questions which are "fair ground for litigation." Both the equities and public interests also heavily weigh in Plaintiffs' favor.

Landlords, including the Plaintiffs, require a steady and reliable stream of rents in order to maintain their own obligations, to pay taxes, mortgages, salaries, and other costs of maintaining their properties. By issuing the Orders, the Defendant created a significant

danger to – and effectively cut off – that rental stream, all without any practical benefit to tenants or the state's stated objective of keeping them home. Most importantly, the Court system already provides all necessary protections for tenants, while at the same time not prejudicing landlords. The legal process in bringing an eviction proceeding includes the opportunity for the Court to fashion reasonable relief, thereby providing tenants the opportunity to repay their rent, while providing assurance to landlords that in the event of continued non-payment, the landlord will be able to recover possession of their properties through the long-established statutory eviction process.

The state is fully capable of providing monetary relief to those tenants who are ultimately unable to pay on-going rent, either through direct payments to landlords, or by grants to tenants. What is untenable is the Defendant foisting upon the Plaintiffs the government's own obligations and the obligations of society to assist needy tenants.[4]

## VI.   <u>CONCLUSION</u>

The "constitution [was] intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. State*, 17 U.S. 316, 415 (1819). For all the reasons discussed herein, Plaintiffs' Emergency Application for a Temporary Restraining Order, or in the Alternative, Motion for Preliminary Injunction should be granted, and the Plaintiffs respectfully request this Court do so.

---

[4] As with the claims addressed herein, the Plaintiff's Equal Protection claim would also succeed, yet need not be addressed at this point for the Court to grant the relief sought by the Plaintiffs through this Motion.

Dated: JUNE 16, 2020        Respectfully submitted,

          */s/ Craig C. Fishbein*
        Craig C. Fishbein, Esq.
        (ct25142)
        FISHBEIN LAW FIRM, LLC
        100 South Main Street
        P.O. Box 363
        Wallingford, Connecticut 06492
        Telephone: 203.265.2895
        Facsimile: 203.294.1396
        E-mail: ccf@fishbeinlaw.com

          */s/ Doug Dubitsky*
        Doug Dubitsky, Esq.
        (ct21558)
        LAW OFFICES OF DOUG DUBITSKY
        P.O. Box 70
        North Windham, CT 06256
        Telephone: 860.933.9495
        Facsimile: 866.477.1120
        Email: doug@lawyer.com

          */s/ Cara Christine Pavalock-D'Amato*
        Cara Christine Pavalock-D'Amato, Esq.
        (ct29967)
        LAW OFFICE OF CARA C. PAVALOCK
        17 Riverside Avenue
        Bristol, CT 06010
        Telephone: 754.444.8803
        Email: carapavalock@gmail.com

        Attorneys for the Plaintiffs