## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AURACLE HOMES, LLC., ET AL. | : | CIVIL ACTION NO. 3:20-CV-829(VAB) |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT | : | |
| *Defendant* | : | JULY 10, 2020 |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR EMERGENCY TEMPORORY RESTRAINING ORDER, OR, IN THE ALTERNATIVE, ISSUANCE OF A PRELIMINARY INJUNCTION

There is no dispute that Connecticut faces a "dramatic challenge" that is "presented by COVID-19, a novel and easily transmitted viral disease that has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020). By the time plaintiffs filed this action on June 16, 2020, Connecticut had 45,349 persons who had tested positive for COVID-19 and there were 4,210 confirmed deaths.[1] The U.S. Constitution gives the states the primary authority to respond to pandemics, and Defendant Governor Lamont has used that authority to issue a series of Executive Orders that are intended to protect the people of Connecticut from this novel and deadly disease.

The plaintiffs ask this Court to temporarily restrain or preliminarily enjoin some of those Executive Orders. A preliminary injunction is an extraordinary and drastic remedy. The plaintiffs fail to meet their burden for a temporary restraining order and preliminary injunction both by failing to adequately brief the issues and on the merits. This Court also does not have

---

[1] https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/06-2020/Governor-Lamont-Coronavirus-Update-June-16. (A-1)(For the Court's convenience, the defendant has provided an Appendix with a material of which this Court may properly take judicial notice with this Memorandum).

jurisdiction over the plaintiff's *Ultra Vires* claim because prospective injunctive relief cannot be obtained against Governor Lamont in his individual capacity, and any claim in his official capacity is an issue of state law and barred by the Eleventh Amendment. This Court should deny plaintiffs' Motion in its entirety.

**FACTUAL BACKGROUND AND PLAINTIFFS' ALLEGATIONS**

**I.      Factual Background**

"In late 2019, a new coronavirus emerged named severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). This virus causes coronavirus disease 2019 (COVID-19), a respiratory illness that can cause serious health problems, including death. SARS-CoV-2 is highly contagious; it appears to spread from person to person through respiratory droplets produced when an infectious person coughs, sneezes, or talks, and the virus can be spread by presymptomatic, or even asymptomatic, individuals. A global pandemic ensued, and the virus and COVID-19 reached the United States in early 2020. On March 13, 2020, the President declared a national emergency concerning COVID-19." *Rural Community Workers All. v. Smithfield Foods, Inc.*, 2020 WL 2145350, at *1 (W.D. Mo. May 5, 2020).

"To reduce the spread of COVID-19, government officials around the world ordered all 'non-essential' businesses closed, and instructed their constitutes to shelter in place, so that medical professionals and other first responders could try to stem the exponential wave of infections that reached catastrophic levels by mid-March." *Elmsford Apt. Ass. V. Cuomo,* 2020 WL 3498456, at *2 (SDNY June 29, 2020)("*Elmsford*"). The New York metropolitan area, which includes Connecticut and New Jersey, became the epicenter of the U.S. public health crisis.

On March 10, 2020, Governor Lamont declared a Public Health Emergency and Civil Preparedness Emergency pursuant to Conn. Gen. Stat. 19a-131a and 28-9. *Amended Complaint*,

Exhibit A.  On March 19, 2020, Governor Lamont issued EO 7G, Subsection 2, which suspended non-critical court operations and associated requirements.  *Amended Complaint*, Exhibit B.  On March 20, 2020, Governor Lamont issued EO 7H, ordering all non-essential businesses to either close or work from home.[2]  As a result of the Governor's Executive Orders, the State of Connecticut's unemployment went from 3.8% in February to an estimated 19% in May.[3]

On March 27, 2020, the President of the United States signed the Coronavirus Aid, Relief and Economic Security Act (CARES).   "This act allocates approximately $2.2 trillion toward mitigating the negative economic, health, and safety impacts of the pandemic. Under the act, funds will be distributed to individuals, families, businesses, public assistance programs, American Indian tribes, and state and local governments."[4]  Title IV of the CARES Act includes mortgage forbearance and renter's protection, a foreclosure moratorium and eviction protection.

Specifically, 15 U.S.C. § 9056(b) permits homeowners with a "federally backed mortgage loan" to seek a 180-day forbearance on their loan, which may be extended for up to an additional 180-days at the request of the borrower.  Section 9056(c) also placed a 60-day foreclosure moratorium on servicers of federally backed mortgage loans beginning on March 18, 2020.   On June 17, 2020, FHA extended the foreclosure and eviction moratorium on its loans until August 31, 2020.[5]

Section 9057 provides similar protections for "a multifamily borrower with a federally backed multifamily mortgage loan experiencing a financial hardship due, directly or indirectly,

---

2 https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7H.pdf.  (A-5).
3 www.ctdol.state.ct.us/communic/2020-4/march2020laborsit.pdf (A-9) and
http://www.ctdol.state.ct.us/communic/2020-6/laborsitmay2020.pdf (The Department of Labor notes that the Bureau of Labor Statistics Local Are Unemployment Statistics program severely underestimated at 9.4% and the CT DOL Office of Research estimates CT unemployment for the same time period to by in the 19% range.)(A-15).
4  http://www.loc.gov/law/foreign-news/article/united-states-president-signs-cares-act-in-response-to-coronavirus-pandemic/.  (A-21).
5  https://www.hud.gov/press/press_releases_media_advisories/HUD_No_20_081.  (A-22).

to the COVID-19 emergency." 15 U.S.C. § 9057(a). Those borrowers can request a forbearance of up to 90 days. 15 U.S.C. § 9057(c). Multifamily borrowers that received a forbearance are prohibited from evicting, initiating an eviction, or issuing a notice to vacate to a tenant living on that property for nonpayment of rent during the period of the forbearance. 15 U.S.C. § 9057(d)&(e).

The CARES Act also provides that tenants living in federally backed housing may not be served with an eviction notice, i.e., a notice to quit, until July 25, 2020, and must be given 30 days after the issuance of an eviction notice to vacate the property. 15 U.S.C. § 9508(c). These tenants also may not have an eviction action for nonpayment of rent be initiated against them until July 25, 2020. At the same time tenants who are not eligible for publicly funded housing were required to pay rent or face eviction proceedings.[6]

On March 31, 2020, Governor Lamont announced that his administration had reached an agreement with over 50 credit unions and banks in Connecticut offering up to 90 days mortgage-payment forbearance, with no late fee accruing and no new foreclosure sales or evictions for 90 days.[7] On June 4, 2020, the agreement with most banks and credit unions was extended to July 30, 2020.[8]

On April 10, 2020, Governor Lamont issued EO 7X, Subsection 1, which protected residential renters impacted by COVID-19 by providing that landlords of dwelling units or their legal representatives could not deliver a notice to quit or serve or return a summary process action, except for serious nuisance; gave renters a 60 day grace period for April and May rent and allowed renters, who had paid more than one month security deposit, to use any deposit for

---

6 https://ctmirror.org/2020/04/03/homeowners-get-90-day-pass-on-mortgage-bills-renters-still-owe-rent/. (A-24).
7 https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-2020/Governor-Lamont-Announces-Mortgage-Payment-Relief-During-COVID19-Crisis. (A-35).
8 https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/06-2020/Governor-Lamont-Coronavirus-Update-June-4. (A-40).

more than one month to pay rent due in April, May or June 2020. *Amended Complaint*, Exhibit C. Although EO 7X to some extent mirrors the protections afforded under the CARES Act, it is broader in scope as it applies to all Connecticut renters, not just those living in federally backed housing.

As the Commissioner of the Department of Public Health recently explained:[9]

> When people lose their housing, they may be forced to resort to living in doubled-up situations or to enter homeless shelters. Science is clear that denser housing conditions and less ability to socially distance mean a greater risk to these individuals and families, and to their communities, of catching and spreading the COVID virus. Helping Connecticut residents stay housed is an important part of our public health response.

In fact, the State is working to place 1,800 homeless in apartments by this Fall.[10]

On June 29, 2020, Governor Lamont issued a press release announcing assistance for renters, homeowners and residential landlords impacted by Covid-19 Emergency.[11] Governor Lamont's June 29, 2020 press release indicates that the State will provide emergency assistance to renters, homeowners and residential landlords impacted by COVID-19, including $10 million dollars for rental assistance which will provide payments to landlords, and $5 million dollars for eviction prevention to help renters who were in the process of being evicted prior to the declaration of the COVID-19 public health emergency. Executive Order 7DDD extended the suspension of service for notices to quit and to serve or return a summary process action, except for nonpayment of rent due on or prior to February 29, 2020 or for serious nuisance, until August 22, 2020. *Amended Complaint*, Exhibit D. EO 7DDD also extended the use of security deposits in excess of one month's rent to apply to rent due in April, May, June, July or August 2020. *Id.*

---

[9] https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/06-2020/Governor-Lamont-Announces-Assistance-for-Renters-Homeowners-and-Residential-Landlords. (A-45).
[10] https://www.courant.com/coronavirus/hc-news-coronavirus-helping-ct-homeless-20200626-562luyw76ff6bowg7k6btwzmsm-story.html. (A-48).
[11] *See* footnote 9.

The State of Connecticut, Judicial Branch has also taken steps to prevent evictions. The chief Administrative Judge for Civil Matters suspended all evictions until August 1, 2020. On March 19, 2020, the Chief Administrative Judge for Civil Matters ordered that there "shall be an immediate stay of all issued executions on evictions and ejectments though May 1, 2020. The judicial branch later extended that stay through August 1, 2020. [12] Regardless of the Governor's Executive Orders, no evictions would have been proceeding until at least August 1, 2020, because of Judicial Branch Orders.

On March 24, 2020, the Judicial Branch, Rules Committee[13] suspended Conn. Prac. Bk. § 17-30(a) and (b) which allow a landlord to file a Default and Judgment for Failure to Appear, a step in getting a judgment of possession. The Committee in listing rules that were suspended stated they did not want this rule enforced against tenants right now.

> 17-30 (a) and (b). –Summary Process; Default and Judgment for Failure To Appear or Plead Subsection (a) requires summary process defendants to appear within two days of the return day or be subject to being defaulted for failure to appear. Under subsection (b), if the defendant fails to plead within two days of return date, the plaintiff can file a motion for judgment and if no responsive pleading is filed within three days of the motion, the judicial authority shall enter judgment of possession. **Clearly, we don't want these provisions to be enforced against tenants right now.**

Even without the Governor's Executive Orders, the plaintiffs would not be able to move forward with any issued executions or evictions to evict their tenants until at least August 1, 2020 and currently have no ability to have a judgment on default for failure to appear granted.

## II.    Plaintiffs' Allegations

The plaintiffs are all LLCs in the State of Connecticut. The plaintiffs filed a five count Complaint regarding Executive Orders 7G and 7X issued by Governor Lamont, which suspended notice to quit and service of summary process for landlords of a residential dwelling, gave

---

[12] https://jud.ct.gov/HomePDFs/execution_61.pdf and https://jud.ct.gov/HomePDFs/ExecutionStayAug1.pdf. (A-55)

[13] https://www.jud.ct.gov/Committees/rules/Appendix_A.pdf. (A-56).

tenants a 60 day grace period to file April rent; a 60 day grace period to file May rent, upon written request due to loss in revenue or increase in expenses due to DOVID-19; and the ability to use any amount over one month's security deposits to pay April, May or June rent. *Compl.*, ECF No. 1 (June 16, 2020). On June 30, 2020, the Plaintiffs' filed an Amended Complaint, regarding Executive Order 7DDD(A-58), which extended protections for residential renters affected by COVID-19. *Am. Compl.,* ECF No. 23 (June 30, 2020).

The Plaintiffs' Amended Complaint Counts are as follows: Count 1 claims a violation of the Equal Protection Clause on the grounds that "the rights of landlords of commercial properties are undistributed." *Am. Compl., ¶¶* 41-48. Count 2 claims a Contract Cause violation claiming EX 7X interferes with their leases and agreements entered prior to the EO. *Am. Compl., ¶¶ 49-57.* Count 3 claims a violation of the plaintiff's right to Due Process claiming they have been deprived of liberty and property without due process of law. *Am. Compl., ¶¶ 58-63.* Count 4 claims a Taking Clause violation calming the EO 7X the plaintiffs' have at least temporarily lost all economically beneficial use of their real and personal property. *Am. Compl., ¶¶ 64-77.* Count 5 claims the Governor did not have the legal authority to issue EO 7G or 7X and claims his actions were *ultra vires* conduct. *Am. Compl., ¶¶ 78-90.* The first four counts are against Governor Ned Lamont in his official capacity and the last count is against Ned Lamont in his individual capacity. *Am. Compl., ¶ 89.*

The issue before this court is Plaintiffs' Emergency Motion for Temporary Restraining Order, or in the Alternative, Issuance of a Preliminary Injunction, ECF No. 2 (June 16, 2020)("TRO"). The Plaintiffs ask the court to enjoin the enforcement of the challenged sections of Executive Orders 7G, 7X (and 7DDD). *Id. Memorandum of Law In Support of Plaintiffs' Motion for Emergency Temporary Restraining Order, or, In The Alternative, Issuance of A*

*Preliminary Injunction*.  ECF No. 3 (June 16, 2020)("MIS").  The Plaintiffs are seeking a TRO

on all counts, except the Equal Protection Clause claim. *MIS*, n. 4, p. 37.

The plaintiffs have provided Declarations that were signed on June 15 or 16, 2020,

outlining their specific claim. The plaintiffs' claims fall into three buckets.  The first bucket is

tenants who have used their security deposits, in excess of one month's rent, to pay their rent for

April, May, or June.  Auracle Homes, LLC., and Orange Capital, LLC., state they have written

lease agreement that require a security deposit equivalent of two months' rent, and the tenant

requested that a portion of their security deposit be used to pay rent.  *ECF* Nos. 3-4 and 3-6.

The second bucket is tenants who have not paid one or more months' rent since March 1, 2020.

Buckley Farms, LLC., BD Property Holdings LLC., and East Main Street Meriden, LLC., state

that they have oral or  written lease agreements with a tenant requiring the payment of rent and

providing for penalties if the tenants failed to pay the rent on time and the tenants have failed to

pay rent after March 1, 2020 for one or more months.  *ECF* Nos. 3-5, 3-7 and 3-8.  BD Property

Holdings LLC., also claims that the plaintiff failed to pay rent on time for May 2020.  *ECF* No.

3-8. The third bucket is tenants who had not paid their rent prior to February 29, 2020[14].  216

East Main Street Meriden, LLC., and Haberfeld Enterprises, LLC., state they have written lease

agreement requiring the payment of rent and the tenants failed to pay the rent for rent due prior

to February 29, 2020.

## ARGUMENT

The Tenth Amendment of the U. S. Constitution reserves "police powers" to the states.

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 535-36 (2012).  Police

powers include the "authority to provide for the public health, safety, and morals…." *Barnes v.*

*Glen Theatre, Inc*., 501 U.S. 560, 569 (1991).  Accord, *South Bay U. Pentecostal Church v.*

---

[14] Executive Order 7DDD allows the plaintiffs to move forward with evictions for claims in the third bucket.

*Newsom*, 140 S. Ct. 1613, 1613-4 (2020) (Roberts, C.J. concurring) (state officials must have broad latitude to protect safety and health of people; federal judiciary "lacks the background, competence, and expertise to assess public health and is not accountable to the people"). Thus, the states have the primary authority to respond to pandemics, and Governor Lamont has used that authority to declare a public health emergency and issue a series of Executive Orders that are intended to protect the people of Connecticut from this novel and deadly disease.[15]

Plaintiffs ask this Court to temporarily enjoin some of those Orders. Plaintiffs have a heavy burden to establish their factual and legal right to such relief. Plaintiffs come nowhere near meeting their burden. Plaintiffs' legal arguments are ill-founded, speculative and conclusory. The plaintiffs also fail to meet the standard for a TRO for any of their Constitutional claims. The plaintiffs' *Ultra Vires* claim against the governor in his official capacity is barred by the Eleventh and plaintiffs' TRO is not available against him in his individual capacity. This Court should deny plaintiffs' TRO in its entirety.

## I. THE ELEVENTH AMENDMENT DEPRIVES THE COURT OF JURISDICTON OF PLAINTIFFS' ULTRA VIRUS CLAIM

In Count Five of the Complaint, the plaintiffs assert an individual capacity claim against the Governor. Specifically, they allege that the Governor acted *ultra viresly* when he issued the

---

[15] The Governor declared a public health emergency consistent with his authority set out in Conn. Gen. Stat. sec. 19a-131a and Conn. Gen. Stat. sec. 28-9.

Conn. Gen. Stat. sec. 19a-131a(a) states in part: "In the event of a statewide or regional public health emergency, the Governor shall make a good faith effort to inform the legislative leaders specified in subsection (b) of this section before declaring that the emergency exists and may do any of the following:…."

Conn. Gen. Stat. sec. 28-9(b)(1) states in part: "Following the Governor's proclamation of a civil preparedness emergency pursuant to subsection (a) of this section or declaration of a public health emergency pursuant to section 19a-131a, the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health…."

Executive Orders at issue because the Orders (1) do not comply with the requirements of Conn. Gen. Stat. §§ 19a-131a and 28-9; and (2) violate the plaintiffs' constitutional rights. *MIS*, pp. 34-35. The plaintiffs do not appear to be seeking a preliminary injunction with respect to Count Five, nor could they, as it is an individual capacity claim. Equitable relief is not available against a state official in his individual capacity. *See, e.g.*, *Thurmand v. Univ. of Connecticut*, 2019 WL 369279, at *3–4 (D. Conn. Jan. 30, 2019) (citing cases, including *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993)); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011) ("Plaintiffs cannot obtain prospective injunctive relief from the Defendants sued in their individual capacities as such Defendants would not have the authority to provide such relief in their individual capacities.").

The plaintiffs, however, do argue that, because the Orders are *ultra vires*, they may pursue prospective relief against the Governor in his official capacity. *MIS*, p. 35. To the extent The plaintiffs are seeking prospective equitable relief against the Governor in his official capacity to ensure he complies with the United States Constitution going forward, this is a correct statement of the law. *See, e.g.*, *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) ("A plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.'") (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)); *Bonilla v. Semple*, 2016 WL 4582038, at *3 (D. Conn. Sept. 1, 2016)(citing *Ex parte Young*, 209 U.S. 123 (1908)).

However, to the extent the plaintiffs claim that the Governor could not issue the Orders pursuant to Conn. Gen. Stat. §§ 19a-131a and 28-9, the Eleventh Amendment would prohibit any

equitable relief based upon this argument. The Supreme Court has long held that the Eleventh Amendment bars claims where "a plaintiff alleges that a state official has violated *state* law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (emphasis in original); *see also Raygor v. Regents of Univ. of Minnesota*, 534 U.S. 533, 541–42 (2002) (holding that the supplemental jurisdiction statute does not "authorize district courts to exercise jurisdiction over claims against nonconsenting States"). It is well-established that "a federal court may not sit in judgment of whether a State or a State official has complied with its own law." *Dennehy v. Soto*, 2018 WL 4936003, at *2 (D. Conn. Oct. 11, 2018) (citing *Pennhurst*, 465 U.S. at 106). As the Supreme Court explained, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106.

## II.     STANDARD OF REVIEW FOR TEMPORARY RESTRAINING ORDER

A preliminary injunction "is an extraordinary and drastic remedy." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). It is "never awarded as of right," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), or "as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). Injunctive relief is used where "the legal rights [of the plaintiff] at issue are 'indisputably clear' and even then, 'sparingly and only in the most critical and exigent circumstances.'" *South Bay U. Pentecostal Church*, 1613 S. Ct. at 1613 (Roberts, C.J.) (concurring) (addressing a restriction on religious gatherings, similar to Connecticut's, opined that "[t]he notion that it is 'indisputably clear' that the Governor's limitations are unconstitutional seems quite improbable).

The standard for granting a preliminary injunction, which is the same standard for granting a temporary restraining order, is strict. *Amato v. Elicker, et al.*, 2020 WL 2542788, at *3, (D.Conn. May 19, 2020).

> "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 640 (2d Cir.), *cert. granted*, ⸺ U.S. ⸺, 140 S. Ct. 660, 205 L.Ed.2d 418 (2019) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

*Jones v. Wolf*, 2020 WL 1643857, at *2 (W.D.N.Y. Apr. 2, 2020).

"Plaintiffs must show a likelihood of success on the merits – as opposed to the lesser showing of 'sufficiently serious questions going to the merits to make them fair grounds for litigation' – because they are challenging governmental action taken in the public interest under a statute." *Amato*, 2020 WL 2542788 at *3 (quoting *Otoe-Missouri Tribe of Indians v. N.Y. State Dept. of Fin. Services*, 769 F. 3d 105, 110 (2d Cir. 2014)). In addition, "plaintiffs must show a *'clear' or 'substantial'* likelihood of success on the merits – as opposed to just a likelihood of success on the merits – because the relief they seek would suspend existing orders and thus change the status quo, making the injunction they seek a 'mandatory injunction' rather than just a 'prohibitory injunction.'" *Id.* (emphasis added; citing *North American Soccer League, LLC v. United States Fed'n Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). This heightened standard also applies when "the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal quotation marks omitted). The plaintiffs acknowledge that they must demonstrate a likelihood of success on the merits but fail to recognize their heightened burden of showing a "clear or substantial" likelihood of success on the merits because they are seeking a mandatory injunction. *See MIS*, p. 12. "The final two factors – the balance of the equities and the public interest – merge when, as in this case, the

Government is the opposing party." *Amato*, 2020 WL 2542788 at *3 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The public interest pervades all aspects of the analysis. "Whenever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Brody v. Vill. of Port Chester*, 261 F.3d 288, 290 (2d Cir. 2001). "Otherwise a claim that appears meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest." *Id.*

III. **PLAINTIFFS CANNOT DEMONTRATE A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS UNDER *JACOBSON*.**

The Supreme Court's decision in *Jacobson v. Commonwealth of Mass*, 197 U.S. 11 (1905) precludes plaintiffs from showing a clear likelihood of success on the merits of any of their claims. The Supreme Court recognized well over a century ago that "[t]he safety and health of the people of" a state "are, in the first instance, for that [state] to guard and protect." *Id.* at 38. "They are matters that do not ordinarily concern the national government." *Id.* Rather, "they depend, primarily, upon such action as the state, in its wisdom, may take." *Id.*

*Jacobson* is the seminal case in the area of state disease response and there is no dispute that it remains good law. *See, e.g., South Bay U. Pentecostal Church, South Bay U. Pentecostal Church*, 1613 S. Ct. at 1613 (Roberts, C.J., concurring); *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015); *Amato*, 2020 WL 2542788, at *7; *In re Abbott*, et al., 954 F.3d 772, 785 (5th Cir. 2020); *Antietam Battlefield KOA, et al. v. Hogan et al.*, 2020 WL 2556496, at *1 (D. Md. 2020) (appeal filed 4th Cir. May 22, 2020); *Henry*, 2020 WL 2479447 *at 8; *Open Our Oregon, et al. v. Brown, et al.*, 2020 WL 2542861, at *2 (D. Oregon 2020) (citing numerous

cases relying on *Jacobson*). *Jacobson* held that local officials – acting pursuant to authority from the state – could criminally charge an individual for refusing a smallpox vaccination. 197 U.S. 11. The Court explained;

> Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was… The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is, then, liberty regulated by law.

*Jacobson*, 197 U.S. at 26 (citations omitted). The court explained that judicial review over a matter affecting general welfare can only occur "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id*. at 31.

Jacobson established that a federal court can intervene as to a state's infectious disease response only in extreme cases, i.e., if the state's exercise of its primary police powers is "arbitrary, [or] unreasonable," or "go[es] so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id*. at 28, 38. "Jacobson requires that courts refrain from second-guessing state governments' response unless there is 'no real or substantial relation' between the actions and the public health and safety or the action is beyond all question, a plain, palpable invasion of rights." *Amato v. Elicker, et al*., 2020 WL 2542788, at *10 (D.Conn. May 19, 2020).

"Jacobson instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency." *In re Abbott*, 954 F.3d at 786 (emphasis in original) (right to abortion had to give way to COVID-19 order). *Jacobson* explicitly applied its analysis to a plaintiff's liberty interest, even though it recognized it as the "greatest of all rights." *Jacobson,* 197 U.S. at 26 (quotation marks omitted). Jacobson has also been looked to in the First Amendment religious liberty area. *South Bay U. Pentecostal Church South Bay U. Pentecostal Church*, 1613 S. Ct. at 1613 (Roberts, C.J., concurring); *see also Prince v. Mass.*, 321 U.S. 158, 166-67 and n.12 (1944) (free exercise and parental rights). The *Antietam* court applied *Jacobson* when addressing claims based on the First Amendment Free Exercise clause, Right of Association, Right To Assemble, Speech, and Commerce Clause. *Antietam*, 2020 WL 2556496. *Amato* applied *Jacobson* to a business claim. 2020 WL 2542788.

The Governor's Orders prevent individuals from being evicted, becoming homeless and having to live in shelters, or having to double up on housing situations. Both outcomes are in direct contradiction to the health expert's advice to shelter in place and social distance. As the Commissioner of the Department of Public Health recently explained:

> When people lose their housing, they may be forced to resort to living in doubled-up situations or to enter homeless shelters. Science is clear that denser housing conditions and less ability to socially distance mean a greater risk to these individuals and families, and to their communities, of catching and spreading the COVID virus. Helping Connecticut residents stay housed is an important part of our public health response.

The Governor's Orders clearly have a "real or substantial" relation to the public health crisis that has gripped our state and nation, and are not "beyond all question, a plain, palpable invasion of rights."

## IV. PLAINTIFFS DO NOT HAVE A LIKELIHOOD OF SUCCESS ON THEIR CONSTITUTIONAL CLAIMS

### A. GOVERNOR LAMONT'S EXECUTIVE ORDERS DO NOT VIOLATE THE TAKINGS CLAUSE

Count 4 of Plaintiffs *Amended Complaint* alleges a Takings Clause violation. As was explained above, in order to obtain a mandatory injunction, Plaintiffs must demonstrate, *inter alia*, a "clear or substantial likelihood of success on the merits." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (internal quotation marks omitted). With respect to their taking claim, there are several reasons why Plaintiffs cannot satisfy this "heightened legal standard." *See id*.

### i. No Grounds for An Injunction

First, as a threshold matter, the Supreme Court recently reaffirmed that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking."); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* 560 U.S. 702, 741 (2010) (Kennedy, J. and Sotomayor, J., concurring) ("It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause 'does not proscribe the taking of property; it proscribes taking without just compensation.") (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985)).

It is well established that a party may bring a taking action against the State of Connecticut in state court. *See, e.g.*, *A. Gallo & Co. v. Comm'r of Envtl. Prot.*, 309 Conn. 810 (2013); *Tamm v. Burns*, 222 Conn. 280 (1992). To be clear, as will be explained below, the

Executive Orders at issue have not resulted in a taking of the plaintiffs' property. However, that is a merits question; it does not go to the availability of the remedy. "As long as just compensation remedies are available . . . injunctive relief will be foreclosed. *Knick*, 139 S. Ct. at 2179.

**ii.      The Plaintiffs Taking Clause Claim Does Not Have A Clear Or Substantial Likelihood of Success**

"The Takings Clause of the Fifth Amendment provides that no 'private property shall be taken for public use, without just compensation.' U.S. Const. amend. V. The clause applies to the states through the Fourteenth Amendment. *See Kelo v. New London,* 545 U.S. 469, 125 S.Ct. 2655, 2658 n. 1 (2005)." *Buffalo Teachers Fed'n v. Tobe,* 464 F.3d 362, 373–74 (2d Cir. 2006). "The Supreme Court has recognized two branches of Taking Clause cases: physical takings and regulatory takings." *1256 Hertel Ave. Associates, LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014.) Physical takings (or physical invasion or appropriation cases) occur when the government physically takes possession of an interest in property for some public purpose. *Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321. A regulatory taking occurs when a governmental regulation of private property goes too far and is tantamount to a direct appropriate or ouster. *1256 Hertel Ave., Assocs*., 761 F.3d. at 263 (quoting *Lingle v. Chevron U.S.A*., Inc, 544 U.S. 528, 537 (2005).

The plaintiffs allege a physical taking claiming that "[b]y prohibiting the Plaintiffs from asserting their contractual right and statutory rights, the Orders effectively create an actual, state-sponsored occupancy of the Plaintiffs' properties." *MIS,* p. 27. The plaintiffs also claim a regulatory taking in that the Governor's Order "force the Plaintiffs and landlords like them to suffer the public burden of airing rent for the state's non-paying tenants by surrendering the

security of the landlords bargained for in their private contracts." *MIS,* p. 27. The plaintiffs' physical and regulatory takings claims are not supported by law.

### iii. Failure to Plead

The plaintiffs' physical and regulatory taking claim contains no argument or legal analysis to support their taking claims. The plaintiffs cite to the general principle of a physical taking claim and a regulatory taking claim but provide no law in a comparable context to support their claims, and then make a conclusory allegation that a violation has occurred. See *MIS*, pp. 26-27. It is the plaintiffs' burden to prove that they are entitled to a TRO. By not making any specific legal argument in a comparable context to their claims, plaintiffs have waived any reliance on a Takings Clause as a basis for injunctive relief. *Cf. Williamson v. Psychiatric Sec. Review Bd.*, 2014 WL 3956692, at *8 (D. Conn. Aug. 13, 2014) (denying a motion for preliminary injunction because *inter alia* the movants did not "cite not a single case" in a comparable context supporting their claims).

### iv. The Executive Orders Do Not Cause A Physical Taking

The plaintiffs fail to meet the legal standard for a physical taking claim. "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido, Cal*., 503 U.S. 519, 527 (1992); *Burnette v. Carothers*, 1998 WL 136177, at *4 (D. Conn. Mar. 11, 1998). "Government action that does not entail a physical occupation, but merely affects the use and value of private property, does not result in a physical taking of property." *Elmsford*, 2020 WL 3498456 at * 7.

Governor Lamont's Executive Orders do not entail physical occupation of plaintiffs' property and plaintiffs provide no argument to the contrary. In *Elmsford*, 2020 WL 3498456 * at 7-8, the Southern District Court of New York addressed Governor Cuomo's Executive Order

202.28 that temporally allowed tenants to apply their security deposit to rents due and owing and temporally prohibited landlords form initiating evictions proceedings against tenants who were facing financial hardship due to the pandemic. The court found that there was no physical taking. The court noted that the tenants are still responsible for rent and the landlords will regain their ability to evict tenants once the EO expires. *Id*, *8. "Since EO 202.28 is temporary on its face, and does not disturb the landlords' ability to vindicate their property rights, the Order is one more example of 'government regulation of the rental relationship [that] does not constitute a physical taking.'" *Id*. at *8 (quoting *Fed. Home Loan Mtge. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal ("FHMLC")*, 83 F.3d 45, 47-48 (2d Cir. 1996) (citing *Yee*, 503 U.S. at 529)). Governor Lamont's Executive Orders do not meet the legal standard for a physical taking.

  v.  **The Executive Orders Do Not Constitute A Regulatory Taking**

  The plaintiffs fail to meet the legal standard for a regulatory taking. The plaintiffs regulatory taking claim is that "the Defendant's Order unquestionable forces the Plaintiffs and landlords like them to suffer the public burden of paying rent for the state's non-paying tenants by surrendering the security the landlords bargained for in their private contracts." *MIS*, p. 27. The plaintiffs' argument is therefore limited to the use of the security deposit to pay rent as a regulatory taking.

  A regulatory taking occurs when a governmental regulation of private property goes too far and is tantamount to a direct appropriation or ouster. "It is well established that states "may regulate any business . . . in the interest of the public welfare or the public convenience, provided it is done reasonably." *Greater New Haven Prop. Owners Ass'n v. City of New Haven*, 288 Conn. 181, 187 (2008). Economic values that businesses enjoy have long been subject to this "implied limitation," and "must yield to the police power" when it is exercised reasonably.

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922); *see Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 424 (1952). "Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Products of Cal., v. Constr. Laborers Pension Trust for S.Cal.*, 508 U.S. 602, 645 (1993).

There are two types of regulatory takings, categorical and non-categorical takings. *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1378 n. 2 (Fed.Cir.2008). "A categorical taking occurs in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330 (2002). "'Anything less than a complete elimination of value, or a total loss' is a non-categorical taking, which is analyzed under the framework created in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978). *Tahoe–Sierra,* 535 U.S. at 330, 122 S.Ct. 1465 (internal quotation marks omitted)." *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014). Governor Lamont's Executive Orders are not a categorical regulatory taking because they do not create an extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.

For a non-categorical regulatory taking the court weighs "three factors to determine whether the interference with the property rise to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006)(quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224-225 (1986)).

Courts have found an economic impact which would allow a regulatory taking when the property owner is prevented from making any economic use of his property. *Sherman v. Town*

*of Chester*, 752 F.3d at 565 ("the Town's actions effectively prevented Sherman from making any economic use of his property.") Governor Lamont's Orders do no prevent the plaintiffs from making any economic use of their properties. The security deposits belong to the tenants by statute and as a result, there is no economic impact to the plaintiffs. "Any security deposit paid by a tenant shall remain the property of such tenant in which the landlord shall have a security interest." Conn. Gen. Stat. § 47a-21(c). Even if there were an economic impact, it would not meet the standard of not being able to make any economic use of the property. Furthermore, the Orders do not relieve the tenants of their obligation to replenishing their security deposit after the pandemic.

The Governor's Orders do not interfere with distinct investment-backed expectations to find a regulatory taking. As stated above, the security deposit is the property of the tenant and allowing tenants to use the excess of first month's security deposit cannot interfere with a distinct investment-backed expectation. The Second Circuit has found that rent control laws do not interfere with distinct investment-backed expectations. "[R]ent stabilization does not deprive FHLMC of economically viable use of the property. Although FHLMC will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents." *Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 48 (2d Cir. 1996). Allowing tenants to use their security deposit, in excess of one month's rent, clearly is not as a significant change to the law as rent stabilization laws. If the government's control of the amount a landlord can charge for rent does not interfere with an investment-backed expectations, allowing a tenant to use their own security deposit to pay rent and to replenish the security deposit after the pandemic, clearly does not interfere with an investment-backed expectations.

The plaintiffs also do not have a clear or substantial likelihood of success on regulatory taking pursuant to the character of the governmental action. "In *Penn Central* itself, the Court stated that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124, 98 S.Ct. 2646 (internal citation omitted)." *Sherman v. Town of Chester*, 752 F.3d 554 at 566. In *Sherman*, the court found that there was no public program, instead the town suffocated the developer with red tape to make sure he never succeeded at developing the property. *Id*. Governor Lamont's Executive Orders are in response to world-wide pandemic. The plaintiffs acknowledge that "[m]aking it easier for people to stay home during a pandemic is concededly 'significant public purpose.'" The Governor's Orders clearly represent a "public program adjusting the benefits and burdens of economic life to promote a common good."

Governor Lamont's Executive Orders do not meet the legal standard for a physical or regulatory taking. As a result, the plaintiffs' taking claims do not demonstrate a clear and substantial likelihood of success on the merits and the TRO must be denied.

Furthermore, the substantial likely hood of success on the merits is even less likely to succeed based on *Jacobson*. Federal courts can intervene as to a state's infectious disease response only if the state's exercise of its primary power is " arbitrary, [or] unreasonable," or "go[es] so far beyond what was reasonably required for the safety of the public as to authorize or compel the courts to interfere for the protection of such persons." *Jacobson*, 197 U.S. at 38. The state's actions must have "no real or substantial relation to those objects, or [be], beyond all question, a plain, palpable invasion of rights secured by the" Constitution, even as those rights are defined in the emergency situation. *Id*., at 31. The Governor's Executive Orders are not

"plaint, palpable invasion of rights" secured by the Constitution; Jacobson, *Id*., at 31; but rather

"reasonably required for the safety of the public." *Id*., at 38. Governor Lamont's Executive

Orders to allow tenants to use their own security deposits to pay rent, so they can stay in their

homes during a pandemic, are not a plain, palpable invasion of rights secured by the

Constitution.

### B. CONTRACT CLAUSE

The plaintiffs' contract clause claim is brought pursuant to 42 U.S.C. § 1983. *Amended*

*Complaint*, Count 3. The plaintiffs cannot bring a contract clause cause of action pursuant to 42

U.S.C. § 1983. Even if the plaintiffs could bring a claim under 42 U.S.C. § 1983, their claim

does not meet the legal standards for a contract clause violation.

#### i.      Contract Clause Claims Cannot Be Brought Under 42 U.S.C. § 1983.

As with the taking cause of action, Plaintiffs face a threshold issue that prevents them

from establishing a clear or substantial likelihood of success on the merits. The Second Circuit

has noted that "it is not clear that suits for violations of the contract clause may be brought

under section 1983." *Haley v. Pataki*, 106 F.3d 478, 482 (2d Cir. 1997). Both the Sixth Circuit

and the Fourth Circuit have concluded that "an alleged Contracts Clause violation cannot give

rise to a cause of action under § 1983." *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017);

*Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011) ("There is little doubt, however,

that *Carter* [*v. Greenhow*, 114 U.S. 317 (1885)] stands even today for the proposition that an

attempted § 1983 action alleging state impairment of a private contract will not lie."). The Ninth

Circuit has reached the opposite conclusion. *See S. California Gas Co. v. City of Santa Ana*, 336

F.3d 885 (9th Cir. 2003) (per curium). Given that two circuit courts have concluded that United

States Supreme Court precedence precludes a § 1983 claim for a contract clause violation,

plaintiffs cannot argue that they have a "clear" or "substantial" likelihood of prevailing on that claim. *See Federated Mut. Ins. Co. v. Federated Nat'l Holding Co., Inc.*, No. CV 18-714 (PAM/DTS), 2018 WL 4328882, at *2 (D. Minn. Sept. 11, 2018), *vacated on other grounds*, 928 F.3d 718 (8th Cir. 2019) ("[W]hile this split of authority gives Respondent a chance to be successful on this issue, that chance does not rise to a strong showing of a likelihood of success.") (internal quotation marks omitted)); *Aslam v. Chertoff*, 2008 WL 341434, at *1 (E.D. Va. Feb. 4, 2008)("The split in authority demonstrates that reasonable jurists can disagree on the question of jurisdiction and, therefore, that there is *some* likelihood of success on the merits.") (emphasis added).

### ii. Failure to Plead

The plaintiffs' Contract Clause claim contains no argument or legal analysis to support their claim. The plaintiffs cite to the general principle of a Contract Clause claim but provide no law in a comparable context to support their claims, and then make a conclusory allegation that a violation has occurred. See *MIS*, pp. 20-25. It is the plaintiffs' burden to prove that they are entitled to a TRO. By not making any specific legal argument in a comparable context to their claims, plaintiffs have waived any reliance on a Contract Clause as a basis for injunctive relief. *Cf. Williamson v. Psychiatric Sec. Review Bd.*, 2014 WL 3956692, at *8 (D. Conn. Aug. 13, 2014) (denying a motion for preliminary injunction because *inter alia* the movants did not "cite not a single case" in a comparable context supporting their claims).

### iii. The Plaintiffs Contract Clause Claim Does Not Have A Clear Or Substantial Likelihood of Success

The plaintiffs' claim that "[t]he Order directly impairs Plaintiffs' rights as regard the use of security deposits tendered by their tenants, by removing the deposit from its agreed purpose, without the Plaintiffs' consent." *MIS*, p. 22. The plaintiffs also claim that the "eviction

moratorium impairs Plaintiffs' right – forming the very foundational terms of the contract – to

use the housing court system to enforce the contract terms against those tenants who fail to

timely pay their rent." *Id*.

The Contract Clause does not trump a State's right to protect the general welfare of its

citizens. The U.S. Supreme Court and the Second Circuit have recognized the inherent police

power of state's to be paramount to rights under contracts between individuals.

> Our attention turns to this clause, which provides that no state shall pass any law
> "impairing the Obligation of Contracts." U.S. Const. art. 1, § 10. Although facially
> absolute, the Contracts Clause's prohibition "is not the Draconian provision that its words
> might seem to imply." *Allied Structural Steel Co. v. Spannaus* (*Spannaus*), 438 U.S. 234,
> 240, 98 S. Ct. 2716, 57 L.Ed.2d 727 (1978). It does not trump the police power of a state
> to protect the general welfare of its citizens, a power which is "paramount to any rights
> under contracts between individuals." *Id.* at 241, 98 S. Ct. 2716; *see also W.B. Worthen
> Co. v. Thomas,* 292 U.S. 426, 433, 54 S. Ct. 816, 78 L.Ed. 1344 (1934) ("[L]iteralism in
> the construction of the contract clause ... would make it destructive of the public interest
> by depriving the State of its prerogative of self-protection."). Rather, courts must
> accommodate the Contract Clause with the inherent police power of the state "to
> safeguard the vital interests of its people." *Home Bldg. & Loan Ass'n v. Blaisdell
> (Blaisdell),* 290 U.S. 398, 434, 54 S. Ct. 231, 78 L.Ed. 413 (1934); *see also Energy
> Reserves Group, Inc. v. Kan. Power & Light Co.,* 459 U.S. 400, 410, 103 S. Ct. 697, 74
> L.Ed.2d 569 (1983); *Sanitation & Recycling Indus., Inc. v. City of New York,* 107 F.3d
> 985, 992–93 (2d Cir.1997). Thus, state laws that impair an obligation under a contract do
> not necessarily give rise to a viable Contracts Clause claim, *see U.S. Trust Co. v. New
> Jersey,* 431 U.S. 1, 16, 97 S. Ct. 1505, 52 L.Ed.2d 92 (1977).

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367–68 (2d Cir. 2006), c*ert. den*. 127 S. Ct. 2133

(2007). "To determine whether a state law violates the Contracts Clause, the Second Circuit

considers 'three questions to be answered in succession: (1) is the contractual impairment

substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a

general social or economic problem and, if such purpose is demonstrated, (3) are the means

chosen to accomplish this purpose reasonable and necessary.'" *Farmington-Girard, LLC v.

Planning & Zoning Comm'n of City of Hartford*, 2019 WL 935500, at *15 (D. Conn. Feb. 26,

2019)(quoting, *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006)).

The plaintiffs have failed to allege that they have a contract that is being violated by Governor Lamont's Orders 7X and 7DDD that do not allow service of notices to quit or summary process of evictions by residential landlords until August 22, 2020. The plaintiffs' Declarations state that they have either an oral or written lease with their tenants and have leases "requiring the payment of rent and providing for penalties for the tenant failing to pay rent on time." *See* Declarations, Doc. 3-5; Doc. 3-7; and 3-8. The plaintiffs' have not declared that they have a contractual right to pursue evictions. They have also not alleged that they cannot bring an civil action for breach of contract. The plaintiffs' have failed to allege a contract provision that was violated as a result or cite to any case that supports an argument that they have a right under the Contract Clause to bring a statutory eviction. As a result, plaintiffs' Contract Clause claim fails as a matter of law. Plaintiffs' Contract Clause violations also fails on the merits.

There also has been no substantial impairment of plaintiffs' contract rights by allowing tenant to use their security deposits to pay rent to their landlords. Executive Order 7DDD, supersedes EO 7X, Section 1.d, and allows a tenant, who states that he or she has become full or partially unemployed or otherwise sustained a significant loss in revenue or an increase in expenses as a result of COVID-19, to use the portion of their security deposit that is in excess of one month's rent to pay rent due in April, May, June, July or August. The security deposit cannot be restored to an amount that exceeds one month's rent until the end of the public and civil preparedness emergency. Allowing a tenant to use their security deposit, in excess of one month's rent, is not a substantial impairment of the plaintiff's contract rights, especially when plaintiffs may eventually demand that their tenants restore any portion of the security deposit that was used for rent. The Executive Orders temporarily suspend the eviction process, but they do not relieve the tenants of having to pay rent.

The plaintiffs acknowledge that landlord/tenant law is highly regulated in the State of Connecticut. *MIS*, p. 18. "Where, as here, the industry has been heavily regulated, and regulation of contracts is therefore reasonably foreseeable, a party's ability to prevail on its Contract Clause challenge is greatly diminished." *Alliance of Auto Mfrs. Inc., v. Currey*, 984 F.Supp. 2d 32, 55 (D.Conn. 2013), aff'd 610 F. App'x 10 (2d Cir. 2015), *cert. den.* 136 S.Ct. 1374 (2016). A landlord cannot charge any amount of security deposit they want, but rather security deposits are regulated by Conn. Gen. Stat. § 47a-21. The process for evictions is also governed by Conn. Gen. Stat. § 47a-23, et seq. The legislature can increase or decrease the amount of security deposits a landlord can require and change the statutory eviction process.

The court in *Elmsford Apt. Ass. V. Cuomo*, 2020 WL 3498456 at * 15-16, found that Governor Cuomo's Executive Order 202.28 that temporally extended allowing tenants to apply their security deposit to rents due and owing; and temporally prohibited landlords from initiating evictions proceedings against tenants who were facing financial hardship due to the pandemic, until August 20, 2020 was not a substantial impairment to the plaintiffs' contract rights.

The Executive Orders serve a legitimate public purpose. The plaintiffs concede that having people stay at home has a "significant public purpose." "Making it easier for people to stay home during a pandemic is concededly a 'significant public purpose.' However, choosing one small segment of society, i.e., landlords of residential properties, to suffer the entire burden of attempting to remedy this broad societal problem is both unconstitutional and wrong." *MIS*, p. 23. To state that only landlords of residential properties are suffering the entire burden to keep people at home is mind boggling since the Governor shut down all non-essential business, EO 7H, and as a result of this shut-down the unemployment rate in Connecticut went from 3.8% to 19%.

Governor's Lamont's Executive Orders are reasonable and necessary. The plaintiffs state "[w]hile amending the timing under which a landlord can execute an eviction judgment to actually remove a tenant from the property may have been a justifiable action to accomplish the stated government objection, preventing Landlords from serving notice to quit, and from initiating summary process actions are not. Neither steps remove a tenant from the property." *MIS*, p. 24.

Conn. Gen. Stat. § 47a-23 provides the process for a landlord to issue a Notice to Quit. Conn. Gen. Stat. § 47a-23(b) provides that the notice shall be in writing and with substantially, the following form: "I . . hereby give notice that you are to quit possession or occupancy of the (apartment) on or before (here insert the date) for the following reasons. . ." The purpose of the Notice to Quit is to have the tenant leave the premises without an eviction. "If, at the expiration of the three days prescribed in section 47a-23, the lessee or occupant neglects or refuses to quit" then a complaint can be filed. Conn. Gen. Stat. § 47a-23a. The Notice to Quit (End) Possession form issued informs the tenant that "[i]f you have not moved out of the premise by the date indicated above, an eviction (summary process case) may be started against you" and is often served by a Connecticut State Marshal. *See* JD-HM-007[16] Serving a Notice to Quit can result in a tenant leaving the property without any further action by the landlord. Since the plaintiffs concede that the government's objection to not to have tenants actually removed from the property is a justifiable action, the Executive Orders that do not allow service of a notice to quit are reasonable and necessary.

### C. DUE PROCESS CLAIMS

The plaintiffs' *Amended Complaint, p. 61,* states that the "defendant's conduct deprives the plaintiffs of liberty and property without due process of law." The plaintiffs claim

---

[16] https://www.jud.ct.gov/webforms/default.aspx?load_catg=Housing#searchTable. (A-62).

substantive and procedural due process violations. *MIS*, p. 18-19. The plaintiffs state that their liberty interest protected by the Fourteen Amendment is based on the Due Process Clause itself and the laws of Connecticut. *MIS, p. 16.* The plaintiff's also claim a Due Process Clause property interest violation.

###     i.        The Due Process Claims Are Duplicative of The Takings Clause Claim.

The court should not entertain due process claims that are duplicative of takings claims. "The first problem with using substantive due process to do the work of the Takings Clause is that we have held it cannot be done. 'Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process,' must be the guide for analyzing these claims.' *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010)(plurality opinion)(internal citations and quotations omitted). The Second Circuit found that due process claims that are duplicative of takings claims cannot be maintained. The Due Process Clause cannot be used "[w]here a particular Amendment provides an explicit textual source of a constructional protection against a particular government behavior." *Harmon v. Markus*, 412 fed. Appx. 420, 421 (2011). *Cf, Wellswood Columbia, LLC v. Town of Hebron*, 2013 WL 356619, at *4 (D. Conn. Jan. 29, 2013), *on reconsideration in part,* 2013 WL 5435532 (D. Conn. Sept. 30, 2013)("due process claim is based on its Fifth Amendment claim that Hebron effected a taking of the Property. This claim is repetitive of [plaintiff's] takings claims and must fail.")

###     ii.       Substantive Due Process Claim is Subsumed in the Procedural Due Process Claim

In addition to seeking a preliminary injunction on the grounds that the Orders violate the Contract Clause, constitute a taking, and deprive the plaintiffs of their right to procedural due

process, they also argue that the Orders violate their substantive due process rights. *MIS*, pp. 19-20. The Court need not address this claim, as it is subsumed in the plaintiffs' more particularized allegations of violations of their liberty and property procedural due process rights, as well as their other constitutional claims. "[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process." *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) (citing *Conn v. Gabbert*, 526 U.S. 286, 293 (1999)). "[Plainitff's] substantive due process claim also fails as a matter of law because it is redundant and is subsumed within his claim for violation of procedural due process." *Sweeney v. Enfield Bd. of Educ.*, 2016 WL 4435331, at *10 (D. Conn. Aug. 18, 2016)

### iii. Procedural Due Process

The plaintiffs allege that the Executive Orders violate procedural due process because the Orders allegedly deprived them of a liberty and property interest without providing them with a "legal or administrative process to contest [the Orders'] application to them." *Am. Compl*. ¶ 59. In other words, the plaintiffs are claiming that, as an example, when the Governor suspended the issuance of notices to quit and service or return of summary process actions until August 22, 2020, he deprived them of their property and liberty by, at least temporarily, preventing them from taking any action to regain their property from a renter who is delinquent on his or her rent payment. As the plaintiffs correctly point out, procedural due process requires that before the State may deprive plaintiffs of their liberty or property, it must "afforded [them] the process [they were] due under the Constitution." *MIS*, p. 16 (quoting *Newton v. City of New York*, 779 F.3d 140 (2dCir. 2015)). Thus, for the plaintiffs to prevail on their procedural due process claim, they must demonstrate that the Orders were enacted without adequate process. This they cannot

do.  Because the Orders are legislative as opposed to adjudicative in nature, there can be no due process challenge, even if the plaintiffs had a cognizable liberty or property interest, which they do not.

The Fourteenth Amendment guarantees an individual due process of the law where the state deprives an individual of a constitutionally protected liberty or property interest. *Board of Regents v. Roth,* 408 U.S. 564, 569 (1972).  "To succeed on a procedural due process claim, 'a plaintiff must first identify a property right, second show that the state has deprived him [or her] of that right, and third show that the deprivation was effected without due process.'" *Progressive Credit Union v. City of New York*, 889 F.3d 40, 51 (2d Cir. 2018) (quoting *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994)).  "As the parties asserting due process rights, plaintiffs bear the burden of establishing that they had a legitimate property interest at stake."  *MacFall v. City of Rochester*, 746 F. Supp. 2d 474, 481 (W.D.N.Y. 2010), *aff'd*, 495 F. App'x 158 (2d Cir. 2012).

The "first step" in any due process claim is to "ask whether the claimant has a cognizable property interest that has been jeopardized by governmental action." *Ganci v. New York City Transit Auth.*, 420 F. Supp. 2d 190, 196 (S.D.N.Y.), *aff'd*, 163 F. App'x 7 (2d Cir. 2005).  The plaintiffs make conclusory allegations that their liberty and property interests have been violated and cite to general principles of due process rights.  However, the plaintiffs fail to cite any specific case law that supports their claim that the Governor's Executive Orders violated those rights.  *Cf. Williamson v. Psychiatric Sec. Review Bd.*, 2014 WL 3956692, at *8 (D. Conn. Aug. 13, 2014) (denying a motion for preliminary injunction because *inter alia* the movants did not "cite not a single case" in a comparable context supporting their claims).

To the extent that the plaintiffs claim a property interest in the business of being a landlord, that claim also is foreclosed. The Supreme Court has held that although a business' assets are property, "business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). *Elmsford Apt. Ass. V. Cuomo*, 2020 WL 3498456 at * 16 (Governor Cuomo's Executive Order that temporarily prohibits landlords from initiating eviction proceedings until August 19, 2020, "does not deprive Plaintiffs' of their property rights.")

If the plaintiffs do not have a property right to initiating evictions prior to August 22, 2020, they clearly do not have a liberty interest. "Liberty interest protected by the Fourteen Amendment may arise from two sources – Due Process Clause itself and the laws of the States.' *Eckert v. Grady*, 2020 WL 3129478, at *7 (D. Conn. June 12, 2020)(citations omitted). The plaintiffs state that they are not claiming "a cognizable liberty interest in obtaining actual possession of their property through the judicial process (this Court obviously cannot prejudge if any give summary process eviction action would result in judgment of possession)." *MIS*, p. 18. The plaintiffs' liberty claim appears to be the same as their property claim, ie., that they will have to wait until August 22, 2020, to begin the statutory process of serving a notice to quit and summary process evictions pursuant to Conn. Gen. Stat. §§ 47a-23, *et seq*. The

Even if the plaintiffs could demonstrate the deprivation of a liberty and property interest, their procedural due process claim nonetheless fails because "[o]fficial action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994). Rather, "constitutional due process requirements apply only where the official action is 'designed to adjudicate disputed

facts in particular cases.'" *Id.* (quoting *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 245 (1973)). As the Second Circuit noted, "'[g]eneral statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving him a chance to be heard.'" *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 896 (2d Cir. 1960) (quoting *Bi-Metallic Investment Co. v. State Board of Equalization of Colorado*, 239 U.S. 441 (1915)).

The Orders at issue in this case are plainly legislative in nature. They were enacted after the Governor declared public health and civil preparedness emergencies, through a process established by the General Assembly. Conn. Gen. Stat. §§ 28-9 and 19a-131a authorize the Governor to declare a state of civil preparedness emergency and a public health emergency respectively. The issuance of the Orders themselves was authorized by § 28-9. Subsection (b)(1) permits the Governor to:

> modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health.

Conn. Gen. Stat. § 28-9(b)(1). "Any such order shall have the full force and effect of law upon the filing of the full text of such order in the office of the Secretary of the State." *Id*. In addition, subsection (b)(7) grants the Governor the authority to "take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state . . . ." Conn. Gen. Stat. § 28-9(b)(7). Thus, the General Assembly has provided a process by which the Governor can effectively enact legislation during a civil preparedness or public health emergency.

The Orders are legislative and not adjudicatory in nature because they were designed to apply to all renters and landlords "as a whole, rather than directed at the adjudication of a particular factual dispute." *Baines v. Masiello*, 288 F. Supp. 2d 376, 388 (W.D.N.Y. 2003); *O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413, 430 (S.D.N.Y. 2004) ("The Village parking ordinance was not designed to adjudicate disputed facts in particular cases, but was instead a prospective rule announcing a new qualification for parking permits that would bind all citizens in the future. Therefore, the Village's passage of the parking ordinance must be considered legislative official action."). As such, the Orders "cannot be challenged under the procedural facet of the Due Process Clause." *Id*; *Six v. Newsom*, 2020 WL 2896543, at *8 (C.D. Cal. May 22, 2020) ("Plaintiffs' procedural due process claim appears to be that they were entitled to some process before Governor Newsom imposed the Stay-at-Home Order. . . . But governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient.") (internal quotation marks omitted).)

However, should the Court conclude that the plaintiffs have been denied the temporary use of their property and are entitled to a court process to regain the use of their property, the Orders' temporary suspension of serving notices to quit and serving or returning summary process cases does not violate due process. "The fundamental requirement of a due process is the opportunity to be heard at a meaningful time an in a meaningful manner." *Mathews v. Eldredge*, 424 U. S. 319, 334 (1976). Where a delay in obtaining a judicial determination is alleged to infringe on due process, "the significance of such a delay cannot be evaluated in a vacuum. In determining how long a delay is justified in affording a post-suspension hearing and

decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242 (1988).

In *Emsford* the court, in reviewing a due process claim challenging Governor's Cuomo's Executive Order that delayed evictions until August 19, 2020, found that "the delay embodied mandate does not deny the Plaintiffs a meaningful opportunity to be heard" and that plaintiffs "Due Process claim fails as a matter of law." *Emsford Apt. Assoc. v. Cuomo*, 2020 WL 3498456 at * 16. Here, in light of the State's extraordinary interest in preventing a public health and financial crisis from compounding into a homelessness crisis; the limited, temporary nature of the delay; and the lack of harm to the plaintiffs due to the retention of their right to recover unpaid rent, being required to wait until August 23, 2020, to initiate eviction proceedings is not a violation of procedural due process.

This is true under normal procedural due process analysis. However, these are not normal times. Given the ravages of COVID-19, placing a temporary moratorium on the plaintiff's ability to begin eviction proceedings against tenants unable to pay their rent due to disruptions caused by COVID-19, is not a "plain, palpable invasion of rights." *Jacobson*, 197 U.S. at 31. Plaintiffs have not been permanently deprived of anything. They will be able to resume eviction proceedings shortly. Additionally, the Orders have not in any way reduced the amount of rent Plaintiffs are owed. Under those circumstances, the Orders due not violate procedural due process. *See, e.g.*, *Prof'l Beauty Fed'n of California v. Newsom*, 2020 WL 3056126, at *7 (C.D. Cal. June 8, 2020) ("Although the Stay at Home Order might effectively prevent Plaintiffs from *using* their licenses to practice cosmetology, it does not deprive them of

those licenses. Thus, the Court finds that Plaintiffs have not met then burden to show that the Stay at Home Order is "beyond all question, a plain, palpable invasion" of Plaintiffs' right to procedural due process." (emphasis in original)).

### iv.  Substantive Due Process

As stated above, if the plaintiffs cannot meet the standard of a procedural due process claim and as a result, they cannot meet the standard of a substantive due process claim.  Even the plaintiffs substantive due process claim is not resolved by the procedural due process claim, it still fails.  Due Process Clause of the Fourteenth Amendment provides "a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State."  The substantive component of the Clause "protects individual liberty against 'certain governmental actions regardless of the fairness of the procedures used to implement them.'"  *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 261 (1992)(quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986).

A state violates due process when its action "'afford[s] those canons of decency and fairness which express the notions of justice of English-speaking peoples' . . . [and are] 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Rochin v. California,* 342 U.S. 165, 169 (1952) (quoting *Malinski v. New York*, 324 U.S. 401, 416-17 (1945) (opinion of Frankfurter, J.)  "Substantive due process protects [individuals] against governmental action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect' or 'ill-advised"  *Gordon v. Nicoletti, et al.,* 84 F. Supp. 2d 304, 312 (D.Conn. 2000)(citation omitted).

The Supreme Court has consistently expressed great reluctance "to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered

area are scarce and open-ended . . . the doctrine of judicial restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. at 125. The Court must therefore "focus on the allegations in the complaint to determine how [the plaintiff] describes the constitutional right at stake and what the [government] allegedly did to deprive her of that right." *Id.*

The Governor's Order to place a moratorium of evictions until August 22, 2020, during a pandemic is not the type is of arbitrary, conscience-shocking, or oppressive action to establish a constitutional liberty or property interest. The plaintiffs' property has not been taken and as stated *supra*, does not even rise to the level of a regulatory taking. "Where the right infringed is not fundamental, the government regulation need only be reasonable related to a legitimate state objective" to satisfy substantive due process. *Bryant v. N.Y. State Educ. Dept*, 692 F.3d 202, 217 (2d Cir. 2020).

The Governor's Orders, that work to keep people in their homes during a pandemic, reasonable meets a legitimate state objective. The plaintiffs concede that "[m]aking it easier for people to stay home during a pandemic is concededly a 'significant public purpose.'" *MIS*, p. 23. "When faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measure have at least some 'real or substantial relations' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by fundamental law." *Amato v. Elicker*, 3:20CV464, 2020 WL 2542788 * 10 (D. Conn. May 19, 2020). The Governor's orders do not violate the plaintiffs' substantive due process rights and as a result, the plaintiff cannot establish a clear and substantial likelihood of success on the merits for this claim. The plaintiffs' TRO motion based on due process must be denied.

### D.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

"[T]he Second Circuit has made clear that 'a showing of irreparable harm is the single most important prerequisite for the issuance of injunctive relief.'" *FEI Hong Kong Co. Ltd. v. GlobalFoundries, Inc.*, 2020 WL 1444956, at *2 (S.D.N.Y. Mar. 25, 2020) ("*FEI*") (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F. 3d 110, 118 (2d Cir. 2009). Given the importance of that showing, "[a] demonstration of irreparable injury by the party seeking relief is an essential prerequisite to a temporary restraining order." *Id.* (quotation marks omitted). Plaintiffs have not come close to making that essential showing.

To establish irreparable harm, the moving party must demonstrate a "continuing harm which cannot be adequately redressed by final relief on the merits" and an injury that is "actual and imminent," not "remote nor speculative." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). In addition, the harm must be an "injury for which a monetary award cannot be adequate compensation." *Kamerling,* 295 F.3d at 214 ; *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995). The U.S. Supreme Court has explained:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . . The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (italics in original; internal quotation and footnote omitted).

The plaintiffs are not irreparable harmed. The Executive Orders do not remove the requirement that tenants pay rent and it requires them to replenish their security deposits. As

found in *Elmsford*, "the Order does not displace the civil remedies always available to landlords seeking to recover costs of repairs or unpaid rent at the end of a lease term… The landlord can collect all he is owed at the end of the day … when the courts are fully reopened. *Elmsford*, WL 3498456, at *14.

### E. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY AGAINST GRANTING THIS MOTION.

Plaintiffs bear the burden to establish that the balance of the equities and the public interest weigh in favor of the relief they demand. *See, e.g.*, *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). "Where the government is the opposing party," these two factors "merge." *Jones v. Wolf*, 2020 WL 1643857 at *13.

The balance weighs heavily against this Court enjoining the Orders. There are few -- if any -- circumstances where the state's side of the balance would be stronger. A little over two months ago, the Second Circuit noted the "dramatic challenge . . . presented [to government] by COVID-19, a novel and easily transmitted viral disease that has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs.*, 954 F.3d at 135. At that time, "[t]he impact of this recent emergency . . . [wa]s just beginning to be felt" and the court noted that "[i]ts likely course we cannot foresee," while observing that "[p]resent information strongly suggests . . . that it may be grave and enduring." *Id.* That has regrettably proven to be the case. Connecticut was in the midst of that emergency when the Governor issued his first Executive Order on March 12, 2020 and the emergency continues.

There is no dispute that the Governor has the primary constitutional responsibility to protect people in Connecticut from the deadly threat COVID-19 poses. That threat is unlike any other. Whereas smallpox—the disease at issue in *Jacobson*—was (and is) deadly, the world had extensive experience with the disease and a vaccine had long been available. *Jacobson*, 197 U.S.

39

at 23–24. In contrast, COVID-19 is a "novel and easily transmitted" disease for which there is no vaccine or universally accepted treatment. *Fed. Defs.*, 954 F.3d at 135. Keeping individuals from becoming homeless or doubling up in housing accommodations during a worldwide pandemic is a public health concern and in the public interest. This is especially true in the context of the national pandemic where coronavirus case nationally keep increases and governments are having to re-close after attempting to open too quickly.

Under these circumstances, the balance of the equities and the public interest weigh heavily against this Court preliminarily undoing the Orders. The risk that plaintiffs' claims will "ultimately [be] determined to be unsuccessful [but] will have precipitated court action that might needlessly have injured the public interest" militates strongly against granting this motion, particularly where plaintiffs' claimed harms do not "remotely compare to the injury to the" state and its people that may come from hindering the state's efforts to respond to this deadly disease. *Brody v Village of Port Chester*, 261 F.3d 288 290–91 (2d Cir. 2001) (quotation marks omitted).

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court deny Plaintiffs' Motion in its entirety without an evidentiary hearing.

DEFENDANT

NED LAMONT

WILLIAM TONG
ATTORNEY GENERAL

BY:     */s/ Maria C. Rodriguez*__
Maria C. Rodriguez (ct08946)
Philip Miller (ct25056)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue, 4th Floor
Hartford, CT  06106
Tel: (860) 808-5050
Fax: (860) 808-5388
Email: Mariac.rodriguez@ct.gov
Email: Philip.Miller@ct.gov

<u>**CERTIFICATION**</u>

I hereby certify that on July 10th, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.

*/s/ Maria C. Rodriguez*
Maria C. Rodriguez
Assistant Attorney General
Federal Bar No. ct08946
165 Capitol Avenue, 4th Floor
Hartford, CT  06106
Tel: (860) 808-5050
Fax: (860) 808-5388
Email: Mariac.rodriguez@ct.gov