UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AURACLE HOMES, LLC et al. | : | 3:20-cv-00829-VAB |
| Plaintiffs, | : | |
| v. | : | |
| NED LAMONT, | : | July 15, 2020 |
| Defendant. | : | |

**BRIEF OF *AMICI CURIAE***
**GREATER HARTFORD LEGAL AID, CONNECTICUT LEGAL SERVICES,**
**NEW HAVEN LEGAL ASSISTANCE ASSOCIATION,**
**CONNECTICUT FAIR HOUSING CENTER,**
**JEROME N. FRANK LEGAL SERVICES ORGANIZATION,**
**CONNECTICUT LEGAL RIGHTS PROJECT, AND**
**CONNECTICUT VETERANS LEGAL CENTER**

**IN SUPPORT OF THE DEFENDANT**

Nilda R. Havrilla (Ct26528)
Mary Conklin (Ct07697)
Raphael L. Podolsky (Ct30960)
Connecticut Legal Services
16 Main Street, 2nd Floor
New Britain, CT 06051
Ph (860) 357-9311
FAX # (860) 225-6105
nhavrilla@ctlegal.org
mconklin@ctlegal.org
rpodolsky@ctlegal.org

Giovanna Shay (Ct26702)
Cecil J. Thomas (Ct27264)
Greater Hartford Legal Aid
999 Asylum Ave., 3rd Fl.
Hartford, CT 06105-2465
Ph (860) 541-5061
FAX # (860) 541-5050
gshay@ghla.org
cthomas@ghla.org

*Additional counsel listed on the following page*

Shelley White (Ct05727)
Amy Eppler-Epstein (Ct01444)
New Haven Legal Assistance Association
205 Orange St
New Haven, CT 06510
Ph (203) 946-4811
swhite@nhlegal.org
aeppler-epstein@nhlegal.org

Liam Brennan (Ct27924)
Darren Pruslow (Ct29089)
Connecticut Veterans Legal Center
114 Boston Post Road, 2d floor
West Haven, Connecticut 06516
Ph (203) 903-2852
lbrennan@ctveteranslegal.org
dpruslow@ctveteranslegal.org

J.L. Pottenger, Jr. (Ct05479)
Jeffrey Gentes (Ct28561)
The Housing Clinic of Jerome N. Frank Legal
        Services Organization,
Yale Law School
133 Wall St.
New Haven, CT 06511
Ph (203) 432-4800
j.pottenger@ylsclinics.org
*This brief does not necessarily represent the
views of Yale Law School or Yale University*

Greg Kirschner (Ct26888)
Jeffrey Gentes (Ct28561)
Connecticut Fair Housing Center
60 Popieluszko Ct.
Hartford, CT  06106
Ph (860) 247-4400
greg@ctfairhousing.org
jgentes@ctfairhousing.org

Kathy Flaherty (Ct19344)
Kirk W. Lowry (Ct27850)
Connecticut Legal Rights Project
P.O. Box 351, Silver Street
Middletown, CT 06457
Ph (860) 262-5033
kflaherty@clrp.org
klowry@clrp.org

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENTS OF INTEREST OF AMICI ............................................................1

PRELIMINARY STATEMENT ...........................................................................3

ARGUMENT .....................................................................................................4

I.      **A Wave of Evictions During the Pandemic Would Trigger an Even More Acute Public Health Crisis** ..................................................................................4

    A. Connecticut is Suffering Unprecedented Unemployment and Many Tenants Cannot Pay Rent ...............................................................................................4
    B. Connecticut Had an Eviction Crisis Before the Pandemic Struck ................................7
    C. A Wave of Evictions in the Pandemic Would be a Public Health Catastrophe ............8

II.     **The Housing Courts Cannot Operate in a Safe Manner Without Further Planning to Ensure Due Process** ....................................................................10

    A. Crowded Housing Courts Present the Risk of a Super-Spreader Event ....................10
    B. Time and Resources Are Needed to Bridge the Digital Divide and Enable Unrepresented Litigants to Participate in Remote Proceedings ................................11
    C. Connecticut's Moratorium is Largely Coextensive with the Federal Eviction Moratorium ...........................................................................................13

III.    **Low-Income Communities of Color Are Disproportionately Affected by Both the Existing Eviction Crisis and the COVID-19 Pandemic** ................................14

    A. Connecticut Has a Racialized Housing Market .......................................................15
    B. The Pandemic Has Caused Particular Harms for Low-Income Workers of Color ......17
    C. The Eviction Moratorium Has Helped Ameliorate the Pandemic's Racialized Harms ...................................................................................................18

CONCLUSION .................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Block v. Hirsch*, 256 U.S. 135 (1921) ............................................................................ 3

*Elmsford Apartment Ass'ns LLC et al. v. Cuomo*, 20-cv-4062 (CM), 2020 WL 3498456
(S.D.N.Y. June 29, 2020) ........................................................................................... 4

*Jacobson v. Mass.*, 197 U.S. 11 (1905) ......................................................................... 3

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ....................................................................... 15

*South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613 (Roberts, C.J., concurring)….4

**Statutes**

15 U.S.C. § 9058 .......................................................................................................... 4

15 U.S.C. § 9058(a) .................................................................................................... 13

15 U.S.C. § 9058(b) .................................................................................................... 13

15 U.S.C. § 9058(c) .................................................................................................... 13

**Other Authorities**

<u>Books</u>

Ira Katznelson, When Affirmative Action Was White (2005) ...................................... 15

<u>Newspaper Articles</u>

Dan Brechlin, *With a Five-Week Unemployment Benefits Backlog, Here Are Some Tips and
Answers on Filing in Connecticut During the Coronavirus Pandemic*, Hartford Courant, Apr. 15,
2020 ................................................................................................................................ 5

Nick Carey, *Racial Predatory Loans Fueled U.S. Housing Crisis: Study,* Reuters, Oct. 4, 2010 16

Emily DiSalvo, *Despite Community Efforts, Some Students Are Still Offline*, CT News Junkie,
July 13, 2020 .............................................................................................................. 12

Jordan Fenster, *'We Didn't Sign Up for This': Not Essential During a Storm But Essential Now*,
New Haven Register, May 14, 2020 ............................................................................. 17

Thomas Fuller, *Coronavirus Outbreak Has America's Homeless at Risk of 'Disaster,'* N.Y.
Times (Mar. 10, 2020) ................................................................................................. 8

Noah Goldberg, Wes Parnell & Molly Crane-Newman, *Coronavirus Leaves Trail of Illness and Death in NYC Courthouses As Slow-to-Change System Struggles to Cope With Pandemic*, N.Y. Daily News, May 25, 2020 ...................................................................................................11

Matt Hoffmann, *No Evictions for Renters, But Increased Risk During Pandemic*, Middletown News-Press, Apr. 6, 2020 ...................................................................................................17

Tracy Jan, *Redlining Was Banned 50 Years Ago. It's Still Hurting Minorities Today*, Wash. Post, March 28, 2018 ...................................................................................................15

Christopher Keating, *As Coronavirus Spikes Across Nation, Gov. Lamont Says Connecticut May Pause Reopening of State*, Hartford Courant, July 1, 2020 ..........................................................10

Rebecca Luyre, *Connecticut Shelters Rapidly Moving People to Hotels to Prevent Covid-19 Outbreaks; Homeless Individual Tests Positive in Hartford*, Hartford Courant, Mar. 30, 2020.....9

Edmund Mahoney, *Connecticut's Court System is Struggling to Recover From Devastating Coronavirus Shutdown*, Hartford Courant, June 30, 2020............................................................10

Shawn McFarland, *Waiting on Unemployment Benefits? This is What has Caused a Five-Plus Week Processing Backlog in Connecticut*, Hartford Courant, Apr. 15, 2020................................. 5

Shawn McFarland, *Self-Employed Workers in Connecticut Still Can't Complete the Process for Unemployment Benefits. State Officials Hope to Have the Issue Fixed This Week*, Hartford Courant, May 5, 2020 ...................................................................................................6

Emilie Munson, *State Will Place 1800 Homeless in Apartments, Considers Buying Hotels*, Conn. Post, June 25, 2020...................................................................................................9

Zach Murdock, *Mass Testing at Connecticut Prisons Identifies Another 832 Covid-19 Cases, Almost All Asymptomatic, DOC Says*, Hartford Courant, June 29, 2020 .......................................8

Zach Murdock, *New Data Show Covid-19 Deaths in Connecticut Nursing Homes Represented 80% of All Deaths Over Past Week*, Hartford Courant, June 11, 2020...........................................8

Richard A. Oppel, Jr. et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. Times, July 5, 2020...................................................................................................8, 18

David Owens, *Connecticut to Close Some Courthouses to Limit Employee, Visitor Exposure to Coronavirus; Evictions, Foreclosures Paused*, Hartford Courant, Mar. 18, 2020.......................10

Mark Pazniokas, *Connecticut Provides Coronavirus Assistance for Undocumented*, Hartford Courant, June 3, 2020 ....................................................................................................................7

Lisa Prevost, *Connecticut—Confronting a Wave of Foreclosures*, N.Y. Times, Feb. 24, 2008 ...16

Alex Putterman, *Air Travelers from Hot Spot States Must Check In Upon Arrival In Connecticut*, July 13, 2020...................................................................................................................................10

Alex Putterman, *Black and Latino Residents Hit Particularly Hard By Covid-19 in Connecticut, As Experts Fear Disparities Will Widen*, Hartford Courant, Apr. 8, 2020 ............................... 3, 17

Jacqueline Rabe Thomas, *Is the State Headed for an Eviction Crisis? To Be Determined*, Conn. Mirror, June 10, 2020................................................................................................................5, 7

Jacqueline Rabe Thomas, *Two Districts, Two Very Different Plans for Students, While School is Out Indefinitely*, Conn. Mirror, Mar. 19, 2020 ...........................................................................12

Ana Radelat, *Connecticut Struggling to Pay Unemployment Claims; Feds Hold Back Billions Pending New Rules*, Conn. Mirror, Apr. 2, 2020.........................................................................6

Ana Radelat, *Some But Not All CT Jobless to Receive $600 Federal Unemployment Payment "Soon"*, Conn. Mirror, Apr. 24, 2020............................................................................................5

Nikita Steward, *'It's a Time Bomb': 23 Die as Virus Hits Crowded Shelters*, N.Y. Times, Apr. 13, 2020) ............................................................................................................................................8

Liz Teitz, *Coronavirus Challenge: Move 60 Percent of Homeless Into Hotels*, Middletown Press, Apr. 1, 2020 ..................................................................................................................................9

Reports

Nicholas Chiumenti, Federal Reserve Bank of Boston Regional Brief: Impact of the Covid-19 Pandemic on New England Homeowners and Renters (May 18, 2020)....................................5, 17

Data Haven, *Towards Health Equity in Connecticut: The Role of Social Inequality & the Impact of COVID-19* (June 2020)..............................................................................................................18

Report of the Task Force to Improve Access to Counsel in Civil Legal Matters, Report to the Judiciary Committee of the Connecticut General Assembly (December 15, 2016).....................11

Journals

Amy E. Hillier, *Redlining and the Homeowners Loan Corporation*, 3 J. Urb. Hist. 394 (2003)..15

Jacob S. Rugh & Douglas S. Massey, *Racial Segregation and the American Foreclosure Crisis*, 75 Am. Soc. Rev. 629 (2010) ...........................................................................................16

Other

Monica Anderson & Madhumitha Kumar, *Digital Divide Persists Even as Lower-Income Americans Make Gains in Tech Adoption*, Pew Res. Ctr. (May 7, 2019) ......................................12

Carmen Baskauf & Lucy Nalpathanchil, *America's Eviction Epidemic*, WNPR (Aug. 30, 2018). 7

Emily Benfer, *Coronavirus Rent Freezes Are Ending — and A Wave of Evictions Will Sweep America*, NBC News (June 22, 2020).......................................................................................... 9

Connecticut Unemployment Facebook group (last accessed July 14, 2020), https://www.facebook.com/groups/222303712529530 ...................................................................7

*Housing Tenure by Race and Ethnicity by County*, Conn. Data Collaborative (last accessed July 9, 2020) ..........................................................................................................................16

DataHaven analysis of US Census Bureau Household Pulse Survey ...........................................17

Matthew Desmond, *Unaffordable America: Poverty, Housing, and Eviction*, Fast Focus 22 (2015)..........................................................................................................................................12

Laurie Goodman, Karan Kaul & Michael Neal, *The CARES Act Eviction Moratorium Covers All Federally Financed Rental—That's One in Four US Rental Units*, Urb. Inst. (Apr. 2, 2020)13, 14

Angela Hanks, Danyelle Solomon & Christian E. Weller, *Systematic Inequality: How America's Structural Racism Helped Create the Black-White Wealth Gap*, Ctr. for Am. Progress (Feb. 21, 2018) ..........................................................................................................................................16

*Hartford: Top Evicting Large Cities in the United States*, Eviction Lab (last accessed July 9, 2020) ...........................................................................................................................................7

Mitchell Hartman, *When $600 a Week Pandemic Unemployment Checks Run Out, What Then?*, Marketplace (June 30, 2020)...........................................................................................................6

Sahil Kapur, *The $600 Federal Unemployment Benefit Ends This Month. GOP Senators Say Enough Already*, NBC News (July 1, 2020)....................................................................................6

Alyse D. Oneto, Samantha Batko, *Why Homeless Encampment Sweeps Are Dangerous During COVID-19*, Urb. Inst. (May 12, 2020)..........................................................................................8

Kim Parker, Juliana Menasce Horowitz & Anna Brown, *About Half of Lower-Income Americans Report Household Job or Wage Loss Due to COVID-19*, Pew Res. Ctr. (Apr. 21, 2020) ...........17

*State Announces Financial Aid for Renters, Homeowners Affected by COVID-19*, NBC Conn. (June 29, 2020)......................................................................................................................9

*State of Connecticut vs. United States Unemployment Rate*, Conn. Dep't of Labor (last visited July 14, 2020)........................................................................................................................5

*State Continues to See High Application Volume*, Conn. Dep't of Labor (July 2, 2020)................4

*Three CT Transit Workers Test Positive for COVID-19*, NBC Conn. (Apr. 14, 2020).................11

*QuickFacts: Hartford City, Connecticut*, United States Census Bureau, July 1, 2019 population estimates........................................................................................................................7

Danyelle Solomon & Darrick Hamilton, *The Coronavirus Pandemic and the Racial Wealth Gap*, Ctr. for Am. Progress (Mar. 19, 2020)..........................................................................16

### STATEMENT OF INTEREST OF AMICI

**Greater Hartford Legal Aid** is a non-profit legal services organization incorporated in the City of Hartford in 1958. Since then, GHLA has provided free legal assistance to indigent residents of greater Hartford, including in housing matters. GHLA Housing Unit attorneys represent hundreds of low-income tenants each year in summary process matters in Housing Court and provide systemic housing advocacy in appeals, impact litigation, and policy initiatives.

**Connecticut Legal Services** is a private nonprofit law firm providing free legal services in civil matters to low-income residents since 1977. Its mission is to represent, advise and educate low-income individuals and families and thereby help them secure the protections, privileges, benefits, rights and opportunities available under the law. The low-income population eligible for the services of CLS consists of approximately 180,000 persons. Representation is provided through six full-service offices and two satellite locations in Connecticut. CLS provides legal representation in numerous specialized areas, including housing.

**New Haven Legal Assistance Association** was incorporated in 1964 with a mission to secure justice for and to protect the rights of New Haven County residents unable to engage legal counsel. NHLAA provides free legal services to low-income individuals and families and advocates administratively and legislatively for policies which protect the interests of the poor and disadvantaged. NHLAA provides legal representation in numerous specialized areas including housing and represents hundreds of clients a year in summary process matters.

**Connecticut Fair Housing Center** is a nonprofit law office dedicated to ensuring that all people have equal access to housing opportunities in Connecticut, free from discrimination. Because

1

housing discrimination disproportionately affects people with low incomes, the Center focuses on the intersection of poverty and housing discrimination. The Center also assists Connecticut homeowners who are hit hardest by foreclosures. The Center's work focuses on direct representation of people facing eviction and foreclosure in trial and appellate-level proceedings in state and federal court (including extensive amicus work), especially when fair housing rights are at stake, along with outreach and advocacy directed at all three branches of government.

**The Jerome N. Frank Legal Services Organization (LSO)** at Yale Law School is comprised of legal clinics in which law students work under the supervision of faculty attorneys to assist individuals who cannot afford private legal representation. The Housing Clinic has represented Connecticut tenants in summary process eviction and other housing-related matters since 1985. It has appeared in cases raising housing issues in state and federal courts in Connecticut at both the trial and appellate levels. The Housing Clinic also has appeared as *amicus curiae* in state and federal appellate court proceedings across the country.

**Connecticut Legal Rights Project** is a statewide nonprofit established in 1990 that provides high-quality legal services to low income persons with psychiatric disabilities living in Connecticut, primarily on matters related to their treatment and civil rights. CLRP represents clients with mental health conditions in housing matters to enable them to access or maintain housing and to fight discrimination.

**Connecticut Veterans Legal Center** is a non-profit legal services organization focused on helping veterans recovering from homelessness and mental illness overcome legal barriers to housing, healthcare, and income. As the first legal services organization to partner with the Veterans Administration, the CVLC is focused on working with our partners to represent

2

veterans across Connecticut in court, including summary process defense, and agency proceedings. These clients often have difficulty securing transportation, recognizing and communicating their legal needs, and following up with appointments and documentation without assistance. CVLC meets these veterans where they already receive various types of mental healthcare, substance abuse treatment, housing and other social services.

## PRELIMINARY STATEMENT

Connecticut was hit early and hard by the COVID-19 pandemic. Governor Lamont responded by declaring a public health emergency and putting in place measures that have succeeded in tamping down the spread of the infection and saving lives. One of these measures, a moratorium on certain evictions, is critical to these efforts to keep Connecticut safe in the face of a nationwide surge in infections.

*Amici* are legal services providers whose staff attorneys represent tenants facing eviction in Connecticut housing courts. Legal services housing clients are people living in poverty, largely from communities of color that have been disparately affected by COVID-19.[1] Well before the pandemic hit, the communities that we serve were affected by Connecticut's long history of racial segregation in housing; the racially disparate impact of the 2008 foreclosure crisis; and some of the highest rates of eviction in the nation. These low-income communities will bear the brunt of the wave of evictions that surely will result if the moratorium is lifted at this time. Our clients will be subjected to heightened risk of exposure to COVID-19 if they are forced to double-up in cramped apartments or to attend crowded housing court calendar calls.

---

[1] Alex Putterman, *Black and Latino Residents Hit Particularly Hard By Covid-19 in Connecticut, As Experts Fear Disparities Will Widen*, Hartford Courant, Apr. 8, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-covid-19-racial-disparities-0407-20200408-jsrg2au2fnab5fbxhpu4ioqmb4-story.html.

Time is needed for Connecticut's newly launched rental assistance program to take effect and for the Judicial Branch to plan for safer housing court proceedings.

Connecticut's eviction moratorium is largely coextensive with the federal moratorium in the CARES Act. 15 U.S.C. § 9058. Governor Lamont's tailored moratorium temporarily suspends evictions and does not absolve tenants of their obligation to pay rent. It is an appropriate use of the Governor's powers to protect public health in a time of great emergency. *See Jacobson v. Mass.*, 197 U.S. 11 (1905); *see also South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613 (Roberts, C.J., concurring); *Block v. Hirsch*, 256 U.S. 135, 156 (1921) (Holmes, J.) (upholding eviction restrictions against constitutional challenge based on "exigency" of crisis posing a "danger to public health"). This Court should reject the Plaintiffs' challenge as the Southern District of New York did in a similar challenge to New York's eviction moratorium. *Elmsford Apartment Ass'ns, LLC et al. v. Cuomo*, 20-cv-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29, 2020).

## ARGUMENT

### I.     A WAVE OF EVICTIONS DURING THE PANDEMIC WOULD TRIGGER AN EVEN MORE ACUTE PUBLIC HEALTH CRISIS.

#### A.   Connecticut is Suffering Unprecedented Unemployment and Many Tenants Cannot Pay Rent.

Connecticut has suffered sky-rocketing unemployment due to the abrupt economic shutdown. The official Bureau of Labor Statistics Connecticut unemployment figure for May 2020—the most recent available as of writing—was 9.4% (nearly three times the March 2020 figure of 3.7%), but the Connecticut Department of Labor (DOL) Office of Research estimates that the true mid-May unemployment figure is closer to 19%.[2] The DOL reports that it has

---

[2] *See State of Connecticut vs. United States Unemployment Rate*, Conn. Dep't of Labor (last visited July 14, 2020), https://www1.ctdol.state.ct.us/lmi/unemprateCTUS.asp.

received a staggering 675,000 applications for unemployment claims since March 13, 2020.[3] For comparison, during the same four-month period at the height of the 2009 crisis, Connecticut saw just over 100,000 applications.[4] A May report by the Boston Federal Reserve Bank estimated that tens of thousands of Connecticut renters were at risk of missing a rent payment even with the support of federal CARES Act payments.[5] A survey of landlords by the Governor's office found that the number of tenants who could not pay had tripled from April to May 2020.[6] Twenty-two percent of Connecticut renters have missed a rent payment by May 2020, and the same percentage (some 140,000 Connecticut residents, three-quarters of them people of color) feared they could not make rent for May.[7]

The avalanche of Unemployment Insurance (UI) claims initially overwhelmed the outdated legacy computer system of Connecticut's DOL,[8] and payments even for regular state benefits lagged for weeks.[9] The automated system poses additional hurdles for applicants with

---

[3] *State Continues to See High Application Volume*, Conn. Dep't of Labor (July 2, 2020), http://www.ctdol.state.ct.us/communic/2020-7/070220%20CTDOL%20update.pdf.

[4] Calculated from data available at Conn. Dep't of Labor, *Average Weekly Initial Claims - State of Connecticut*, (last accessed July 14, 2020), https://www1.ctdol.state.ct.us/lmi/awiclaims.asp.

[5] Nicholas Chiumenti, Federal Reserve Bank of Boston Regional Brief: Impact of the Covid-19 Pandemic on New England Homeowners and Renters, Table 3 (May 18, 2020), *available at* https://www.bostonfed.org/publications/new-england-public-policy-center-regional-briefs/2020/impact-of-the-covid-19-pandemic-on-new-england-homeowners-and-renters.aspx.

[6] Jacqueline Rabe Thomas, *Is the State Headed for an Eviction Crisis? To Be Determined*, Conn. Mirror, June 10, 2020, *available at* https://ctmirror.org/2020/06/10/is-the-state-headed-for-an-eviction-crisis-to-be-determined.

[7] *Id.*

[8] Ana Radelat, *Some But Not All CT Jobless to Receive $600 Federal Unemployment Payment "Soon"*, Conn. Mirror, Apr. 24, 2020, *available at* https://ctmirror.org/2020/04/24/some-but-not-all-ct-jobless-to-receive-600-federal-unemployment-pay-soon; Shawn McFarland, *Waiting on Unemployment Benefits? This is What has Caused a Five-Plus Week Processing Backlog in Connecticut*, Hartford Courant, April 15, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-department-of-labor-unemployment-claims-backed-up-20200413-6l2ypvfyxnfvbngv3gcvfioyyy-story.html.

[9] Dan Brechlin, *With a Five-Week Unemployment Benefits Backlog, Here Are Some Tips and Answers on Filing in Connecticut During the Coronavirus Pandemic*, Hartford Courant, Apr. 15,

disabilities, limited English proficiency, and low literacy. Payments from federal unemployment programs under the CARES Act, including Pandemic Unemployment Assistance (PUA) and Pandemic Unemployment Compensation (PUC), were delayed for months awaiting federal guidance,[10] and because the DOL had to create computer programs that interfaced with the 40-year-old legacy COBOL language to enable Connecticut residents to apply for the federal programs.[11] Federal PUC payments will expire on July 25, 2020,[12] and even if Congress renews PUC in some form, it will not do so for weeks or months and the benefits paid will be less than the current PUC program.[13] Once that $600-per-week lifeline runs out, the income of tens of thousands of families relying on UI will be reduced to a fraction of its prior amount through no fault of their own.

The problems continue to date. Throughout the public health emergency, an estimated 120,000 Connecticut residents are not eligible for UI or federal relief because of their immigration status; those residents are forced to rely on a small state fund or community and

---

2020, *available at* https://www.courant.com/coronavirus/hc-biz-unemployment-insurance-q-a-20200323-zte46alvxbhgxfq4l5rnlpgt3a-story.html.

[10] Ana Radelat, *Connecticut Struggling to Pay Unemployment Claims; Feds Hold Back Billions Pending New Rules*, Conn. Mirror, Apr. 2, 2020, *available at* https://ctmirror.org/2020/04/02/ct-struggling-to-pay-unemployment-claims-feds-holding-back-billions-pending-new-rules.

[11] Shawn McFarland, *Self-Employed Workers in Connecticut Still Can't Complete the Process for Unemployment Benefits. State Officials Hope to Have the Issue Fixed This Week*, Hartford Courant, May 5, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-unemployment-closures-self-employed-pua-red-button-20200505-dehruqp2zfderafq4rxg5kpavu-story.html.

[12] Mitchell Hartman, *When $600 a Week Pandemic Unemployment Checks Run Out, What Then?*, Marketplace (June 30, 2020), *available at* https://www.marketplace.org/2020/06/30/what-happens-when-600-a-week-in-unemployment-ends.

[13] Sahil Kapur, *The $600 Federal Unemployment Benefit Ends This Month. GOP Senators Say Enough Already*, NBC News (July 1, 2020), https://www.nbcnews.com/politics/congress/600-federal-unemployment-benefit-ends-month-gop-senators-say-enough-n1232588.

mutual aid.[14] Other Connecticut residents stopped working due to concerns about workplace

safety, fear for their health or that of their household members, or reluctance to use public

transportation.[15] UI applicants continue to report difficulty reaching the DOL, navigating the

application process, and receiving their benefits.[16] The State is poised for a surge in evictions in

the fall.

    B. <u>Connecticut Had an Eviction Crisis Before the Pandemic Struck.</u>

      This new spike of Connecticut renters at risk of eviction is layered on top of an existing

housing crisis for low-income renters in Connecticut, particularly in communities of color.

Analysis of 2016 court records by the Eviction Lab at Princeton University reveals that the City

of Hartford, a community that is about 37% Black and African-American and 45% Latinx,[17]

ranks 29th in the nation in the rate of evictions.[18] Hartford's eviction rate is twice the national

average[19]: eviction judgments were entered against 5.73 of 100 renter homes in Hartford in 2016,

an average of 5.54 such eviction judgments each day.[20] Bridgeport's 2016 eviction rate was

5.03%, and Waterbury had an even higher eviction rate in 2016, with eviction judgments against

---

[14] Mark Pazniokas, *Connecticut Provides Coronavirus Assistance for Undocumented*, Hartford Courant, June 3, 2020, *available at* https://ctmirror.org/2020/06/03/connecticut-provides-coronavirus-assistance-for-undocumented.

[15] Rabe Thomas, *supra* note 6.

[16] *See* Connecticut Unemployment Facebook group (last accessed July 14, 2020), https://www.facebook.com/groups/222303712529530.

[17] *QuickFacts: Hartford City, Connecticut*, United States Census Bureau, July 1, 2019 population estimates, *available at* https://www.census.gov/quickfacts/hartfordcityconnecticut.

[18] *Hartford: Top Evicting Large Cities in the United States*, Eviction Lab (last accessed July 9, 2020), *available at*
https://evictionlab.org/rankings/#/evictions?r=United%20States&a=0&d=evictionRate&l=28

[19] Carmen Baskauf & Lucy Nalpathanchil, *America's Eviction Epidemic*, WNPR (Aug. 30, 2018), *available at* https://www.wnpr.org/post/americas-eviction-epidemic.

[20] Eviction Lab, *supra* note 18.

6.1% of renters that year.[21] Now that unprecedented unemployment has hit Connecticut, eviction rates as high as 13% are projected.[22]

    C.  <u>A Wave of Evictions in the Pandemic Would Be a Public Health Catastrophe.</u>

    An eviction surge would have devastating health consequences for low-income communities, threatening the hard-won gains Connecticut has made in controlling the spread of the virus. In order to reduce the spread of COVID-19, Connecticut residents have been told to practice social distancing, stay home, and shelter in place. But you cannot shelter in place without shelter. When families are evicted, by definition, they are forced out of their homes.

    After this often-traumatic loss, many have no choice but to enter the state's emergency shelter system, "double-up" in overcrowded apartments, or sleep outside in encampments— setting the stage for a surge of infections. Through bitter experience, we have learned that these types of congregate living settings are prime locations for the spread of COVID-19.[23] In an

---

[21] *Connecticut*, Eviction Lab (last accessed July 9, 2020), *available at* https://evictionlab.org/map/#/2016?geography=states&type=er&locations=09,-72.729,41.62.

[22] Rabe Thomas, *supra* note 6.

[23] Zach Murdock, *Mass Testing at Connecticut Prisons Identifies Another 832 Covid-19 Cases, Almost All Asymptomatic, DOC Says*, Hartford Courant, June 29, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-doc-mass-testing-numbers-20200629-fdgou7ywpneknewyl32d4e3bxe-story.html; Zach Murdock, *New Data Show Covid-19 Deaths in Connecticut Nursing Homes Represented 80% of All Deaths Over Past Week*, Hartford Courant, June 11, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-nursing-home-deaths-slow-june-20200612-7xqvh75f6rexvajecn7nnqnody-story.html; Thomas Fuller, *Coronavirus Outbreak Has America's Homeless at Risk of 'Disaster*,' N.Y. Times, Mar. 10, 2020, *available at* https://www.nytimes.com/2020/03/10/us/coronavirus-homeless.html; Nikita Steward, *'It's a Time Bomb': 23 Die as Virus Hits Crowded Shelters*, N.Y. Times, Apr. 13, 202), *available at* https://www.nytimes.com/2020/04/13/nyregion/new-york-coronavirus-homeless.html; Alyse D. Oneto, Samantha Batko, *Why Homeless Encampment Sweeps Are Dangerous During COVID-19*, Urb. Inst. (May 12, 2020), *available at* https://www.urban.org/urban-wire/why-homeless-encampment-sweeps-are-dangerous-during-covid-19; Richard A. Oppel, Jr. et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. Times, Jul. 5, 2020, *available at* https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html (noting expert conclusions based on largest nationally available dataset that Black and Latinx individuals are far more likely than white individuals to contract COVID-19 in part

attempt to avoid viral outbreaks in the state's shelter system, Connecticut's government and network of homeless shelters worked quickly to "decompress" shelters by moving 60% of the shelter population into hotels.[24] The State is now undertaking a $14 million campaign to house 1,800 individuals more permanently.[25] A new wave of evictions would reverse these efforts and lead to new spikes in infections.[26]

The same day that the Governor issued Executive Order 7DDD extending the eviction moratorium (June 29, 2020), the State also announced relief for renters and landlords. These initiatives include $10 million for residential renters with priority to low-income families that do not qualify for unemployment insurance; $2.5 million in relief for families that do not qualify for federal assistance, such as undocumented immigrant families; and $5 million in relief for those who already were facing eviction when the pandemic hit.[27] These programs launched July 15,

---

because those groups are more likely to "live in cramped apartments or multigenerational homes).

[24] Liz Teitz, *Coronavirus Challenge: Move 60 Percent of Homeless Into Hotels*, Middletown Press, Apr.1, 2020, *available at* https://www.middletownpress.com/news/coronavirus/article/State-pushing-cities-to-move-60-percent-of-15170627.php; Rebecca Luyre, *Connecticut Shelters Rapidly Moving People to Hotels to Prevent Covid-19 Outbreaks; Homeless Individual Tests Positive in Hartford*, Hartford Courant, Mar. 30, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-homeless-shelter-relocations-20200330-i5mzljkeanduhnxnt74wwkqpmu-story.html.

[25] Emilie Munson, *State Will Place 1800 Homeless in Apartments, Considers Buying Hotels*, Conn. Post, June 25, 2020, *available at* https://www.ctinsider.com/news/ctpost/article/State-will-place-1-800-homeless-in-apartments-15365707.php.

[26] In addition to an increased risk of contracting and spreading COVID-19, evicted individuals will also be more likely to experience other negative health outcomes, such as depression and suicidal ideation. They will also be less likely to secure safe and decent permanent housing in the future. Emily Benfer, *Coronavirus Rent Freezes Are Ending — and A Wave of Evictions Will Sweep America*, NBC News (June 22, 2020), *available at* https://www.nbcnews.com/think/opinion/coronavirus-rent-freezes-are-ending-wave-evictions-will-sweep-america-ncna1230916.

[27] *State Announces Financial Aid for Renters, Homeowners Affected by COVID-19*, NBC Conn. (June 29, 2020), *available at* https://www.nbcconnecticut.com/news/coronavirus/state-announces-financial-aid-for-renters-homeowners-affected-by-covid-19/2295100.

2020, and will need time to be implemented and to take effect. Nothing prevents the state from expanding these programs, which rely on federal funds already available to Connecticut, if expansion is needed. An abrupt onslaught of evictions will overwhelm the available relief, just as the State is struggling to maintain its gains in the face of a troubling national wave of infections.[28]

## II.    THE HOUSING COURTS CANNOT OPERATE IN A SAFE MANNER WITHOUT FURTHER PLANNING TO ENSURE DUE PROCESS.

A.   Crowded Housing Courts Present the Risk of a Super-Spreader Event.

Early in the pandemic, the Judicial Branch closed most of its courthouses, and for good reason. On a typical day, 27,000 people pass through the metal detectors of Hartford Judicial District buildings.[29] If evictions resume, the operation of the housing courts themselves will pose a threat to public health. When the State epidemiologist estimates that there are ten COVID infections for every confirmed case, there is no telling how many people present for the morning housing court calendar call could be positive for the virus.[30]

In pre-pandemic days, the hallways of Superior Court on housing calendar days were often jammed with tenants, most of them unrepresented, awaiting hearings or mediation in small, poorly ventilated rooms.[31] This status quo mode of operating does not permit social distancing

---

[28] Christopher Keating, *As Coronavirus Spikes Across Nation, Gov. Lamont Says Connecticut May Pause Reopening of State*, Hartford Courant, July 1, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-lamont-being-cautious-20200701-hdicoy4uyjbilllpcj35y7mcz4-story.html.

[29] David Owens, *Connecticut to Close Some Courthouses to Limit Employee, Visitor Exposure to Coronavirus; Evictions, Foreclosures Paused*, Hartford Courant, Mar. 18, 2020, *available at* https://www.courant.com/coronavirus/hc-news-coronavirus-some-state-courthousess-close-20200318-p2ah2kjtbjehveyuycym2mwbqu-story.html.

[30] Alex Putterman, *Air Travelers from Hot Spot States Must Check In Upon Arrival In Connecticut*, July 13, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-daily-updates-0713-20200713-vmetgrjzezb2nhlwgp6xwa5e2a-story.html.

[31] Edmund Mahoney, *Connecticut's Court System is Struggling to Recover From Devastating Coronavirus Shutdown*, Hartford Courant, June 30, 2020, *available at*

and would risk the health not only of legal services clients, but also of the vast majority of unrepresented tenants, landlords, clerks, marshals, interpreters, court reporters, judges, and members of the bar. When New York courts continued operating during the early days of the pandemic, court personnel were sickened; tragically, some lost their lives.[32]

Reopening the housing courts in-person would require many tenants, especially low-income tenants, to travel on public transportation or share rides, creating further exposure risks in the community.[33] Processing large numbers of evictions in the housing courts almost assuredly will spark new outbreaks in Connecticut's towns and cities.

B.   Time and Resources Are Needed to Bridge the Digital Divide and Enable
     Unrepresented Litigants to Participate in Remote Proceedings.

Connecticut is not ready to conduct housing court remotely. Connecticut's Judicial Branch simply does not have adequate technology in place to process the backlog of existing cases, let alone a surge in new evictions.[34] Many housing court defendants do not have sufficient access to technology to participate effectively in high stakes proceedings that could render them homeless. In housing court, unlike other Divisions of Superior Court, most defendants are poor and the great majority are unrepresented. The Connecticut Judicial Branch estimates that 75% of

---

http://www.courant.com/coronavirus/hc-news-coronavirus-connecticut-courts-20200626-20200630-dn5hvpmsqzeaffxhbnevmzehem-story.html#rt=chartbeat-flt.

[32] Noah Goldberg, Wes Parnell & Molly Crane-Newman, *Coronavirus Leaves Trail of Illness and Death in NYC Courthouses As Slow-to-Change System Struggles to Cope With Pandemic*, N.Y. Daily News, May 25, 2020, *available at* http://www.nydailynews.com/coronavirus/ny-coronavirus-pandemic-unprepared-nyc-courts-20200526-fe2zknj7cbgutpjdn3vtfruiiq-story.html.

[33] *Three CT Transit Workers Test Positive for COVID-19*, NBC Conn., Apr. 14, 2020, *available at* https://www.nbcconnecticut.com/news/local/three-cttransit-workers-test-positive-for-covid-19/2251710.

[34] Edmund Mahoney, *Connecticut's Court System is Struggling to Recover From Devastating Coronavirus Shutdown*, Hartford Courant, June 30, 2020, *available at* http://www.courant.com/coronavirus/hc-news-coronavirus-connecticut-courts-20200626-20200630-dn5hvpmsqzeaffxhbnevmzehem-story.html#rt=chartbeat-flt.

all housing court cases involve at least one *pro se* party;[35] in many housing courts nationwide, it is reported that 90% of tenants facing eviction lack a lawyer, while 90% of landlords are represented.[36] Without lawyers, unrepresented litigants who are low-income or of modest means may not have access to stable wifi or devices that will enable them to participate effectively in remote court proceedings.

Connecticut's experience in online learning this spring demonstrated a stark digital divide. School districts that surveyed families found that low-income households faced substantial barriers to accessing devices that could support online learning platforms.[37] Despite some internet providers' offers of free or low-cost wifi, access to internet bandwidth sufficient to support some platforms remains a problem.[38]

Due to this deep digital divide,[39] unrepresented tenants likely will not have the means to defend effectively against summary process proceedings. Eviction proceedings can require the

---

[35] Report of the Task Force to Improve Access to Counsel in Civil Legal Matters, Report to the Judiciary Committee of the Connecticut General Assembly, at 16 (December 15, 2016), *available at* https://www.cga.ct.gov/jud/tfs/20160729_Task%20Force%20to%20Improve%20Access%20to%20%20Legal%20Counsel%20in%20Civil%20Matters/Final%20Report.pdf.

[36] Matthew Desmond, *Unaffordable America: Poverty, housing, and eviction*, Fast Focus 22 (2015) at 5, *available at* https://www.irp.wisc.edu/publications/fastfocus/pdfs/FF22-2015.pdf.

[37] Jacqueline Rabe Thomas, *Two Districts, Two Very Different Plans for Students, While School is Out Indefinitely*, Conn. Mirror, Mar. 19, 2020, *available at* https://ctmirror.org/2020/03/19/two-districts-two-very-different-plans-for-students-while-school-is-out-indefinitely.

[38] Emily DiSalvo, *Despite Community Efforts, Some Students Are Still Offline*, CT News Junkie, July 13, 2020, *available at* https://www.ctnewsjunkie.com/archives/entry/20200713_despite_community_efforts_some_students_are_still_offline/?utm_source=CTNewsJunkie+Main+List+With+Publication+Groups&utm_campaign=549c3ff2ce-MCP_COPY_01&utm_medium=email&utm_term=0_a493d2308d-549c3ff2ce-92888149.

[39] Monica Anderson & Madhumitha Kumar, *Digital Divide Persists Even as Lower-Income Americans Make Gains in Tech Adoption*, Pew Res. Ctr. (May 7, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/05/07/digital-divide-persists-even-as-lower-income-americans-make-gains-in-tech-adoption.

presentation of witnesses and exhibits and may require interpreters. Housing mediation requires meaningful opportunities for consultation and consent, lest tenants be rushed into unfair or unreasonable stipulated agreements. Almost 800 evictions were filed in Superior Court in the time period after the public health emergency was declared March 10th and before the initial April 10th moratorium took effect.[40] Until resources are in place, Connecticut's housing courts cannot restart safely, let alone process a tsunami of new non-payment cases.

      C.  <u>Connecticut's Moratorium is Largely Coextensive with the Federal Eviction Moratorium.</u>

The June 29th extension of Connecticut's eviction moratorium until August 22, 2020 makes it roughly coextensive with the eviction moratorium enacted by Congress in the CARES Act. The federal CARES Act imposes a 120-day moratorium (through July 25, 2020) on initiating eviction proceedings for non-payment of rent against residential tenants living in covered properties. 15 U.S.C. § 9058(b). After the 120 days pass, landlords of covered housing must give their tenants 30 days' written notice to vacate before commencing an eviction action. 15 U.S.C. § 9058(c). Thus, no eviction for nonpayment of rent can be filed in CARES Act-covered residential property until at least August 25, 2020.

The federal moratorium covers all properties receiving federal assistance, including housing that is privately-owned.[41] The Urban Institute estimates that the federal moratorium

---

[40] Calculated based on data from Connecticut Judicial Branch *available* at <u>https://jud.ct.gov</u>.

[41] In addition to federal low-income public housing, the federal moratorium applies to properties with tenants who have Housing Choice Vouchers (commonly known as "Section 8" vouchers), all HUD-assisted housing, privately owned housing with construction subsidies such as the Low Income Housing Tax Credit program, and other federally subsidized housing programs. 15 U.S.C. § 9058(a). The CARES Act moratorium also covers properties with a "federally backed mortgage," that is, a mortgage insured, guaranteed, or "assisted in any way" by the Federal Housing Administration (FHA), Veterans Administration (VA) or U.S. Department of Agriculture (USDA), or purchased or securitized by Fannie Mae or Freddie Mac. 15 U.S.C. § 9058(a)(4).

covers over one quarter of all rental units in the U.S. and almost half of all multifamily rental units. [42] The actual figure is higher, because the Urban Institute estimate does *not* include units in Low Income Housing Tax Credit properties, rent subsidy programs like Section 8, and public housing.[43]

The federal moratorium demonstrates the propriety of the Governor's response to the pandemic. In addition, coordinating the length of the state and federal eviction moratoria will reduce confusion in Connecticut's housing courts. Tenants—the vast majority of whom do not have counsel—will not know, or know how to determine, whether a particular property is subject to the federal moratorium. That is because the federal moratorium applies not only to types of federal assistance of which the tenant may be aware (e.g., public housing or Section 8 assistance) but also to mortgages that are federally insured but not otherwise assisted and, more important, to the securitization of private mortgages in the secondary market by Fannie Mae and Freddie Mac. Indeed, because mortgages are commonly bundled and resold without the property owner's knowledge, even property owners may not immediately know if a property has a federally backed mortgage.

Housing court judges and clerks cannot be expected to identify the thousands of properties that are federally assisted to determine which rules apply. Extending Connecticut's eviction moratorium to the end of August reduces this confusion and makes it more administratively feasible for the Judicial Branch to reopen the housing courts when it is safer.

## III.   LOW-INCOME COMMUNITIES OF COLOR ARE DISPARATELY AFFECTED BY BOTH THE EXISTING EVICTION CRISIS AND THE COVID-19

---

[42] *See* Laurie Goodman, Karan Kaul & Michael Neal, *The CARES Act Eviction Moratorium Covers All Federally Financed Rentals--That's One in Four US Rental Units*, Urb. Inst. (Apr. 2, 2020), *available at* https://www.urban.org/urban-wire/cares-act-eviction-moratorium-covers-all-federally-financed-rentals-thats-one-four-us-rental-units.

[43] *Id.* ("Our estimates only cover federally financed units in single-family and multifamily properties and exclude units covered by LIHTC, federal assistance or voucher programs.").

**PANDEMIC.**

Connecticut has long had a racialized housing market in which people of color, particularly those who live in low-income communities, have borne a disproportionate share of the burdens. When combined with the effects of the COVID-19 pandemic, Connecticut's segregation places renters of color at heightened risk of both homelessness and illness. The eviction moratorium has helped prevent a disastrous increase in homelessness and virus exposure that would disproportionately impact renters of color.

A.  Connecticut Has a Racialized Housing Market.

Due to a long history of government and private action, people of color living in Connecticut are more likely to rent than own their homes and less likely to have accumulated the wealth needed to survive an economic crisis. Starting in the 1930s and continuing for several decades, the federal government refused to lend, and federal agencies refused to back loans, in mixed race and Black neighborhoods.[44] Racial covenants locked Black homebuyers out of suburban communities until the Supreme Court's decision in *Shelley v. Kraemer*, 334 U.S. 1 (1948). Redlining did the same, and discriminatory lending practices continue despite the passage of the Fair Housing Act of 1968.[45] Steering, intimidation, and other forms of discrimination—all of which continue today—excluded Black people from homeownership at the time real estate was most affordable. As a result, the families who vaulted into the middle

---

[44] *See* Amy E. Hillier, *Redlining and the Homeowners Loan Corporation*, 3 J. URB. HIST. 394 (2003).

[45] Tracy Jan, *Redlining Was Banned 50 Years Ago. It's Still Hurting Minorities Today*, Wash. Post, March 28, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/03/28/redlining-was-banned-50-years-ago-its-still-hurting-minorities-today.

15

class through subsidized homeownership programs and through moves out of the city and to the suburbs were overwhelmingly white.[46]

When the mortgage industry did expand its lending to Black and Latinx borrowers, it targeted those communities for predatory mortgages.[47] By 2008, Black and Latinx communities in Connecticut's cities and diverse inner-ring suburbs were seeing the first wave of foreclosures resulting from those predatory and equity-stripping practices.[48] These foreclosures contributed to a drop in homeownership in those communities, resulting in a homeownership gap with Black Connecticut residents now owning their homes at rates barely half (39%), and Latinx residents less than half (34%), that of whites (73%).[49] Combined with the lingering effects of earlier exclusion from appreciating housing markets, this has led to a vast disparity in wealth based on race and ethnicity.[50]

As a result, the majority of Black and Latinx residents in Connecticut rent their homes, leaving them vulnerable to loss of housing through eviction via summary process rather than the

---

[46] *See* Ira Katznelson, When Affirmative Action Was White (2005).

[47] Nick Carey, *Racial Predatory Loans Fueled U.S. Housing Crisis: Study*, Reuters, Oct. 4, 2010, *available at* https://www.reuters.com/article/us-usa-foreclosures-race/racial-predatory-loans-fueled-u-s-housing-crisis-study-idUSTRE6930K520101004; *see also* Jacob S. Rugh & Douglas S. Massey, *Racial Segregation and the American Foreclosure Crisis*, 75 Am. Soc. Rev. 629 (2010).

[48] Lisa Prevost, *Connecticut—Confronting a Wave of Foreclosures*, N.Y. Times, Feb. 24, 2008, *available at* https://www.nytimes.com/2008/02/24/realestate/24wczo.html.

[49] *Housing Tenure by Race and Ethnicity by County*, Conn. Data Collaborative (last accessed July 9, 2020), *available at* http://data.ctdata.org/dataset/housing-tenure-by-race-and-ethnicity-by-county.

[50] Angela Hanks, Danyelle Solomon & Christian E. Weller, *Systematic Inequality: How America's Structural Racism Helped Create the Black-White Wealth Gap*, Ctr. for Am. Progress (Feb. 21, 2018), *available at* https://www.americanprogress.org/issues/race/reports/2018/02/21/447051/systematic-inequality.

longer foreclosure process. The racialized wealth gap means these residents have less in savings and are more vulnerable to homelessness soon after a job loss.[51]

When coupled with the pandemic's economic and health consequences, the effects of government and private practices have left thousands of Connecticut families of color vulnerable to eviction. Thirty-one percent of Black renters and forty-three percent of Latinx renters recently told the Census Bureau they were facing housing instability as a result of the pandemic as compared to only sixteen percent of white renters.[52]

B.  The Pandemic Has Caused Particular Harms for Low-Income Workers of Color.

The pandemic has caused outsized economic and health disruptions for low-income workers of color. When the pandemic hit, 61% of Hispanic adults and 44% of Black adults reported that they or someone in their household had either lost their job or taken a pay cut as a result of the pandemic, compared to 38% of whites; these numbers were higher for lower-income households (52%) when compared to all households (43%).[53]

Perversely, lower-income Black and Latinx workers who have kept their jobs in Connecticut are more likely than whites to be front-line or essential workers who must risk exposure to the coronavirus that causes COVID-19.[54]  Furthermore, because lower-income

---

[51] *See* Chiumenti, *supra* n. 5; *see also* Danyelle Solomon & Darrick Hamilton, *The Coronavirus Pandemic and the Racial Wealth Gap*, Ctr. for Am. Progress (Mar. 19, 2020), *available at* https://www.americanprogress.org/issues/race/news/2020/03/19/481962/coronavirus-pandemic-racial-wealth-gap.

[52] DataHaven analysis of US Census Bureau Household Pulse Survey public use microdata, weeks 1 through 7, https://www.census.gov/householdpulsedata, *available at* https://ct-data-haven.github.io/covidpub/#economic-impacts.

[53] Kim Parker, Juliana Menasce Horowitz & Anna Brown, *About Half of Lower-Income Americans Report Household Job or Wage Loss Due to COVID-19*, Pew Res. Ctr. (Apr. 21, 2020), *available at* https://www.pewsocialtrends.org/2020/04/21/about-half-of-lower-income-americans-report-household-job-or-wage-loss-due-to-covid-19.

[54] *See, e.g.*, Putterman, *supra* n. 1; Jordan Fenster, "*We Didn't Sign Up for This": Not Essential During a Storm But Essential Now*, New Haven Register, May 14, 2020.

households are more likely to rent than own, they face increased exposure to COVID-19 merely by virtue of being renters (*e.g.*, through shared common areas).[55] Renter households are five times as likely to be overcrowded, and in Connecticut, Latinx and Black households are more likely than white to be overcrowded.[56] Partly for these reasons, Black and Latinx people are far more likely to test positive for, and to die from, COVID-19 than white people.[57]

      C.  <u>The Eviction Moratorium Has Helped Ameliorate the Pandemic's Racialized Harms.</u>

The eviction moratorium has had at least two positive effects. First, it prevents people who have lost their jobs from the further destabilization of losing their homes and all the costs and harmful effects that would follow. Second, it reduces the exposure to the virus that dislocation would otherwise cause, whether through: (1) the actual move itself; (2) entering homeless shelters that lack the ability to house all their residents in a safe manner during a pandemic, and either exposing or being exposed to the coronavirus in that setting; or (3) combining households with others who may be at risk of contracting COVID-19 by virtue of their status as an essential worker or otherwise. In this manner, the moratorium has helped prevent the racialized health effects of the pandemic from getting even worse.

## CONCLUSION

Connecticut's eviction moratorium is critical to protect the health of low-income communities, especially communities of color. Indeed, the eviction moratorium is necessary to

---

[55] Matt Hoffmann, *No Evictions for Renters, But Increased Risk During Pandemic*, Middletown News-Press, Apr. 6, 2020, *available at* https://www.newspressnow.com/coronavirus/no-evictions-for-renters-but-increased-risk-during-pandemic/article_ee1dc646-7814-11ea-b0c7-e726682830ce.html.

[56] Data Haven, *Towards Health Equity in Connecticut: The Role of Social Inequality & the Impact of COVID-19*, at 19 (June 2020), *available at* https://ctdatahaven.org/sites/ctdatahaven/files/DataHaven%20Health%20Equity%20Connecticut%20061820.pdf.

[57] Oppel, Jr., *supra* n.23.

ensure that Connecticut maintains the public health gains that it has worked so hard to achieve against this insidious virus. Accordingly, *amici* legal services programs respectfully request that this Court deny the Plaintiffs' request to enjoin Connecticut's eviction moratorium.

Respectfully submitted,

*/s/Giovanna Shay*

| | |
|---|---|
| Nilda R. Havrilla (Ct26528) | Giovanna Shay (Ct26702) |
| Mary Conklin (Ct07697) | Cecil J. Thomas (Ct27264) |
| Raphael L. Podolsky (Ct30960) | Greater Hartford Legal Aid |
| Connecticut Legal Services | 999 Asylum Ave., 3rd Fl. |
| 16 Main Street, 2nd Floor | Hartford, CT 06105-2465 |
| New Britain, CT 06051 | Ph (860) 541-5061 |
| Ph (860) 357-9311 | FAX # (860) 541-5050 |
| FAX # (860) 225-6105 | gshay@ghla.org |
| nhavrilla@ctlegal.org | cthomas@ghla.org |
| mconklin@ctlegal.org | |
| rpodolsky@ctlegal.org | |
| | |
| Shelley White (Ct05727) | Greg Kirschner (Ct26888) |
| Amy Eppler-Epstein (Ct01444) | Jeffrey Gentes (Ct28561) |
| New Haven Legal Assistance Association | Connecticut Fair Housing Center |
| 205 Orange St | 60 Popieluszko Ct. |
| New Haven, CT 06510 | Hartford, CT  06106 |
| Ph (203) 946-4811 | Ph (860) 247-4400 |
| swhite@nhlegal.org | greg@ctfairhousing.org |
| aeppler-epstein@nhlegal.org | jgentes@ctfairhousing.org |
| | |
| Liam Brennan (Ct27924) | Kathy Flaherty (Ct19344) |
| Darren Pruslow (Ct29089) | Kirk W. Lowry (Ct27850) |
| Connecticut Veterans Legal Center | Connecticut Legal Rights Project |
| 114 Boston Post Road, 2d floor | P.O. Box 351, Silver Street |
| West Haven, Connecticut 06516 | Middletown, CT 06457 |
| Ph (203) 903-2852 | Ph (860) 262-5033 |
| lbrennan@ctveteranslegal.org | kflaherty@clrp.org |
| dpruslow@ctveteranslegal.org | klowry@clrp.org |

J.L. Pottenger, Jr. (Ct05479)
Jeffrey Gentes (Ct28561)
The Housing Clinic of Jerome N. Frank Legal Services Organization,
Yale Law School
133 Wall St.
New Haven, CT 06511
Ph (203) 432-4800
j.pottenger@ylsclinics.org
*This brief does not necessarily represent the views of Yale Law School or Yale University*

*On the brief:* R. Elizabeth Rosenthal & Melissa Marichal, New Haven Legal Assistance Assoc.