# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AURACLE HOMES, LLC; FD MANAGEMENT, LLC; BUCKLEY FARMS, LLC; ORANGE CAPITOL, LLC; 216 EAST MAIN STREET MERIDEN, LLC; BD PROPERTY HOLDINGS, LLC; PRIME MANAGEMENT, LLC; AND, HABERFELD ENTERPRISES, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>NED LAMONT<br><br>    Defendant. | **Case No.** 3:20-cv-00829-VAB<br><br><br>JULY 17, 2020<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE, ISSUANCE OF A PRELIMINARY INJUNCTION** |

## INTRODUCTION

The Plaintiffs own their properties just as any homeowner owns their home. Owning property gives the Plaintiffs, and all property owners, certain property rights under Connecticut law, and under common law. When those rights are stripped from them without due process, and when their lawful expectations and use of their property are taken from them without just compensation – even temporarily – their constitutional rights have been violated.

Under an established set of legislatively enacted laws and regulations, the Plaintiffs invested their time and money into those properties to make them suitable to house people who were in need of housing, and who would pay to rent such properties. At the core of their relationship, and in reliance upon applicable laws, the Plaintiff landlords negotiated and contracted with tenants to provide the tenants with housing, in exchange for payment of rent. When the Defendant then unilaterally changed the terms of those contracts without the

1

Plaintiffs' consent, to the Plaintiffs' detriment, the Plaintiffs' constitutional rights were violated.

Notwithstanding the Defendant's argument to the contrary (Opp. Br. at 18), the Defendant's illegal orders effect a physical occupation of the Plaintiffs' properties. When the Defendant forces the Plaintiff to house people in the their properties for extended periods of time without paying the rent they contracted to pay, and forces the Plaintiffs to allow the tenants to accrue multiple months' worth of unpaid rent, the Plaintiffs' rights have been violated, no differently than if the government forced homeowners to suffer the burden of housing homeless people in their spare bedrooms for months, with nothing but the fleeting hope that those homeless people might one day pay for the months they had been housed.

Analogies to 1950s East Germany would be widely invoked if any governor, acting unilaterally and without any legislative oversight, imposed such a burden on the wider home owning public. But here, the Defendant expects the Plaintiffs to simply suck it up and keep quiet, when those same injuries are being imposed on those property owners who contract to provide housing to those who cannot afford to buy their own homes. The courts cannot ignore such constitutional violations based on the government's dismissive remarks that unwanted people occupying the Plaintiffs' property will still be obligated to "someday" and "somehow" pay in arrears the debts the Defendant's acts are permitting them to accrue. Common sense and human experience recognize that in a great many cases, those payments will simply never be made, and there has been no promise by the state to compensate the Plaintiffs for their losses.[1]

These violations would be bad enough if duly enacted through the legislative process,

---

[1] The Defendant argues that the Plaintiffs have "failed to plead" their taking claim because they did not cite any previous court decision that dealt with a similar set of facts. Yet simply because no plaintiff has before filed a takings claim against an out of control governor who has forced the plaintiff to house nonpaying persons in their properties, does not make the violation any less egregious.  There is a first-heard case for any constitutional violation.

which necessarily affords the people, including the Plaintiffs the opportunity to be heard prior to

the laws affecting their established rights being changed. However, when a single person, acting

under color of law but beyond the limits of his statutory and constitutional powers, unilaterally

decrees that one party to a duly negotiated contract must now also bear the burden of the other

party's contractual obligations, and must relinquish possession of their property rights, without

any realistic chance of recovering the expected benefits of the contract, and without any

possibility of accessing the housing courts to adjudicate the loss of their property rights, and the

violations of the contract rights, the federal courts must step in.

More frightening, however, is the Defendant's apparent view that his efforts to combat a

public health emergency put all constitutional rights at his own unchallengeable discretion. If the

Defendant is enabled to proclaim that anything he does in the name of public health is within

his absolute power, our "inalienable" constitutionally guaranteed rights become nothing but

tentative state-bestowed privileges revocable at the whim of any official who unilaterally declares

it in the public interest. To address a public health emergency, the Defendant's arguments would

sanction issuing warrants without probable cause, quartering soldiers during peacetime in houses

without the owners' consent, and inflicting cruel and unusual punishment. Our constitutional

principles cannot countenance such benevolent disregard.

The United States Constitution establishes unyieldable guardrails beyond which the

government may not and shall not venture, even with the best of motives. Our constitutional

system gives the government immense powers and authorities to act to protect the public in the

face of a public health crisis. Unilaterally changing state law to operate a substantial impairment

of Plaintiffs' contractual relationships, taking the Plaintiffs' property for public use without just

compensation, and closing the courts to the Plaintiffs to remedy the injuries to them and their

property without sale, denial or delay, are not among them.

Notwithstanding the Defendant's apparent best intentions, he has exceed the limits of his authority, and is violating the Plaintiff's constitutional rights. In such unique and troubling circumstances, preventing further irreparable injury falls to the federal courts.

## ELEVENTH AMENDMENT DOES NOT SHIELD THE DEFENDANT

The Defendant justifies his restrictions on the Plaintiffs' contract and property rights by alleging that his acts "prevent individuals from being evicted, becoming homeless and having to live in shelters, or having to double up on housing situations. Both outcomes are in direct contradiction to the health expert's advice to shelter in place and social distance." Opp. Br. at 15. But the Defendant's own actions belie that purported justification. The fact that "Executive Order 7DDD allows the plaintiffs to move forward with evictions for claims . . . [against] tenants who had not paid their rent prior to February 29, 2020," (Opp. Br. at 8, fn 14) shows that Defendant cannot justify his restrictions on the Plaintiffs' rights under the guise of keeping nonpaying tenants in their homes to protect against the Corona Virus.

Tenants who failed to pay rent prior to February 29, 2020 would be just as at risk as would tenants failing to pay rent after that date. Since the Defendant allows eviction actions against this one group of tenants, COVID-19 cannot possibly be the reason to continue preventing eviction actions against others. If the wheels of government can be turned for owners whose tenants failed to pay on February 29th, those wheels can surely turn to facilitate the only process afforded under state law for the Plaintiffs to legally exercise their fundamental constitutional rights regarding contracts with tenants who failed to pay rent on March 1st.

The Defendant argues that prospective injunctive relief is not available against him in his personal capacity because, he argues, he has no authority to provide such relief in his individual

capacity. Opp. Br. at 10. But here, Defendant is acting beyond the scope of his official capacity, but under color of law. Notwithstanding that he is exceeding his statutory and constitutional limitations, his *ultra virus* orders are being enforced by the Defendant's own subordinates as if the orders were officially authorized acts of the governor. The Plaintiffs seek an injunction ordering the Defendant to rescind the orders which exceeded his authority to issue.

The Defendant incorrectly invokes the Eleventh Amendment to the U.S. Constitution arguing, wrongly, that the Plaintiffs are seeking to adjudicate a violation of state law. Opp. Br. at 11. This, of course, is a red herring. The Plaintiffs have brought no claims seeking to adjudicate violations of state law. They are not asking this Court to "sit in judgment of whether a State or a State official has complied with its own law." *Id.* quoting *Dennehy v. Soto*, 2018 WL 4936003, at *2 (D. Conn. Oct. 11, 2018). Here, the Plaintiffs claim the Defendant has violated numerous provisions of the U.S. Constitution by taking actions that harm their constitutional rights without any legal authority to do so. The Plaintiffs claim that the Defendant's unilateral changes to state law effect injuries on Plaintiffs' rights, in violation of the United States Constitution. If the Defendant were correct in his argument,  our federal courts would be without jurisdiction over a claim that a police officer violated an unarmed suspect's constitutional rights by beating him on account of the color of the suspect's skin, because the federal court would ultimately have to decide if such horrific act conformed to state law. The fact that a federal court must determine the limits of the Defendant's statutory and constitutional authority in order to decide if the Defendant has exceeded those limits in violating the Plaintiff's constitutional rights, does not collide with Eleventh Amendment jurisdictional issues.

## *JACOBSON* DOES NOT SAVE DEFENDANT'S ARGUMENT

The Defendant waives *Jacobson v. Commonwealth of Mass*, 197 U.S. 11 (1905) as if it were a

magic wand, the mere presentation of which would vanquish all challenges to the government's

constitutional infringements. Fortunately for the people of this country, *Jacobson* wields no such

omnipotent power, and cannot be deployed to defend acts of direct violence against the

Plaintiffs' fundamental constitutional rights.

Admittedly, *Jacobson* has been cited to defend constitutional abuses in the past. However,

*Jacobson* itself makes clear that federal courts must enjoin the state's police power when it reaches

"beyond the necessity of the case, and, under the guise of exerting a police power…violate[s]

rights secured by the Constitution," "has no real or substantial relation to…protect[ing] the

public health, the public morals, or the public safety," or "is, beyond all question, a plain,

palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 28, 30. [2]

The fact that the Defendant is sanctioning evictions of tenants that failed to pay rent

prior to February 29, 2020, (Executive Order 7DDD) but not tenants that failed to pay rent

after that date, lays bare that the Defendant's restrictions have no substantial relation to

protecting public health or safety. Completely shutting down the housing courts, preventing the

adjudication of lawful eviction actions, compelling the Plaintiff to relinquish their security funds,

and even banning the non-litigation step of issuing notices to quit – none of which result in a

tenant being legally required to vacate the property – goes well "beyond the necessity of the

case," especially when tenants who defaulted prior to February 29, 2020 can be evicted in the

normal course. "[J]ust as constitutional rights have limits, so too does a state's power to issue

executive orders limiting such rights in times of emergency." *Robinson v. Attorney Gen.*, 957 F.3d

1171, 1179 (11th Cir. 2020). The restrictions on the Plaintiffs' rights have had no practical

---

[2] Importantly, *Jacobson* involved the challenge of a legislatively enacted state law. Here, in contrast, the Plaintiffs are challenging the unilateral edict of one man which explicitly suspends the state statutes duly enacted by the people's legislature specifically to protect the very constitutional rights now being violated by the Defendant. For that prospect, *Jacobson* offers the Defendant no comfort.

impact on the physical removal of any tenant from any property.[3]

Unlike here, the "law at issue in *Jacobson* did not expressly purport to interfere with rights secured by the Constitution." *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *4–5 (D. Kan. Apr. 18, 2020). Instead of alleging specific violations to specific constitutional rights secured by specific constitutional provisions as Plaintiffs here have done, the plaintiff in *Jacobson* claimed impairment of his generalized liberty interests under the Preamble and the Fourteenth Amendment. *Jacobson*, 197 U.S. at 29. In other words, the plaintiff in *Jacobson* did not even allege a specific constitutional violation, and after he failed to present any evidence or witnesses to support his case, the Court divined none from the sparse record before it.

Furthermore, the 115 year old *Jacobson* is no shining light of modern constitutional jurisprudence, having been decided long before the modern constitutional frameworks for analyzing many fundamental constitutional rights were established. Consequently, any reliance upon *Jacobson* must overcome the significant "challenge of reconciling century-old precedent with… more recent constitutional jurisprudence." *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 926 (6th Cir. 2020). [4]  In *Slatery*, the court affirmed with slight modification the preliminary injunction against the Tennessee Governor's Executive Order issued during COVID-19 pandemic requiring health care providers postpone abortions for three weeks. As requested here, the *Slatery* court refused to countenance "the notion that COVID-19 has somehow

---

[3] With no legal or factual predicate, the Defendant just throws out the statement that "Serving a Notice to Quit can result in a tenant leaving the property without any further action by the landlord." Opp. Br. at 28. The Defendant has presented no statistics, no testimony, and no support at all for this bald statement. Obviously, anything a landlord does "can result in a tenant leaving the property," including playing The Ramones at high volume, or stinking up the building by frying liver and onions. But there is no basis to infer that any significant number of tenants will vacate a property if they have no safe alternative housing options after simply receiving a notice to quit.

[4] Under modern constitutional jurisprudence developed since 1905, governmental actions ostensibly relying on *Jacobson* to negate fundamental constitutional rights would have little chance of surviving any reasonable level of modern scrutiny. See e.g., *Buck v. Bell*, 274 U.S. 200, 207 (1927) (relying on *Jacobson* to uphold the Virginia law mandating the forced sterilization of the "feeble minded.").

demoted [the Plaintiffs' constitutional rights] to second-class rights, enforceable against only the most extreme and outlandish violations. Such a notion is incompatible not only with *Jacobson*, but also with American constitutional law writ large." *Id.* at 927.

Our federal courts cannot fail to fulfill their constitutional role by rubber-stamping every state action taken in the name of public health. Where, as here, the government – by executive order, no less – reorders the expectations and obligations of contracts, compels relinquishment of bargained for security, compels the unconsented occupation of private property, and cuts off all access to the state courts and judicial process, the federal courts must step in.

The Defendant misses the point when arguing that "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." Opp. Br. at 11. The taking in this instance, perpetrated via executive beyond the Defendant's statutory powers, is <u>not</u> "duly authorized by law." In fact, the injuries the Defendant compels the Plaintiffs to suffer by his *ultra virus* acts are in direct contravention of law and both the U.S. and Connecticut Constitutions. While the Defendant would have the Court slice up Plaintiffs' claims into isolated buckets and handled separately, the Defendant's orders affect numerous interrelated rights that cannot be so easily compartmentalized. See, *Cobb v. Pozzi*, 363 F.3d 89, 105 (2d Cir.2003) (freedom of association claims interrelated and overlapping freedom of speech claims). The interaction between the takings and *ultra virus* claims here is a prime example.

Further, the Plaintiffs are not seeking prospective equitable relief to enjoin past takings or some speculative future taking. The Plaintiffs are suffering the Defendant's ongoing current orders right now, which is taking both the properties from under their feet, and the money out of their pockets. The Plaintiff landlords here simply seek help from the Court to limit the

ongoing bleeding. The Defendant has made it clear that he is relying on the delinquent tenants to eventually pay their past due rent. See Executive Order X (EXHIBIT A) at pg. 4. There is no indication the state will pay any of the tenant's debts - the Plaintiffs are simply trying to mitigate damage going forward. Of course the Plaintiffs can bring an action for the past taking(s), but here, since it is a continuing violation, the Plaintiffs are seeking injunctive relief to stop the ongoing damage.

## *ELMSFORD* **IS WHOLLY DISTINGUISHABLE**

The Defendant relies on *Elmsford Apt. Ass. V. Cuomo*, 2020 WL 3498456 (SDNY June 29, 2020) throughout his brief, as though it were at all analogous. It is not. Unlike the Defendant's orders, the initial order at issue in *Elmsford* curtailed only actual enforcement of eviction (actual removal of a tenant from the property): "There shall be no enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property through June 20, 2020."[5] This is materially different than the Executive Orders at issue here which precluded the service of notices to quit, the initiation of summary process actions, or the adjudication of eviction actions.

Through a subsequent Executive Order, Governor Cuomo did curtail initiation of eviction actions, but that limitation was specifically limited to tenants "eligible for [Unemployment Insurance] or benefits under state or federal law or otherwise facing financial hardship due to COVID-19."[6] It did not shut down the entire system as the Defendant did here.

Most critically, the orders at issue in *Elmsford* balanced limiting evictions with a moratorium on foreclosures against the landlords. The property owners in *Elmsford* were not at

---

[5] New York Governor Andrew M. Cuomo's Executive Order 202.8, of March 20, 2020 (EXHIBIT B).
[6] New York Governor Andrew M. Cuomo's Executive Order 202.28, of May 7, 2020 (EXHIBIT C).

risk of being foreclosed upon for failure to pay their mortgages under the governor's orders. In glaring contrast, the Defendant here has hung the Plaintiffs out to dry: enabling their tenants to withhold the Plaintiffs' only revenue source for up to five months with no realistic chance of recovering much of that money, while leaving the Plaintiffs at the mercy of their mortgage lenders with unrestricted ability to foreclose their mortgages if not paid on time and in full.

The Defendant misconstrues the Plaintiffs' takings claim as duplicative of their due process claim (Opp. Br. at 29) when the two are premised on two different directives affecting two different constitutional rights. The takings claim is premised, *inter alia*, on taking the Plaintiffs' property by compelling the Plaintiffs to relinquish their bargained for security and to house non-paying persons, while the due process claim is premised primarily on stripping the Plaintiffs of their constitutional right to access the courts, to issue notices to quit, initiate summary process actions, and their right to have their claims adjudicated.

The Defendant then makes the odd, and even scary, argument that any unilateral order he may make – without any input from the legislature – is immune from a due process challenge because he claims it is "legislative as opposed to adjudicative in nature . . . ." (Opp. Br. at 31). This argument should be flatly rejected for two reasons: first, because it would hand one person near monarchical power to rescind virtually any constitutional protection deemed procedural, and second, because the primary basis of the Plaintiffs' due process claim is that the Defendant, without statutory or constitutional authority, closed the courts to the Plaintiffs' claims in direct violation of the Connecticut Constitution. The Defendant cannot unilaterally eliminate the Plaintiffs' access to the court adjudicative process – in violation of the Connecticut Constitution and outside of his legal authority – and then claim the act is non-adjudicative in nature, and thus, immune from challenge. Conn. Gen. Stat. §§ 28-9 and 19a-131a give the Defendant tremendous

power, but they do not give him the power to unilaterally change the terms of duly executed

private contracts, or to bar the Plaintiffs from adjudicating the enforcement of those contracts.

**CONCLUSION**

The existence of a pandemic does not eliminate the existence of our Constitution.  Here,

the Defendant's actions, even if they are within the gambit of his authority, still inappropriately

violate the Constitutional rights of the Plaintiff landlords.  That being the case, the Plaintiffs

should be awarded preliminary relief, in accordance with their proposed order.

Dated: JULY 17, 2020                    Respectfully submitted,

> /s/ Craig C. Fishbein
> Craig C. Fishbein, Esq. (ct25142)
> FISHBEIN LAW FIRM, LLC
> 100 South Main Street
> P.O. Box 363
> Wallingford, Connecticut 06492
> Telephone: 203.265.2895
> Facsimile: 203.294.1396
> E-mail: ccf@fishbeinlaw.com

> /s/ Doug Dubitsky
> Doug Dubitsky, Esq.  (ct21558)
> LAW OFFICES OF DOUG DUBITSKY
> P.O. Box 70
> North Windham, CT 06256
> Telephone: 860.933.9495
> Facsimile: 866.477.1120
> Email: doug@lawyer.com

> /s/ Cara Christine Pavalock-D'Amato
> Cara Christine Pavalock-D'Amato, Esq. (ct29967)
> LAW OFFICE OF CARA C. PAVALOCK
> 17 Riverside Avenue
> Bristol, CT 06010
> Telephone: 754.444.8803
> Email: carapavalock@gmail.com

> Attorneys for the Plaintiffs

## **CERTIFICATION**

I hereby certify that, on this date, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


Dated: July 17, 2020                                  */s/Craig C. Fishbein*
                                                      Craig C. Fishbein, Esq.
                                                      (ct25142)
                                                      FISHBEIN LAW FIRM, LLC
                                                      100 South Main Street
                                                      P.O. Box 363
                                                      Wallingford, Connecticut 06492
                                                      Telephone: 203.265.2895
                                                      Facsimile: 203.294.1396
                                                      E-mail: ccf@fishbeinlaw.com
                                                      *Attorney for Plaintiff*

12