# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AURACLE HOMES, LLC; FD MANAGEMENT, LLC; BUCKLEY FARMS, LLC; ORANGE CAPITOL, LLC; 216 EAST MAIN STREET MERIDEN, LLC; BD PROPERTY HOLDINGS, LLC; PRIME MANAGEMENT, LLC; AND, HABERFELD ENTERPRISES, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>NED LAMONT<br><br>    Defendant. | **Case No.** 3:20-cv-00829-VAB<br><br>AUGUST 5, 2020<br><br>**PLAINTIFFS' RESPONSE TO BRIEF OF AMICI CURIAE** |

    Amici are all organizations that seek to keep tenants from being evicted, payment of rent or not, COVID or not. They write passionately about "Connecticut's long history of racial segregation in housing" although segregation and Connecticut's sordid history have no bearing on the Plaintiff's 42 USC § 1983 claims that the Defendant's actions have violated their constitutional rights.

    The Plaintiffs deeply empathize with any individual or group that has been historically excluded or denied housing due to their race, religion, national origin or sexual orientation. Such discrimination is abhorrent and rightly illegal. The Amici will get no argument from the Plaintiffs on that account. In that respect, the Plaintiffs are the good guys here, investing their money and risking their livelihoods to provide clean and reasonably priced housing, in decent neighborhoods to those who seek it, regardless of race, religion, national origin or sexual orientation. The unconstitutional infringement on their rights to contract with people of all

1

races, religions, national origins and sexual orientations is making it far harder for the Plaintiffs to help alleviate the very housing shortages about which the Amici complain. The Amici do an excellent job of describing the problem. Unfortunately, their proposed solution of forcing the Plaintiffs to let their properties without compensation will, and already is, making that very problem even worse, while at the same time, compounding the unconstitutional injuries the Defendant's conduct is causing the Plaintiffs.

The Amici erect a straw man they passionately pray the Court not to topple: that being the full and unconditional return of all housing court procedures, including in-person morning housing court calendar calls, to pre-COVID ways. Neither the Plaintiffs, nor common sense, argue for such thoughtless abandonment of safe and deliberate court operations. The Plaintiffs have not prayed for any such relief. Instead, the Plaintiffs ask this Court to recognize the existence of a middle ground between the unconstitutional complete closure of the housing courts, and the crowded and chaotic cattle calls typical of the pre-COVID era.

Numerous state and federal courts across Connecticut and across the nation, including this very Court, have found responsible and effective ways to keep the judiciary's constitutionally-mandated business moving, albeit more slowly than normal, without putting the parties or court personnel at risk. Every Walmart, Home Depot, Tractor Supply, Pets-Mart and Bob's Discount Furniture in the state has done it. Connecticut's housing courts can, and constitutionally must, do so as well. Access to flat screen TVs, vertical blinds, hydraulic fluid, chewy toys and overstuffed chairs is not a constitutional right. Access to the courts to adjudicate the terms of private contracts is. The Plaintiffs have asked this Court for no more. Due process, the Contracts Clause of the U.S. Constitution, and Art. First, Sec. 10 of the Connecticut Constitution require the Defendant to afford the Plaintiffs no less.

And to be clear, it is the Defendant, not the Judicial Branch, who closed the courts to the Plaintiffs and is keeping them closed. The Judicial Branch has no power or authority to order the housing courts closed, or that eviction actions be suspended.. Instead, its only option is to rely on the Defendant's executive orders.

In fact, when Chief Administrative Judge Patrick Carroll addressed the Judicial Branch Rules Committee on March 29, 2020, he specifically stated that when the Judicial Branch wanted to "shrink [its] footprint" and reduce its operations, it had to "persuade the governor to issue [its] requested emergency order . . . ." Transcript of March 29, 2020 Rules Committee Telephonic Meeting at 5-6, attached as Exh. A.

Additionally, on its web site, the Judicial Branch confirmed that eviction actions were shut down pursuant to the Defendant's executive orders, not on the Judicial Branch's own authority. See July 1, 2020 notice from Judicial Branch, posted on its web site https://www.jud.ct.gov/HomePDFs/Jud_Expands_Court_Ops.pdf, attached as Exh. B. ("Pursuant to the Governor's Executive Order extending the residential eviction moratorium to Aug. 25, residential eviction matters are not currently being processed by the courts.") Clearly the Judicial Branch recognizes the fact that it could not have undertaken its actions to close the housing courts absent the Defendant's Executive Order 7G. Therefore it sought such an order, and acted therefrom.

The Amici argue that "[t]he federal moratorium demonstrates the propriety of the Governor's response to the pandemic" (Amici Br. at 14) when it demonstrates the exact opposite. In cases that qualify, the federal moratorium affords relief to both tenants and landlords – both sides of the contractual agreement. Here, the Defendant's orders relieve the obligations of the tenant side of the contract, while leaving the landlords to the mercy of their

mortgage holders. Being "largely coextensive with the federal moratorium" (Amici Br. at 4) affords the Plaintiffs no relief from the Defendant's constitutional violations. The CARES Act, 15 U.S.C. § 9058 not only suspends tenant's rental obligations, but correspondingly suspends landlords' covered mortgage payment obligations. Reducing the landlord's income, it also reduces the landlord's overhead. In stark contrast, the Defendant's orders here cut off the Plaintiffs' means of paying the landlord's mortgage obligations which continue unabated.

That the rent moratorium imposed by the Defendant "does not absolve tenants of their obligation to pay rent" (Amici Br. at 4) is no comfort to the Plaintiffs who will be forced to initiate collection actions against non-paying tenants, many of whom will move out leaving many months' rent past due and owing. Coupled with the backlog of cases precipitated and compounded by the Defendant's court closure order, in the unlikely event the Plaintiffs ever recover a penny from any delinquent tenant, it will likely not be for many months or even years. During the entire time, the Plaintiffs are still required to pay the mortgages on the properties they must still maintain for the benefit of tenants who are not upholding their end of the contract, and likely never will.

There is no doubt the state has suffered large unemployment increases due to the Defendant's mandated shutdown. Many small businesses across the state which the Defendant ordered to close will never reopen, leaving their owners and employee alike without a livelihood. That suffering has not bypassed the Plaintiffs, whose compelled lack of rental income has forced some of the Plaintiffs to lay off employees, and others to stop hiring contractors. Without relief from the Court, the Plaintiff themselves will eventually succumb to the Defendant's orders, be unable to pay their bills, to maintain their properties, or even to feed their families. The Amici are right to describe the pain and anguish the people of this state are suffering under the

Defendant's unilateral orders. The Amici are wrong to imply that the Plaintiffs have escaped that suffering, and that they should be compelled to somehow endure it for the benefit of those who occupy their properties.

The Amici write of the problems suffered by those ineligible for unemployment insurance without acknowledging that, as small business owners, the Plaintiffs themselves are ineligible for UI coverage. Amici Br. at 6. Nor do any of them receive the "$600-per-week lifeline" from the federal government. *Id.* Under the Defendant's orders, the Plaintiffs' tenants were not even required to provide any evidence that their incomes had been adversely affected by the Defendant's shutdown to invoke the Defendant's rent moratorium or to demand the Plaintiffs apply part of the security funds to the tenants' rent. Indeed, there is nothing in the record to establish that any of the Plaintiffs' tenants have lost a job, lost a business, were unable to pay the agreed-to rent, or actually suffered any financial diminution at all.

What is in the record, however, is evidence that two of 216 East Main Street Meriden LLC's tenants, and one of Haberfeld Enterprises, LLC's tenants had not paid rent for months prior to the Defendant ordered the courts closed, prior to the Defendant banning notices to quit, and prior to the Defendant making it literally impossible for the Plaintiffs to have their lawful contract claims against those tenants adjudicated. Of course, every person and situation is different, and the situation of each individual person must be taken under consideration on a case-by-case basis by the housing court. Keeping the courts closed to all cases, regardless of individual situation, only exacerbates the crisis by piling up huge numbers of cases that will overwhelm the courts, drastically delay proper adjudication, and put the Plaintiffs at heightened risk of foreclosure and bankruptcy.

The Amici correctly state that "Connecticut had an eviction crisis before the pandemic

struck." Amici Br. at 7. Yet, their ill-advised solution would create an enormous backlog of cases that will clog the housing courts for months or years to come. Notwithstanding the constitutional mandate to keep the courts open to adjudicate private contract disputes, basic principles of due process and equal protection require that the courts must be open to move cases to timely resolution to avoid an even larger and wider housing crisis. The solution cannot be to unconstitutionally prevent the Plaintiffs from accessing the courts. The solution is to allow housing court judges to exercise their statutory discretion to consider each case's individual circumstances and, where appropriate, to stay execution of eviction or to order such other appropriate relief in appropriate cases. Allowing the Defendant's order to stand, unconstitutionally places the entire burden of Connecticut's long-standing "eviction crisis" squarely on the backs of that small subset of landlords, like the Plaintiffs, who are not eligible for any state or federal relief whatsoever.

The Amici warn of an impending "wave of evictions in the pandemic" (Amici Br. at 6) while arguing to make that impending wave far larger. The longer the Defendant's moratorium is allowed to remain in effect, the greater the backlog of cases to adjudicate, and the larger the surge will be when the levy eventually breaches. Like the foreclosure crisis of the early 2000s, it will necessarily take years for the courts to work through such a backlog. However, unlike the mega-banks involved in the foreclosure crisis, small landlords like the Plaintiffs will be crushed, and ruined if compelled to suffer so long with little or no income to pay their mortgages, their insurance and building maintenance, not to mention feeding their families. The Contracts Clause, Due Process Clause and Art. First, Sec. 10 of the Connecticut Constitution are there to protect the Plaintiffs from this exact type of state-imposed nightmare.

Since the number of units not covered by the federal moratorium is but a small subset of

all rental housing (Amici Br. at 12-13), opening Connecticut's housing courts now only to those uncovered properties, like those at issue in this action, would actually allow the courts to slowly and safely restart operations with a limited group of cases. This would afford the Plaintiffs their constitutional rights, avoid the parade of horribles against which the Amici argue, and help shrink the impending wave of cases by limiting the growing backlog behind the levy. Affording the Plaintiffs the temporary relief they seek would act as a flood prevention mechanism by limiting the build-up of pressure on the system, so long as that relief valve is opened quickly.

The Amici have failed to provide a scintilla of support for the Defendant's order banning Notices to Quit. A Notice to Quit is not even a legal action. It is merely an administrative prerequisite to a landlord initiating a legal action. One would imagine if any factual support at all existed for the Defendant's bald statement that "[s]erving a Notice to Quit can result in a tenant leaving the property without any further action by the landlord," the fifteen attorneys representing seven different nonprofit legal service organizations would have been able to find it. See Defendant's Opp. Br. at 28; Plaintiff's Reply Br. at 7, fn 3).

The uncontested fact is that neither a Notice to Quit, nor the initiation of a summary process action, nor even a judgment for possession, results in a tenant being obligated to vacate a property. In Connecticut, only an Order of Execution has that force of law, and housing courts already have broad discretion to stay such orders, or even refuse to issue them in the first place, based on the individual circumstances of any given tenant. If the Defendant wished housing court judges had more or less such discretion, he was within his legal authority to make it so under his emergency powers. The Defendant does not, however, have the legal authority, even under his emergency powers, to completely close the courts to the Plaintiffs or to flat out ban the Plaintiffs from any and all process to initiate housing court actions or to have their

7

claims adjudicated. Clearly, the Defendant has gone too far, and this Court must step in to protect the Plaintiffs' constitutional rights.

The Amici argue that this Court should give the state time to implement a housing assistance program announced on June 29, 2020. Amici Br. at 9-10. The Amici cite to a news story carried by NBC Connecticut about a June 29, 2020 announcement by the Defendant. Amici Br. at 9, fn 27. However, there is nothing in the record to indicate that any such program has ever actually been initiated, or that, if in effect, would give the Plaintiffs any relief from their constitutional injuries.[1] Further, the program announced on June 29, 2020 would not even apply to the Plaintiffs or their tenants because tenants are only eligible to participate in the program if they have "paid rent in full up to the date of application." See Dept. of Housing's Temporary Rental Housing Assistance Program description, attached as Exh. C.[2]

But none of the tenants at issue in this action are current on their rent. If they were current on their rent, the Plaintiffs would not be seeking to have them evicted and the Plaintiffs would not have been injured by the Defendant's orders. Therefore, additional delay will only further injure the Plaintiffs, without any possibility that the program will help them or their tenants, even if the program is fully implemented.

---

[1] The Amici claim "[t]hese programs were launched July 15, 2020 . . ." without any citation. A review of the Connecticut Dept. of Housing's web site shows no such new program, only its regular Rental Assistance Program (RAP) which '[b]ecause the demand for housing assistance always exceeds the limited funds available, long waiting periods are common." https://portal.ct.gov/DOH/DOH/Programs/Rental-Assistance-Program. Further, based on the strict eligibility requirements of the program, neither the Plaintiffs nor their tenants would likely qualify even if they were allowed to apply. *Id.* ("DOH's RAP waitlist is currently closed. Please register at cthcvp.org to be notified when the RAP opens its waiting list.").

[2] Although the document states that it is five pages long, the only version on the Connecticut Department of Housing's website is just three pages long.

8

Virtually every retail store, restaurant, auto repair shop, hair & nail salon, dog kennel, insurance office, law firm, and medical practice in the state has figured out ways to safely keep business moving with revised procedures during the pandemic. Even Post Offices, Town Halls and state agencies have found ways to keep the wheels of government turning without putting their staffs or the public at risk. It defies credulity that the housing courts are inherently incapable of doing the same, even under revised procedures and a severely limited caseload.

The Amici oddly argue that Connecticut courts are incapable of determining which cases are subject to the federal moratorium and which are not. Amici Br. at 14. But this is precisely what courts do; they look at the facts of each case, determine if prerequisites to the court's jurisdiction exist, determine if the party with the burden of proof on any given issue has met that burden, and rule on whether or not the court has jurisdiction to adjudicate the claims. Establishing to the court's satisfaction that a given case is not subject to the federal moratorium would be the Plaintiff's burden to prove subject matter jurisdiction. This is nothing new or novel, and is not affected in the least by COVID-19. It is what happens day in and day out in courts across the nation. It simply makes no rational sense for the Amici to argue the Connecticut housing courts lack that capacity.

The Amici are rightfully concerned that "[t]hirty-one percent of Black renters and forty-three percent of Latinx renters recently told the Census Bureau they were facing housing instability as a result of the pandemic as compared to only sixteen percent of white renters." Amici Br. at 17. The Plaintiff's share the Amici's concern, and have devoted their businesses to making safe, clean and reasonably-priced housing available to people in decent neighborhoods regardless of race, religion, national origin or sexual orientation. As housing providers, the Plaintiffs understand that allowing the Defendant's orders to remain in effect will greatly

exacerbate this problem by forcing property owners into foreclosure and bankruptcy, and by making it far more difficult – and therefore, less likely – for small property owners like the Plaintiffs to make housing stock available to those who need it.

While the Amici clearly write from the heart, they seek a course that will invariably lead to severe consequences they don't appear to have anticipated, both for the Plaintiff's constitutional rights, and for the low-income families of color the Amici would hope to protect. Temporarily enjoining the Defendant from keeping the courts closed to the Plaintiffs, and from prohibiting the Plaintiffs from initiating and adjudicating their private contract claims is the best way to ensure a healthy and abundant housing market to serve the people of this state, specifically including families of color.

Dated: AUGUST 5, 2020               Respectfully submitted,

    /s/ Craig C. Fishbein
Craig C. Fishbein, Esq. (ct25142)
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
E-mail: ccf@fishbeinlaw.com

    /s/ Doug Dubitsky
Doug Dubitsky, Esq.  (ct21558)
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Email: doug@lawyer.com

    /s/ Cara Christine Pavalock-D'Amato
Cara Christine Pavalock-D'Amato, Esq. (ct29967)
LAW OFFICE OF CARA C. PAVALOCK
17 Riverside Avenue
Bristol, CT 06010
Email: carapavalock@gmail.com

Attorneys for the Plaintiffs

## **CERTIFICATION**

I hereby certify that, on this date, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: AUGUST 5, 2020			/s/ *Craig C. Fishbein*
						Craig C. Fishbein, Esq.
						(ct25142)
						FISHBEIN LAW FIRM, LLC
						100 South Main Street
						P.O. Box 363
						Wallingford, Connecticut 06492
						Telephone: 203.265.2895
						Facsimile: 203.294.1396
						E-mail: ccf@fishbeinlaw.com
						*Attorney for Plaintiff*