UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AURACLE HOMES, LLC, *et al.*,<br>        *Plaintiffs*,<br><br>    v.<br><br>NED LAMONT, GOVERNOR OF<br>CONNECTICUT,<br>        *Defendant*. | No. 3:20-cv-00829 (VAB) |

**RULING AND ORDER ON MOTION FOR EMERGENCY TEMPORARY
RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

Auracle Homes, LLC; Buckley Farms, LLC; Orange Capitol, LLC; 216 East Main Street

Meriden, LLC; BD Property Holdings, LLC; Prime Management, LLC; and Haberfeld

Enterprises, LLC (collectively "Plaintiffs") are residential landlords; and they have sued Ned

Lamont, the Governor of the State of Connecticut ("Defendant") over several executive orders

issued to address the novel coronavirus known as COVID-19[1]: specifically, certain sections of

Executive Order Nos. 7G, 7X, and 7DD (collectively, the "Executive Orders").[2]

These Executive Orders seek to temporarily limit the ability of residential landlords to

initiate eviction proceedings against tenants and allow tenants to apply security deposit funds to

past due rents, provided the security deposit amount exceeds the value of one month's rent.

---

[1] As of today, over four and a half million Americans are known to have contracted COVID-19 and more than 155,000 Americans have died from the disease. *See Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, CENTERS FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Aug. 5, 2020). These numbers are steadily increasing, and they have increased significantly since the filing of this lawsuit on June 16, 2020. *Id.*

[2] The State of Connecticut has over 50,000 cases and 4,437 deaths. Although still increasing, the reported cases in Connecticut are much lower than most states. *See Connecticut COVID-19 Data Trackers*, CT.GOV, https://portal.ct.gov/Coronavirus/COVID-19-Data-Tracker (last visited Aug. 5, 2020).

Plaintiffs seek a temporary restraining order or preliminary injunction, alleging that Governor Lamont's Executive Orders violate their rights under the U.S. Constitution's Equal Protection Clause, Contracts Clause, Due Process Clause, and Takings Clause; and they allege that the Executive Orders are *ultra vires*.

For the reasons that follow, their motion is **DENIED**.

## I.      BACKGROUND

### A.  Factual Findings Related to Connecticut's Response to COVID-19 and the Challenged Executive Orders

On July 22, 2020, the Court conducted a hearing on Plaintiffs' motion for a preliminary injunction. As a result of the parties' written submissions[3] and oral arguments, the Court finds the following:

Connecticut General Statutes §§ 47a-1 through 47a-74 address landlord-tenant relations in Connecticut. In Connecticut, a lease can provide for the payment of money (or "rent") by the tenant to the landlord; absent a lease, a landlord and a tenant can also agree on a rent for a tenancy. Joint Stip. of Facts ¶¶ 3–4, ECF No. 33 (July 19, 2020) ("Joint Stip. Facts").

If the tenant fails to pay the rent, the landlord may terminate the tenancy and regain possession of the property by following established procedures. *Id.* ¶ 5. Under Connecticut General Statutes § 47a-15a, the landlord may serve a Notice to Quit Possession, which is followed by a summary process eviction action under Connecticut General Statutes § 47a-23 *et*

---

[3] All information is obtained from the Amended Complaint, documents incorporated by reference therein, or the Joint Stipulated Facts. *See* Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Roth v. CitiMortgage Inc*., 756 F.3d 178, 180 (2d Cir. 2014) (consideration of a complaint is limited "to the factual allegations in [the] . . . complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

*seq. Id.* ¶ 6. The landlord is subject to significant penalty for failing to follow the statutory eviction process to dispossess the tenant. *Id* ¶ 7.

On March 10, 2020, under the statutory authority granted to him by Connecticut General Statutes §§ 19a-131a and 28-9, Governor Lamont issued a declaration of public health and civil preparedness emergencies, and proclaimed a state of emergency due to the COVID-19 outbreak in the United States and Connecticut. *Id.* ¶ 11. Among the powers of the Governor under section 28-9 is the power to "modify or suspend in whole or in part, by order as hereinafter provided, any statute . . . whenever the Governor finds such statute . . . is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health." Conn. Gen. Stat. § 28-9(b)(1).

Since his declaration and proclamation, Governor Lamont has issued over sixty executive orders aimed at reducing the threat of COVID-19 to Connecticut.[4] At issue here are Executive Orders 7G, 7X, and 7DDD. On March 19, 2020, Governor Lamont issued Executive Order 7G, which suspended non-critical court operations and associated requirements. Joint Stip. Facts ¶ 13. On March 20, 2020, Governor Lamont issued Executive Order 7H, which ordered all non-essential businesses to either close or work from home. *Id.* ¶ 14. As a result, Connecticut's unemployment rate increased significantly from 3.8% in February to 9.8% in June.[5]

---

[4] All of the Executive Orders are accessible on the website for the State of Connecticut, of which the Court takes judicial notice. *See generally Governor Lamont's Executive Orders*, CT.GOV, https://portal.ct.gov/Office-of-the-Governor/Governors-Actions/Executive-Orders/Governor-Lamonts-Executive-Orders?page=1 (last visited Aug. 3, 2020); *see also* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[5] The Connecticut Department of Labor states that the "Connecticut unemployment rate continues to be underestimated due to challenges encountered in the collection of data," but "estimates the unemployment rate to be in the range of 16–17 % for the Mid-June period," a slight decline from May. *State of Connecticut v. U.S. Unemployment Rate*, CONNECTICUT DEPARTMENT OF LABOR, https://www1.ctdol.state.ct.us/lmi/unemprateCTUS.asp (last visited Aug. 3, 2020).

On March 27, 2020, the President of the United States signed the Coronavirus Aid, Relief and Economic Security act ("CARES"), which provided numerous forms of relief to affected industries and individuals. Joint Stip. Facts ¶ 15. The CARES Act also included protections for renters and homeowners, including a prohibition against new eviction cases filed by housing providers who participate in certain federal housing rental programs on the basis of nonpayment of rent. 15 U.S.C. §§ 9056–58. Under 15 U.S.C. § 9056(b), homeowners with a "federally backed mortgage loan" may seek a 180-day forbearance on their loan, with an additional 180-day extension at the homeowner's request. Section 9056(c) placed a sixty-day foreclosure moratorium on services of federally backed mortgage loans beginning on March 18, 2020. 15 U.S.C. § 9056(c). On June 17, 2020, the Federal Housing Administration extended this moratorium until August 31, 2020.[6] Similar protections are available for multifamily borrowers. 15 U.S.C. § 9057(a) ("During the covered period, a multifamily borrower with a Federally backed multifamily mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID-19 emergency may request a forbearance under the terms set forth in this section.").

On March 31, 2020, Governor Lamont announced an agreement with over fifty Connecticut credit unions and banks to offer up to ninety days of mortgage-payment forbearance, with no late fees, new foreclosure sales, or evictions for ninety days. Press Release, Office of Gov'r Ned Lamont, Governor Lamont Announces Mortgage Payment Relief During COVID-19 Crisis (Mar. 31, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-2020/Governor-Lamont-Announces-Mortgage-Payment-Relief-During-

---

[6] Press Release, Dep't of Hous. & Urban Dev., FHA Extends Foreclosure and Eviction Moratorium for Single Family Homeowners for Add'l Two Months (June 17, 2020), https://www.hud.gov/press/press_releases_media_advisories/HUD_No_20_081.

COVID19-Crisis. This agreement with most banks and credit unions was recently extended to apply until July 30, 2020.[7]

On April 10, 2020, Governor Lamont issued Executive Order 7X,[8] which included numerous protections for residential renters impacted by COVID-19 for the duration of the declared public health and civil preparedness emergencies. Joint Stip. Facts ¶ 16. As relevant to this case, Executive Order 7X included the following provisions:

- Connecticut General Statutes § 47a-23 is modified to additionally provide that neither landlords of residential dwelling units nor their legal representatives could deliver a notice to quit or serve/return a summary process action for nonpayment of rent for any reason before July 1, 2020, "except for serious nuisance as defined in section 47a-15 of the Connecticut General Statutes." *Id*. ¶ 16(a).

- Connecticut General Statutes § 47a-15a is modified to additionally provide an automatic sixty-day grace period for April rent, as well as a sixty-day grace period for May rent upon request. *Id*. ¶ 16(b)–(c).

- Renters who had paid a security deposit greater than one month's rent could apply the additional security deposit over one month's rent to any rent due for April, May, or June. Specifically, Connecticut General Statutes § 47a-21 is modified to additionally provide:

> (m) Upon the written request of a tenant of a dwelling unit who is not enrolled in the security deposit guarantee program established by the Commissioner of Housing pursuant to Section 8-339 of the Connecticut General Statutes, who has paid a security deposit in an amount that exceeds one month's rent, and who provides written

---

[7] *Governor Lamont and Banking Commissioner Perez Announce 60-Day Extension to Mortgage Relief Program* CT.gov (June 4, 2020), https://portal.ct.gov/DOB/Newsroom/2020/CT-Mortgage-Relief-Program-Extended.

[8] *Executive Order No. 7X: Protection of Public Health and Safety During COVID-19 Pandemic and Response – Renter Protections, Extended Class Cancellation and Other Safety Measures, Educator Certification, Food Trucks for Truckers*, CT.GOV, https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7X.pdf (last visited July 17, 2020).

> notice, including but not limited to in written electronic communication, that he or she has become fully or partially unemployed or otherwise sustained a significant loss in revenue or increase in expenses as a result of the COVID-19 pandemic, a landlord of such unit shall withdraw an amount of said deposit equal to the amount in excess of one month's rent from an escrow account and apply it toward the rent due in April, May, or June 2020. Notwithstanding subsection (h) of this section, an escrow agent may withdraw funds from an escrow account to comply with such a request. The amount withdrawn by the escrow agent and applied toward the rent due shall no longer be considered an amount of the security deposit for any purpose, including but not limited to the calculation of interest, assignment to successor, and the payment of security deposit and interest at the termination of a tenancy. Notwithstanding subsection (b) of this section, no landlord who has complied with such a request may demand the security deposit be restored to an amount that exceeds one month's rent earlier than the later of the end of the public health and civil preparedness emergency declared on March 10, 2020, including any period of extension or renewal of such emergency, or the date the rental agreement is extended or renewed.

*Id*. ¶ 16(d).

On June 29, 2020, Governor Lamont issued Executive Order 7DDD,[9] which extended protections for residential renters impacted by COVID-19. *Id*. ¶ 27. As relevant to this case, Executive Order 7DD included the following provisions:

- Connecticut General Statutes § 47a-23 is modified to additionally provide that neither landlords of residential dwelling units nor their legal representatives could deliver a notice to quit or serve/return a summary process action for nonpayment of rent for any reason before August 22, 2020, "except for nonpayment of rent due on or prior to February 29, 2020 or for serious nuisance[]." *Id*.

---

[9] *Executive Order No. 7DDD: Protection of Public Health and Safety During COVID-19 Pandemic and Response – Extension of Eviction Moratorium and Administrative Deadlines* (June 29, 2020), CT.GOV, https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7DDD.pdf.

- Connecticut General Statutes § 47a-21 is modified to additionally provide:

> (m) Upon the written request of a tenant of a dwelling unit who is not enrolled in the security deposit guarantee program established by the Commissioner of Housing pursuant to Section 8-339 of the Connecticut General Statutes, who has paid a security deposit in an amount that exceeds one month's rent, and who provides written notice, including but not limited to in written electronic communication, that he or she has become fully or partially unemployed or otherwise sustained a significant loss in revenue or increase in expenses as a result of the COVID-19 pandemic, a landlord of such unit shall withdraw an amount of said deposit equal to the amount in excess of one month's rent from an escrow account and apply it toward the rent due in April, May, or June, July or August 2020. Notwithstanding subsection (h) of this section, an escrow agent may withdraw funds from an escrow account to comply with such a request. The amount withdrawn by the escrow agent and applied toward the rent due shall no longer be considered an amount of the security deposit for any purpose, including but not limited to the calculation of interest, assignment to successor, and the payment of security deposit and interest at the termination of a tenancy. Notwithstanding subsection (b) of this section, no landlord who has complied with such a request may demand the security deposit be restored to an amount that exceeds one month's rent earlier than the later of the end of the public health and civil preparedness emergency declared on March 10, 2020, including any period of extension or renewal of such emergency, or the date the rental agreement is extended or renewed.

*See id.* ¶¶ 16(d), 27. Executive Order 7DDD further stated, as did Executive Order 7X: "[N]othing in this order shall relieve a tenant of liability for unpaid rent or of the obligation to comply with other terms of a rental agreement or statutory obligations pursuant to Connecticut law," and "nothing in this order shall relieve a landlord of the obligation to comply with a rental agreement or statutory obligations pursuant to Connecticut law." *Id.* ¶ 16(e).

On the same day, Governor Lamont also announced "a comprehensive plan to put more than $33 million in state and federal resources to work providing emergency assistance to renters, homeowners, and residential landlords impacted by the COVID-19 public health emergency." Press Release, Office of Gov'r Ned Lamont, Governor Lamont Announces

Assistance for Renters, Homeowners, and Residential Landlords Impacted by COVID-19

Emergency (June 29, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-

Releases/2020/06-2020/Governor-Lamont-Announces-Assistance-for-Renters-Homeowners-

and-Residential-Landlords. In the same press release announcing this plan, Social Services

Commissioner and Acting Public Health Commissioner Deidre Gifford issued the following

statement:

> When people lose their housing, they may be forced to resort to
> living in doubled-up situations or to enter homeless shelters. Science
> is clear that denser housing conditions and less ability to socially
> distance mean a greater risk to these individuals and families, and to
> their communities, of catching and spreading the COVID virus.
> Helping Connecticut residents stay housed is an important part of
> our public health response.

*Id.* The plan includes providing $10 million in rental assistance payments "to landlords on behalf

of approved tenant applicants, with a priority on lower-income households who have been denied

unemployment insurance." *Id.*

The Judicial Branch of the State of Connecticut also has independently suspended all

evictions until September 1, 2020. *See* Order by Chief Administrative Judge for Civil Matters

(Conn. Super. Ct. Apr. 23, 2020) (ordering "an immediate stay of the service of all issued

executions on evictions and ejectments through June 1, 2020" (emphasis omitted)),

https://jud.ct.gov/HomePDFs/execution_61.pdf; Order by Chief Administrative Judge for Civil

Matters (Conn. Super. Ct. June 9, 2020) (ordering "an immediate stay of the service of all issued

executions on evictions and ejectments through August 1, 2020" (emphasis omitted)),

https://jud.ct.gov/HomePDFs/ExecutionStayAug1.pdf; Order by Chief Administrative Judge for

Civil Matters (Conn. Super. Ct. July 20, 2020) (ordering "an immediate stay of the service of all

issued executions on evictions and ejectments through September 1, 2020" (emphasis omitted)),
https://jud.ct.gov/HomePDFs/ExecutionStaySeptember.pdf.

Plaintiffs are limited liability companies and owners of residential real property located in
various Connecticut cities, with written lease agreements with at least one tenant. Am. Compl. ¶¶
10–15; *see also* Joint Stip. Facts ¶¶ 17–26. Plaintiffs are landlords of residential properties that
have not received rent for either at least one month before March or March and after. *Id.* ¶¶ 28–
35. Plaintiffs have been "forced to relinquish a portion of their legally retained security deposit"
for tenants requesting to use the security deposit for rent owned for May and/or June. *Id.* ¶ 36.

Plaintiffs allege that the "Legislature has provided no findings or declarations to support
any legitimate government interest for permitting the commercial eviction process while totally
halting the residential eviction process." *Id.* ¶ 38.

### B.  Procedural History

On June 16, 2020, Plaintiffs filed their Complaint against Governor Lamont. Compl.,
ECF No. 1 (June 16, 2020). On the same day, they also filed their emergency motion for a
temporary restraining order or, alternatively, the issuance of a preliminary injunction. Pls.' Mot.
for Emergency Temporary Restraining Order, or, in the Alternative, Issuance of a Preliminary
Injunction, ECF No. 2 (June 16, 2020) ("Pls.' Mot."); Mem. of Law in Supp. of Pls.' Mot., ECF
No. 3 (June 16, 2020) ("Pls.' Mem.").

Plaintiffs seek to enjoin the enforcement of the challenged measures in Executive Orders
7G and 7X (and later 7DDD) for "depriv[ing] the Plaintiffs of their Constitutional right to private
contract, right to due process of law, right to equal protection under the law, and right against
having their property taken for public use without just compensation." Pls.' Mot. at 1. They
further allege that the relevant portions of Executive Order 7X (and later 7DDD) are "outside the

scope of the Defendant's constitutional and statutory authority, and are therefore *ultra vires.*" *Id.*

at 1–2. Plaintiffs seek the issuance of a preliminary injunction as follows:

> 1. The Defendant and all governmental agencies, departments, political subdivisions, under the Defendants' authority or direction, are hereby restrained, are enjoined and prohibited from taking any action to enforce Executive Order 7X to sanction, charge, punish or penalize any Landlord for failing or refusing to follow or abide by such Executive Order.
>
> 2. The Defendant shall issue Executive Orders which modify Executive Orders 7G and 7X so as to provide the Plaintiffs and those like them a process under which to issue Notices to Quit, to initiate and pursue summary process eviction actions, and to proceed with execution of eviction judgments.
>
> 3. The Defendant shall issue Executive Orders which repeal the remaining portions of Executive Order 7G and 7X that are outside the scope of the legal authority of the Defendant Governor.

Proposed Order Regarding Pls.' Mot., ECF No. 4 (June 16, 2020).

Plaintiffs assert that Executive Orders 7G, 7X, and 7DDD are issued in excess of

Governor Lamont's constitutional and statutory power, "completely eliminate[] all process, and

thus prohibit[] owners of residential real property . . . from exercising their constitutionally

guaranteed right to liberty[,] property, or even from taking meaningful preparatory steps toward"

exercising those rights. Pls.' Mem. at 14–15. In their view,

> [m]andating a judicial judgment to exercise a constitutional right while barring all means and process to obtain such judgment, is a clear violation of the Plaintiffs' Fifth and Fourteenth Amendment right to due process of law. Banning the Plaintiffs from exercising their constitutional rights while allowing landlords renting to commercial tenants to continue serving notices to quit and initiating summary process eviction actions violates the Plaintiffs' right to equal protection under the law. Ordering the Plaintiffs and other landlords like them to surrender part of the security for which they negotiated and agreed in a private contract violates the Landlords' constitutional rights under both the Contracts Clause and the Takings Clause of the U.S. Constitution.

*Id.* at 15.

In support of their due process claim, Plaintiffs argue that, "rather than providing for expeditious resolution of rent issues, the Defendant's Orders actually preclude the Plaintiffs from being heard at any time in any manner, let alone at a meaningful time or in a meaningful manner." *Id.* at 16. They claim that Governor Lamont "is violating the fundamental, constitutionally guaranteed rights of the Plaintiffs and similarly situated landlords—who are otherwise entirely eligible to regain possession of their properties under all applicable federal and state laws." *Id.* at 17.

In addition, they contend that the Executive Orders apply "a prior restraint against the right to obtain the benefits of voluntarily negotiated and entered private contracts." *Id.* Plaintiffs argue that "[t]he complete ban on all residential eviction proceedings imposed by Defendant's Executive Orders nullifies Connecticut's established statutory eviction procedures[.]" *Id.* In their view, the "more immediate liberty interest being violated . . . is their right, under Connecticut law, to issue notices to quit, to submit their cases for adjudication for due consideration, and to have those cases timely and objectively adjudicated." *Id.* at 18. Plaintiffs further argue that their substantive due process rights are being violated for the same reasons, because "[t]he right not to be deprived of property without due process is a fundamental right." *Id.* at 19. Because the Executive Orders do not affect commercial landlords, Plaintiffs argue that Governor Lamont cannot demonstrate a "compelling government purpose" for depriving them of "fundamental constitutional rights." *Id.* at 20.

In support of their Contracts Clause claim, Plaintiffs argue that the Executive Orders "directly impair[] [their] rights as regard the use of security deposits tendered by their tenants, by removing the deposit from its agreed upon purpose, without the Plaintiffs' consent." *Id.* at 22.

They contend that the eviction moratorium "also impairs [their] right—forming the very foundational terms of the contract—to use the housing court system to enforce the contract terms against those tenants who fail to timely pay their rent." *Id.*

Plaintiffs concede that "[m]aking it easier for people to stay home during a pandemic is a 'significant public purpose,'" and that "controlling and reducing the spread of COVID-19 is an important government objective." *Id.* at 23. But they object to the means chosen to accomplish these purposes as unreasonable and inappropriate, because residential landlords are prevented "for an indefinite period of time . . . from not only completing an eviction process . . . but also from taking even the initial administrative or procedure steps to commence an eviction process." *Id.* at 23–24. Plaintiffs argue that "preventing Landlords from serving notices to quit[], and from initiating summary process actions are not [justifiable actions]." *Id.* at 24. In Plaintiffs' view, because "no court was open in Connecticut to hear any eviction cases based upon non-payment of rent[,] . . . both the moratorium and the compelled use of security deposits were wholly unnecessary and do nothing to actually remove the threat of eviction or the spread of COVID-19 as regards any tenant." *Id.*

In support of their Takings Cause claim, Plaintiffs argue that "the Defendant's Order unquestionably forces the Plaintiffs and landlords like them to suffer the public burden of paying rent for the state's non-paying tenants by surrendering the security the landlords bargained for in their private contracts." *Id.* at 27. They "also allege physical takings of their properties." *Id.* According to them, "the Orders effectively create an actual, state-sponsored occupancy of the Plaintiffs' properties." *Id.*

Plaintiffs argue that the Executive Orders prevent them from using "the exclusive process to legally dispossess a defaulted tenant," which violates their constitutional rights. *Id.* at 29. In

their view, "Defendant has closed the courts[,] leaving the Plaintiffs with no recourse, no process to follow, no venue to have their rights adjudicated, and nowhere to appeal." *Id.* at 30.

> Given the scope and effect of Defendant's Orders, completely extinguishing the right of property owners like the Plaintiffs to protect their property interests and reap the benefits under private contracts during this pandemic, they cannot survive heightened scrutiny. At issue here is the very sort of categorical elimination of fundamental rights that can never be tolerated, even under the government's broad emergency powers.

*Id.* at 31. Plaintiffs claim the Executive Orders also fail to meet intermediate scrutiny. *Id.* at 31–32. In their view, the Executive Orders have no reasonable fit "with the stated objective of controlling and reducing the spread of COVID-19 because the effect is an outright and total ban against these Plaintiffs' rights." *Id.* at 33. Despite being "purportedly issued under the legislature's emergency delegation of power" under Connecticut General Statutes §§ 19a-131a and 28-9, Plaintiffs claim the Executive Orders are *ultra vires* acts issued without authority. *Id.* at 34–35.

Plaintiffs emphasize that they "require a steady and reliable stream of rents in order to maintain their own obligations, to pay taxes, mortgages, salaries, and other costs of maintaining their properties." Pls.' Mem. at 36. They argue that the Executive Orders "cut off [] that rental stream, all without any practical benefit to tenants or the state's stated objective of keeping them home." *Id.* at 37. They claim that Connecticut "is fully capable of providing monetary relief to those tenants who are ultimately unable to pay on-going rent, either through direct payments to landlords, or by grants to tenants." *Id.* On June 19, 2020, the Court held a telephonic scheduling conference, and set a briefing schedule as well as a hearing date. Minute Entry, ECF No. 17 (June 19, 2020).

On June 30, 2020, Plaintiffs filed an Amended Complaint, adding the recently-issued

Executive Order 7DDD. Am. Compl., ECF No. 23 (June 30, 2020). Governor Lamont is "sued in his official capacity and, for his *ultra vires* acts as described herein, is also sued in his individual capacity." *Id.* ¶ 16. Plaintiffs allege that Governor Lamont's actions and orders, issued while acting under color of state law, deny Plaintiffs of "their right to own and possess residential real property as they see fit, and as legally authorized by U.S. Constitution and Connecticut statute." *Id.* ¶ 39.

On July 10, 2020, Governor Lamont filed an opposition to the motion for a preliminary injunction. Def.'s Mem. of Law in Opp'n to Pls.' Mot., ECF No. 27 (July 10, 2020) ("Def.'s Opp'n").

Governor Lamont argues that he has used his constitutionally authorized "police powers" to respond to the pandemic. Def.'s Opp'n at 8–9. He argues that "Plaintiffs come nowhere near meeting their burden . . . [with] legal arguments [that] are ill-founded, speculative and conclusory." *Id.* at 9. Furthermore, he argues that the Eleventh Amendment prohibits equitable relief based on Plaintiffs' *ultra vires* claim. *Id.* at 10–11.

According to Governor Lamont, the U.S. Supreme Court in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), established that a federal court can intervene as to a state's infectious disease response only in extreme cases, because all constitutional rights may be reasonably restricted to combat a public health emergency. *Id.* at 13–15. He argues that the Executive Orders "prevent individuals from being evicted, becoming homeless and having to live in shelters, or having to double up on housing situations," which has a "'real or substantial' relation to the public health crisis that has gripped our state and nation." *Id.* at 15.

As to the Takings Clause claims, Governor Lamont argues that because there is an adequate provision for obtaining just compensation, "there is no basis to enjoin the government's

action effecting a taking." *Id.* at 16 (internal quotation marks and citation omitted). Besides the Plaintiffs' failure to plead a physical taking, *id.* at 18–19, Governor Lamont also argues that "the Executive Orders do not meet the legal standard for a physical or regulatory taking," *id.* at 22, and that Plaintiffs' takings claims thus do not demonstrate a clear and substantial likelihood of success on the merits.

As to the Contracts Clause claims, Governor Lamont argues that the Second Circuit has not established that these claims may be brought under 42 U.S.C. § 1983, as Plaintiffs have done. *Id.* at 23. In addition to arguing that Plaintiffs failed to plead these claims, Government Lamont also argues that the Contracts Clause "does not trump a State's right to protect the general welfare of its citizen[s]." *Id.* at 25. He also argues that allowing tenants to pay rent using their security deposit in excess of one month's rent if they face financial hardship "is not a substantial impairment of [Plaintiffs'] contract rights, especially when [P]laintiffs may eventually demand that their tenants restore any portion of the security deposit that was used for rent." *Id.* at 26. Governor Lamont notes that Connecticut highly regulates landlord and tenant law, and that the Executive Orders are "reasonable and necessary" and "serve a legitimate public purpose." *Id.* at 27–28.

As to the due process claims, Governor Lamont argues they are duplicative of the Takings Clause claims, and that the substantive due process claim is subsumed in the procedural due process claim. *Id.* at 29–30. He asserts that "[b]ecause the Orders are legislative as opposed to adjudicative in nature, there can be no due process challenge, even if the [P]laintiffs had a cognizable liberty or property interest, which they do not." *Id.* at 31. Furthermore, he argues that "the Orders' temporary suspension of serving notices to quit and serving or returning summary process cases does not violate due process," especially "[g]iven the ravages of COVID-19." *Id.*

at 34–35. In addition, he argues that the Executive Orders "meet a legitimate state objective" and do not violate substantive due process, because Plaintiffs have no constitutional liberty or property interest at stake here. *Id.* at 37.

Governor Lamont further argues that there is no irreparable harm caused by the temporary nature of the Executive Orders, and that "the balance of equities and the public interest weigh heavily against this Court preliminary undoing the Orders." *Id.* at 40.

On July 16, 2020, Greater Hartford Legal Aid, Connecticut Legal Services, New Haven Legal Assistance Association, Connecticut Fair Housing Center, Jerome N. Frank Legal Services Organization, Connecticut Legal Rights Project, and Connecticut Veterans Legal Center (collectively, the "*Amici*") filed, with the Court's permission, an *amici curiae* brief in support of Governor Lamont. Br. of *Amici Curia*, ECF No. 30 (July 16, 2020) ("*Amici* Br.").

Amici, who are "legal services providers whose staff attorneys represent tenants facing eviction in Connecticut housing courts," *Amici* Br. at 3, argue that individuals "cannot shelter in place without shelter. . . . [and] [w]hen families are evicted, by definition, they are forced out of their homes," *id.* at 8. They also argue that "[a]n abrupt onslaught of evictions will overwhelm the available relief, just as the State is struggling to maintain its gains in the face of a troubling national wave of infections." *Id.* at 10. Furthermore, based on *Amici*'s experience, "[u]ntil resources are in place, Connecticut's housing courts cannot restart safely, let alone process a tsunami of new non-payment cases." *Id.* at 13.

Finally, *Amici* argue that Connecticut's eviction moratorium is largely coextensive with the CARES Act eviction moratorium, which "demonstrates the propriety of the Governor's response to the pandemic." *Id.* at 14. In their view, Connecticut's "eviction moratorium has had at least two positive effects":

> First, it prevents people who have lost their jobs from the further
> destabilization of losing their homes and all the costs and harmful
> effects that would follow. Second, it reduces the exposure to the
> virus that dislocation would otherwise cause, whether through: (1)
> the actual move itself; (2) entering homeless shelters that lack the
> ability to house all their residents in a safe manner during a
> pandemic, and either exposing or being exposed to the coronavirus
> in that setting; or (3) combining households with others who may be
> at risk of contracting COVID-19 by virtue of their status as an
> essential worker or otherwise. In this manner, the moratorium has
> helped prevent the racialized health effects of the pandemic from
> getting even worse.

*Id.* at 18.

On July 17, 2020, Plaintiffs filed their reply. Reply in Supp. of Pls.' Mot., ECF No. 32 (July 17, 2020) ("Pls.' Reply"). They argue that Executive Order 7DDD "shows that Defendant cannot justify his restrictions on the Plaintiffs' rights under the guise of keeping nonpaying tenants in their homes to protect against the Corona Virus," because it allows residential landlords to move forward with evictions for claims against tenants who had not paid their rent prior to February 29, 2020. *Id.* at 4.

On the same day, Plaintiffs also objected to the filing of the *Amici* brief as unduly late, "foreclosing [them] from any real opportunity to review and respond." Obj., ECF No. 31 (July 17, 2020).

On July 19, 2020, the parties filed a joint stipulation of facts for the hearing. Joint Stip. Facts.

On July 20, 2020, Plaintiffs filed a notice that "there will be no additional witness testimony nor additional evidence presented to the Court at the hearing on Wednesday, July 22, 2020." Notice, ECF No. 35 (July 20, 2020). They also filed a revised proposed order:

> 1. That the Defendant take such action(s) necessary so that
> Connecticut state courts are no longer precluded by Executive Order
> 7G, from procedurally addressing, as well as issuing and
> effectuating Judgment in, residential housing summary process

actions instituted prior to the Defendant's Declaration(s) of Public Health Emergency and Civil Preparedness (March 10, 2020);

2. That the Plaintiffs, and those similarly situated, be lawfully permitted, once again, to serve a Notice to Quit Possession (without qualification) upon tenants;

3. That the Plaintiffs, and those similarly situated, be lawfully permitted, once again, to serve and return a summary process action, to court;

4. That the Defendant take such action(s) necessary so that Connecticut state courts are no longer precluded by Executive Order 7G, from adjudicating, as well as issuing and effectuating Judgment in, residential housing summary process actions instituted after the Defendant's Declaration(s) of Public Health Emergency and Civil Preparedness (March 10, 2020); and,

5. Since the above would likely call for modifications to Executive Orders 7G, 7X, and 7DDD, counsel for the Defendant would need to work together with counsel for the Plaintiff over the next 48 hours, to draft acceptable modifications to those Executive 2 Orders, with the ability of either side to ask for a status conference should the parties be unable to agree upon appropriate language to meet the intent of the above.

Pls.' Revised Proposed Order Re: Pls.' Mot., ECF No. 36 (July 20, 2020).

On July 22, 2020, the Court held a hearing by videoconference. Minute Entry, ECF No. 39 (July 22, 2020). The Court also granted Plaintiffs leave to file a reply to the brief of the *Amici* by August 5, 2020.

On August 5, 2020, Plaintiffs filed their response to the *Amici* brief. Pls.' Resp. to *Amici* Br., ECF No. 40 (Aug. 5, 2020). They emphasize that they have not asked for "the full and unconditional return of all housing court procedures," but have instead asked the Court "to recognize the existence of a middle ground between the unconstitutional complete closure of the housing courts, and the crowded and chaotic cattle calls typical of the pre-COVID era." *Id.* at 2.

Plaintiffs assert that "it is the Defendant, not the Judicial Branch, who closed the courts to

the Plaintiffs and is keeping them closed." *Id.* at 3. According to Plaintiffs, the Connecticut

Judicial Branch can only rely on the Executive Orders, and has no independent power or

authority to close the housing courts or suspend evictions. *Id.* Plaintiffs acknowledge the case-

by-case basis on which the housing courts must operate, but they argue:

> Keeping the courts closed to all cases, regardless of individual situation, only exacerbates the crisis by piling up huge numbers of cases that will overwhelm the courts, drastically delay proper adjudication, and put the Plaintiffs at heightened risk of foreclosure and bankruptcy. . . . Allowing the Defendant's order to stand[] unconstitutionally places the entire burden of Connecticut's long-standing 'eviction crisis' squarely on the backs of that small subset of landlords, like the Plaintiffs, who are not eligible for any state or federal relief whatsoever.

*Id.* at 5–6. Furthermore, Plaintiffs argue that "neither a Notice to Quit, nor the initiation of a

summary process action, nor even a judgment for possession, results in a tenant being obligated

to vacate a property." *Id.* at 7. They claim:

> Temporarily enjoining the Defendant from keeping the courts closed to the Plaintiffs, and from prohibiting the Plaintiffs from initiating and adjudicating their private contract claims is the best way to ensure a healthy and abundant housing market to serve the people of this state, specifically including families of color.

*Id.* at 10.

## II.       STANDARD OF REVIEW

Preliminary injunctive relief is an extraordinary remedy and not a matter of right. *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction under

Federal Rule of Civil Procedure 65, a movant "must establish that [they are] likely to succeed on

the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief,

that the balance of equities tips in [their] favor, and that an injunction is in the public interest."

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555

U.S. at 20); *see also Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

When deciding a motion for preliminary injunction, "a court may consider the entire

record including affidavits and other hearsay evidence." *Johnson v. Newport Lorillard*, No. 01

Civ. 9587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003). The moving party, however,

must also make a "clear" or "substantial" showing of a likelihood of success if the injunction

sought will alter, rather than maintain the status quo. *See Jolly v. Coughlin*, 76 F.3d 468, 473 (2d

Cir. 1996).

In the Second Circuit, "[t]he same standards used to review a request for a preliminary

injunction govern consideration of an application for a temporary restraining order." *Stagliano v.*

*Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264 (N.D.N.Y. 2015); *Local 1814 Int'l*

*Longshoreman's Ass'n v. N.Y. Shipping Assoc., Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992)

(recognizing that the standard for a temporary restraining order is the same as preliminary

injunction standard). Irreparable harm is the "most significant condition which must be present to

support the granting of a temporary injunction." *Capital City Gas Co. v. Phillips Petroleum Co.*,

373 F.2d 128, 131 (2d Cir. 1967) (citation omitted); *Reuters Ltd. v. United Press Int'l., Inc.*, 903

F.2d 904, 907 (2d Cir. 1990) ("the moving party must first demonstrate that [irreparable] injury

is likely before the other requirements for the issuance of an injunction will be considered"). As with a request for preliminary injunctive relief, the moving party must show irreparable harm that is "not remote or speculative but actual and imminent." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F. 2d 70, 72 (2d Cir. 1979) (internal citations omitted).

## III.   DISCUSSION

Plaintiffs allege that Governor Lamont's Executive Orders 7G, 7X, and 7DDD violate their rights under the U.S. Constitution's (1) Equal Protection Clause, (2) Contracts Clause, (3) Due Process Clause, and (4) Takings Clause, and that his conduct in issuing the Executive Orders are (5) *ultra vires*. They appear to seek a preliminary injunction based on all counts, except Count One, the claim based on the Equal Protection Clause.[10]

### A.  Standing and Redressability

Article II, Section 2 of the U.S. Constitution limits federal court jurisdiction to "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1550 (2016) (quoting *Vt. Agency of Nat. Res. V. U.S. ex rel. Stevens*, 529 U.S. 765, 774 (1998)). Because "standing is necessary to our jurisdiction," a federal court is required to determine standing at the outset. *Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2d Cir. 2016). A party has standing when it is the proper party to bring each claim it seeks to press. *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012). A plaintiff is the proper party when she satisfies the "irreducible constitutional minimum" of standing in federal court: (1) "injury in fact;" (2) that is "fairly traceable" to a defendant's challenged conduct; and

---

[10] Plaintiffs do not include any arguments for seeking a preliminary injunction based on the Equal Protection Clause claim. *See* Pls.' Mem. at 37 n.4 ("As with the claims addressed herein, the Plaintiff's [sic] Equal Protection claim would also succeed, yet need not be addressed at this point for the Court to grant the relief sought by the Plaintiffs through this motion."). As a result, the Court need not address this claim in order to determine the appropriateness of any relief now.

(3) that is "likely to be redressed" by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 589–90 (1992). To support standing, an injury must be both "concrete and particularized." *Mejia v. Time Warner Cable Inc.*, No. 15-CV-6445 (JPO), 2017 WL 3278926, at *7 (S.D.N.Y. Aug. 1, 2017) (quoting *Spokeo, Inc.*, 136 S. Ct. at 1548).

This case presents redressability issues, because the Connecticut Judicial Branch has independently suspended all evictions. Consequently, a favorable outcome in this case would not necessarily allow Plaintiffs to proceed with evictions, as the most recent order issued by the Chief Administrative Judge for Civil Matters stayed "the service of all issued executions on evictions and ejectments through September, 2020."[11] Order by Chief Administrative Judge for Civil Matters (Conn. Super. Ct. July 20, 2020), *available at* https://jud.ct.gov/HomePDFs/ExecutionStaySeptember.pdf.

Nevertheless, because discovery could demonstrate redressability, the Court will decide Plaintiffs' motion on its merits and will not dismiss for a lack of standing at this time.

### B. Likelihood of Success on the Merits

Before issuing a preliminary injunction, "a district court must consider whether plaintiffs have demonstrated that they are likely to prevail on the merits." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

#### 1. The *Ultra Vires* Claim

As an initial matter, this Court lacks jurisdiction over Plaintiffs' *ultra vires* claim under the Eleventh Amendment of the U.S. Constitution. "The Eleventh Amendment bars a suit against

---

[11] At the hearing by videoconference, counsel for Plaintiffs indicated that if the Court granted their preliminary injunction and the Connecticut Judicial Branch orders were still in effect, preventing them from pursuing evictions, then Plaintiffs would also bring suit against the Judicial Branch, which is not a party to this lawsuit, and is separately protected by its own doctrine of immunity. *See Bliven v. Hunt*, 579 F.3d 204, 209–11 (2d Cir. 2009) (recognizing and delineating the doctrine of judicial immunity.).

state officials when 'the state is the real, substantial party in interest.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). And "it is difficult to think of a greater intrusion on state sovereignty than . . . a federal court instruct[ing] state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106.

Here, Plaintiffs argue that Governor Lamont "is acting beyond the scope of his official capacity . . . under color of law." Pls.' Reply at 5 (emphasis omitted). Similarly to the residential landlord plaintiffs in *Elmsford Apartment Associates, LLC v. Cuomo*, Plaintiffs do not argue that Governor Lamont "lacks the power to respond to the COVID-19 emergency—only that he has abused that power." 20-cv-4062 (CM), 2020 WL 3498456, at *6 (S.D.N.Y. June 29, 2020). Therefore, by seeking redress for Governor Lamont's alleged violations of the authority delegated to him by the Connecticut General Assembly under Connecticut General Statutes §§ 28-9 and 19a-131a, Plaintiffs ask the Court to cure violations of state law. But "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Pennhurst*, 465 U.S. at 106.

Accordingly, the Eleventh Amendment bars Plaintiffs' *ultra vires* claims.

## 2. Takings Clause Claims

The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. There are two general categories of takings: physical takings and regulatory takings. *Vizio, Inc. v. Klee*, No. 3:15-cv-00929 (VAB), 2016 WL 1305116, at *17 (D. Conn. Mar. 31, 2016) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002)). "To state a claim under . . . the Takings Clause, plaintiffs [are] required to allege facts showing that state action deprived them of a

23

protected property interest." *Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000–04 (1984)).

The Takings Clause does not proscribe the "vast governmental power" to take private property for public use, provided that the government pays just compensation when it does. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 734 (2010) (Kennedy, J., concurring). Therefore, takings claims typically involve property interests for which the government can provide monetary compensation without the government being deprived of the property or public benefit that it seeks. *See id.* at 740–41 ("It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause does not proscribe the taking of property; it proscribes taking without just compensation." (internal quotation marks omitted)). A taking "may more readily be found when the interference with property can be characterized as a physical invasion by government, than when [as here] interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978) (internal citation omitted).

### a.   Physical Taking

"The government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992) (emphasis omitted). Although Plaintiffs allege physical takings of their properties, "no government has required any physical invasion of [Plaintiffs'] property." *See id.* at 528 (finding that a state law prohibiting the discharge or eviction of rental customers was not a taking). As in *Yee*, Plaintiffs here "voluntarily rented their land" to residential tenants. *See id.* at 527. The Executive Orders at issue here, also like the state and local laws in *Yee*, "merely regulate [Plaintiffs'] use of their land by regulating the relationship between landlord and tenant." *See id.*

at 528 (emphasis omitted); *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987)

("statutes regulating the economic relations of landlords and tenants are not *per se* takings");

*Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011) (summary order) (affirming dismissal

of physical takings claim because the rent stabilization law "does not effect permanent physical

occupation of the [owners'] property"); *W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. &

Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (summary order) (holding that New York's rent control

laws "regulate[] land use rather than effecting a physical occupation").

Accordingly, the Court finds that Plaintiffs are unlikely to succeed on their takings claim

based on a physical taking.

### b. Regulatory Taking

The U.S. Supreme Court "'has consistently affirmed that States have broad power to

regulate housing conditions in general and the landlord-tenant relationship in particular without

paying compensation for all economic injuries that such regulation entails.'" *Yee*, 503 U.S. at

528–29 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982)).

Regulatory takings claims therefore must allege "specific and identified properties or

property rights . . . to come within the regulatory takings prohibition," such that the challenged

regulations are "so excessive as to destroy, or take, a specific property interest." *E. Enterprises v.

Apfel*, 524 U.S. 498, 541–42 (1998) (Kennedy, J., concurring in the judgment and dissenting in

part) (collecting cases identifying various specific property interests); *see also id.* at 554, 118 S.

Ct. 2131 (Breyer, J., dissenting) ("The 'private property' upon which the [Takings] Clause

traditionally has focused is a specific interest in physical or intellectual property."). A categorical

regulatory taking occurs in "the extraordinary circumstance when no productive or economically

beneficial use of land is permitted." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (emphasis omitted).

This is not the case here. Plaintiffs continue to enjoy economic benefits of ownership, and "can continue to accept rental payments from tenants not facing financial hardship, while also covering the cost of ownership by collecting security deposit funds from consenting tenants who have been affected by the pandemic." *See Elmsford*, 2020 WL 3498456, at *9.

"Anything less than a complete elimination of value, or a total loss," is a non-categorical taking analyzed under the framework from *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). *Tahoe-Sierra*, 535 U.S. at 330 (internal quotation marks and citation omitted). This "[r]egulatory takings analysis requires an intensive ad hoc inquiry into the circumstances of each particular case." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006) (emphasis omitted). Courts

> weigh three factors to determine whether the interference with property rises to the level of a taking: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."

*Id.* (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224–25 (1986).

First, as to the economic impact, the Executive Orders constitute a regulatory taking only if they "effectively prevented [Plaintiffs] from making any economic use of [their] property." *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014). To compare the loss of property value as a result of the Executive Orders, the Court must determine the "unit of property whose value is to furnish the denominator of the fraction." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) (internal quotation marks and citation omitted). Courts focus on "the nature of the interference with rights in the parcel as a whole," including portions

26

of the property not affected by the regulation. *Id.* (quoting *Penn Central*, 438 U.S. at 130–01) (emphasis omitted).

Here, Plaintiffs have not quantified the precise economic impact that the eviction moratorium and security deposit provisions have had on their property. Although they allege not receiving rent on time from some tenants, *see* Am. Compl. ¶¶ 28–35, and being "forced to relinquish a portion of their legally retained security deposit," *id.* ¶ 36, Plaintiffs have not alleged sufficiently precise facts to support a finding that the Executive Orders have "a constitutionally significant economic impact." *See Elmsford*, 2020 WL 3498456, at *10 (arriving at the same conclusion for Governor Andrew Cuomo's Executive Order 202.28).

In the Joint Stipulation of Facts, Plaintiffs have provided some evidence about which tenants owe rent, and for which months, *see* Joint. Stip. Facts ¶¶ 17–26, but they have not provided any evidence as to how the "parcel as a whole" is affected, beyond this subset of rented apartments occupied by tenants facing financial hardship. Significantly, "[b]ecause our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property," Plaintiffs cannot succeed by "narrowly defin[ing] certain segments of their property [to] assert that . . . the [Executive Orders] den[y] them economically viable use." *Keystone*, 480 U.S. at 486; *cf. Sherman*, 752 F.3d at 565 (finding that "the Town's actions effectively prevented [the plaintiff] from making any economic use of his property").

Second, as to the investment-backed expectations, "the purpose [of this *Penn Central* factor] is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996). In Connecticut, landlord-tenant relations are publicly regulated, *see* Joint Stip. Facts. ¶¶ 2–7 (outlining the relevant provisions of Conn. Gen. Stat. §§

47a-1 *et seq.*), and "'[o]ne who choose[s] to engage in a publicly regulated business . . . by so doing surrenders his right to unfettered discretion as to how conduct same.'" *Elmsford*, 2020 WL 3498456, at *10 (quoting *Alexandre v. N.Y.C. Taxi & Limousine Comm'n*, No. 07 Civ. 8175 (RMB), 2007 WL 2826952, at *8 (S.D.N.Y. Sept. 28, 2007)).

As residential landlords, Plaintiffs' contractual right to collect rent is premised on compliance with a framework of state laws. Consequently, their reasonable investment-backed expectations cannot operate apart from "public programs adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124; *see also Park Avenue Tower Assocs. v. City of N.Y.*, 746 F.2d 135, 140 (2d Cir. 1984), *cert. denied*, 470 U.S. 1087 (1985) (upholding a zoning amendment as not effecting a regulatory taking because the property retained economically beneficial use to the current owner as long as "others might be interested in purchasing all or part of the land for permitted uses" (internal quotation marks and citation omitted)). As the Second Circuit has made clear, "government regulation of the rental relationship does not constitute a physical taking. . . . [n]or does the caselaw support the view that application of [a rent regulation] constitute[] a regulatory taking." *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47–48 (2d Cir. 1996) ("*FHLMC*") (citing cases). Here, the Executive Orders merely "regulate[] the terms under which the [Plaintiffs] may use the property as previously planned," during a global pandemic. *Id.* at 48.

The Executive Orders also do not prevent Plaintiffs from collecting or continuing to accrue unpaid rent, and importantly, "nothing in [the Executive Orders] shall relieve a tenant of liability for unpaid rent or the obligation to comply with other terms of a rental agreement or statutory obligations pursuant to Connecticut law." Joint Stip. Facts ¶ 16 (quoting Executive Order 7X); *see also* Executive Order 7DDD (same language). The Executive Orders are a

temporary adjustment of the status quo, and only defer the ability of residential landlords like Plaintiffs to collect, or obtain a judgment for, the full amount of rent the tenants agreed to pay. Because Plaintiffs continue to derive "economically viable use" from their investments, they cannot establish a regulatory taking under this factor.

Third, the character of the governmental action also weighs against a finding that Plaintiffs have suffered a regulatory taking, because the Executive Orders are "part of a public program adjusting the benefits and burdens of economic life to promote the common good." *Sherman*, 752 F.3d at 565; *see also Buffalo Teachers*, 464 F.3d at 375 (finding that a temporary wage freeze did not amount to a regulatory taking because "[n]othing is affirmatively taken by the government" when a state action mandates nonpayment of a preexisting obligation). "Given the propriety of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever the legislation requires one person to use his or her assets for the benefit of another." *Connolly*, 475 U.S. at 223.

Although Plaintiffs argue that the Executive Orders force them to "suffer the public burden" and "create an actual, state-sponsored occupancy of [their] properties," Pls.' Mem. at 27, the law is contrary to their position. *See Elmsford*, 2020 WL 3498456, at *12 (dismissing plaintiffs' takings claims because "state governments may, in times of emergency or otherwise, reallocate economic hardships between private parties, including landlords and their tenants, without violating the Takings Clause"). Just because Plaintiffs cannot derive as much "profit [from their properties] . . . as . . . under a market-based system" does not mean the loss of value equates to a taking. *FHLMC*, 83 F.3d at 48; *see also Greater New Haven Prop. Owners Ass'n v. City of New Haven*, 288 Conn. 181, 187 (2008) ("The state may regulate any business or the use

of any property in the interest of the public welfare or the public convenience, provided it is done reasonably." (internal citation omitted)).

Because Plaintiffs fail to establish that the Executive Orders inflict "any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking," *Keystone*, 480 U.S. at 493, they have failed to establish a likelihood of the success on the merits of their takings claim.

Accordingly, Plaintiffs' Takings Clause claims cannot be a basis for issuing a preliminary injunction.

### 3. Contracts Clause Claims

Article I, Section 10 of the U.S. Constitution prohibits states from passing any law "impairing the Obligation of Contracts." U.S. Const. Art. I § 10, cl. 1. The Contracts Clause "does not trump the police power of a state to protect the general welfare of its citizens, a power which is paramount to any rights under contracts between individuals." *Buffalo Teachers*, 464 F.3d at 367 (internal quotation marks and citations omitted). "Thus, state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim." *Id.* at 368. Furthermore, "[a] prerequisite to any violation . . . is that the challenged action be a law, or as the Supreme Court has explained, that it be legislative in nature." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 61 (2d Cir. 2020) (internal quotation marks and citation omitted).

To determine whether a law "trenches impermissibly on contract rights," courts ask:

> (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary.

*Buffalo Teachers*, 464 F.3d at 368 (citing *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–13 (1983); *Sanitation & Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 993 (2d Cir. 1997)).

As an initial matter, the Executive Orders are legislative in nature. Governor Lamont issued them under a process established by the General Assembly. Connecticut General Statutes § 28-9 specifically authorizes Governor Lamont to:

> modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health.

Conn. Gen. Stat. § 28-9(b)(1).

### a.  Substantial Impairment

Substantial impairment depends upon "the extent to which reasonable expectations under the contract have been disrupted." *Sullivan*, 959 F.3d at 64 (quoting *Sanitation & Recycling*, 107 F.3d at 993). "And the reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." *Id.* (citations omitted).

As previously described, Plaintiffs operate in a heavily regulated industry. Neither the eviction moratorium nor the security deposit provisions operate as a substantial impairment of Plaintiffs' contractual rights, because neither are "wholly unexpected" government legislation. *Sanitation & Recycling*, 107 F.3d at 993. "For those who do business in a heavily regulated industry, 'the expected costs of foreseeable future regulation are already presumed to be priced into the contracts formed under the prior regulation.'" *Elmsford*, 2020 WL 3498456, at *12

31

(quoting *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 55 (D. Conn. 2013), *aff'd*, 610 F. App'x 10 (2d Cir. 2015)).

"The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 431 (1934). As to the eviction moratorium, the Executive Orders do not eliminate Plaintiffs' contractual remedies for evicting nonpaying tenants; Plaintiffs instead have to wait before they may issue notices to quit or initiate summary proceedings. As to the security deposits being used to pay rent past due, in Connecticut, "[a]ny security deposit paid by a tenant shall remain the property of such tenant in which the landlord shall have a security interest." Conn. Gen. Stat. § 47a-21(c). The Executive Orders' modification of statutorily permissible uses of security deposits thus cannot amount to a substantial impairment of Plaintiffs' rights under their rental agreements. *See, e.g.*, *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 53 (2d Cir. 1998) ("If the plaintiff could anticipate, expect, or foresee the governmental action at the time of contract execution, the plaintiff will ordinarily not be able to prevail." (citation omitted)).

### b.  Public Purpose

Even assuming the Executive Orders operate as a substantial impairment of Plaintiffs' contracts, their claim nevertheless fails.

"When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law." *Buffalo Teachers*, 464 F.3d at 368 (citations omitted). "A legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'" *Id.* (quoting *Sanitation & Recycling*, 107 F.3d at 993). "The key . . . is to determine whether the state in breaching a

contract is acting like a private party who reneges to get out of a bad deal, or is governing, which justifies its impairing the plaintiffs' contracts in the public interest." *Sullivan*, 959 F.3d at 65.

When, as here, the challenged law impairs private contracts, courts "must accord substantial deference to the [State's] conclusion that its approach reasonably promotes the public purposes for which [it] was enacted." *Sal Tinnerello*, 141 F.3d at 54 (internal citation omitted).

Plaintiffs concede that "[m]aking it easier for people to stay home during a pandemic is . . . a 'significant public purpose.'" Pls.' Mem. at 23.

The Court agrees, and will address Plaintiffs' arguments as to the Executive Orders' reasonableness.

### c.  Reasonableness

"If the legislative purposes behind the law or regulation are valid, the final inquiry is whether the means chosen to achieve those purposes are reasonable and necessary." *Sal Tinnerello*, 141 F.3d at 54 (citation omitted).

Plaintiffs argue that "both the moratorium and the compelled use of security deposits were wholly unnecessary and do nothing to actually remove the threat of eviction or the spread of COVID-19 as regards any tenant." Pls.' Mem. at 24. Plaintiffs are correct, because the Executive Orders do not "relieve a tenant of liability for unpaid rent" or any other obligation in their rental agreement; but as to whether the Executive Orders have stemmed the spread of COVID-19, the Court disagrees.

Governor Lamont's Executive Orders "aim[] to limit the spread of COVID-19, a novel severe acute respiratory illness that has killed thousands of people in [Connecticut] and more than [155,000] nationwide." *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (mem.) (Roberts, C.J., concurring) (denying application to enjoin the Governor of

California's COVID-19 related executive order that "places temporary numerical restrictions on public gatherings to address this extraordinary health emergency"). "At this time, there is no known cure, no effective treatment, and no vaccine." *Id.* "Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States to 'guard and protect.'" *Id.* (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Id.* (quoting *Marshall v. U.S.*, 414 U.S. 417, 427 (1974)). "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* at 1614 (quoting *Garcia v. San Antonia Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

There is nothing in this record to suggest that Governor Lamont acted unreasonably.[12]

Accordingly, Plaintiffs' Contract Clause claims are not likely to succeed and therefore cannot be the basis for issuing a preliminary injunction.

### 4. Due Process Clause Claims

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause of the Fourteenth Amendment requires states to operate in accordance with the 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.'" *Hancock v. Cty. of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018) (quoting *Duncan v.*

---

[12] Indeed, Connecticut's relative success in its management of the COVID-19 pandemic may support the reasonableness–and necessity–of the Executive Orders to ensure the public's safety during this global pandemic. *See* Erica Moser, *Connecticut has been on a better COVID-19 path than most states,* THE DAY (updated July 12, 2020, 8:29 PM), https://www.theday.com/article/20200711/NWS01/200719892 (noting Connecticut's then-trend of decreasing COVID-19 cases); *but see Tracking Our COVID-19 Response*, COVID EXIT STRATEGY, https://www.covidexitstrategy.org/ (last visited Aug. 3, 2020) (indicating "caution warranted" for Connecticut due to increasing positive COVID-19 cases over a fourteen-day trend).

*Louisiana*, 391 U.S. 145, 148 (1968)). "Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (internal quotation marks omitted). Substantive due process requires plaintiffs to show deprivation of a constitutional right under circumstances that were "arbitrary" and "outrageous," typically as demonstrated by conduct that "shocks the conscience." *See Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999) (quoting *Rochin v. Cal.*, 342 U.S. 165, 172 (1952)). Violation of the substantive standards of the Due Process Clause requires "conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Id.* at 259.

Because Plaintiffs have failed to demonstrate a substantial impairment of their property rights, they "ha[ve] pointed to no specific constitutional guarantee safeguarding the interest [they] assert ha[ve] been invaded." *Paul v. Davis*, 424 U.S. 693, 700 (1976); *accord Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake."). Plaintiffs have not identified a property interest independent of the interests asserted in their other constitutional claims, and the "Second Circuit has expressly forbidden this sort of duplication[.]" *Elmsford*, 2020 WL 3498456, at *15. "[T]he Due Process Clause cannot 'do the work of the Takings Clause' because '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these

claims.'" *Harmon*, 412 F. App'x at 423 (quoting *Stop the Beach Renourishment, Inc.*, 560 U.S. at 720–21 (internal quotation marks and citations omitted)).

Plaintiffs also fail to show a denial of procedural due process for the same reasons, because they have not identified an independent liberty or property interest. Even if Plaintiffs did identify a liberty or property interest independent of their other constitutional claims, they have not established the denial of an "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 334. As previously discussed, the Executive Orders only delay Plaintiffs' ability to initiate evictions; they do not eradicate all future opportunity for Plaintiffs to pursue evictions.[13]

Accordingly, Plaintiffs' Due Process claims are not likely to succeed on the merits and thus cannot serve as a basis for issuing a preliminary injunction.

### C.  Irreparable Harm

For irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citations and internal quotation marks omitted); *see also L.A. v. Lyons*, 461 U.S. 95, 111–12 (1983) (holding that a court cannot find injunctive relief if the claimed injury is speculative or remote). "The relevant [irreparable] harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction . . . . Harm might be irremediable, or irreparable, for many reasons,

---

[13] Furthermore, the State of Connecticut Judicial Branch has independently stayed the consideration of all eviction claims until September 1, 2020. As the Court noted in its discussion of whether Plaintiffs have established redressability for standing, even if the Court were to find that the Executive Orders were unconstitutional, Plaintiffs may not be able to proceed with evictions expeditiously in any event. Indeed, the delay mandated by the Executive Orders not only does not deny Plaintiffs a meaningful opportunity to be heard at a future time, but it also allows Plaintiffs to continue accruing rent for future collection.

including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d. Cir. 2010).

Although Plaintiffs assert that "there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights," *see* Pls.' Mem. at 13, at core, because they have failed to demonstrate a likelihood of success on the merits on any of their constitutional claims, Plaintiffs cannot demonstrate irreparable harm. *See, e.g.*, *Amato v. Elicker*, No. 3:20-cv-464 (MPS), 2020 WL 2542788, at *6 (D. Conn. May 19, 2020) ("The injuries the Plaintiffs allege stemming from Executive Order 7D are financial, and the Plaintiffs have not shown that an award of damages would be inadequate . . . Courts have found irreparable harm when plaintiffs allege that their business would be shut down entirely if relief is not granted.").

### D.  Balance of Equities and the Public Interest

The Court finally "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK,* 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312 (1982). These "final two factors—the balance of the equities and the public interest— merge when, as in this case, the Government is the opposing party." *Amato*, 2020 WL 2542788, at *3 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

In light of the Court's prior findings, the Court need not and will not address the remaining factors for issuing a preliminary injunction. If it did, given the nature of this pandemic, the balance of the equities and the public interest favor denying a preliminary injunction. *See, e.g., Amato*, 2020 WL 2542788, at *7 (declining to "reach the public interest in a

temporary restraining order against [one of Governor Lamont's Executive Orders issued during COVID-19] or the balance of equities" because "[p]laintiffs have not established standing or irreparable harm" related to the alleged "violat[ion] [of] their constitutional 'right to earn an honest living'"); *TJM 64, Inc. v. Harris*, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (recognizing "the burden that the [COVID-19] Closure Order places on Plaintiffs' businesses," but finding that "the issuance of a TRO preventing the enforcement of the COVID-19 Closure Order is not appropriate" given "the potential public health consequences of allowing Plaintiffs to continue to operate their businesses unfettered by Shelby Government public safety and health regulations"); *see also Amici* Br. at 16 ("An eviction surge would have devastating health consequences for low-income communities, threatening the hard-won gains Connecticut has made in controlling the spread of the virus. In order to reduce the spread of COVID-19, Connecticut residents have been told to practice social distancing, stay home, and shelter in place. But you cannot shelter in place without shelter. When families are evicted, by definition, they are forced out of their homes."); *id. at* 23 ("The eviction moratorium has helped prevent a disastrous increase in homelessness and virus exposure that would disproportionately impact renters of color.").

Even in the absence of record evidence that these specific measures directed at preventing evictions are causally related to any reduction in the spread of COVID-19 in the State of Connecticut, given the ongoing nature and continued uncertainty of when public life will resume to normal,[14] there is nothing in this record to suggest that Governor Lamont's efforts thus far should be second-guessed, much less stayed. *See Jacobson*, 197 U.S. at 38 ("The safety and

---

[14] *See, e.g.*, General Order, *In re: Court Operations Under the Exigent Circumstances Created by COVID-19* (D. Conn. July 14, 2020), *available at* http://ctd.uscourts.gov/sites/default/files/20-24_COVID-19-General-Order-Re-Jury-Selections-Trials.pdf (continuing, "pending further of the Court," criminal jury trials and related jury selections to November 2, 2020).

health of the people of [the state] are, in the first instance, for that [state] to guard and protect.");
*see also S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" (quoting *Jacobson*, 197 U.S. at 38)). The balance of equities thus do not favor granting a preliminary injunction.

While this pandemic has adversely affected Plaintiffs' businesses—as it has much of the nation's economy—Plaintiffs have failed to satisfy the standards necessary for obtaining a temporary restraining order or a preliminary injunction as a matter of law.

Accordingly, having weighed all of the relevant factors, the Court will deny the motion for a preliminary injunction.

## IV.   CONCLUSION

For the reasons explained above, Plaintiffs' motion for a temporary restraining order or a preliminary injunction is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of August, 2020.

      /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge