## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AURACLE HOMES, LLC., ET AL., | : | 3:20-CV-829 (VAB) |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT | : | |
| *Defendant* | : | OCTOBER 5, 2020 |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DISMISS

There is no dispute that Connecticut faces a "dramatic challenge" that is "presented by COVID-19, a novel and easily transmitted viral disease that has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020).  By May 29, 2020, COVID-19 had killed more than 100,000 persons nationwide*. South Bay United Pentecostal Church, et al. v. Newsome*, 140 S.Ct. 1613 (2020) (Roberts, C.J., concurring in the judgment denying temporary injunction).

The Tenth Amendment of the U. S. Constitution reserves "police powers" to the states. *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 535-36 (2012).  Police powers include the "authority to provide for the public health, safety, and morals…." *Barnes v. Glen Theatre, Inc*., 501 U.S. 560, 569 (1991).  Accord, *South Bay U. Pentecostal Church*, 140 S.Ct. 1613 (C.J. Roberts, C.J. concurring) (state officials must have broad latitude to protect safety and health of people; federal judiciary "lacks the background, competence, and expertise to assess public health and is not accountable to the people").   Thus, the states have the primary authority to respond to pandemics and Defendant Governor Lamont has used that authority to declare a public health emergency and issue a series of Executive Orders that are intended to protect the people of Connecticut from this novel and deadly disease.

## I.   FACTUAL BACKGROUND

On March 10, 2020, in response to the Coronavirus Governor Lamont declared a Public Health and Civil Preparedness Emergencies.  Amended Complaint, "Am. Compl."  Exhibit A. ECF No. 23-1.  The declaration provided that a public health emergency and civil preparedness emergency were declared pursuant to Conn. Gen. Stat. §§ 19a-131 and 28-9.  *Id.*  The declaration was effective until September 9, 2020.  *Id.*  On September 1, 2020, Governor Lamont renewed the existing public health and civil preparedness emergencies[1] until February 9, 2021, unless terminated earlier.  (A-1).

On March 19, 2020, Governor Lamont issued Executive Order 7G[2].  Am. Compl. Exhibit B.  ECF-23-2.  Executive Order 7G provides, in relevant part:

> Notwithstanding any provision of the Connecticut General Statutes or of any regulation, local rule or other provision of law, I hereby suspend, for the duration of this public health and civil preparedness emergency, unless earlier modified or terminated by me, all statutory (1) location or venue requirements; (2) time requirements, statutes of limitation or other limitations or deadlines relating to service of process, court proceedings or court filings; and (3) all time requirements or deadlines related to the Supreme, Appellate and Superior courts or their judicial officials to issue notices, hold court, hear matters and/or render decisions including, but not limited to, the following:   . . .
> c. All time limitations for rendering judgments in civil actions provided in C.G.S. § 51-183b;
> d. All time limitations concerning civil process, service and return provided in Chapter 896 of the General Statutes . . . .

*See* Am. Compl. ¶ 25.

---

[1] *Declaration of Public Health and Civil Preparedness Emergencies,* CT.gov, https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200901-Renewed-COVID-19-Emergency-Declarations.pdf; (A-1) (For the Court's convenience, the defendant has provided an Appendix with material of which this Court may properly take judicial notice). "*see also* Fed. R. Evid. 201(b)(The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.')." *Auracle,* 2020 WL 4558682, at n. 4.

[2] *Executive Order No. 7G: Protection of Public Health and Safety During COVID-19 Pandemic and Response – Presidential Primary Postponement and Additional Public Health Measures*, CT.GOVhttps://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7G.pdf.

On April 10, 2020, Governor Lamont issued Executive Order 7X[3].  Am. Compl.

Exhibit C.  ECF-23-3.  As relevant to this case, Executive Order 7X provides:

- Connecticut General Statutes § 47a-23 is modified to additionally provide that neither landlords of residential dwelling units nor their legal representatives could deliver a notice to quit or serve/return a summary process action for nonpayment of rent for any reason before July 1, 2020, "except for serious nuisance as defined in section 47a-15 of the Connecticut General Statutes."

- Connecticut General Statutes § 47a-15a is modified to additionally provide an automatic sixty-day grace period for April rent, as well as a sixty-day grace period for May rent upon request.

- Renters who had paid a security deposit greater than one month's rent could apply the additional security deposit over one month's rent to any rent due for April, May, or June.

*See Auracle Homes, LLC v. Lamont*, 20-cv-00829 (VAB), 2020 WL 4558682, at *3 (D. Conn.

Aug. 7, 2020).

On June 29, 2020, Governor Lamont issued Executive Order 7DDD,[4] which extended

protections for residential renters impacted by COVID-19.   Am. Compl. Exhibit D.  ECF-23-4.

As relevant to this case, Executive Order 7DDD provides:

- Connecticut General Statutes § 47a-23 is modified to additionally provide that neither landlords of residential dwelling units nor their legal representatives could deliver a notice to quit or serve/return a summary process action for nonpayment of rent for any reason before August 22, 2020, "except for nonpayment of rent due on or prior to February 29, 2020 or for serious nuisance[]."

- § 47a-21 is modified to additionally provide:

> (m) Upon the written request of a tenant of a dwelling unit who is not enrolled in the security deposit guarantee program established by the Commissioner of Housing pursuant to Section 8-339 of the Connecticut General Statutes, who has paid a security deposit in an

---

[3]*Executive Order No. 7X: Protection of Public Health and Safety During COVID-19 Pandemic and Response – Renter Protections, Extended Class Cancellation and Other Safety Measures, Educator Certification, Food Trucks for Truckers*, CT.GOV, https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7X.pdf.

[4] *Executive Order No. 7DDD: Protection of Public Health and Safety During COVID-19 Pandemic and Response – Extension of Eviction Moratorium and Administrative Deadlines* (June 29, 2020), CT.GOV, https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7DDD.pdf.

> amount that exceeds one month's rent, and who provides written notice, including but not limited to in written electronic communication, that he or she has become fully or partially unemployed or otherwise sustained a significant loss in revenue or increase in expenses as a result of the COVID-19 pandemic, a landlord of such unit shall withdraw an amount of said deposit equal to the amount in excess of one month's rent from an escrow account and apply it toward the rent due in April, May, or June, July or August 2020.

Executive Order 7DDD further stated, as did Executive Order 7X: "[N]othing in this order shall relieve a tenant of liability for unpaid rent or of the obligation to comply with other terms of a rental agreement or statutory obligations pursuant to Connecticut law," and "nothing in this order shall relieve a landlord of the obligation to comply with a rental agreement or statutory obligations pursuant to Connecticut law." Am. Compl. ¶ 26 and Exhibit C and ¶ 27 and Exhibit D.  *See Auracle*, 2020 WL 4558682, at *4.

On August 21, 2020, Governor Lamont issued Executive Order 7OOO[5], which extended the eviction moratorium of Executive Orders 7X and 7DDD for nonpayment of rent in dwelling units, except for nonpayment of rent due prior to February 29, 2020 and serious nuisance, until October 1, 2020.  Executive Order 7OOO.  (A-4).  It also extended the use of security deposits in excess of one month's rent to apply to September rent.  *Id*.  Executive Order 7OOO also removed the suspension of statutory requirements or deadlines for defaults and nonsuits in civil matters contained in EO 7G, Section 2.  *Id*.

On September 1, 2020, Department of Health and Human Services, Centers for Disease Control and Prevention issued an Order,[6] ("CDC Order") effective September 4, 2020, to

---

[5] *Executive Order No. 7OOO: Protection of Public Health and Safety During COVID-19 Pandemic and Response – Extension of Eviction Moratorium and Outdoor Dining Expansion, Resumption of Requirements for Defaults and Nonsuits in Civil and Family Matters*, CT.GOV. https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7OOO.pdf.  (A-4).

[6] *Federal Register, Vol 85, No. 173, Friday September 4, 2020, Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/2020-19654.pdf. (A-9).

temporarily halt residential evictions to prevent the further spread of COVID-19. (A-9).  This

federal moratorium on evictions applies if a tenant provides the landlord with a declaration under

the penalty of perjury that:

1) The individual has used best efforts to obtain all available government assistance
   for rent or housing;
2) The individual either (i) expects to earn no more than $99,000 in annual income
   for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return), (ii)
   was not required to report any income in 2019 to the U.S. Internal Revenue
   Service, or (iii) received an Economic Impact Payment (stimulus check) pursuant
   to Section 2201 of the CARES Act;
3) the individual is unable to pay the full rent or make a full housing payment due to
   substantial loss of household income, loss of compensable hours of work or wages, a
   lay-off, or extraordinary out-of-pocket medical expenses;
4) the individual is using best efforts to make timely partial payments that are as close
   to the full payment as the individual's circumstances may permit, taking into account
   other nondiscretionary expenses; and
5) eviction would likely render the individual homeless - or force the individual to
   move into and live in close quarters in a new congregate or shared living setting -
   because the individual has no other available housing options.

CDC Order. (A-14).  The CDC Order also states that the individual must still pay rent or make a

housing payment.  *Id*.  The CDC Order is issued under Section 361 of the Public Health Service

Act to temporarily halt residential evictions to prevent the further spread of COVID-19.  *Id*. (A-10).

It also states that there is currently a pandemic of a respiratory disease (COVID-19) that spreads

very easily and sustainable between people who are in close contact with one another.  *Id*.  "As of

August 24, 2020, there were over 23,000,000 cases of COVID-19 globally resulting in over

800,000 deaths; over 5,500,000 cases have been identified in the United States, with new cases

being reported daily and over 174,000 deaths due to the disease."  *Id*.

On September 3, 2020, the Chief Administrative Judge for Civil Matters for the

Connecticut Judicial Branch issued an Order[7] in response to Executive Order 7OOO and the CDC

Order.  (A-8).  The Order states:

> Consistent with Governor Lamont's Executive Order 7OOO and to the extent
> permitted by any applicable federal laws, orders, rules or regulations, effective
> immediately there is no further stay ordered on the issuance or service of an
> execution following judgment on non-residential evictions, evictions for serious
> nuisance, residential nonpayment evictions for nonpayment of rent on or before
> February 29, 2020…. Further, there shall be no additional stay on the issuance or
> service of any summary process execution, or execution of ejectment, where the
> judgment of possession in a summary process case, or vesting of title in a
> foreclosure case, occurred prior to March 19, 2020. All previously issued executions
> that have expired must be returned to Court and a new application must be filed. No
> action taken pursuant to this order shall be in violation of the moratoria contained in
> the federal Coronavirus Aid, Relief, and Economic Security Act, the "Temporary
> Halt in Residential Evictions to Prevent the Further Spread of COVID-19" order
> issued by the Centers for Disease Control on September 1, 2020, or other applicable
> federal law, order, rule or regulation.

On September 30, 2020, Governor Lamont issued Executive Order 9E[8] which extend the

eviction moratorium until January 1, 2021.  (A-15).  The Order preamble states it is being taken to

prevent the spread of COVID.  *See* Executive Order 9E.  The Order states:

1. **Extension of Eviction Moratorium.** The provisions of Executive Order No. 7X,
   Section 1, as modified by Executive Order Nos. 7NN, Section 4, 7DDD, Section 1,
   and 7OOO, Section 3 shall remain in effect until January 1, 2021, with the following
   modifications:

   a **No Notice to Quit or Service of Summary Process Before January 1, 2021.**
      Section 47a-23 of the Connecticut General Statutes is modified to provide,
      "(g) No landlord of a dwelling unit . . . shall, before January 1, 2021, deliver
      or cause to be delivered a notice to quit or serve or return a summary process
      action, for any reason set forth in this chapter or in sections 21-80 et seq. of the
      Connecticut General Statutes, except for nonpayment of rent due on or before
      February 29, 2020, for serious nonpayment of rent as defined herein, for
      serious nuisance as defined in section 47a-15 of the Connecticut General

---

[7] Order by Chief Administrative Judge for Civil Matters (Conn. Super. Ct. September 3, 2020),
https://www.jud.ct.gov/HomePDFs/executionstayliftingv2.pdf.  (A-8).
[8] *Executive Order No. 9E: Protection of Public Health and Safety During COVID-19 Pandemic and Response –*
*Extension of Eviction Moratorium, Club Liquor Permits, and Effective Date of Insurance Data Security Law,* CT.GOV,
https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-
9E.pdf. (A-15).

Statutes, or, provided the notice to quit is not delivered during the term of any existing rental agreement…. For the purposes of this subsection, 'serious nonpayment of rent' means a rent arrearage equal to or greater than six months' worth of rent due on or after March 1, 2020, which shall exclude all other costs, fees, attorney fees, and other charges arising from the tenancy."

b. All notices to quit issued before January 1, 2021 shall be delivered with a copy of the Declaration ("CDC Declaration") attached to the CDC Order "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," 85 FR 55292 (September 4, 2020) ("CDC Order"). . . . Upon delivery of the executed CDC Declaration to the landlord . . . by a tenant or representative of the tenant, the landlord shall immediately and for the effective period of the CDC Order cease all action to evict.

c. All notices to quit for nonpayment of rent for rent due on or before February 29, 2020 that are issued before January 1, 2021 shall specify and recite the period of nonpayment of rent before February 29, 2021 for which rent has not been paid.

d. All notices to quit and all complaints in summary process actions for serious nonpayment of rent that are issued before January 1, 2021 shall specify and recite the amount of the rent arrearage due on or after March 1, 2020, the months for which rent has not been paid, and in what amounts.

## II.   PLAINTIFFS' ALLEGATIONS AND CASE HISTORY

The plaintiffs are all LLCs in the State of Connecticut.  Am. Compl ¶¶ 10-15.  On June 16, 2020, plaintiffs filed a five count Complaint regarding Executive Orders, "EO" 7G and 7X issued by Governor Lamont.  Complaint, ECF No. 1.  On June 30, 2020, the Plaintiffs filed an Amended Complaint, regarding Executive Order 7DDD, which extended protections of 7X for residential renters affected by COVID-19.  Am. Compl.

The Plaintiffs' Amended Complaint Counts are as follows: Count 1 claims a violation of the Equal Protection Clause on the grounds that "the rights of landlords of commercial properties are undistributed."  Am. Compl. ¶¶ 41-48.  Count 2 claims a Contract Cause violation claiming EO 7X interferes with their leases and agreements entered into prior to EO 7X.  Am. Compl. ¶¶ 49-57.  Count 3 claims a violation of the plaintiffs right to Due Process claiming they have been deprived of liberty and property without due process of law.  Am. Compl. ¶¶ 58-63.  Count 4 claims a Taking Clause violation claiming that due to EO 7X the plaintiffs have at least temporarily lost all

economically beneficial use of their real and personal property.  Am. Compl. ¶¶ 64-77.  Count 5 claims the Governor did not have the legal authority to issue EOs 7G or 7X and claims his actions were *ultra vires* conduct.  Am. Compl. ¶¶ 78-90.  The first four counts are against Governor Ned Lamont in his official capacity and the last count is against Ned Lamont in his official and individual capacities.  Am. Compl. ¶ 89. The plaintiffs state that the primary rights and responsibilities of landlords and tenants are set forth in Conn. Gen. Stat. §§ 47a-1 through 47a-20f and there is a statutory requirement to issue a notice to quit and for eviction process. Am. Compl. ¶¶ 18, 22 & 23.

BD Property Holdings LLC., through Prime Management, LLC., and East Main Street Meriden, LLC., claim they did not receive rent for months prior to the issuance of EO 7X, served notices to quit, but were prohibited from initiating summary process eviction actions. Am. Compl. ¶ 29.  These plaintiff's claim that the previous notice to quits are rendered useless because the notices have to "specify and recite the period of nonpayment of rent prior to February 29, 2020 for which rent has not been paid."  Am. Compl. ¶ 30.  216 East Main Street Meriden, LLC., claims it did not receive rent for months prior to the issuance of EO 7X, served notices to quit and served summary process evictions, but was prohibited from proceeding with summary process eviction actions.  Am. Compl. ¶ 31.

East Main Street Meriden, LLC., and Haberfeld Enterprises, LLC., claim they have not received rent for the months of at least March, April and May of 2020 and have been prevented from serving notice to quits on these tenants.  Am. Compl. ¶ 28.  BD Property Holdings LLC., through Prime Management LLC.; East Main Street Meriden, LLC.; Haberfeld Enterprises, LLC.; and Buckley Farms, LLC., through Haberfeld Enterprises, LLC., claim they did not receive rents for April and May and are precluded by EO 7X and/or 7DDD from employing remedies available

to them under their respective leases.  Am. Compl. ¶'s 32-35.  Auracle Homes, LLC., through FD Property Management LLC., and Orange Capital, LLC., claim that their tenants used a part of their security deposition to pay May and/or June 2020 rent and they were forced to relinquish a portion of their legally retained security deposit.  Am. Compl. ¶ 36.

The plaintiffs filed Plaintiffs' Motion for Emergency Temporary Restraining Order, or, in the Alternative, Issuance of a Preliminary Injunction.  ECF No. 2.  The defendant filed Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Emergency Temporary Restraining Order, or, in the Alternative, Issuance of a Preliminary Injection. ECF No. 27.  This Court issued Ruling and Order on Motion for Emergency Temporary Restraining Order or Preliminary Injunction and denied the Plaintiffs' motion for temporary restraining order or a preliminary injunction.  ECF No. 41[9].

The present motion to dismiss is filed pursuant to Fed. R. Civ. Proc. 12(b)(1) and 12(b)(6), seeking dismissal of plaintiffs' Amended Complaint in its entirety based on lack of subject matter jurisdiction, the Eleventh Amendment, mootness, failure to state a claim upon which relief can be granted and qualified immunity.

## ARGUMENT

## I.   STANDARD OF REVIEW

This Motion to Dismiss is filed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted.  A "case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike v. Already, LLC*, 663 F.3d 89, 94 (2d. Cir. 2011), *aff'd*, 568 U.S. 85 (2013).  The "plaintiff asserting subject matter

---

[9] *Auracle*, 2020 WL 4558682, (D. Conn. Aug. 7, 2020).

jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002). To meet that burden, a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue" and the court "need not 'credit a complaint's conclusory statements without reference to its factual context.'" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 & 146 (2d Cir. 2011) (per curiam) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1954 (2009)).  Where a defendant files a Rule 12(b)(1) motion, the court "may refer to evidence outside the pleadings" to decide the motion.  *Id.*

In ruling on a 12(b)(6) motion, this Court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *Id.*, and "requires more than labels and conclusions." *Twombly,* 550 U.S. at 555. Thus, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* at 570.  Complaints based on violations of constitutional rights must contain more than conclusory allegations to avoid dismissal. *Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990), *cert. denied*, 499 U.S. 937 (1991).  Complaints containing only conclusory, vague or general allegations of wrongdoing on the part of government officials will be dismissed. *Oster v. Aronwald,* 567 F.2d 551, 553 (2d Cir. 1977).

II.     **LACK OF JURISDICTION**

    A.      **PLAINTIFFS' CLAIMS BASED ON SUPERSEDED ORDERS AND CLAIMS SUBJECT TO THE FEDERAL MORATORIUM ARE MOOT.**

"To satisfy the Constitution's case-or-controversy requirement, a party must, at each stage of the litigation, have an actual injury which is likely to be redressed by a favorable judicial decision." *Janakievski v. Executive Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020). "If, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." *Id*.

Broadly stated, "mootness is 'standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997)). "To avoid mootness, 'throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Leybinsky v. U.S. Immigration & Customs Enf't*, 553 F. App'x 108, 109 (2d Cir. 2014) (Summary Order) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks omitted)).

    i.      **PLAINTIFFS' CLAIMS BASED ON SUPERSEDED ORDERS ARE MOOT**

Since the filing of the complaint, Executive Orders 7G, and 7X have been modified by EO 7DDD, EO 7OOO, and EO 9E, which have resulted in a lifting of the stay to allow residential evictions for nonpayment of rent on or before February 29, 2020, and for "serious nonpayment of rent" to proceed. When an Order no longer restricts the plaintiffs as alleged, or is superseded by a new order, plaintiffs' claims are moot as to injunctive and declaratory relief. *Elim Romanian*

*Church, et al. v. Pritzker, Governor of Illinois*, 140 S. Ct. 2823 (2020)(Mem); *Amato v. Elicker*, 20-cv-464 (MPS), 2020 WL 2542788, at *4-5 (D. Conn. May 19, 2020); *Ministries v. Newsom*, 20-cv-683 (BAS-AGH), 2020 WL 2991467, at *2–3 (S.D. Cal. June 4, 2020); *Martinko v. Whitmer,* 20-cv-10931 (BAF) (2020 WL 3036342, at *2-3 (E.D. Mich. June 5, 2020) (motion to dismiss complaint granted due to rescinded executive orders underlying complaint).

216 East Main Street Meriden, LLC., claims it had not received rent prior to the issuance of Executive Order 7G and had issued Notices to Quit on its tenants and served them with summary process evictions actions and but for EO 7G, they would proceed with those summary eviction actions.  Am. Compl. ¶ 31.  Not only can 216 East Main Street Meriden, LLC., proceed with summary eviction actions for nonpayment of rent prior to February 29, 2020, but has it in fact already done so, filing a Motion for Default for Failure to Appear and Judgment of Possession Summary Process – Nonpayment Action Prior to February 29, 2020 on September 2, 2020[10].  Any claim that the plaintiffs cannot proceed with summary eviction actions for rent not paid prior to February 29, 2020, based on an Executive Order is moot and as a result, this claim must be dismissed for lack of jurisdiction.

Plaintiffs BD Property Holdings, LLC through Prime Management, LLC., and 216 East Main Street Meriden LLC claim that they did not receive rent for months prior to the issuance of Executive Order 7X and they had issued Notice to Quits that are rendered useless by EO 7DDD. Am. Compl. ¶¶ 29 and 30.  The plaintiffs have not stated whether these notices to quits are for nonpayment of rent prior to February 29, 2020.  Any claim based on nonpayment of rent prior to February 29, 2020, are moot by EO 7OOO and EO 9E, which do not stay notice to quits and

---

[10] 216 East Main Street Meriden, LLC. v. Laura Lumbra, et al., NNI-CV-19-6018416 S, http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=NNICV196018416S.(A-20).

summary process eviction actions for nonpayment of rent prior to February 29, 2020 and should be dismissed for lack of subject matter jurisdiction.

All the plaintiffs, except Auracle Homes, LLC., and Orange Capital, LLC., claim they did not receive rents for the months starting in March or April of 2020, and have been prevented from serving notice to quits or summary process on these tenants.  *See* Am. Compl. ¶¶ 28, 32-35.  If these plaintiffs did not receive rent after their Complaint was filed for the months of May, June, July, August and September, Executive Order 9E allows for notices to quit and summary process actions to proceed.   As a result, all claims for nonpayment of rent that was due on or after March 1, 2020, for six or more months' rent are moot and must be dismissed for lack of subject matter jurisdiction.

> ### ii.     PLAINTIFFS' CLAIMS SUBJECT TO THE FEDERAL MORATORUIM ARE MOOT.

A change in federal law can render claims challenging state laws or policies in the impacted area moot.  *See, e.g.*, *Green v. Mansour*, 474 U.S. 64, 67 (1985) (affirming lower court holdings that "changes in federal law rendered moot . . . claims for prospective relief" against state officials). Effective September 4, 2020, the Department of Health and Human Services, Centers for Disease Control and Prevention issued an order to temporarily halt residential evictions to prevent the further spread of COVID-19 until December 31, 2020.  The federal moratorium prevents residential tenants from being evicted if they complete a declaration, under oath, that certain conditions have been meet.

The State of Connecticut, Judicial Branch issued a notice on September 14, 2020[11], stating the hearings for summary process (eviction) cases in which a request for execution has been

---

[11] *9/14/20 Notice Regarding Summary Process (eviction) Execution hearings and Centers for Disease Control and Prevention's Eviction Moratorium*, https://www.jud.ct.gov/HomePDFs/MoratoriumEvictions.pdf. (A-23).

filing would be scheduled for hearings.  The notice stated that "[p]ursuant to the September 4, 2020 order from the Centers for Disease Control and Prevention (CDC) which allows for an adult tenant to submit a signed declaration to their landlord meeting the CDC's criteria, a landlord would be prohibited from executing on a judgment for possession, through December 31, 2020 if a tenant submits the declaration."  As a result, the plaintiffs are precluded from evicting their tenants who complete a CDC declaration wholly independent of the Governor's Executive Orders.  As a result, the plaintiffs' claims that fall within the CDC Order are moot and must be dismissed.

## B.      THE ELEVENTH AMENDMENT BARS PLAINTIFFS' *ULTRA VIRES* CLAIM AGAINST THE GOVERNOR IN HIS OFFICIAL CAPACITY.

The Supreme Court has long held that the Eleventh Amendment bars claims where "a plaintiff alleges that a state official has violated *state* law."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (emphasis in original); *see also Raygor v. Regents of Univ. of Minnesota*, 534 U.S. 533, 541–42 (2002) (holding that the supplemental jurisdiction statute does not "authorize district courts to exercise jurisdiction over claims against nonconsenting States").  It is well-established that "a federal court may not sit in judgment of whether a State or a State official has complied with its own law."  *Dennehy v. Soto*, 2018 WL 4936003, at *2 (D. Conn. Oct. 11, 2018) (citing *Pennhurst*, 465 U.S. at 106).  As the Supreme Court explained, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."  *Pennhurst*, 465 U.S. at 106.

This Court has already found that it lacks jurisdiction over the plaintiffs *Ultra Vires* Claim because it is barred by the Eleventh Amendment.  *Auracle*, 2020 WL 4558682, at *13.  This court stated "by seeking redress for Governor Lamont's alleged violations of the authority delegated to him by the Connecticut General Assembly under Connecticut General Statutes §§ 28-9 and 19a-

131a, Plaintiffs ask the Court to cure violations of state law. But '[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.' *Pennhurst*, 465 U.S. at 106, 104 S. Ct. 900." *Id.*, *12. As a result, the court lacks jurisdiction of Count 5 of the plaintiffs' Amended Complaint, and it must be dismissed pursuant to Rule 12(b)(1).

### C.   ELEVENTH AMENDMENT BARS MONETARY DAMAGES

The plaintiffs state that they are seeking compensatory damages and punitive damages. *Amended Complaint, Prayer for Relief.* This Court should dismiss the Second Amended Complaint to the extent, if any, it could be construed as asserting official capacity damages claims against the Governor. "The Eleventh Amendment bars the award of money damages against state officials in their official capacities." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003).[12] That bar applies to all of Plaintiffs' claims regardless of whether they are based on federal or state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) ("*Pennhurst*") (holding that the Eleventh Amendment bars claims sounding both in federal and state law against a state or its officials in their official capacities when brought in federal court). Accordingly, all such claims for money damages against Governor Lamont are barred.

### D.   NO CONTRACT CLAUSE CLAIM UNDER 42 U.S.C. § 1983

Count 2 of the plaintiffs *Amended Complaint* alleges a "deprivation of civil rights violations of the right to private contract 42 U.S.C. § 1983." Although there is a split in the circuits, the defendant maintains that there is no right to a contract clause violation pursuant to § 1983. The Second Circuit has noted that "it is not clear that suits for violations of the contract clause may be brought under section 1983." *Haley v. Pataki*, 106 F.3d 478, 482 (2d Cir. 1997). Both the Sixth

---

[12] A Rule 12(b)(1) motion is the correct vehicle to raise the Eleventh Amendment. *See, e.g.*, *Morabito v. New York*, 2020 WL 897595, at *1 n.2 (2d Cir. Feb. 25, 2020), *as amended* (Feb. 27, 2020) (Summary Order) (citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)).

Circuit and the Fourth Circuit have concluded that "an alleged Contracts Clause violation cannot give rise to a cause of action under § 1983." *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017); *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011) ("There is little doubt, however, that *Carter v. Greenhow*, 114 U.S. 317 (1885) stands even today for the proposition that an attempted § 1983 action alleging state impairment of a private contract will not lie."). *But See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) (per curium) ( The Ninth Circuit has reached the opposite conclusion). The plaintiffs' Contract Clause Claim does not provide a private contract cause of action pursuant to § 1983 and Count 2 must be dismissed for lack of subject matter jurisdiction.

## III.   PLAINTIFFS' ALLEGATIONS FAIL TO STATE A CLAIM FOR RELIEF.

The Supreme Court recognized over a century ago in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), that "[t]he safety and the health of the people of" a state "are, in the first instance, for that [state] to guard and protect." *Id*. at 38.  "They are matters that do not ordinarily concern the national government." *Id*.  Rather, "they depend, primarily, upon such action as the state, in its wisdom, may take." *Id*.

*Jacobson* is the seminal case in the area of state disease response, and there is no dispute that it remains good law.  *See, e.g., South Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, J. concurring); *Phillips v. City of New York*, 775 F. 3d 538, 542-543 (2d Cir. 2015); *Amato*, 2020 WL 2542788, at *7.  *Jacobson* held that local officials – acting pursuant to authority from the state – could criminally charge an individual for refusing a smallpox vaccination. 197 U.S. 11.  In so holding, the Court explained that the liberty secured by the Constitution does "not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.,* at 26.  It is only when a law has "no real or substantial relation" to protecting the

public health or safety, or is, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law," that it is susceptible to constitutional challenge. *Id.*, at 31.

"*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency." *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) (emphasis in original). This includes a plaintiff's liberty interest, even though it is the "greatest of all rights," *Jacobson*, 197 U.S. at 26, and the Free Exercise of Religion, Association, Assembly, and Speech First Amendment rights. *See, e.g., South Bay United Pentecostal Church*, 140 S. Ct. at 1613-1614; *Prince v. Mass.*, 321 U.S. 158, 166-167 and n.12 (1944); *Antietam Battlefield KOA v. Hogan*, 2020 WL 2556496 (D. Md. May 20, 2020); *Amato*, 2020 WL 2542788 at *7; *Geller v. de Blasio*, 20-cv-3566 (DLC), 2020 WL 2520711 (S.D.N.Y. May 18, 2020).

Based on the *Jacobson* standard, plaintiffs' claims should be dismissed in their entirety for failure to state a claim. "*Jacobson* requires that courts refrain from second-guessing state governments' responses [to COVID-19] unless there is 'no real or substantial relation' between the actions and the public health and safety or the action is 'beyond all question, a plain, palpable invasion of rights.'" *Amato*, 2020 WL 2542788, at *10 (quoting *Jacobson*, 197 U.S. at 31). As Chief Justice Roberts recently emphasized, when state "officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Robert, C.J., concurring; quoting *Marshall*, 414 US. at 427. Here, Governor Lamont's actions were well within the especially broad powers, that the Constitution allows him, "to limit the spread of COVID-19, a novel severe acute respiratory illness that has killed thousands of people…." and for which "[a]t this time, there is no known cure, . . . and no vaccine." *Id.* at 1613. Plaintiffs' claims therefore lack merit and should be dismissed.

17

A.      **Count 1- Plaintiffs Fail to State an Equal Protection Claim.**

The plaintiffs' claim that Executive Order 7X, and the extension of 7X through 7DDD,

7OOO and 9E, violates the Equal Protection Clause because the Executive Orders do not apply to

commercial landlords.  "The Equal Protection Clause of the Fourteenth Amendment commands that

no State shall deny to any person within its jurisdiction the equal protection of the laws, which is

essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne

v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  Two types of claims may arise from a

violation of the Equal Protection Clause: (1) selective enforcement claim and (2) a "class-of-one

claim."

To state a selective enforcement claim "a plaintiff must allege that (1) compared with others

similarly situated, he or she was treated differently; and (2) that such different treatment was based

on impermissible considerations such as race, national origin, religion, or some other protected

right.  "A plaintiff may bring a "class of one" equal protection claim 'where the plaintiff alleges

that [he] has been intentionally treated differently from others similarly situated and that there is no

rational basis for the difference in treatment' *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000). In the Second Circuit, a class-of-one plaintiff 'must show an extremely high degree of

similarity between themselves and the persons to whom they compare themselves.' *Clubside v.

Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted)."  *Smith v. Perez,* No. 3:19-CV-1758

(VAB), 2020 WL 2307643, at *7 (D. Conn. May 8, 2020).

The Equal Protection Clause "does not forbid classifications" in the abstract, and instead

"simply keeps governmental decisionmakers from treating differently persons who are in all

relevant respects alike." *Nordlinger* v. *Hahn,* 505 U.S. 1, 10 (1992).  It is therefore "axiomatic that

[equal protection violations must be based on a claim] that similarly situated persons have been

treated differently." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994).  "[T]he

government can treat persons differently if they are not 'similarly situated.'" *Jankowski–Burczyk v.

INS*, 291 F.3d 172, 176 (2d Cir.2002) (quoting *Able v. United States*, 155 F.3d 628, 631 (2d

Cir.1998)). Because plaintiffs are not claiming membership in a protected class, "plaintiffs 'must

show an extremely high degree of similarity between themselves and the persons to whom they

compare themselves.'" *Progressive Credit Union*, 889 F.3d 40, 49 (2d Cir. 2007)(quoting *Clubside,

Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). In fact, plaintiffs "must be '*prima facie*

identical' to the persons alleged to receive irrationally different treatment." *Id.* (quoting *Neilson v.

D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

Residential landlords are not similarly situated to commercial landlords.  The plaintiffs'

claim that Executive Order 7X infringed on plaintiffs' rights "while leaving the rights of landlords

of commercial properties undisturbed."  Am. Compl. ¶ 45.  The plaintiffs are owners and

management companies of "dwelling units" and are not similarly situated to "landlords of

commercial business."  Landlords of commercial business are not renting to individuals and

families who can face homelessness if they are served with a Notice to Quit or eviction summary

process.  Plaintiffs have not plead any facts identifying any similarly situated businesses, much

less any facts showing that Plaintiffs were treated differently from any similarly situated

business.  The plaintiffs have failed to state a cause of action under the Equal Protection Clause and

as a result, this count must be dismissed.

Even if Plaintiffs could pass the similarly situated hurdle, the Executive Orders do not

violate the Equal Protection Clause.  Because the Governor's Executive Orders do not draw

distinctions based on any suspect classifications and do not implicate any fundamental rights, they

are reviewed under a deferential rational basis level of scrutiny.  *See Heller* v. *Doe*, 509 U.S.312,

319-20 (1993).  "Under rational basis review, legislation that does not draw a distinction along

suspect lines such as race or gender passes muster … as long as there is any reasonably

conceivable state of facts that could provide a rational basis for the classification." *PCG-SP*

*Venture I, LLC., v. Newsom, et al.,* 20-cv-3566 (DLC), 2020 WL 4344631, at *6 (C.D. Cal. June

23, 2020)(internal quotation marks and citations omitted).  Legislative classifications are

"accorded a strong presumption of validity," and must be upheld "if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification."  *Heller* v. *Doe*,

509 U.S. at 319-20 (1993).

Executive Order 7X states "COVID-19 is a respiratory disease that spreads easily from

person to person and may result in serious illness or death."  Am. Compl. Exhibit C.  The order

also states "many residents of Connecticut are experiencing or will experience a significant loss of

income as a result of business closures, reduced work hours or wages, or layoffs related to

COVID-19, all of which affect their ability to pay their rent, and thus leave them vulnerable to

eviction and increased amounts owed in the form of rent, penalties, interest, and late fees, all of

which cause potential risks to public health and safety."  *Id*.  "Minimizing evictions during this

public health period is critical to controlling and reducing the spread of COVID-19 by allowing all

residents to stay home or at their place of residence."  *Id*.  Executive Order 7DDD added "in order

to keep people safely in their homes and avoid increased homelessness and the associated risk of

COVID-19 transmission, Executive Order No. 7X, Section 1 provided temporary relief from

statutory eviction proceedings . . .  continued economic disruption could increase homelessness

and associate risk of COVID-19 transmission unless certain relief measures provided in Executive

Order No. 7X are continued."  Am. Compl. Exhibit D.  Executive Orders 7OOO and 9E also state

that they were being implemented to stop the spread of COVID-19.  A-4 and A-15.

The Governor's Executive Orders survive a rational basis test because they are being undertaken during a pandemic to reduce the spread of COVID-19. The governor's orders are supported by the fact that the federal government has also issued a moratorium on evictions because they are trying to stop the spread of COVID-19. As a result, the plaintiffs have failed to state a cause of action under the Equal Protection Clause and this count must be dismissed.

**B.      Count 2- Plaintiffs Fail to State a Contract Clause Claim.**

The Contracts Clause of the United States Constitution states that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. Art. I § 10, cl. 1. A prerequisite to any violation of that Clause is that the challenged action be a "[l]aw" or, as the Supreme Court has explained, that it be legislative in nature. *See New Orleans Water-Works Co. v. Louisiana Sugar-Refining Co.*, 125 U.S. 18, 30–32 (1888). *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 60–61 (2d Cir. 2020). This Court has already found that the Executive Orders are legislative in nature. *Auracle,* WL 4558682, at *17. This Court stated that "[t]he Contracts Clause 'does not trump the police power of a state to protect the general welfare of its citizens, a power which is paramount to any rights under contracts between individuals.' *Buffalo Teachers*, 464 F.3d at 367(internal quotation marks and citations omitted). 'Thus, state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim.' *Id.* at 368." *Id.*, at *16.

"To determine whether a state law violates the Contracts Clause, the Second Circuit considers 'three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary.'" *Farmington-Girard, LLC v. Planning &*

*Zoning Comm'n of City of Hartford*, 17-cv-1915 (MPS), 2019 WL 935500, at *15 (D. Conn. Feb. 26, 2019)(quoting, *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006)).  "When, as in this case, the challenged law only impairs private contracts, and not those to which the state is a party, courts must accord substantial deference to the State's conclusion that its approach reasonably promotes the public purpose for which it was enacted." *Elmsford*, 2020 WL 3498456, at * 12 (internal quotation marks and citations omitted).

> ### i.      Substantial Impairment.

The plaintiffs have failed to allege that they have suffered a substantial impairment. Plaintiffs stated that they are landlords of residential real property and have written leases agreements with tenants.  Am. Compl. ¶¶ 10-15.  The plaintiffs have not provided any contract language that they claim is being violated by Governor Lamont's Orders. The plaintiffs' have not declared that they have a contractual right to pursue evictions or the amount of security deposit to be retained.  They have also not alleged that they cannot bring a civil action for breach of contract. The plaintiffs' have failed to allege a contract provision that was violated as a result or cite to any case that supports an argument that they have a right under the Contract Clause to bring a statutory eviction.

In *Elmsford* the court noted that the eviction process is governed by statute not by the contract.  "It is generally true that 'laws which subsist at the time and place of the making of a contract … enter into and become a part of it.  However, the implied contractual rights covered by state laws, including judicial remedies such as eviction, may be subject of Contract Clause claim only when those laws affect the validity, construction, and enforcement of contracts.  *Id.*\*14. (internal quotation marks and citations omitted).    The plaintiffs' Contract Clause claim does not allege that the Executive Orders impact the validity, construction or enforcement of the contract.

The plaintiffs acknowledge that landlord/tenant law is highly regulated in the State of Connecticut.  Am. Comp. ¶¶ 18, 22 & 23.  "Where, as here, the industry has been heavily regulated, and regulation of contracts is therefore reasonably foreseeable, a party's ability to prevail on its Contract Clause challenge is greatly diminished."  *Alliance of Auto Mfrs. Inc., v. Currey*, 984 F.Supp. 2d 32, 55 (D.Conn. 2013), aff'd 610 F. App'x 10 (2d Cir. 2015), *cert. den.* 136 S.Ct. 1374 (2016).  A landlord cannot charge any amount of security deposit they want, but rather security deposits are regulated by Conn. Gen. Stat. § 47a-21. The process for evictions is also governed by Conn. Gen. Stat. § 47a-23, et seq.  The legislature can increase or decrease the amount of security deposits a landlord can require and change the statutory eviction process.

The court in *Elmsford*, 2020 WL 3498456 at * 15-16,  found that Governor Cuomo's Executive Order 202.28 that temporally extended allowing tenants to apply their security deposit to rents due and owing; and temporally prohibited landlords from initiating evictions proceedings against tenants who were facing financial hardship due to the pandemic, until August 20, 2020 was not a substantial impairment to the plaintiffs' contract rights.   This Court has already found that "Neither the eviction moratorium nor the security deposit provisions operate as a substantial impairment of Plaintiffs' contractual rights, because neither are 'wholly unexpected' government legislation." *Auracle*, 2020 WL 4558682, at *13.

### ii.    Public Purpose.

The Executive Orders serve a legitimate public purpose.  As evidenced by both Governor Lamont's Executive Orders and the CDC Order, there is a legitimate public purpose in keeping people in their homes during a pandemic, preventing homelessness and congruent housing to stop the spread of COVID-19.  This Court has already recognized that the Executive Orders serve a

public purpose.  *Auracle*, 2020 WL 4558682, at *18.  This is further supported by the CDC Order

which has institute a national eviction moratorium under its public health authority.  (A-9).

      **iii.**    **Reasonableness.**

Governor's Lamont's Executive Orders are reasonable and necessary.  The Supreme Court

recognized over a century ago in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11

(1905), that "[t]he safety and the health of the people of" a state "are, in the first instance, for that

[state] to guard and protect." *Id*. at 38.  "They are matters that do not ordinarily concern the

national government." *Id*.  Rather, "they depend, primarily, upon such action as the state, in its

wisdom, may take." *Id*.  "*Jacobson* requires that courts refrain from second-guessing state

governments' responses [to COVID-19] unless there is 'no real or substantial relation' between the

actions and the public health and safety or the action is 'beyond all question, a plain, palpable

invasion of rights.'"  *Amato*, 2020 WL 2542788, at *10 (quoting *Jacobson*, 197 U.S. at 31).  As

Chief Justice Roberts recently emphasized, when state "officials 'undertake[ ] to act in areas

fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South

Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Robert, C.J., concurring; quoting *Marshall*,

414 US. at 427).

    Executive Order 9E states, in relevant part, that:

    **WHEREAS,** the President of the United States has declared that people dislocated
    from their homes may be unable to shelter in place, may have more difficulty
    maintaining a routine of social distancing, and will have to find alternative living
    arrangements that may include a homeless shelter, a crowded family home, or travel to
    other states, posing multiple challenges that can exacerbate and amplify the spread of
    COVID-19; and

    **WHEREAS,** for those reasons, as declared in certain executive orders issued by the
    President of the United States, it is the policy of the United States to minimize, to the
    greatest extent possible, residential evictions and foreclosures during the ongoing
    COVID-19 national emergency; and

> **WHEREAS,** the CDC has determined that, in a pandemic, eviction moratoria can be an effective public health measures to prevent the spread of communicable disease because they facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19, allow state and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID-19, and decrease the risk of unsheltered homelessness and the likelihood of individuals moving into congregate settings such as shared housing and homeless shelters.

(A- 15.)  The CDC Order is issued under Section 361 of the Public Health Service Act to temporarily halt residential evictions to prevent the further spread of COVID-19.  (A-10).  It also states that there is currently a pandemic of a respiratory disease (COVID-19) that spreads very easily and sustainable between people who are in close contact with one another.  *Id*.  "As of August 24, 2020, there were over 23,000,000 cases of COVID-19 globally resulting in over 800,000 deaths; over 5,500,000 cases have been identified in the United States, with new cases being reported daily and over 174,000 deaths due to the disease."  *Id*.  This court has recognized the reasonableness of Governor Lamont's Executive Orders.  "Governor Lamont's Executive Orders aim to limit the spread of COVID-19, a novel severe acute respiratory illness that has killed thousands of people in Connecticut and more nationwide." *Auracle,* 2020 WL 4558682, at *18.

## C.       Count 3 - Plaintiffs Fail to State a Due Process Claim.

The plaintiffs state that the "defendant's conduct deprives the plaintiffs of liberty and property without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution."  Am. Compl. ¶ *61*.  The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  The plaintiffs due process claims are duplicative of the Takings Clause claim and as a result, must be dismissed.  The plaintiffs have failed to allege a liberty right or a substantial impairment of a property interest protected by the U.S. Constitution.  The plaintiffs also do not meet the standard for a substantive due process claim or a procedural due process claim.

This Court has already found that the "[b]ecause Plaintiffs have failed to demonstrate a substantial impairment of their property rights, they have pointed to no specific constitutional guarantee safeguarding the interest they assert have been invaded.  Plaintiffs have not identified a property interest independent of the interests asserted in their other constitutional claims, and the Second Circuit has expressly forbidden this sort of duplication."  *Auracle,* 2020 WL 4558682, at *20 (internal quotation marks and citation omitted).  Because the plaintiffs have failed to provide a specific constitutional guarantee they fail to state a cause of action and this count must be dismissed.  The plaintiffs also fail to state a cause of action for a substantive or procedural due process claim in their Amended Complaint.

### i.      Substantive Due Process.

Due Process Clause of the Fourteenth Amendment provides "a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State."  The substantive component of the Clause "protects individual liberty against 'certain governmental actions regardless of the fairness of the procedures used to implement them.'"  *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 261 (1992)(quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986). A state violates due process when its action "'afford[s] those canons of decency and fairness which express the notions of justice of English-speaking peoples' . . . [and are] 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Rochin v. California,* 342 U.S. 165, 169 (1952) (quoting *Malinski v. New York*, 324 U.S. 401, 416-17 (1945) (opinion of Frankfurter, J.).  "Substantive due process protects [individuals] against governmental action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect' or 'ill-advised'  *Gordon v. Nicoletti, et al.,* 84 F. Supp. 2d 304, 312 (D.Conn. 2000)(citation omitted).

The plaintiffs' claims do not rise to the level of a substantive due process violation.  The Supreme Court has consistently expressed great reluctance "to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended . . . the doctrine of judicial restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field."  *Collins v. City of Harker Heights*, 503 U.S. at 125.  The Court must therefore "focus on the allegations in the complaint to determine how [the plaintiff] describes the constitutional right at stake and what the [government] allegedly did to deprive her of that right."  *Id.*

The Governor's Order to place a moratorium of evictions, during a pandemic is not an arbitrary, conscience-shocking, or an oppressive action.  The plaintiffs' property has not been taken and as stated *infra*, does not even rise to the level of a regulatory taking.  "Where the right infringed is not fundamental, the government regulation need only be reasonable related to a legitimate state objective" to satisfy substantive due process.  *Bryant v. N.Y. State Educ. Dept*, 692 F.3d 202, 217 (2d Cir. 2020).  The Governor's Orders, that work to keep people in their homes during a pandemic, reasonably meets a legitimate state objective.  "When faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measure have at least some 'real or substantial relations' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by fundamental law."  *Amato v. Elicker*, 2020 WL 2542788, at * 10.  The Governor's orders do not violate the plaintiffs' substantive due process rights.

      **ii.**        **Procedural Due Process.**

The Fourteenth Amendment guarantees an individual due process of the law where the state deprives an individual of a constitutionally protected liberty or property interest. *Board of Regents*

*v. Roth,* 408 U.S. 564, 569 (1972).  "To succeed on a procedural due process claim, 'a plaintiff

must first identify a property right, second show that the state has deprived him [or her]

of that right, and third show that the deprivation was affected without due process.'"  *Progressive*

*Credit Union v. City of New York,* 889 F.3d 40, 51 (2d Cir. 2018) (quoting *Local 342, Long Island*

*Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir.

1994)).  "As the parties asserting due process rights, plaintiffs bear the burden of establishing that

they had a legitimate property interest at stake."  *MacFall v. City of Rochester*, 746 F. Supp. 2d

474, 481 (W.D.N.Y. 2010), *aff'd*, 495 F. App'x 158 (2d Cir. 2012).

Even if the plaintiffs could demonstrate the deprivation of a liberty and property interest,

their procedural due process claim nonetheless fails because "[o]fficial action that is legislative in

nature is not subject to the notice and hearing requirements of the due process clause."  *Interport*

*Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994).  Rather, "constitutional due process

requirements apply only where the official action is 'designed to adjudicate disputed facts in

particular cases.'"  *Id*.  (quoting *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 245

(1973)).  As the Second Circuit noted, "'[g]eneral statutes within the state power are passed that

affect the person or property of individuals, sometimes to the point of ruin, without giving him a

chance to be heard.'"  *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 896 (2d Cir. 1960)

(quoting *Bi-Metallic Investment Co. v. State Board of Equalization of Colorado*, 239 U.S. 441

(1915)).

The Executive Orders at issue in this case are plainly legislative as opposed to adjudicative

in nature.  They were enacted after the Governor declared public health and civil preparedness

emergencies, through a process established by the General Assembly.  Conn. Gen. Stat. §§ 28-9

and 19a-131a authorize the Governor to declare a state of civil preparedness emergency and a

public health emergency respectively.  The issuance of the Executive Orders themselves was

authorized by § 28-9. Subsection (b)(1) permits the Governor to:

> modify or suspend in whole or in part, by order as hereinafter provided, any statute,
> regulation or requirement or part thereof whenever the Governor finds such statute,
> regulation or requirement, or part thereof, is in conflict with the efficient and
> expeditious execution of civil preparedness functions or the protection of the public
> health.

Conn. Gen. Stat. § 28-9(b)(1). "Any such order shall have the full force and effect of law upon the

filing of the full text of such order in the office of the Secretary of the State."  *Id*.  In addition,

subsection (b)(7) grants the Governor the authority to "take such other steps as are reasonably

necessary in the light of the emergency to protect the health, safety and welfare of the people of the

state . . . ." Conn. Gen. Stat. § 28-9(b)(7).

   The Executive Orders are legislative and not adjudicatory in nature because they were

designed to apply to all renters and landlords "as a whole, rather than directed at the adjudication of

a particular factual dispute."  *Baines v. Masiello*, 288 F. Supp. 2d 376, 388 (W.D.N.Y. 2003);

*O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413, 430 (S.D.N.Y. 2004) ("The Village parking

ordinance was not designed to adjudicate disputed facts in particular cases, but was instead a

prospective rule announcing a new qualification for parking permits that would bind all citizens in

the future.   Therefore, the Village's passage of the parking ordinance must be considered

legislative official action" ).  As such, the Orders "cannot be challenged under the procedural facet

of the Due Process Clause."  *Id*; *Six v. Newsom*, 2020 WL 2896543, at *8 (C.D. Cal. May 22, 2020)

("Plaintiffs' procedural due process claim appears to be that they were entitled to some process

before Governor Newsom imposed the Stay-at-Home Order. . . . But governmental decisions which

affect large areas and are not directed at one or a few individuals do not give rise to the

constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient.") (internal quotation marks omitted).

Furthermore, the plaintiffs have also not been denied an opportunity to be heard at a meaningful time and in a meaningful manner. "The fundamental requirement of a due process is the opportunity to be heard at a meaningful time an in a meaningful manner." *Mathews v. Eldredge*, 424 U. S. 319, 334 (1976). Where a delay in obtaining a judicial determination is alleged to infringe on due process, "the significance of such a delay cannot be evaluated in a vacuum. In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242 (1988).

In *Elmsford* the court, in reviewing a due process claim challenging Governor's Cuomo's Executive Order that delayed evictions until August 19, 2020, found that "the delay embodied mandate does not deny the Plaintiffs a meaningful opportunity to be heard" and that plaintiffs "Due Process claim fails as a matter of law." *Elmsford*, 2020 WL 3498456, at * 16. Given the ravages of COVID-19, placing a temporary moratorium on the plaintiff's ability to begin eviction proceedings against tenants unable to pay their rent due to disruptions caused by COVID-19, is not a "plain, palpable invasion of rights." *Jacobson*, 197 U.S. at 31.

Plaintiffs have not been permanently deprived of anything. They are able to begin evictions for tenants who have failed to pay rent prior to February 29, 2020 and for tenants in "serious nonpayment of rent" for after March 1, 2020. They will also be able to begin evictions that do not fall into an EO 9E exception on January 1, 2021. Additionally, the Orders have not in any way

reduced the amount of rent Plaintiffs are owed.  Under those circumstances, the Orders due not violate procedural due process.

In light of the State's extraordinary interest in preventing a public health and financial crisis from compounding into a homelessness crisis; the limited, temporary nature of the delay; and the lack of harm to the plaintiffs due to the retention of their right to recover unpaid rent, being required to wait until January  1, 2021, to initiate eviction proceedings is not a violation of procedural due process. This Court has also found that the plaintiffs have not established the denial of an opportunity to be heard at a meaningful time and in a meaningful manner, *Auracle,* 2020 WL 4558682, at *19-20, and as a result, plaintiffs claim of a procedural due process claim must be dismissed.

> **D.      Count 4- Plaintiffs Fail to State a Taking Clause Claim.**

The plaintiffs claim that the "Defendant's challenged conduct caused, under color of law, the illegal seizure without just compensation of the Plaintiffs' security interest in their real estate which the Plaintiffs possessed prior to the issuance of Executive Orders 7X and Executive Order 7DDD.  These uncompensated seizures violate the Takings Clause of the Fifth Amendment made applicable to the States though the Fourteenth Amendment."  Am. Compl., 's ¶ 67-68.

"The Takings Clause of the Fifth Amendment provides that no 'private property shall be taken for public use, without just compensation.' U.S. Const. amend. V.  The clause applies to the states through the Fourteenth Amendment. *See Kelo v.  New London,* 545 U.S. 469, 125 S. Ct. 2655, 2658 n. 1 (2005)."  *Buffalo Teachers Fed'n v. Tobe,* 464 F.3d 362, 373–74 (2d Cir. 2006). "The Supreme Court has recognized two branches of Taking Clause cases: physical takings and regulatory takings."  *1256 Hertel Ave. Associates, LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014.)  Physical takings (or physical invasion or appropriation cases) occur when the government

physically takes possession of an interest in property for some public purpose. *Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321 (2002).  A regulatory taking occurs when a governmental regulation of private property goes too far and is tantamount to a direct appropriate or ouster.  *1256 Hertel Ave., Assocs.*, 761 F.3d. at 263 (quoting *Lingle v. Chevron U.S.A.*, Inc, 544 U.S. 528, 537 (2005).  The plaintiffs have failed to state a cause of action for taking clause cause of action under both the physical and regulatory takings standards.

### i.      The Executive Orders Do Not Cause A Physical Taking.

The plaintiffs fail to state a claim of a physical taking.  "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land."  *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992); *Burnette v. Carothers*, 94-cv-420 and 94-cv-676 (EBB), 1998 WL 136177, at *4 (D. Conn. Mar. 11, 1998).  "Government action that does not entail a physical occupation, but merely affects the use and value of private property, does not result in a physical taking of property."  *Elmsford*, 2020 WL 3498456, at * 7.

As this court has stated "[a]lthough Plaintiffs allege physical takings of their properties, "no government has required any physical invasion of [Plaintiffs'] property." *See id.* at 528, 112 S.Ct. 1522 (finding that a state law prohibiting the discharge or eviction of rental customers was not a taking). As in *Yee*, Plaintiffs here "voluntarily rented their land" to residential tenants. *See id.* at 527, 112 S.Ct. 1522. The Executive Orders at issue here, also like the state and local laws in *Yee*, "merely regulate [Plaintiffs'] use of their land by regulating the relationship between landlord and tenant." *See id.* at 528, 112 S.Ct. 1522 (emphasis omitted)."  *Auracle,* 2020 WL 45558682, at *13. The plaintiffs' have failed to state a cause of action for a physical taking and as a result, their claim must be dismissed pursuant to Rule 12 (b)(6).

### ii.      The Executive Orders Do Not Constitute A Regulatory Taking.

The plaintiffs fail to state a claim of a regulatory taking.  A regulatory taking occurs when a governmental regulation of private property goes too far and is tantamount to a direct appropriation or ouster.  "It is well established that states "may regulate any business . . . in the interest of the public welfare or the public convenience, provided it is done reasonably." *Greater New Haven Prop. Owners Ass'n v. City of New Haven*, 288 Conn. 181, 187 (2008).  Economic values that businesses enjoy have long been subject to this "implied limitation," and "must yield to the police power" when it is exercised reasonably. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922); *see Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 424 (1952).  "Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Products of Cal., v. Constr. Laborers Pension Trust for S.Cal*., 508 U.S. 602, 645 (1993).

There are two types of regulatory takings, categorical and non-categorical takings. *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1378 n. 2 (Fed.Cir. 2008).  "A categorical taking occurs in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted."  *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330 (2002).  "'Anything less than a complete elimination of value, or a total loss' is a non-categorical taking, which is analyzed under the framework created in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978).  *Tahoe–Sierra,* 535 U.S. at 330, 122 S.Ct. 1465 (internal quotation marks omitted)."  *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014).  Governor Lamont's Executive Orders are not a categorical regulatory taking because they do not create an extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.  "Plaintiffs continue to enjoy economic benefits of ownership, and can continue to accept rental payments from tenants not facing financial hardship, while also

covering the cost of ownership by collecting security deposit funds from consenting tenants who have been affected by the pandemic." *Auracle*, 2020 WL 45558682, at *14. (internal quotation marks and citation omitted). The plaintiffs fail to state a claim for a categorical regulatory taking and any such claim must be dismissed.

The plaintiffs also fail to state a claim for a non-categorical taking. For a non-categorical regulatory taking the court weighs "three factors to determine whether the interference with the property rise to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006)(quoting *Connolly v. Pension Benefit Guar. Corp*., 475 U.S. 211, 224-225 (1986)). The plaintiffs fail to state of cause of action under any of the three factors for a non-categorical taking.

Plaintiffs have failed to allege an economic impact necessary to support a regulatory taking. Courts have found an economic impact which would allow a regulatory taking when the property owner is prevented from making any economic use of his property. *Sherman v. Town of Chester*, 752 F.3d at 565 ("the Town's actions effectively prevented Sherman from making any economic use of his property.") "To determine the loss of property value as a result of the Executive Orders, the Court must determine the unit of property whose value is to furnish the denominator of the fraction. Courts focus on the nature of the interference with rights in the parcel as whole, including portions of the property not affected by the regulation." *Auracle*, 2020 WL 45558682, at *14.

The plaintiffs claim they have had to allow tenants to use security deposits to pay rent and some tenants have not paid rent because of the Executive Orders. The plaintiffs have not alleged that they are not receiving any rent on their properties, or even what percentage of tenants are

paying rent.  Furthermore, the Orders do not relieve the tenants of their obligation to replenishing their security deposit or their obligation to pay back rent after the Executive Orders expire. "Plaintiffs have not quantified the precise economic impact that the eviction moratorium and security deposit provisions have had on their property." *Id.* (internal quotation marks and citations omitted).

The Governor's Orders do not interfere with distinct investment-backed expectations to find a regulatory taking.  "The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996)(internal quotation marks and citations omitted).  Connecticut landlord-tenant law is regulated by Connecticut statutes.  "Because landlords understand that the contractual right to collect rent is conditioned on compliance with a variety of state laws, their reasonable investment-backed expectations cannot extend to absolute freedom from public programs adjusting the benefits and burdens of economic life to promote the common good." *Elmsford*, 2020 WL 3498456, at *10 (internal quotation marks and citations omitted).  The Second Circuit has found that rent control laws do not interfere with distinct investment-backed expectations.   "[R]ent stabilization does not deprive [the plaintiff] of economically viable use of the property. Although [the plaintiff] will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents." *Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 48 (2d Cir. 1996).  The plaintiffs have failed to state a cause of action under the investment-backed factor of a regulatory taking.

"Plaintiffs' contractual right to collect rent is premised on compliance with a framework of state laws.  Consequently, their reasonable investment-backed expectations cannot operate apart

from public programs adjusting the benefits and burdens of economic life to promote the common good." *Auracle*, 2020 WL 45558682, at *15 (internal quotation marks and citations omitted). The Executive Orders do not relieve a tenant of liability for unpaid rent. "The Executive Orders are a temporary adjustment of the status quo, and only defer the ability of residential landlords like Plaintiffs to collect, or obtain a judgment for, the full amount of rent the tenants agreed to pay. Because Plaintiffs continue to derive 'economically viable use' from their investments, they cannot establish a regulatory taking under this factor." *Auracle*, 2020 WL 45558682, at *16.

The character of the Executive Orders does not support a cause of action for a regulatory taking. "In *Penn Central* itself, the Court stated that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124, 98 S. Ct. 2646 (internal citation omitted)." *Sherman v. Town of Chester*, 752 F.3d 554 at 566. In *Sherman*, the court found that there was no public program, instead the town suffocated the developer with red tape to make sure he never succeeded at developing the property. *Id*. Governor Lamont's Executive Orders are in response to world-wide pandemic. The Governor's Orders clearly represent a "public program adjusting the benefits and burdens of economic life to promote a common good."

This Court has already found that the "Plaintiffs fail to establish that the Executive Orders inflict any deprivation significant enough to satisfy the heavy burden placed upon one allege a regulatory taking." *Auracle*, 2020 WL 45558682, at *16 (internal quotation marks and citations omitted). The plaintiffs have failed to state a cause of action for a taking and as a result, this claim should be dismissed.

Furthermore, federal courts can intervene as to a state's infectious disease response only if the state's exercise of its primary power is " arbitrary, [or] unreasonable," or "go[es] so far beyond what was reasonably required for the safety of the public as to authorize or compel the courts to interfere for the protection of such persons." *Jacobson*, 197 U.S. at 38.  The state's actions must have "no real or substantial relation to those objects, or [be], beyond all question, a plain, palpable invasion of rights secured by the" Constitution, even as those rights are defined in the emergency situation.  *Id*., at 31. The Governor's Executive Orders are not "plaint, palpable invasion of rights" secured by the Constitution,"  *Id*., at 31; but rather "reasonably required for the safety of the public."  *Id*., at 38.  Governor Lamont's Executive Orders to allow tenants to use their own security deposits to pay rent and delay eviction proceedings so tenants can stay in their homes during a pandemic, are not a plain, palpable invasion of rights secured by the Constitution.

In fact, the Supreme Court has recognized that the government can use it police powers to take property without compensation in times of imminent peril.  In *United States v. Caltex*, 344 U.S. 149 (1952), the Army destroyed oil companies' terminal facilities to deprive the Japanese of a "valuable logistic weapon" as they advanced following the attack on Pearl Harbor. *Id*. at 151. The Supreme Court denied compensation noting that "the common law had long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved." *Id*. at 154. There is no question that the pandemic has made this a "time[ ] of imminent peril "and the Governor has the authority to take action to protect the people in Connecticut from that peril without incurring constitutional taking liability. *See, e.g.*, *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (citing *Caltex* as an example of the *Jacobson* principle in the context of this pandemic).

## IV.    QUALIFIED IMMUNITY BAR ANY INDIVIDUAL CAPACITY CLAIMS FOR DAMAGES.

Qualified immunity bars all individual capacity money damages claims. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id*. at 741 (brackets and quotation marks omitted). In determining whether qualified immunity applies, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (emphasis in *Mullenix*). For an official to lose immunity, "'in the light of pre-existing law,' the unlawfulness of the offic[ial]'s conduct 'must be apparent,'" *Id*. at 1867 (quotation marks omitted), and "beyond debate." *Mullenix*, 136 S. Ct. at 308.

Here, not only have plaintiffs failed to plead facts showing the violation of a statutory or constitutional right, but no Governor would have known that the challenged Orders were, beyond debate, unconstitutional. *See, e.g., Ziglar*, 137 S.Ct. at 1867; *Liberian Cmty. Ass'n of Connecticut v. Malloy*, 16-cv-201 (AVC), 2017 WL 4897048, at *8-14 (D. Conn. 2017), *aff'd* 970 F.3d 174 (2nd Cir. 2020)(qualified immunity barred claims against public health Commissioner arising out of Ebola quarantines); *Hickox v. Christie*, 205 F. Supp. 3d 579, 588-603 (D. N.J. 2016) (qualified immunity barred claims against Governor arising out of Ebola quarantine). The Governor is "deal[ing] in a terrible context and the consequences of mistaken indulgence can be irretrievably

tragic." *U.S. ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 790, 791 (E.D.N.Y. 1963). Qualified immunity therefore applies.

## V.      THE EXERCISE OF SUPPLEMENTAL JURISDICTION IS UNWARRANTED.

The Eleventh Amendment should bar all the state law claims from being heard.  But assuming arguendo it doesn't, and this Court dismisses plaintiffs' federal claims, it should decline to exercise supplemental jurisdiction over their state law claims. In general, "if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (emphasis omitted).  "[D]eclining to exercise jurisdiction after all original-jurisdiction claims have been dismissed is especially appropriate where the pendent claims present novel or unsettled questions of state law." *Oneida Indian Nation of New York v. Madison Cty.*, 665 F.3d 408, 437 (2d Cir. 2011).  That is the case here, where Connecticut courts have not defined the parameters of the Connecticut constitution in this pandemic, and the Connecticut Supreme Court has held that not all violations of the Connecticut constitution give rise to damages claims.  S*ee Binette v. Sabo*, 244 Conn. 23 (1998). Given that plaintiffs may be "seeking to extend the narrow holding of *Binette*…well beyond the limits established…in that case, any decision to so drastically extend Connecticut constitutional law in this manner should be made in the first instance by the courts of Connecticut, not a federal court." *Lopez v. Smiley*, 375 F.Supp.2d 19, 23 (D. Conn. 2005).  Supplemental jurisdiction is therefore inappropriate, and the court should decline to exercise supplemental jurisdiction of any state law claims.

## CONCLUSION

For all the foregoing reasons, plaintiffs' claims should be dismissed in their entirety.

Respectfully submitted,

DEFENDANT
GOVERNOR NED LAMONT

WILLIAM TONG
ATTORNEY GENERAL

BY:    */s/ Maria C. Rodriguez*
Maria C. Rodriguez (ct08946)
Philip Miller (ct25056)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue, 4th Floor
Hartford, CT  06106
Tel: (860) 808-5050
Fax: (860) 808-5388
Email: Mariac.rodriguez@ct.gov
Email: Philip.Miller@ct.gov

## **CERTIFICATION**

I hereby certify that on October 5, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system.  Parties may access this filing through the Court's system.

*/s/ Maria C. Rodriguez*
Maria C. Rodriguez
Assistant Attorney General