## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

AURACLE HOMES, LLC; BUCKLEY
FARMS, LLC; ORANGE CAPITOL LLC; 216
MAIN STREET MERIDEN, LLC; BD
PROPERTY HOLDINGS, LLC; AND,
HABERFELD ENTERPRISES, LLC,

       Plaintiffs,

v.

NED LAMONT

       Defendant.

**Case No.** 3:20-cv-00829-VAB

December 3, 2020

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The Plaintiffs in this action hereby submit their brief in opposition to the Defendant's Motion to Dismiss. As set forth herein, this Court should deny the Defendant's Motion because it possesses subject matter jurisdiction over the claims in this action; the Plaintiffs continue to suffer serious, ongoing injuries; the Plaintiffs' claims are live, not moot; the Plaintiffs have stated constitutional claims against the Defendant in his official capacity upon which this Court can afford them prospective injunctive relief; and, because the Plaintiffs have stated constitutional claims against the defendant in his individual capacity upon which this Court can afford them damages. For the foregoing reasons, as more fully set forth herein, the Plaintiffs ask the Court to deny the Defendant's Motion and allow the Plaintiffs to have their claims adjudicated.

## ORAL ARGUMENT REQUESTED

## I. STATEMENT OF FACTS

On March 10, 2020, in response to the outbreak of the Coronavirus (aka "COVID-19"), the Defendant declared Public Health and Civil Preparedness Emergencies.

On April 10, 2020, the Defendant issued Executive Order 7X which, among other things contained "Protections for Residential Renters Impacted by COVID -19."

On June 29, 2020, the Defendant issued Executive Order 7DDD which contained "Extended Protections for Residential Renters Affected by COVID-19" which provides in relevant part:

> a. **No Notice to Quit or Service of Summary Process Before August 22**. Section 47a-23 of the Connecticut General Statutes is modified to additionally provide, "(g) No landlord of a dwelling unit, and no such landlord's legal representative, attorney-at-law, or attorney-in-fact, shall, before August 22, 2020, deliver or cause to be delivered a notice to quit or serve or return a summary process action, for any reason set forth in this chapter or in sections 21-80 et seq. of the Connecticut General Statutes, except for nonpayment of rent due on or prior to February 29, 2020 or for serious nuisance as defined in section 47a-15 of the Connecticut General Statutes." All notices to quit for nonpayment of rent issued before August 22 shall specify and recite the period of nonpayment of rent prior to February 29, 2020 for which rent has not been paid.

Executive Order 7DDD also allowed tenants to apply a portion of their security deposit to rent owed to the landlord for the month of April, May, or June, July or August 2020.

On August 21, 2020, the Defendant issued Executive Order 7OOO which contained a provision titled "Extension of Eviction Moratorium." It provides in relevant part:

> **Extension of Eviction Moratorium.** The provisions of Executive Order No. 7X, Section 1, as modified by Executive Order Nos. 7NN, Section 4 and 7DDD, Section 1, shall remain in effect until October 1, 2020, with the following modifications:
>
> > **No Notice to Quit or Service of Summary Process Before October 1.** Section 47a-23 of the Connecticut General Statutes is modified to

additionally provide, "(g) No landlord of a dwelling unit, and no such landlord's legal representative, attorney-at-law, or attorney-in-fact, shall, before October 1, 2020, deliver or cause to be delivered a notice to quit or serve or return a summary process action, for any reason set forth in this chapter or in sections 21-80 et seq. of the Connecticut General Statutes, except for nonpayment of rent due on or before February 29, 2020, for serious nuisance as defined in section 47a-15 of the Connecticut General Statutes, or, provided the notice to quit is not delivered during the term of any existing rental agreement, for a bona fide intention by the landlord to use such dwelling unit as such landlord's principal residence." All notices to quit for nonpayment of rent issued before October 1 shall specify and recite the period of nonpayment of rent before February 29, 2020 for which rent has not been paid. All notices to quit issued before October 1, 2020 based upon the bona fide intention by the landlord to use such premises for the landlord's principal residence shall state that reason, and specify the date of the expiration of the lease.

Executive Order 7OOO also allowed tenants to apply a portion of their security deposit to rent owed to the landlord for the month of September 2020.

On September 1, 2020, the Defendant signed a declaration renewing the public health and civil preparedness emergencies that began on March 10, 2020 to remain in effect until February 9, 2021.

On September 4, 2020, the United States Centers for Disease Control and Prevention ("CDC"), Department of Health and Human Services ("HHS") issued an agency Order (Exhibit B) that temporarily halts residential evictions until December 31, 2020, contingent upon the tenant providing a signed Declaration, attesting that they: have used best efforts to obtain all available government assistance to pay their rent; do not earn more than $99,000 per year; are unable to pay full rent due to a substantial loss of income; are using best efforts to make partial rental payments; and, would likely become homeless if evicted.

On September 30, 2020, the Defendant issued Executive Order 9E. It extended the state eviction moratorium through January 1, 2021 and to allow a notice to quit to be served on a tenant for a "serious nonpayment of rent" which consists of a rent arrearage equal to or greater than six months due on or after March 1, 2020. Executive Order 9E further requires the landlord to deliver the CDC Declaration issued on September 4, 2020 with all notices to quit. The relevant part reads:

> **Extension of Eviction Moratorium.** The provisions of Executive Order No. 7X, Section 1, as modified by Executive Order Nos. 7NN, Section 4, 7DDD, Section 1, and 7OOO, Section 3 shall remain in effect until January 1, 2021, with the following modifications:

> a. **No Notice to Quit or Service of Summary Process Before January 1, 2021.** Section 47a-23 of the Connecticut General Statutes is modified to provide, "(g) No landlord of a dwelling unit, and no such landlord's legal representative, attorney-at-law, or attorney-in-fact, shall, before January 1, 2021, deliver or cause to be delivered a notice to quit or serve or return a summary process action, for any reason set forth in this chapter or in sections 21-80 et seq. of the Connecticut General Statutes, except for nonpayment of rent due on or before February 29, 2020, for serious nonpayment of rent as defined herein, for serious nuisance as defined in section 47a-15 of the Connecticut General Statutes, or, provided the notice to quit is not delivered during the term of any existing rental agreement, for a bona fide intention by the landlord to use such dwelling unit as such landlord's principal residence. For the purposes of this subsection, 'serious nonpayment of rent' means a rent arrearage equal to or greater than six months' worth of rent due on or after March 1, 2020, which shall exclude all other costs, fees, attorney fees, and other charges arising from the tenancy."

> b. All notices to quit issued before January 1, 2021 shall be delivered with a copy of the Declaration ("CDC Declaration") attached to the CDC Order "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," 85 FR 55292 (September 4, 2020) ("CDC Order"). The CDC Declaration shall be attached in English and Spanish. Upon delivery of the executed CDC Declaration to the landlord, landlord's legal representative, attorney-at-law, or attorney-in fact by a tenant or representative of the tenant, the landlord shall immediately and

for the effective period of the CDC Order cease all action to evict.

c. All notices to quit for nonpayment of rent for rent due on or before February 29, 2020 that are issued before January 1, 2021 shall specify and recite the period of nonpayment of rent before February 29, 2021 for which rent has not been paid.

d. All notices to quit and all complaints in summary process actions for serious nonpayment of rent that are issued before January 1, 2021 shall specify and recite the amount of the rent arrearage due on or after March 1, 2020, the months for which rent has not been paid, and in what amounts.

e. All notices to quit issued before January 1, 2021 based upon the bona fide intention by the landlord to use such premises for the landlord's principal residence shall state that reason and specify the expiration date of the lease.

After filing his Motion to Dismiss, the Defendant also issued Executive Order 9H on

October 20, 2020 which repealed Executive Order 9E and replaced it with the following:

The provisions of Executive Order No. 7X, Section 1, as modified by Executive Order Nos. 7NN, Section 4, 7DDD, Section 1, 7OOO, Section 3, shall remain in effect until January 1, 2021, with the following modifications:

a. No Notice to Quit or Service of Summary Process Before January 1, 2021. Section 47a-23 of the Connecticut General Statutes is modified to provide, "(g) No landlord of a dwelling unit, and no such landlord's legal representative, attorney at-law, or attorney-in-fact, shall, before January 1, 2021, deliver or cause to be delivered a notice to quit or serve or return a summary process action, for any reason set forth in this chapter or in sections 21-80 et seq. of the Connecticut General Statutes, except for nonpayment of rent due on or before February 29, 2020, for serious nonpayment of rent as defined herein, for serious nuisance as defined in section 47a-15 of the Connecticut General Statutes, or, provided the notice to quit is not delivered during the term of any existing rental agreement, for a bona fide intention by the landlord to use such dwelling unit as such landlord's principal residence. For the purposes of this subsection, 'serious nonpayment of rent' means a rental arrearage equal to or greater than six months' worth of rent due on or after March 1, 2020, which shall exclude all other costs, fees, attorney fees, and other

charges arising from the tenancy.

b. All residential notices to quit, except those for serious nuisance, issued before January 1, 2021 shall be delivered with a copy of the CDC Declaration. The CDC Declaration is attached to the CDC Order "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," 85 FR 55292 (September 4, 2020). The CDC Declaration, which may be found in translation at https://nlihc.org/national-eviction-moratorium, shall be delivered in English and Spanish.

c. All residential notices to quit for nonpayment of rent for rent due on or before February 29, 2020 that are issued before January 1, 2021 shall specify and recite the period of nonpayment of rent before February 29, 2020 for which rent has not been paid.

d. All residential notices to quit and all complaints in summary process actions for serious nonpayment of rent that are issued before January 1, 2021 shall specify and recite the amount of the rental arrearage, the months for which rent has not been paid, and in what amounts.

e. All residential notices to quit issued before January 1, 2021 based upon the bona fide intention by the landlord to use such premises for the landlord's principal residence shall state that reason and specify the expiration date of the lease.

## II.   THIS COURT HAS SUBJECT MATTER JURISDICTION 12(b)(1)

### A. Standard of Review

The Defendant's Motion to Dismiss should be denied because the court continues to have subject matter jurisdiction over the Plaintiffs' case.

When a party files a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff ... but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008). "A

plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance

of the evidence that it exists." *AMIDAX Trading Group v. S.W.I.F.T.,* 607 F.Supp.2d 500, 504

(S.D.N.Y. 2009) quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000).

In deciding whether to grant a motion to dismiss based on lack of subject matter

jurisdiction a court can consider materials outside the pleadings. *AMIDAX Trading Group v.

S.W.I.F.T.*, 607 F.Supp.2d 500, 504 (S.D.N.Y. 2009);

> The distinction [between a Rule 12(b)(6) motion and a Rule 12(b)(1) motion] is
> significant: while we must accept all factual allegations in a complaint as true when
> adjudicating a motion to dismiss under Fed.R.Civ.P. 12(b)(6), ... we have held that, in
> adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court
> may resolve disputed factual issues by reference to evidence outside the pleadings,
> including affidavits.

*State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n. 4 (2d Cir. 2007) (citation

omitted).

## III.    THIS CASE IS NOT MOOT

### A.  Applicable Law

Under the U.S. Constitution, federal courts have jurisdiction over actual "cases" and

"controversies." U.S. Const. art. III, § 2, cl. 1. A court will not have subject matter

jurisdiction if a case is moot. *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d

1143, 1146-47 (10th Cir. 2007). "Simply stated, a case is moot when the issues presented are

no longer `live' or the parties lack a legally cognizable interest in the outcome." *Powell v.

McCormack*, 395 U.S. 486, 496 (1969). The burden of demonstrating mootness is on the party

asserting it, and that burden "is a heavy one." See *United States v. W. T. Grant Co.*, supra at

632-633; *County of Los Angeles v. Davis*, 99 S.Ct. 1379, 440 U.S. 625, 59 L.Ed.2d 642, (1979)

When deciding if a case is moot, a court must determine the type of relief sought, and whether meaningful relief can be provided. "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111 (10th Cir. 2010).

## B. Argument

The Defendant's Motion to Dismiss should be denied because the Plaintiffs' claims are not moot, and therefore Court continues to have subject matter jurisdiction. The relief the Plaintiffs seek will have a real and very meaningful effect in the real world for them.

The Defendant's argument that executive orders issued subsequent to Plaintiffs' Complaint and Amended Complaint moot the underlying action fails for three reasons, 1) the Defendant's actions fall squarely under the "Voluntary Cessation" doctrine 2) the Defendant's subsequent executive orders apply to only some of the Plaintiffs and some of their claims and so, those Plaintiffs to whom the subsequent executive orders do not apply are still suffering significant ongoing injury; and 3) the federal moratorium does not moot the Plaintiffs' claims. As a result, the Court maintains subject matter jurisdiction over Plaintiffs' claims and should deny the Defendant's Motion.

### a. The Voluntary Cessation Doctrine Prevents Mootness

An exception to the continuous injury requirement of the mootness doctrine is "based on voluntary cessation to avoid review." *Chihuahuan Grasslands Alliance vs. Dirk Kempthorne*, 545 F.3d 884, 890 (10th Cir. 2008). "[A] party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Id.* at 892 (quoting *City News & Novelty, Inc. v. City of Waukesha,* 531 U.S. 278, 284 n. 1, 121 S.

Ct. 743, 148 L. Ed. 2d 757 (2001).

Since the Defendant can simply change his mind at any time and reverse whatever subsequent executive orders he has issued to date, the Plaintiffs remain in danger of the Defendant's illegal conduct and the case is not moot under the voluntary cessation doctrine. Voluntary cessation doctrine prevents a case from being dismissed as moot when a defendant voluntarily stops an alleged illegal activity without any binding constraints to his reimposing the illegal activity in the future.

The Supreme Court has long recognized that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953).

> [T]It is well settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite* [*v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)]. "[I]f it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Id.*, at 289, n. 10 (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)). In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968). The "heavy burden of persuading" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000).

The Defendant's past conduct and the existence or non-existence of any constraints on the Defendant's future conduct, must be considered in determining the possibility of the Defendant reversing the cessation of the offending conduct. *Coral Constr. Co. v. King County*, 941 F.2d 910, 928 (9th Cir. 1991) ("One factor to consider in deciding if a case is moot … is

whether the governmental entity is likely to reenact the offending provision …"). "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden, of showing that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 603-604 (2016) (quoting *Laidlaw*, 528 U.S. at 189). "'[A] case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the [offending] provision."). *Coral Constr. Co. v. King County*, 941 F.2d 910, 928 (9th Cir. 1991)). Otherwise, "the courts would be compelled to leave [t]he defendant … free to return to his old ways." *Id.* (internal quotations omitted); See also, *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case.").

In the specific context of a governor's ability to reverse his previous executive orders at will under emergency powers, the Supreme Court just addressed this issue in *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S __ (2020). There the Catholic church sought injunctive relief from the New York Governor's executive orders which restricted to ten the number of people who were allowed attend religious services under the "red zone" designation. After the Plaintiff sought certiorari, Governor Cuomo eased the attendance restrictions by allowing 25 people under the "orange zone" designation.  Recognizing that the governor frequently changed classifications of various areas without prior notice, the Court held:

> It has taken weeks for the plaintiffs to work their way through the judicial system and bring their case to us. During all this time, they were subject to unconstitutional restrictions. Now, just as this Court was preparing to act on their applications, the Governor loosened his restrictions, all while continuing

to assert the power to tighten them again anytime as conditions warrant. So if we dismissed this case [as moot], nothing would prevent the Governor from reinstating the challenged restrictions tomorrow. And by the time a new challenge might work its way to us, he could just change them again … Even our dissenting colleagues do not suggest this case is moot or otherwise outside our power to decide.

*Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S __ slip op. *6 (2020).

Similarly, the Defendant here has claimed unfettered discretion to unilaterally change laws through his emergency powers that he renewed on September 1, 2020 and which remain in effect (at least) until February 9, 2021. The Defendant's near-omnipotent power to unilaterally change by executive order any law, regulation, or policy he chooses at any time, leaves him completely "unconstrained should [he] later desire to reenact the [offending] provision." *Coral Constr. Co. v. King County*, 941 F.2d at 928.

Here, the Defendant cannot possibly meet his "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again" (*Friends of Earth, Inc.*, 528 U.S. at 189) and the Plaintiffs have a reasonable expectation that the violation will reoccur (*County of Los Angeles v. Davis*, 440 U.S. at 631). The Defendant has already taken steps to reverse loosening of his prior restrictions by extending his emergency powers for an additional six months and ordering the state to revert back to his more oppressive "Phase 2" protocols.[1]

The Defendant's unfettered power to unilaterally change the applicable policies by executive order leaves him completely "unconstrained should [he] later desire to reenact the

---

[1] See Press Release from the Office of Governor Ned Lamont, *Governor Lamont Provides Update on Connecticut's Coronavirus Response Efforts Latest Data as of 5:00PM on Monday, November 2, 2020* (November 2, 2020) https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/11-2020/Governor-Lamont-Coronavirus-Update-November-2

[offending] provision." *Coral Constr. Co. v. King County*, 941 F.2d at 928. This is exactly the type of situation under which the Supreme Court's voluntary cessation doctrine prevents dismissal of a case as moot. See *Friends of Earth, Inc.*, 528 U.S. at 189. Otherwise, "the courts would be compelled to leave [t]he defendant … free to return to his old ways." *U.S. v. W.T. Grant Co.*, 345 U.S. at 632. The Plaintiffs remain in danger of the Defendant's illegal conduct and the case is not moot. *Friends of Earth, Inc.*, 528 U.S. at 189; *Roman Catholic Diocese of Brooklyn, supra*. Therefore, the Defendant's motion should be denied.

### b. Defendant's Interim Order Does Not Afford Complete Relief

Even if the Court disregards the voluntary cessation doctrine, this case cannot be moot because the Defendant's supposed interim relief orders, issued subsequent to Executive Order 7X, have not eradicated the deleterious effects of the initial challenged orders regarding each claim brought by each Plaintiff. The supposed interim relief orders – upon which the Defendant hangs his mootness argument – only allow for residential evictions under specific circumstances not applicable to all claims by all Plaintiffs. In fact, Plaintiff, BD Property Holdings, LLC is still entirely prohibited by the Defendant's executive orders from filing a Summary Process Complaint for Eviction even under the Defendant's supposed interim relief orders. Further examples are:

### 1. Plaintiff, 216 E. MAIN ST. MERIDEN LLC

Plaintiff, 216 E. MAIN ST. MERIDEN LLC filed a complaint on June 16, 2020 whereby it claimed that it had not received rent from numerous tenants for at least the months of March, April and May 2020 and could not serve a notice to quit on the nonpaying tenants. Plaintiff 216 E. MAIN ST. MERIDEN LLC also claimed that it served tenants

with a Notice to Quit but was prohibited from initiating summary process eviction action(s) on said tenants due to Executive Order X. Executive Order 7OOO allows the landlord to serve a Notice to Quit and Service of Summary for nonpayment of rent due on or before February 29, 2020.

Plaintiff 216 E. MAIN ST. MERIDEN LLC's complaint consisted of claims covering six different units. A granted motion for default in one of the Plaintiff's eviction lawsuits in Superior Court does not moot the other claims before this court relating to the other five units. At the time the complaint was filed, Plaintiff 216 E. MAIN ST. MERIDEN LLC had three pending eviction lawsuits. One eviction lawsuit for Unit 6 is pending and the Plaintiff was granted a motion for default.[2] A second eviction lawsuit, for Unit 3 was withdrawn because the tenant vacated the property.[3] And a third eviction lawsuit for Unit 4 is still pending before the Superior court in Meriden and does not fall under the circumstances that allow for a landlord to proceed with eviction in Executive Order 7OOO or Executive Order 9E because the eviction was filed due to "lapse of time."[4] The Plaintiff's claims relating to units 2, 7 and 10 are not impacted by the new executive orders and are therefore, not moot.

## 2. Plaintiff, BD PROPERTY HOLDINGS, LLC.

BD Property Holdings, LLC. owns the property located at 191 Sherman Avenue, New Haven, CT. At the time the complaint was filed the tenants on the 2nd floor had not paid rent for the month of March, April and May and Plaintiff was precluded from serving a Notice to Quit on the tenants for nonpayment of rent. Tenants still owe rent for September

---

[2] 216 E. Main Street Meriden LLC. vs. Laura Lumbra case #NNI-CV-19-6018416-S
[3] 216 E. Main Street Meriden LLC. vs. Jamille Palanco case #NNI-CV-20-6019833-S
[4] 216 E. Main Street Meriden LLC. vs. Jaziel Maldonado case #NNI-CV-20-6019842-S

and October and as a result the Plaintiff still cannot serve a Notice to Quit on the tenants for nonpayment of rent and are still precluded from filing a Summary Process Complaint for Eviction.  Therefore, the claims of the Plaintiff BD Property Holdings, LLC are not moot.

### 3.  PLAINTIFF BUCKLEY FARMS, LLC

Plaintiff, Buckley Farms LLC owns real property located at 206 Crown Street, Meriden, Connecticut 06450. On the date the Complaint was filed, the tenant on the 3rd floor had not paid rent for the month of April and May 2020. As of October 29, 2020, the tenant was still behind in rent and Plaintiff is owed $1,845.00. Because the tenant is not more than six months behind in rent, Executive Order 9E and 9H do not apply and Plaintiff's claim is not moot.

### c.  The Federal Moratorium Does Not Moot the Plaintiffs' Claims

The order issued by the United States Centers for Disease Control ("CDC") has not mooted the Plaintiffs' claims because it is legally inapplicable to the facts of this case.

On September 4, 2020 the CDC issued a notice (the "CDC Notice") that there would be no residential evictions prior to January 1, 2021 and that all residential notices to quit, except those for serious nuisance, issued before January 1, 2021 shall be delivered with a copy of the CDC Declaration.  The Plaintiffs' claims are not mooted by the CDC Notice because pursuant to the language of the CDC Notice itself, the CDC Notice does not apply where, as here, a state has a residential eviction moratorium that provides the same or greater protections to public health.

Specifically, the CDC Notice announced in relevant part: "This Order does not apply in any State, local, territorial, or tribal area with a moratorium on residential evictions

13

that provides the same or greater level of public-health protection than the requirements listed in this Order." United States Department of Health and Human Services, Centers for Disease Control and Prevention Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19 pg. 15 (September 4, 2020).

On September 30, 2020, the Defendant extended the moratorium on evictions in Connecticut until January 1, 2021 via Executive Order 9E. It states:

> The provisions of Executive Order No. 7X, Section 1, as modified by Executive Order Nos. 7NN, Section 4, 7DDD, Section 1, and 7OOO, Section 3 shall remain in effect until January 1, 2021, …
>
>> a. All notices to quit issued before January 1, 2021 shall be delivered with a copy of the Declaration ("CDC Declaration") attached to the CDC Order "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," 85 FR 55292 (September 4, 2020) ("CDC Order"). The CDC Declaration shall be attached in English and Spanish. Upon delivery of the executed CDC Declaration to the landlord, landlord's legal representative, attorney-at-law, or attorney-in fact by a tenant or representative of the tenant, the landlord shall immediately and for the effective period of the CDC Order cease all action to evict.

Executive Order 9E. By this executive order, the Defendant has imposed upon the State of Connecticut "a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in [the CDC Notice]." CDC Notice. The CDC Notice allows for *inter alia* the commencement of summary process actions in a wider array of circumstances than do the Defendant's Executive Orders.

Moreover, the CDC Notice permits landlord actions to continue through judgment under certain circumstances while the Connecticut moratorium does not. Under the federal moratorium, each tenant must also sign a declaration under penalty of perjury and meet specific income criteria to obtain a stay of execution, while the Connecticut

moratorium contains no such hurdles or restrictions. In other words, the CDC Notice is less restrictive than the Defendant's Executive Orders. Therefore, Connecticut has imposed "a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in [the CDC Notice]" and the federal moratorium does not apply.

Even if the Court finds that the provisions of Executive Order No. 7X, Section 1, as modified by Executive Order Nos. 7NN, Section 4, 7DDD, Section 1, 7OOO, 9E and 9H do not provide the same or greater public health protections as the CDC Notice, the provisions of the CDC Notice still do not apply because there is no evidence in the record that any of the tenants properly invoked the CDC Notice's protections by submitting a signed Renter's or Homeowner's Declaration to any of the Plaintiffs.

The CDC Notice states in relevant part:

> To invoke the CDC's order [tenants, lessees, or residents of residential properties who are covered by the CDC's order] must provide an executed copy of the Declaration form (or a similar declaration under penalty of perjury) to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed from where they live. Each adult listed on the lease, rental agreement, or housing contract should likewise complete and provide a declaration.

CDC Notice p. 6.

If the federal moratorium applied, then providing a signed and sworn declaration would be mandatory to invoke its provisions. *Id.* Here, the Defendant has produced no evidence that any Plaintiffs' tenants ever invoked the CDC Notice protections by providing an executed CDC Declaration or other sworn document to any of the Plaintiffs. Without such proof, the provisions of the CDC Notice do not apply and cannot render the Plaintiffs'

15

claims moot. The Defendant's motion should be denied.

## VIII.   THE 11TH AMENDMENT DOES NOT SHIELD THE DEFENDANT'S OFFICIAL ACTS

The Defendant cannot hide behind the Eleventh Amendment to prevent judicial review of his unconstitutional acts. Under *Ex Parte Young*, 209 U.S. 123 (1908), "state officers [sued in their official capacities] do not have Eleventh Amendment immunity from claims for prospective injunctive relief." *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 123 (1st Cir. 2003).  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 2003), quoting, *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002) (internal citation and quotation marks omitted). Here, the Complaint alleges ongoing violations of the Plaintiffs' constitutional rights and seeks only prospective injunctive relief against the Defendant in his official capacity. See Complaint at 14, 15, 16, and 17. As such, *Ex Parte Young*'s immunity exemption applies to the Plaintiffs' claims and the Defendant's unconstitutional conduct is not shielded by 11th Amendment immunity.

## IX.   PLAINTIFFS PROPERLY SEEK MONEY DAMAGES AGAINST DEFENDANT INDIVIDUALLY

The Defendant's position that the Eleventh Amendment bars money damages in this case is a red herring arguing against a prayer for relief the Plaintiffs have not made. There is no argument that the Defendant may be sued in his individual capacity. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  The only Count in the Complaint which seeks compensatory and

punitive damages is Count 5 – Ultra Vires Act. Complaint at 18-19. Every other Count specifically avers that "[t]he Plaintiffs have no adequate remedy at law as *no damages could compensate the Plaintiffs for the deprivation of their constitutional rights*." Complaint at 14, 15, 16, and 17 (emphasis added). Counts 1 through 4 seek only prospective injunctive relief. *Id.*

In other words, the Plaintiffs seek compensatory and punitive damages only against the Defendant in his *individual* capacity, not his official capacity. Complaint at ¶ 86 ("For the *ultra vires* conduct challenged here, the Defendant is sued in his individual capacity."). Therefore, the Eleventh Amendment poses no bar to the Plaintiffs' damages claims against the Defendant in this action.

## IV.    PLAINTIFFS HAVE STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED - 12(b)(6)

### A.  Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (1955); *see also Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 71 (1st Cir. 2014) ("A court's goal in reviewing a Rule 12(b)(6) motion is to determine whether the factual allegations in the plaintiff's complaint set forth "a plausible claim upon which relief may be granted."). On a 12(b)(6) motion, the Court must take all the pleaded factual allegations in the complaint as true. *Id.* Stated another way, "[t]o survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to state a claim for relief that is both actionable as a matter of law and "'plausible on its face.'" *Lucey v. Prudential Ins. Co. of Am.*, 783 F. Supp. 2d 207, 211(D.

Mass. 2011), *quoting Iqbal,* 556 U.S. 662 at 678.

## B. Defendant's Reliance on 1905 *Jacobson* Case is Misplaced

While the Defendant continues to rely on the 115-year-old *Jacobson v Massachusetts*, 197 US 11 (1905) to argue that virtually any action the Defendant chooses to undertake during a declared emergency is both legal and justified, modern jurisprudence shows us why reliance on *Jacobson* is mistaken.

Admittedly, *Jacobson* has been cited to defend constitutional abuses in the past. However, the Supreme Court recently explained why courts cannot rely on *Jacobson* to uphold constitutional violations. "Nothing in *Jacobson* purported to address, let alone approve, such serious and long-lasting intrusions into settled constitutional rights. In fact, *Jacobson* explained that the challenged law survived only because it did not 'contravene the Constitution of the United States' or 'infringe any right granted or secured by that instrument.'" *Roman Catholic Diocese of Brooklyn* quoting *Jacobson*, 197 US at 25.

Importantly, *Jacobson* involved the challenge of a legislatively enacted state law. Here, in contrast, the Plaintiffs are challenging the Executive Order of one man which explicitly empowers the courts to take actions in direct contradiction to state statutes duly enacted by the people's legislature specifically to protect the very constitutional rights now being violated by the Defendant. For that prospect, *Jacobson* offers the Defendant no comfort.

Furthermore, *Jacobson* is no shining light of modern constitutional jurisprudence, having been decided long before the modern constitutional frameworks for analyzing many fundamental constitutional rights were established. Consequently, any reliance upon *Jacobson* must overcome the significant "challenge of reconciling century-old precedent with… more

recent constitutional jurisprudence." *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 926 (6th Cir. 2020).[5] In *Slatery*, the Sixth Circuit affirmed with slight modification the preliminary injunction against the Tennessee Governor's Executive Order issued during the COVID-19 pandemic requiring health care providers postpone abortions for three weeks. As requested here, the *Slatery* court refused to countenance "the notion that COVID-19 has somehow demoted [the Plaintiffs' constitutional rights] to second-class rights, enforceable against only the most extreme and outlandish violations. Such a notion is incompatible not only with *Jacobson*, but also with American constitutional law writ large." *Id.* at 927.

Now nine months after the first declared emergency, the United States Supreme Court has taken notice of the states' inappropriate reliance on *Jacobson* to improperly overburden plaintiffs' constitutionally protected rights. The decision in *Roman Catholic Diocese of Brooklyn, New York, supra* shows why a broad application of *Jacobson* is mistaken. There, the Court re-asserted that certain rights protected by our Constitution will be subject to strict scrutiny, especially when the infringement of those rights extends for long periods of time.

> Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical. Rather than apply a nonbinding and expired concurrence from *South Bay*, courts must resume applying the Free Exercise Clause. Today, a majority of the Court makes this plain. ... Not only did the *South Bay* concurrence address different circumstances than we now face, that opinion was mistaken from the start. To justify its result, the concurrence reached back 100 years in the U. S. Reports to grab hold of our decision in *Jacobson v. Massachusetts*, 197 U. S. 11 (1905). But Jacobson hardly supports cutting the Constitution loose during a pandemic. That decision involved an entirely different mode of analysis, an entirely different right, and an entirely different

---

[5] Under modern constitutional jurisprudence developed since 1905, governmental actions ostensibly relying on *Jacobson* to negate fundamental constitutional rights would have little chance of surviving any reasonable level of modern scrutiny. See e.g., *Buck v. Bell*, 274 U.S. 200, 207 (1927) (relying on *Jacobson* to uphold the Virginia law mandating the forced sterilization of the "feeble minded").

kind of restriction. Put differently, Jacobson didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, Jacobson applied what would become the traditional legal test associated with the right at issue—exactly what the Court does today. Here, that means strict scrutiny.

*Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S __ (2020)

Changed facts and the passage of time have turned what might arguably have begun as an exercise of police power by the Defendant into clearly unconstitutional government overreach. This was again emphasized by the District of Massachusetts in *Baptiste vs. Kennealy*, C.A. No. 1: 20-cv-11335-MLW (September 25, 2020) and confirmed by the Supreme Court in *Roman Catholic Diocese of Brooklyn*. The *Baptiste* court reviewed a state statute which, like the statute at issue in *Jacobson*, was duly-enacted by the Massachusetts legislature, and gave the governor authority to extend the legislature's temporary emergency eviction moratorium. The *Baptiste* court recognized that even a modest change in the underlying facts can significantly affect the nature of what may once have been considered an emergency, and puts into question the constitutionality of a law that was previously upheld on the basis that it was only temporary. "[C]hanging facts, including for some claims the mere passage of time, could affect the ultimate outcome of this case." *Id.* at *6.

In *Baptiste*, the Court specifically held that: "The court's ruling on plaintiff's motion for preliminary injunction may, as a practical matter, conclude this case. However, if the Governor extends the Moratorium beyond October 17, 2020, it may be necessary to decide the case on the merits." Id. at *6. The *Baptiste* court further explained "[I]t should be recognized that the Chief Justice noted that the emergency order at issue in *South Bay* was 'temporary;' although 'broad,' there are unconstitutional 'limits' to the authority of elected

officials in an emergency; and courts expect that elected officials will 'actively shap[e] their response to changing facts on the ground.' *Baptiste* at \*6, citing *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 207 L. Ed. 2d 154 (2020).

The COVID-19 pandemic is not a blank check for the Governor and other elected officials. Rather, it should be recognized that:

> [A] public health emergency does not give Governors and other public officials carte blanche to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights.

*Baptist* at \*7 citing *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2605 (2020) (Alito, J., dissenting); *Cnty. of Butler v. Wolf*, No. 2:20-cv-677, 2020 WL 5510690, \*7 (W.D. Pa. Sept. 14, 2020).

The court in *ACA International v. Maura Healey*, 20-10767-RGS, 2020 WL 2198366 (D. Mass. May 6, 2020) also found the actions of the Massachusetts Attorney General to be a constitutional overstep, while emphasizing the importance of keeping constitutional protections in tact:

> Constitutions can not be changed by events alone. They remain binding as the acts of the people in their sovereign capacity, as the framers of Government, until they are amended or abrogated by the action prescribed by the authority which created them. It is not completent [*sic*] for any department of the Government to change a constitution, or declare it changed, simply because it appears ill adapted to a new state of things.

*ACA International v. Maura Healey*, 20-10767-RGS, 2020 WL 2198366 (D. Mass. May 6, 2020) quoting *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. at 398, 451 (1934) (Sutherland, J., dissenting), quoting *People ex rel. Twitchell v. Blodgett*, 13 Mich. 127, 139 (1865).

In other words, in deciding how to exercise their broad discretion in responding to

the evolving COVID-19 pandemic, elected officials have a duty to consider the limitations imposed by the Constitution, rather than merely to rely on courts to countenance any violations of it. As Justice Anthony Kennedy has written, "the very fact that an official may have broad discretion . . . makes it all the more imperative for him or her to adhere to the Constitution and to its meaning and promise." *Baptist \*7* citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2424, 201 L. Ed. 2d 775 (2018) (Kennedy, J., concurring).

Over nine months after the Defendant issued Executive Order 7G on March 19, 2020 and 7X on April 10, 2020, the Plaintiffs are still without their constitutional right to due process, right of equal protection and right to access the courts. The 115-year-old *Jacobson* case cannot justify such extended abuse of the Plaintiffs' constitutional rights. Defendant's motion to dismiss should be denied.

## V. THE PLAINTIFFS STATE A CLAIM UNDER THE CONTRACTS CLAUSE

Citing *dicta* from *Hadley v. Pataki*, 106 F.3d 478, 482 (2d Cir. 1997) to acknowledge a spilt among federal circuits, the Defendant asks the Court to following a broad reading of *Carter v. Greenhow*, 114 U.S. 317 (1885) by the Fourth and Sixth Circuits and rule that there is no private cause of action under §1983 for violations of the Contracts Clause in the Second Circuit. However, as the *Hadley* Court itself makes clear, the Second Circuit has <u>never</u> rejected a constitutional Section 1983 claim premised on the United States Constitution's Contract Clause.

Rather, the Plaintiffs urge this Court to side with the increasing number of circuits, including the Third and Ninth Circuits, which have recognized a Contracts Clause cause of action under Section 1983. The Third Circuit for example, recently adopted a narrow

interpretation of *Carter* when finding that:

> [The defendant's] argument that section 1983 provides no relief for a party
> deprived of its rights under the Contracts Clause is without merit. Section 1983
> provides for liability against any person acting under color of law who deprives
> another of any rights, privileges, or immunities secured by the Constitution and
> laws" of the United States. 42 U.S.C. § 1983. The rights guaranteed by section
> 1983 are liberally and beneficently construed. . .

*Watters v. Board of School Directors of City of Scranton,* 400 F.Supp.3d 117, 127 (3rd Cir., 2019),

(internal quotes omitted), quoting *Monell v. Department of Social Services*, 436 U.S. 658, 684, 98

S. Ct. 2018, 56 L.Ed.2d 611 (1978)).

> The right of a party not to have a State, or a political subdivision thereof, impair
> its obligations of contract is a right secured by the first article of the United
> States Constitution. A deprivation of that right may therefore give rise to a cause
> of action under section 1983.

*Watters v. Board of School Directors,* 400 F.Supp.3d at 127, quoting *Southern California Gas Co. v.

City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam).

The Plaintiffs have stated a cause of action under the Contracts Clause. To state

Contracts Clause action under section 1983, the Plaintiffs must allege, 1) a substantial

impairment of the contract, *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105,

117 L.Ed.2d 328 (1992) and 2) the state law is not drawn in an "… appropriate and

reasonable way to advance a significant and legitimate public purpose." *Energy Reserves Group,

Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 411–412 (1983).

Because the Court must take the Plaintiffs' allegations as true for the purposes of this

Motion to Dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009),

the Plaintiffs need not prove their case at this stage of the proceedings, they only need to

have stated a sufficient claim. *Ashcroft, supra.*

## A. Plaintiffs are Incurring Substantial Impairment

The Executive Orders are a substantial impairment under the Contracts Clause because they interfere with the timing of payments needed to provide a service to the tenants, here the provision of housing. The Ninth Circuit has held the State postponing when employees would be paid substantially impaired the contracts of employees.

> Plaintiffs are wage earners, not volunteers. They have bills, child support obligations, mortgage payments, insurance premiums, and other responsibilities. Plaintiffs have the right to rely on the timely receipt of their paychecks. Even a brief delay in getting paid can cause financial embarrassment and displacement of varying degrees of magnitude..

*University of Hawaii Prof. Asm. v. Cayetano*, 183 F.3d 1096, 1106 (9th Cir. 1999).

Here similarly, Plaintiffs earn their livelihoods by providing housing services in exchange for specifically timed payments. They are not volunteers. They have bills, child support obligations, mortgage payments, insurance premiums, and other responsibilities.[6] Like employees, the Plaintiffs have the right to rely on the timely receipt of the contractually-agreed to payments. Even a brief delay in getting paid can cause financial embarrassment and displacement of varying degrees of magnitude.

More recently, the U.S. District Court for the District of Massachusetts in *ACA International v. Healey*, No. 20-10767 (D. Mass. May 6, 2020) (order granting temporary restraining order and preliminary injunction) identified when weighing the burden of the law versus the benefit to the public, that executive orders limiting a certain industry's ability to

---

[6] Although the Plaintiffs are each an LLC, each is a small closely held company with either one or two owners. Rental payments to the Plaintiffs are used invariably to directly pay the living expenses of the people who own and operate the LLCs and their families, and to pay the expenses and maintain the buildings being rented to the tenants.

operate, increase the likelihood that the business will cease to exist.

> Given the plethora of protection provided to debtors by the laws and regulations the court has previously cited, the interest a debtor may have in the Regulation may not weigh as heavily as the threat of extinction faced by smaller collection agencies who have been effectively put out of business. Of perhaps greater concern is the impact the Regulation may have on hospitals and utilities who depend on collection agencies to remain solvent.

*ACA International v. Healey*, No. 20-10767, *28 (D. Mass. May 6, 2020) (order granting temporary restraining order and preliminary injunction). The Defendant's Executive Orders which effectively prevent the Plaintiffs from being paid, are substantially impairing the Plaintiff's contract rights and their ability to earn a living and pay their bills.

### B. Legitimate Purpose Does Not Justify Ongoing Constitutional Violations

While the Defendant argues that the executive orders were issued for a legitimate purpose, here preventing homelessness, the Plaintiffs maintain that the executive orders shifted the potential problem of homelessness from one group to another. Ultimately the Defendant has provided no facts to support its claim that a high number of people were about to be evicted and become homeless, or that his executive orders have done anything to prevent homelessness. Contrary to Defendant's unsubstantiated allegations of near-homelessness, the facts are that thousands of people in Connecticut were the recipients of state unemployment compensation benefits in addition to another $600 a week in federal unemployment compensation, in addition to a stimulus check in the amount of $1,200.00, in addition to more stimulus funds in the amount of $500 for each child. Merely alleging some hypothetically altruistic motive for the Defendant's executive orders does cannot justify the blatant infringement of the Plaintiffs' constitutional rights, especially after so many months.

### C. Defendant's Executive Orders are Neither Reasonable or Necessary

The Executive Orders issued by the Defendant are neither reasonable or necessary. The Executive Orders are not necessary because state law already provides the courts discretion to allow a tenant to remain in possession of a property upon review of the facts. CGS § 47a-39 grants the court broad deference when granting additional time to a tenant pursuant to an eviction. It states:

> Upon the hearing on such application in the Superior Court the judgment of the trial court shall stand, but upon such hearing if it appears that the premises, judgment for possession or occupancy of which has been rendered, are used for dwelling purposes and are not excluded by the provisions of section 47a-36; **that the applicant cannot secure suitable premises for himself and his family elsewhere within the city or town or in a city or town adjacent thereto in a neighborhood reasonably comparable to that in which the premises occupied by him are situated**; that he has used due diligence and reasonable effort to secure other premises; that his application is made in good faith, and that he will abide by and comply with such terms and provisions as the court may prescribe, the court may grant a stay of execution for a period or for periods in the aggregate not exceeding **six months** from the date of the judgment in the summary process action upon such conditions and terms as appear fair and equitable, except that such stay of execution shall not exceed **three months** in the aggregate if the reason for the judgment against the defendant was nonpayment of rent; …"

Both the Defendant's Motion to Dismiss and the Court's Ruling and Order on Motion for Emergency Temporary Restraining Order or Preliminary Injunction have relied on *Elmsford v. Cuomo*, 2020 WL 3498456 (June 29, 2020) in claiming that Defendant's executive orders do not substantially impair the contract between landlords and tenants.

However, *Elmsford* is clearly distinguishable because the executive orders issued by the New York Governor differ drastically from the executive orders issued by the Defendant here, and do not support a similar finding by this Court.

Executive Order 202.28 issued by Governor Cuomo on May 7, 2020 precludes both

residential *and commercial* evictions for unpaid rent in contrast to the Defendant's executive order that applied solely to residential evictions. While the New York executive orders imposed a moratorium on foreclosure proceedings for unpaid mortgage payments, landlords in Connecticut are still required to pay their mortgage without any relief. And while a New York tenant who applied a portion of their security deposit to past rent was directed to replenish their deposit after ninety days in 12 monthly installments, a landlord in Connecticut cannot demand that the tenant pay back the deposit until the end of the public health and civil preparedness emergency, which date has yet to be determined and could be months in the future.

Governor Cuomo's Executive Order 202.38 extended the provisions of 202.28 but didn't extend the eviction moratorium past August 19, 2020. This is in sharp contrast to Defendant's Executive Order 7X which allowed tenants not to pay rent for the month of April, 2020 whether or not the tenant was facing financial hardship and is still to this day preventing some of the Plaintiffs from evicting non-paying tenants.

## VI. PLAINTIFFS STATE A CLAIM UNDER EQUAL PROTECTION CLAUSE

The Defendant argues that Plaintiffs failed to state a claim of relief because as residential landlords, they are not similarly situated to commercial landlords and are subject to a rational basis test because there was no different treatment based on a protected right. Defendant's argument of a lack of similarity between residential and commercial landlords is not based on the class of landlords themselves but rather on the tenants who are a distinct, separate class of individuals, not part of the applicable analysis.

Commercial landlords and residential landlords are prima facie identical in that the

rules governing residential and commercial landlords are based on fundamental contract and property principles that are taught in law school as Black Letter law. Both are creditors who lease real property to tenants for their use. Both types of landlords enter into a contract with their tenant for consideration, typically rent for a specified period of time. If there is a breach of that contract then the injured party has a right to sue in court to regain possession of the property. Since the Defendant and the Court have both relied on *Elmsford v. Cuomo*, 2020 WL 3498456 (June 29, 2020), the Court should note that Executive Order 202.28 issued by Governor Cuomo on May 7, 2020 precludes both residential and commercial evictions for unpaid rent in contrast to the Defendant's executive order that applies solely to landlords of residential tenants. As such the Defendant's argument fails.

While the Defendant advocates for a rational basis test because the differential treatment was not based on a protected right, this is clearly not the case. The Plaintiffs' Amended Complaint states a claim for relief under the Equal Protection Clause based on the Defendant's denial of Plaintiffs' constitutionally protected right to access the courts. As a result the offending executive orders are subject to heightened scrutiny.

This is similar to the holding in *ACA International v. Healey*, No. 20-10767 (D. Mass. May 6, 2020) (order granting temporary restraining order and preliminary injunction) where the court found the state's moratorium on the filing of debt collection lawsuits to be a violation of the First Amendment.

> The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." The constitutional guarantee of the right of citizen access to the courts, state and federal, has been identified by the United States Supreme Court as "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222

(1967); *see also California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed . . . one aspect of the right of petition."); *NAACP v. Button*, 371 U.S. 415, 433 (1963) (noting that First Amendment freedoms, including the right to petition, are "delicate and vulnerable, as well as supremely precious in our society" and therefore demand exacting protection).

*ACA International v. Healey*, No. 20-10767, slip op. at 23 (D. Mass. May 6, 2020) (order granting temporary restraining order and preliminary injunction).

Under heightened scrutiny, the Defendant must prove that he "has employed the most narrowly tailored means available to satisfy a compelling state interest." *Roman Catholic Church of Brooklyn v. Cuomo*, 592 U.S. _____ (2020) quoting *Church of Lukumi v. Hialeah*, 508 U.S. 520, 546 (1993). Defendant has already asserted that the compelling state interest was to prevent people who were facing financial hardship from unemployment due to the pandemic from being evicted and becoming homeless.

Assuming arguendo that there is a compelling government interest, the question is whether the Defendant's executive orders are narrowly tailored. Clearly, they are not.

Executive Order G shuttered court operations previously available to the Plaintiffs and Executive Order X not only allowed a 60 day grace period for the payment of rent for the month of April, 2020, whether or not the tenant was financially harmed as a result of the pandemic, but also prevented a landlord from filing a summary process complaint with the court for a tenant's nonpayment of rent, also irrespective of whether or not a tenant's failure to pay rent was the result of the pandemic. The blanket delay in the payment of rent and lack of access to the courts because the filing party is a landlord and not because the tenant has suffered financial harm due to the pandemic is not narrowly tailored to achieve the government interest. The executive orders could have, and should have, been drafted to

require at least some minimal amount of proof to establish financial harm by the tenant to either the landlord or a court of law as did the CDC Notice. The differences between the challenged Executive Orders and the CDC Notice undercut the Defendant's reasonable and necessary argument and show the Executive Orders are not narrowly tailored. Specifically, the CDC Notice permits evictions to continue under its parameters, though it provides for stays of execution of any judgment against tenants who could sustain the burden imposed to make certain showings. The Defendant's Executive Orders offer the Plaintiffs no such relief. This fundamental difference in procedure shows the same public purpose could be achieved through less onerous means. Because the provisions of Executive Order X 1 (a) and (b) are not narrowly tailored to achieve a compelling government interest, they fail the strict scrutiny test.

## VII. PLAINTIFFS STATE A CLAIM UNDER THE DUE PROCESS CLAUSE

Plaintiffs have asserted a violation of due process pursuant to the Fifth and Fourteenth Amendments of the U.S. Constitution. The Defendant argues that Plaintiffs have not identified a property interest independent of other interests asserted in their other constitutional claims, and therefore cannot maintain their Due Process claim.

Plaintiffs however do not seek duplicative damages but are permitted to argue for relief in the alternative. Federal Rule of Civil Procedure 8(d) permits plaintiffs or counterclaimants to plead in the alternative. See *Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999) ("[Rule 8(d)] offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as we must do in reviewing orders granting motions to dismiss").

Defendant's argument that there is no "substantial impairment" of the property interest in the real property is misplaced. The landlords possess a legal and equitable interest in the security deposit as a first lien holder (as opposed to a possessory interest asserted in the security deposit asserted in Plaintiffs' Takings Claim). To understand the scope of the property interest federal courts must look at state law. *Kaiser Development Co. vs. City and County of Honolulu*, 649 F. Supp. 926, 932 (1986). Having the rights of a first lien holder is in fact a legally recognized and protectable interest under Connecticut law, CGS §47a-21 (c) states: "Any security deposit paid by a tenant shall remain the property of such tenant in which the landlord shall have a security interest as defined in subdivision (35) of subsection (b) of section 42a-1-201, to secure such tenant's obligations." CGS §42a-1-201(b)(35) defines "Security interest" as an "interest in personal property or fixtures which secures payment or performance of an obligation."

Although utilized in terms of the Contracts Clause, a law will substantially impair a contract right if it deprives a private party of an important right, thwarts the performance of an essential term, defeats the expectations of the parties, or alters a financial term. *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003). That Plaintiffs can file lawsuits for lost rent speaks only to the issue of money damages for breach of contract, not their possessory interest in their property, which is innate and fundamental.

Notwithstanding any substantial impairment in the real property, there is no doubt that there has been not only a substantial impairment but an outright elimination of a landlord's legal interest as first lien holder of the tenant's security deposit under Executive Order 7X. The executive orders constitute a substantial impairment of the first lien holders'

rights in the security deposit because they eliminate the subject matter of the agreement altogether. The executive orders alter a financial term, here the holding of the money by the landlord as collateral for possession of the unit, and alter the contractual expectations of the parties. In this case, without providing the full two months of rent as a security deposit, the units would not have been rented to the tenants because of their poor credit and lack of equity in assets. The legal interest in the security deposit is of even greater importance when the tenant who maintains a possessory interest in the property has insufficient collateral to secure that interest. The rights of the first lien holder are actual, valuable and legally protectable, especially where there is property damage and unpaid rent.

The rights of the landlord as first lien holder in the deposit are similar to the rights held by a pawnshop in a piece of personal property provided to the pawnshop owner as collateral for a loan. If the Defendant ordered pawnshop owners to relinquish the collateral while the loan was still outstanding, the whole purpose of the transaction would be frustrated, as the pawnshop owner would be left only with a cause of action as opposed to possession of the collateral itself. The same holds true for landlords.

Yet the executive orders go even further; violating the Plaintiffs' procedural Due Process rights by denying them access to the courts to seek replenishment of the deposit. This is because the current executive orders only allow a notice to quit to be served and a summary process to be filed with the court in the case of severe nonpayment of rent of six months or more, nonpayment of rent prior to February 29, 2020 or a serious nuisance. Such is the case with Plaintiffs Orange Capitol, LLC and Auracle Homes, LLC. both of whom have not had security deposits replenished by three separate tenants, none of whom have

any equity or assets to satisfy their debts.

The fact that the Plaintiffs can file collection actions against non-paying tenants is of little comfort to the deprivation of their separate possessory rights. Money damages are not permitted in summary process cases because prayers for monetary relief do not implicate the unique right to possession. See e.g., *Fellows v. Martin*, 217 Conn. 57, 70, 584 A.2d 458 (1991). "It has always been the policy of our law to limit the issues in an action of summary process to a few simple ones within the express scope of the statutory provisions." *Webb v. Ambler*, 125 Conn. 543, 550-51,7 A.2d 228 (1939). Property ownership is recognized as a unique right that stands distinct from the ability to collect rent.

The lack of access to courts for nine months for a tenant's failure to pay rent or failure to abide by the terms of the rental agreement by not replenishing their security deposit fails to meet the "opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 334 (1976). Accordingly, Defendant's Motion should be denied.

## X.      PLAINTIFFS STATE A CLAIM UNDER THE TAKINGS CLAUSE

The provisions of the Defendant's Executive Orders that require a landlord to utilize a tenant's security deposit towards rent also rise to the level of a noncategorical taking. Contrary to the Plaintiffs' Due Process argument, the provisions of the executive orders that allow tenants to apply their security deposit to past due rent constitute a regulatory taking of landlord's possessory interest in the money itself.

Because the Defendant's emergency powers have been extended to February 2021, the relinquishment of the security deposit for over eight months which can continue for the

length of the emergency, with no end in sight, the taking has now risen to the level of a significant deprivation. While the Defendant continues to rely on *Elmsford* to assert constitutional compliance, the ruling in *Elmsford* was in light of facts that existed to August 19, 2020 and were premised on the fact that the orders were of limited duration. The court specifically stated "[f]irst, contrary to the Plaintiffs' insinuation that the Governor will extend duration of the Order as long as he can, into 2021 (Dkt. No 24, Pl.'s Reply at 6), there is nothing permanent about EO 202.28; it expires on August 19." *Elmsford v. Cuomo*, 2020 WL 3498456, at *8 (June 29, 2020). See also, *Roman Catholic Church of Brooklyn v. Cuomo*, 592 U.S. ____ (2020).

Here, the Defendant's executive orders are now more than three months past the date held constitutional in *Elmsford* due to their limited duration. The only foreseeable end date at this point is February 2021 unless the Defendant unilaterally extends his emergency powers yet again. No matter how noble the cause, the longer the constitutional violations remain, the more urgent it is for the federal courts to intervene.

## XI. PLAINTIFFS HAVE BEEN, AND CONTINUE TO BE, INJURED

The Plaintiffs have met the three elements required to establish standing and maintain a cause of action before the court. In addition to the repeated violation of their constitutional rights, the Plaintiffs have suffered multiple injuries as a result of the Defendant's Executive Orders.

Firstly, they have been deprived of income pursuant to Executive Order 7X issued on April 10, 2020, which allowed a 60-day grace period for the payment of rent for the months of April and May, 2020. Executive Order 7X also prohibited them from serving and

returning a Notice to Quit to Court. Plaintiff 216 E. MAIN ST. MERIDEN LLC has been injured in the decrease in rental income and inability to move paying tenants into the property due to the restriction of court access.

For example, Plaintiff 216 E. MAIN ST. MERIDEN LLC owns an eight-unit apartment building with a monthly carrying costs of over $4,000.00.00 a month.[7] Prior to the issuance of Executive Order 7X, the landlord had three units with eviction lawsuits pending in court and was collecting rent from tenants in four units. After the issuance of Executive Order 7X, 216 E. MAIN ST. MERIDEN LLC had **one unit** that continued to pay rent and was collecting a total of $600.00 a month. [8]

In its Ruling and Order on Motion for Emergency Temporary Restraining Order or Preliminary Injunction the Court wrote that "Plaintiffs continue to enjoy the economic benefits of ownership and can continue to accept rental payments from tenants not facing financial hardship … while also covering the cost of ownership by collecting security deposit funds from consenting tenants who have been affected by the pandemic." *Auracle*, 2020 WL 45558682 at *26. However, receiving $600.00 in rent to cover $4,000.00 in expenses is not "covering the cost of ownership," and due to the Defendant's Executive Orders, there are no "consenting tenants" from whom to accept voluntary deposits.

Our courts do not require that the injury be grand or a specific dollar amount to find standing. "[S]tanding cannot be denied because of the relatively modest quantum of the

---

[7] The building has nine units but the non-rent-paying superintendent occupies one unit.
[8] A Tenant told the landlord that "The Governor said we do not have to pay rent." That tenant convinced at least two other tenants not to pay rent as well for the same reason.

injury ..." *Halkin v. Helms*, 690 F.2d 977, 1000 n. 81 (D.C. Cir. 1982) and need not be significant. *Southern Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 523 (D.C. Cir. 1977) *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n. 14, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973).

For the Plaintiffs, the reduction in rental income and inability to access the courts is injury in fact and has resulted in a trickle-down effect that has led to additional harm including the inability to pay costs associated with the properties and in one case, the denial of refinance application to take advantage of lower interest rates. This, on top of their constitutional injuries, more than suffice to afford the Plaintiffs standing.

## **CONCLUSION**

Federal courts around the nation are now recognizing that state governors, under the mantle of public emergency, are overstepping the limits of their emergency powers to infringe on the constitutionally protected rights of people in their states. Acts that may once have been understandable, have become serious constitutional violations by the passage of time. When state actors violate the constitutional rights of American citizens, the federal courts must step in. For these reasons, and those set forth herein, the Court should deny the Defendant's Motion to Dismiss, and allow the Plaintiffs to have their claims adjudicated.

Dated: December 3, 2020 Respectfully submitted,

*/s/Craig C. Fishbein*
Craig C. Fishbein, Esq.
(ct25142)
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
E-mail: ccf@fishbeinlaw.com

*/s/Doug Dubitsky*
Doug Dubitsky, Esq.
(ct21558)
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.808-8601
Facsimile: 866.477.1120
Email: doug@lawyer.com

*/s/Cara Christine Pavalock-D'Amato*
Cara Christine Pavalock-D'Amato, Esq.
(ct29967)
LAW OFFICE OF CARA C. PAVALOCK
17 Riverside Avenue
Bristol, CT 06010
Telephone: 754.444.8803
Email: carapavalock@gmail.com

*Attorneys for the Plaintiffs*

## **CERTIFICATION**

I hereby certify that, on this date, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Doug Dubitsky*

Doug Dubitsky, Esq.          (ct21558)
Commissioner of the Superior Court