**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| AURACLE HOMES, LLC., ET AL. | : | CIVIL ACTION NO.  3:20-CV-829(VAB) |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT | : | |
| *Defendant* | : | APRIL 8, 2021 |

**NOTICE OF SUPPLEMENTAL AUTHORITY**
**RE: MOTION TO DISMISS AMENDED COMPLAINT (ECF NO. 44)**

The defendant hereby respectfully submits to this Court a Notice of Supplemental

Authority relating to Defendant's Brief in Support of Motion to Dismiss (ECF No. 44-1) and

Defendant's Reply Brief in Support of Motion to Dismiss (ECF No. 54).   The defendant is

providing the court with notice of *Casey v. Lamont* which was cited in Defendant's Reply Brief ,

a CT Special Act and a CDC Order that has been extended the eviction moratorium.

On March 29, 2021, the Connecticut Supreme Court issued a slip opinion in *Casey v.*

*Lamont*, 2021 Conn. LEXIS 78 * (Conn. March 29, 2021).  Attached hereto as Attachment 1.

The plaintiffs claimed in their Amended Complaint that the Governor's executive orders were

*Ultra Vires* on the grounds that the Governor did not have the legal authority to issue the orders.

The Governor filed a motion to dismiss arguing that the Eleventh Amendment bars this court

from addressing the plaintiff's *Ultra Vires* claim.     The Governor also argued the issue was

before the Connecticut Supreme Court in *Casey v. Lamont*, 2020 Conn. Super. LEXIS 1043

(X06-UWY-CV-20-6055406 September 16, 2020).  Defendant's Reply Brief in Support of

Motion to Dismiss, pp. 3-4.  The Connecticut Supreme Court found that the Governor was

empowered to issue the executive order at issue in that case and Connecticut General Statutes

Sec. 28-9(b)(1) and (7) were not an unconstitutional delegation of legislative powers to the Governor. *Casey v. Lamont*, 2021 Conn. LEXIS 78 * (Conn. March 29, 2021). While the Governor maintains that plaintiffs' *Ultra Vires* claim is barred by the Eleventh Amendment and sovereign immunity, defense counsel wanted to provide this Court with the *Casey* decision.

The Connecticut Legislature authorized the Governor to renew the public health and civil preparedness emergency declarations through May 20, 2021. 2021 Conn. Special Act 21-2, An Act Concerning Public and Civil Preparedness Emergencies Declared and Renewed by The Governor, attached hereto as Attachment 2.

The defendant cited to the CDC Order issued on September 1, 2020 which placed a federal temporary halt on residential evictions to prevent the spread of COVID-19. Defendant's Memorandum of Law in Support of Motion to Dismiss, pp. 4-5. The CDC Order expired on March 31, 2021. Effective April 1, 2021, the CDC issued an Order extending the residential evictions moratorium until June 30, 2021. https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/CDC-Eviction-Moratorium-03292021.pdf. The CDC Order is attached hereto as Attachment 3.

DEFENDANT

NED LAMONT

WILLIAM TONG
ATTORNEY GENERAL

BY:     */s/ Maria C. Rodriguez*
        Maria C. Rodriguez (ct08946)
        Philip Miller (ct25056)
        Assistant Attorneys General
        Attorney General's Office
        165 Capitol Avenue, 4th Floor
        Hartford, CT  06106
        Tel: (860) 808-5050
        Fax: (860) 808-5388
        Email: Mariac.rodriguez@ct.gov
        Email: Philip.Miller@ct.gov

## **CERTIFICATION**

I hereby certify that on April 8, 2021, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.

        */s/ Maria C. Rodriguez*
         Maria C. Rodriguez
         Assistant Attorneys General
         Federal Bar No. CT08946
         Attorney General's Office
         165 Capitol Avenue, 4th Floor
         Hartford, CT  06106
         Tel: (860) 808-5050
         Fax: (860) 808-5388
         Email: Mariac.rodriguez@ct.gov

**A** Neutral
As of: April 8, 2021 12:30 PM Z

## *Casey v. Lamont*

Supreme Court of Connecticut

December 11, 2020, Argued; March 29, 2021[*], Decided

SC 20494

---

[*] March 29, 2021, the date that this decision was released as a slip opinion, is the operative date for the beginning of all time periods for the filing of any post opinion motions or petitions.

Attachment 1

**Reporter**
2021 Conn. LEXIS 78 *

KRISTINE CASEY ET AL. v. GOVERNOR NED LAMONT

**Prior History:** Action to enjoin the defendant from enforcing certain executive orders, and for other relief, brought to the Superior Court in the judicial district of New Haven and transferred to the judicial district of Waterbury, Complex Litigation Docket, where the case was tried to the court, Bellis, J.; judgment denying the plaintiffs' request for injunctive and declaratory relief, and the plaintiff, upon certification by the Chief Justice pursuant to *General Statutes § 52-265a* [*1] that a matter of substantial public interest was at issue, appealed to this court.

*Casey v. Lamont, 2020 Conn. Super. LEXIS 1043, 2020 WL 6121713 (Conn. Super. Ct., Sept. 16, 2020)*

**Disposition:** Affirmed.

## Core Terms

disaster, emergency, executive order, preparedness, public health, pandemic, general assembly, declaration, marks, delegation, quotation, catastrophe, powers, separation of powers, constitutes, regulation, proclamation, modify, functions, proclaim, suspend, food, restaurants, disease, spread, legislative authority, reasonably necessary, emergency powers, plaintiffs', man-made

## Case Summary

### Overview

HOLDINGS: [1]-Because the COVID-19 pandemic constituted a catastrophe under the dictionary definition of that term, and the Governor had declared a civil preparedness emergency under *Conn. Gen. Stat. § 28-9*, the COVID-19 pandemic constituted a serious disaster under *Conn. Gen. Stat. § 28-9(a)*; [2]-The Governor's proclamation of a civil preparedness emergency empowered him to issue the challenged executive orders under *Conn. Gen. Stat. § 28-9(b)(1)* and *(7)* as they provided guidance to limit the spread of the virus, thereby protecting public health; [3]-*Conn. Gen. Stat. § 28-9(b)(1)* and *(7)* were not an unconstitutional delegation of legislative powers to the Governor as they set forth the policy to follow in the event of a serious disaster, and the Governor's actions were limited to those reasonably necessary to protect public health, safety, and welfare.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Governments > Legislation > Interpretation

**HN1[⬇]  Standards of Review, De Novo Review**

On a question of statutory interpretation, appellate review is plenary. The appellate court reviews a statutory provision in accordance with *Conn. Gen. Stat. § 1-2z* and the familiar principles of statutory construction.

Governments > Legislation > Interpretation

**HN2[⬇]  Legislation, Interpretation**

When a term is not defined in a statute, courts look to its common dictionary definition.

Governments > Legislation > Interpretation

HN3[⬇] **Legislation, Interpretation**

The doctrine of ejusdem generis is inapplicable when statutory enumeration is preceded by phrase including, but not limited to.

Governments > Legislation > Interpretation

HN4[⬇] **Legislation, Interpretation**

In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended.

Governments > Legislation > Interpretation

HN5[⬇] **Legislation, Interpretation**

Courts assume that the legislature has a different intent when it uses different terms in the same statutory scheme.

Governments > State & Territorial Governments > Employees & Officials

Public Health & Welfare Law > Social Services > Emergency Services

HN6[⬇] **State & Territorial Governments, Employees & Officials**

Conn. Gen. Stat. § 28-1(2)(B) provides that a major disaster includes any catastrophe that, in the determination of the Governor, requires the declaration of a civil preparedness emergency pursuant to Conn. Gen. Stat. § 28-9. The General Assembly's reference to a civil preparedness emergency under § 28-9 in the definition of major disaster set forth in Conn. Gen. Stat. § 28-1(2) makes clear that it intended that any event that constitutes a catastrophe under § 28-1(2) also constitutes a serious disaster if the Governor declares a civil preparedness emergency under § 28-9. Put

differently, if an event constitutes a catastrophe under § 28-1(2), and the Governor determines that the proclamation of a civil preparedness emergency under § 28-9 is required to address it, then the catastrophe necessarily is both a major disaster and a serious disaster.

Governments > State & Territorial Governments > Employees & Officials

HN7[⬇] **State & Territorial Governments, Employees & Officials**

Following the proclamation of a civil preparedness emergency pursuant to Conn. Gen. Stat. § 28-9(a), Conn. Gen. Stat. § 28-9(b)(1) empowers the Governor to modify or suspend any statute, regulation or requirement that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. Conn. Gen. Stat. § 28-9(b)(7) additionally empowers the Governor to take other steps that are reasonably necessary in light of the emergency to protect the health, safety, and welfare of the people of the state.

Governments > Local Governments > Employees & Officials

HN8[⬇] **Local Governments, Employees & Officials**

The Governor has the authority under Conn. Gen. Stat. § 28-9(b)(1) to modify or suspend a statute if it conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health.

Governments > Local Governments > Employees & Officials

HN9[⬇] **Local Governments, Employees & Officials**

Under Conn. Gen. Stat. § 28-9 (b) (1), the Governor is authorized to modify or suspend any statute, regulation or requirement, if it conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health.

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

Constitutional Law > ... > Case or Controversy > Constitutionality of Legislation > Inferences & Presumptions

Evidence > Burdens of Proof > Allocation

### HN10[⤓]  Standards of Review, Questions of Fact & Law

A challenge to the constitutionality of a statute presents a question of law over which appellate review is plenary. It also is well established that a validly enacted statute carries with it a strong presumption of constitutionality, and that those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. The court will indulge in every presumption in favor of the statute's constitutionality. Therefore, when a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear.

Constitutional Law > Separation of Powers

Governments > State & Territorial Governments > Legislatures

### HN11[⤓]  Constitutional Law, Separation of Powers

The constitution of Connecticut provides for the separation of the governmental functions into three basic departments, legislative, executive, and judicial, and it is inherent in this separation, since the law-making function is vested exclusively in the legislative department, that the legislature cannot delegate the law-making power to any other department or agency. The primary purpose of the separation of powers doctrine is to prevent commingling of different powers of government in the same hands. The Constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers. It is axiomatic that no branch of government organized under a constitution may exercise any power that is not explicitly bestowed by that constitution or that is not essential to the exercise thereof. Thus the separation of powers doctrine serves a dual function: it limits the exercise of power within each branch, yet ensures the independent exercise of that power.

Constitutional Law > Separation of Powers

Governments > State & Territorial Governments > Legislatures

### HN12[⤓]  Constitutional Law, Separation of Powers

Unlike the separation of powers doctrine that has developed under the federal constitution, the historical evolution of Connecticut's governmental system has established a tradition of harmony among the separate branches of government. Recognizing that executive, legislative and judicial powers frequently overlap, judicial precedent holds that the doctrine of the separation of powers cannot be applied rigidly. As we have recognized, the great functions of government are not divided in any such way that all acts of the nature of the function of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative and judicial powers of necessity overlap each other, and cover many acts which are in their nature common to more than one department. For example, the General Assembly does not have exclusive responsibility for legislating. Rather, the legislature and the governor work together to pass legislation.

Constitutional Law > Separation of Powers

### HN13[⤓]  Constitutional Law, Separation of Powers

A statute will be held unconstitutional on the ground that it violates the separation of powers only if it (1) confers on one branch of government the duties which belong exclusively to another branch or (2) if it confers the duties of one branch of government on another branch which duties significantly interfere with the orderly performance of the latter's essential functions.

Administrative Law > Separation of Powers > Executive Controls

Governments > Local Governments > Police Power

Governments > Police Powers

Administrative Law > Separation of

Powers > Legislative Controls > Scope of Delegated Authority

Administrative Law > Separation of Powers > Legislative Controls > Explicit Delegation of Authority

**HN14[⬇]  Separation of Powers, Executive Controls**

*Conn. Gen. Stat. § 28-9* sets forth the General Assembly's policy that the State must be able to mount a rapid and agile response to a serious disaster, and the executive branch, namely, the Governor, is most capable of carrying out that response. Significantly, although the law-making power is in the legislative branch of the government and cannot constitutionally be delegated, the General Assembly may carry out its legislative policies within the police power of the State by delegating to an administrative agency the power to fill in the details. Put differently, the General Assembly has the right to determine in the first instance what is the nature and extent of the danger to the public health, safety, morals, and welfare and what are the measures best calculated to meet that threat. Once the General Assembly has made that determination, it may carry out that policy by delegating to the executive branch the power to fill in the details in order to effectuate that policy.

Administrative Law > Separation of Powers > Constitutional Controls > Nondelegation Doctrine

Constitutional Law > Congressional Duties & Powers > Delegation of Authority

**HN15[⬇]  Constitutional Controls, Nondelegation Doctrine**

In order to render admissible such delegation of legislative power, it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits. So long as General Assembly shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power. The answer requires construing the

challenged statute to figure out what task it delegates and what instructions it provides.

Governments > Local Governments > Employees & Officials

**HN16[⬇]  Local Governments, Employees & Officials**

In enacting *Conn. Gen. Stat. § 28-9,* the General Assembly set forth the policy for the governor to follow in the event of a serious disaster. Specifically, through *Conn. Gen. Stat. § 28-9(b)(1),* the General Assembly's policy directs that, upon the proclamation of a civil preparedness emergency, or upon the declaration of a public health emergency under *Conn. Gen. Stat. § 19a-131a,* the Governor may modify or suspend any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. *Section 28-9(b)(1)* further requires the Governor to specify the reasons for suspending or modifying the statute, regulation or requirement and the period, not exceeding six months unless sooner revoked, during which such order shall be enforced.

Governments > State & Territorial Governments > Employees & Officials

**HN17[⬇]  State & Territorial Governments, Employees & Officials**

The legislature set forth the standards that limit the governor's authority to act under *Conn. Gen. Stat. § 28-9(b)(1)* in three primary ways. First, the Governor may act pursuant to *§ 28-9(b)(1)* only after the Governor has proclaimed a civil preparedness emergency or declared a public health emergency. Second, the Governor's actions are limited to modifying or suspending, not repealing, statutes or other regulations only to the extent that they are in conflict with the execution of civil preparedness functions or are required to protect the public health, and the governor is required to specify the reasons for the modification or suspension. Finally, the Governor's actions have temporal limitations, namely, the period of time the modification or suspension may be enforced is limited to six months. Therefore, any actions the governor takes under *§ 28-9(b)(1)* are

temporary, that is, he cannot modify or suspend any statutes or regulations permanently.

Governments > State & Territorial Governments > Employees & Officials

**HN18[⬇]    State & Territorial Governments, Employees & Officials**

*Conn. Gen. Stat. § 28-9(b)(7)* makes clear that the Governor may take other steps to address the serious disaster, only if they are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and to minimize the effects of hostile action. In other words, the Governor may act under *§ 28-9(b)(7)* only after he has proclaimed a civil preparedness emergency, and his actions are limited to those that are reasonably necessary to protect the health, safety, and welfare of the people of Connecticut. Moreover, the Governor may act only to the extent that the health, safety, and welfare of the people are implicated by this particular serious disaster.

Governments > Local Governments > Employees & Officials

**HN19[⬇]    Local Governments, Employees & Officials**

The Governor's actions under *Conn. Gen. Stat. § 28-9(b)(7)* must be reasonably necessary to address the specific serious disaster that warranted the civil preparedness emergency proclamation.

Constitutional Law > Congressional Duties & Powers > Delegation of Authority

**HN20[⬇]    Congressional Duties & Powers, Delegation of Authority**

Case law supports the conclusion that *Conn. Gen. Stat. § 28-9(b)(1)* and *(7)* are not an unconstitutional delegation of legislative authority.

Governments > State & Territorial Governments > Legislatures

**HN21[⬇]    State & Territorial Governments, Legislatures**

A broad grant of authority is not the same as limitless or standardless authority. Although the General Assembly may not delegate its law-making function, it may delegate some considerable segment of its legislative authority. Once the legislature has made a policy determination, it is no objection that the legislation calls for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework.

Insurance Law > ... > Life
Insurance > Beneficiaries > Effect of Divorce

**HN22[⬇]    Beneficiaries, Effect of Divorce**

In enacting *Conn. Gen. Stat. § 28-9(b)*, the General Assembly was as precise as it could be in defining the contours of the governor's authority given that there are myriad serious disasters that could arise and the actions the governor would be required to take could vary significantly from one serious disaster to another.

Governments > State & Territorial Governments > Employees & Officials

**HN23[⬇]    State & Territorial Governments, Employees & Officials**

*Conn. Gen. Stat. § 28-9* sets forth the General Assembly's policy that, in the event of a serious disaster, the health, safety, and welfare of Connecticut's residents is of utmost importance. *Conn. Gen. Stat. § 28-9(b)* affords the Governor considerable latitude to employ the necessary means for accomplishing that policy objective. But that latitude is neither standardless nor limitless. In the event an aggrieved party believes the Governor has taken any particular action that exceeds his lawful authority or violates the state constitution, that party may seek redress from the courts. The legislature may also deem it proper to impose greater oversight of the Governor's actions during a proclaimed civil preparedness emergency or otherwise amend or repeal *§ 28-9* to further limit the Governor's authority.

**Counsel:** Jonathan J. Klein, for the appellants (plaintiffs).

Philip Miller, assistant attorney general, with whom, on the brief, were William Tong, attorney general, Clare E. Kindall, solicitor general, and Alma Rose Nunley, assistant attorney general, for the appellee (defendant).

**Judges:** McDONALD, J. Robinson, C. J., and McDonald, D'Auria, Mullins, Kahn, Ecker and Keller, Js. In this opinion the other justices concurred.

**Opinion by:** McDONALD

# Opinion

McDONALD, J. For more than one year now, the world has been in the unyielding grip of a highly virulent infectious disease that, to date, has infected approximately 127 million people worldwide and has killed more than 2.7 million individuals. Of those **[*2]** deaths, about 20 percent, or approximately 549,000, have been in the United States of America. In Connecticut alone, more than 305,000 people have been infected and more than 7800 have died. [1] These numbers, while jarring on their own, tell but one part of the enormous toll inflicted on society since the pandemic's onset. Around the country—indeed the world—large segments of economic activity have been severely disrupted, if not fallen into collapse, millions of people have lost their employment, many hospitals and other health-care operations have been overrun by gravely ill and dying patients, and extraordinary lockdowns ordered by government officials, in an effort to abate the rate of infection, have limited the free flow of personal and commercial activity. As this opinion is

---

[1] See Coronavirus Resource Center, Johns Hopkins University & Medicine, COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at John Hopkins University (JHU), available at https://coronavirus.jhu.edu/map.html (last visited March 29, 2021); Connecticut Department of Public Health, Connecticut's COVID-19 Response, available at https://portal.ct.gov/coronavirus (last visited March 29, 2021).

issued, it is uncertain when, or how, the pandemic will end.

The disease that has caused so much death and damage is known as COVID-19. It is a respiratory disease caused by a virus that is transmitted easily from person to person and can result in serious illness or death. According to the Centers for Disease Control and Prevention (CDC), the virus is primarily spread through respiratory droplets from infected **[*3]** individuals coughing, sneezing, or talking while in close proximity to other people. Centers for Disease Control & Prevention, How COVID-19 Spreads (last updated October 28, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited March 29, 2021). On January 31, 2020, the United States Department of Health and Human Services declared a national public health emergency, effective January 27, 2020, on the basis of the rising number of confirmed COVID-19 cases in the United States. United States Department of Health & Human Services, Press Release, Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (January 31, 2020), available at https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last visited March 29, 2021). The CDC explained that COVID-19 "represents a tremendous public health threat." Centers for Disease Control & Prevention, Press Release, Update on COVID-19 (February 21, 2020), available at https://www.cdc.gov/media/releases/2020/t0221-cdc-telebriefing-covid-19.html (last visited March 29, 2021).

With this **[*4]** context in mind, we turn to the matter before us, which requires this court to consider the extent of the governor's authority to issue executive orders during the civil preparedness emergency he declared pursuant to *General Statutes § 28-9* in response to the COVID-19 pandemic. In particular, we consider whether the defendant, Governor Ned Lamont, lawfully issued certain executive orders that limited various commercial activities at bars and restaurants throughout the state. To that end, we must determine whether the COVID-19 pandemic constitutes a "serious disaster" pursuant to *§ 28-9* and whether that statute empowers the governor to issue the challenged executive orders. Because we conclude that *§ 28-9* provides authority for the governor to issue the challenged executive orders, we also consider whether *§ 28-9* is an unconstitutional delegation of legislative authority to the governor in violation of the separation of

powers provision of the Connecticut constitution. See Conn. Const., art. II. We conclude that the statute passes constitutional muster.

The pleadings and the record reveal the following undisputed facts and procedural history. On March 10, 2020, "[i]n response to the global pandemic of [COVID-19]," Governor Lamont "declare[d] a [*5] public health emergency and civil preparedness emergency throughout the [s]tate, pursuant to [*General Statutes §§ 19a-131a* and *28-9* . . . .]" Governor Lamont has renewed the declaration of both emergencies twice, most recently on January 26, 2021. The emergencies currently remain in effect until April 20, 2021. On March 13, 2020, three days after Governor Lamont's declaration, President Donald J. Trump made "an emergency determination under *[§] 501 (b)* of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, *42 U.S.C. [§§] 5121-[207]* [Stafford Act]." Letter from President Donald J. Trump to Acting Secretary of the Department of Homeland Security Chad F. Wolf (March 13, 2020) p. 1. On March 28, 2020, President Trump determined that, beginning on January 20, 2020, the impacts of the COVID-19 pandemic on Connecticut "are of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act] . . . ." *Federal Emergency Management Agency, Connecticut, Major Disaster and Related Determinations, 85 Fed. Reg. 31,542 (May 26, 2020).*

Following Governor Lamont's declaration of the pub-lic health and civil preparedness emergencies, he promulgated a series of executive orders in an attempt to contain and mitigate the spread of COVID-19. Relevant to this appeal, on March 16, 2020, he issued Executive Order No. 7D, which provides, among other things, [*6] that "any location licensed for [on premise] consumption of alcoholic liquor in the [s]tate of Connecticut . . . shall only serve food or [nonalcoholic] beverages for [off premise] consumption." Executive Order No. 7D (March 16, 2020). In response to the rapidly evolving COVID-19 pandemic, Governor Lamont continued to promulgate a series of executive orders modifying Executive Order No. 7D. Specifically, in April, 2020, Governor Lamont issued Executive Order No. 7X, which extended to May 20, 2020, Executive Order No. 7D's limitations on bars and restaurants. Given that the state had made some progress in stemming the spread of COVID-19, in May, 2020, Governor Lamont issued guidance called "Reopen Connecticut" to begin reopening portions of the state's economy. The goal of Reopen Connecticut was to "[p]roactively protect public health and speed up the pace of economic, educational, and community recovery while restoring Connecticut's quality of life." N. Lamont, Reopen Connecticut: Sector Rules for May 20th Reopen (May 18, 2020) (Reopen Connecticut), available at https://portal.ct.gov/-/media/DECD/Covid_Business_Recovery/CTReopens_Offices_C4_V1.pdf (last visited March 29, 2021). In [*7] service of that goal, Governor Lamont issued Executive Order 7MM, which permitted restaurants to serve food outside and ordered that "[a]lcoholic liquor may be served only in connection with outdoor dining . . . ." Executive Order No. 7MM (May 12, 2020). Thereafter, he issued Executive Order No. 7ZZ, which allowed the resumption of some indoor dining except that the ban on "the sale of alcohol by certain permittees without the sale of food . . . shall remain in effect and [is] extended through July 20, 2020." Executive Order No. 7ZZ (June 16, 2020). In July, 2020, and in response to certain developments related to COVID-19, Governor Lamont announced that he was suspending phase 3 of the Reopen Connecticut plan, which was previously scheduled to start on July 20, 2020.

In compliance with Executive Order No. 7D, and after determining that it would not be profitable to operate a takeout business, the plaintiffs, Kristine Casey and Black Sheep Enterprise, LLC, closed their establishment, Casey's Irish Pub, on March 16, 2020. Casey is the permittee of a café liquor permit for the pub, which has fifteen stools at the bar, two high-top tables, a pool table, and a maximum capacity of fifty-nine [*8] patrons. The pub does not typically serve hot meals, and approximately 90 percent of its revenue comes from the sale of alcohol. The parties agree that, because of the physical location of the pub, "[o]utdoor service is not a viable option . . . because the tables would completely block the sidewalk, and there would be no protection from cars approaching to park . . . ." The parties also stipulate that "[p]reparing takeout meals and sealed alcoholic beverages for [off premise] consumption is not a viable option . . . as Casey knows from her experience in operating the pub and dealing with her customer base that, without the pub atmosphere, there would be insufficient interest from her clientele to justify the expense of providing such service." The plaintiffs' pub remains closed, and the parties stipulate that "it is not economically or physically feasible for [the plaintiffs] to reopen the pub." Since the pub's shutdown, the plaintiffs have continued to pay rent in the amount of $3200 per month and operating expenses totaling approximately $14,000 per month without any income stream.

In June, 2020, the plaintiffs commenced this action against Governor Lamont, requesting the court to [*9] declare that he acted beyond his statutory and constitutional authority when he issued Executive Order Nos. 7D, 7G, 7N, 7T, 7X, 7MM and 7ZZ. [2] The operative complaint sought a "temporary and permanent injunction" against the enforcement of the challenged executive orders. The complaint also requested a judgment declaring the executive orders unconstitutional. The parties filed a stipulation of facts, and, after the filing of briefs, the case was tried to the court by way of oral argument and based on the briefs and the parties' stipulation of facts. [3]

Thereafter, the trial court, *Bellis, J.*, issued a memorandum of decision, in which it denied the plaintiffs' request for injunctive and declaratory relief, and the court rendered judgment for Governor Lamont. The court reasoned that the COVID-19 pandemic constitutes a "serious disaster" under *§ 28-9 (a)* and Governor Lamont's executive orders were authorized by *§ 28-9 (b) (1)* and *(7)*. The court also concluded that *§ 28-9* is not an unconstitutional delegation of legislative authority to the governor because, when the General Assembly passed *§ 28-9*, "it set forth a clear legislative policy" and "gave the governor the ability to implement measures to achieve this goal."

The plaintiffs appealed directly [*10] to this court pursuant to *General Statutes § 52-265a*, and the Chief Justice subsequently certified that this action involves a matter of substantial public interest. On appeal, the plaintiffs do not contend that the restrictions Governor Lamont imposed on the pub were unreasonable or were not related to the public health, safety, and welfare of the people of this state. Rather, they claim that Governor Lamont exceeded his statutory authority by issuing the challenged executive orders. The plaintiffs further contend that, even if Governor Lamont's executive orders are valid under *§ 28-9, § 28-9 (b) (1)* and *(7)* is an unconstitutional delegation by the General Assembly of its legislative powers in violation of the separation of powers provision of the Connecticut constitution. See Conn. Const., art. II.

Governor Lamont disagrees and contends that, because the COVID-19 pandemic is a "serious disaster," *§ 28-9* provides him with statutory authority to limit the pub's operation. Governor Lamont further contends that *§ 28-9* does not violate the separation of powers provision of the Connecticut constitution because it does not infringe on legislative authority and it provides sufficient standards for implementation. [4]

Following oral argument, we issued a per curiam ruling on [*11] December 31, 2020, in which we affirmed the judgment of the trial court, explaining that Governor Lamont's actions to date had been constitutional. We indicated at that time that a full opinion would follow. This is that opinion.

---

[2] In addition to Executive Order Nos. 7D, 7X, 7MM, and 7ZZ, the provisions of which we have set forth in the text of this opinion, Executive Order No. 7G clarified the limits of Executive Order No. 7D on businesses such as the pub, allowing them "to sell sealed containers of alcoholic liquor for [pickup] at such restaurant, café or tavern" under certain conditions, including a requirement that the alcohol purchase "accompany a [pickup] order of food prepared on the premises . . . ." Executive Order No. 7G (March 19, 2020). Executive Order No. 7N directed businesses that remained open to serve food and drink for off-premise consumption to "limit entrance of customers into their locations to the minimum extent necessary to pick up and/or pay for orders, use touchless payment systems, and require remote ordering and payment . . . ." Executive Order No. 7N (March 26, 2020). Executive Order No. 7T expanded the list of sealed containers of alcohol that liquor permit holders could sell under the conditions set forth in Executive Order No. 7G.

[3] Oral argument was conducted using remote technologies because the Superior Court buildings at the time were closed to the public for most purposes as a result of the pandemic.

[4] Following oral argument, we ordered the parties to file supplemental briefs addressing the questions of whether Governor Lamont abandoned reliance on *§ 19a-131a* as a legal basis to support the challenged executive orders and, assuming he did not, whether his authority resulting from a public health emergency declaration, alone, supports the challenged executive orders. In their supplemental brief, the plaintiffs contend, as the trial court concluded, that Governor Lamont abandoned reliance on *§ 19a-131a*. Assuming he did not abandon reliance on *§ 19a-131a*, the plaintiffs claim that the governor's authority resulting from a public health emergency, alone, does not support any of the challenged executive orders. Governor Lamont contends that he has not abandoned reliance on *§ 19a-131a* as a legal basis to support the actions taken pursuant to *§ 28-9 (b) (1)*. He also contends, however, that he can rely on *§ 19a-131a* as authority to issue only Executive Order Nos. 7MM and 7ZZ because those are the only orders that fall within the governor's authority to modify statutes during a public health emergency pursuant to *§ 28-9 (b) (1)*. Because the parties agree that *§ 19a-131a*, alone, does not provide authority for Governor Lamont to issue all of the challenged executive orders, we must consider whether *§ 28-9* provides that authority.

Case 3:20-cv-00829-VAB   Document 55   Filed 04/08/21   Page 13 of 45

Page 10 of 23
2021 Conn. LEXIS 78, *11

I

We begin with the plaintiffs' contention that, by issuing the challenged executive orders, Governor Lamont exceeded his statutory authority. Whether the governor has statutory authority to issue the challenged executive orders during a proclaimed civil preparedness emergency turns on whether the COVID-19 pandemic constitutes a "serious disaster" under *§ 28-9 (a)*. **HN1**[↑] ] This presents a question of statutory interpretation over which our review is plenary. See, e.g., *Gould v. Freedom of Information Commission, 314 Conn. 802, 810, 104 A.3d 727 (2014)*. We review *§ 28-9* in accordance with *General Statutes § 1-2z* and our familiar principles of statutory construction. See, e.g., *Sena v. American Medical Response of Connecticut, Inc., 333 Conn. 30, 45-46, 213 A.3d 1110 (2019)*.

We begin with the text of *§ 28-9 (a)*, which provides in relevant part: "In the event of serious disaster, enemy attack, sabotage or other hostile action or in the event of the imminence thereof, the Governor may proclaim that a state of civil preparedness emergency exists, in which event the Governor may personally take direct operational control of any or all parts of the civil preparedness forces and functions in the state. [*12] Any such proclamation shall be effective upon filing with the Secretary of the State. . . ." Governor Lamont does not contend that the COVID-19 pandemic has resulted from an "enemy attack, sabotage or other hostile action . . . ." *General Statutes § 28-9 (a)*. Rather, the governor relies on the term "serious disaster" to justify the civil preparedness emergency proclamation. The plaintiffs contend that the COVID-19 pandemic is not a "serious disaster" because the General Assembly did not intend that term "to include the contagion of disease." Governor Lamont contends that, regardless of whether the statute is plain and unambiguous, the COVID-19 pandemic constitutes a "serious disaster."

The term "serious disaster" is not defined in *§ 28-9* or in Chapter 517 of the General Statutes. The term "major disaster," however, is defined in the definitional provision of Chapter 517. [5] Specifically, *General Statutes § 28-1 (2)* defines "major disaster" as "*any catastrophe including, but not limited to*, any hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide,

mud-slide, snowstorm or drought, or, regardless of cause, any fire, flood, explosion, or man-made disaster in any part of this state [*13] that, (A) in the determination of the President, causes damage of sufficient severity and magnitude to warrant major disaster assistance under the [Stafford Act], as amended from time to time, to supplement the efforts and available resources of this state, local governments within the state, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused by such catastrophe, or (B) in the determination of the Governor, requires the declaration of a civil preparedness emergency pursuant to *section 28-9*." (Emphasis added.)

**HN2**[↑] ] Because the term "catastrophe" is not defined in *§ 28-1*, we look to its common dictionary definition. See, e.g., *Studer v. Studer, 320 Conn. 483, 488, 131 A.3d 240 (2016)*; see also *General Statutes § 1-1 (a)*. "Catastrophe" is often defined as "a momentous tragic usu[ally] sudden event marked by effects ranging from extreme misfortune to utter overthrow or ruin . . . ." Webster's Third New International Dictionary (1961) p. 351; accord Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 194. The COVID-19 pandemic has caused vast disruption to everyday life, and it has had a devastating impact on our economy. K. Phaneuf, "CT Economy Will Struggle Until at Least 2030 To Recover from COVID, UConn Report Warns," CT Mirror, October [*14] 23, 2020, available at https://ctmirror.org/2020/10/23/ct-economy-will-struggle-until-at-least-2030-to-recover-from-covid-uconn-report-warns/ (last visited March 29, 2021). Most tragically, the United States has now recorded more COVID-19 deaths than the total number of Americans killed during World Wars I and II combined. See Congressional Research Service, American War and Military Operations Casualties: Lists and Statistics (Updated July 29, 2020) p. 2, available at https://crsreports.congress.gov/product/pdf/RL/RL32492 (last visited March 29, 2021). Thus, by any reasonable measure, the COVID-19 pandemic certainly fits the dictionary definition of catastrophe.

The plaintiffs note, however, that the enumerated list that follows the term "catastrophe" in *§ 28-1 (2)* is limited to "weather conditions, seismic activity, fire, explosion and man-made conditions . . . ." As a result, the plaintiffs argue that there is no language in *§ 28-1 (2)* that indicates any legislative "intent to include the contagion of disease." The plaintiffs argue, albeit implicitly, that we should apply the statutory interpretation rule of ejusdem generis, which provides that, "when a general word or

---

[5] We subsequently discuss in this opinion whether there is any analytic difference between a "serious disaster" and a "major disaster," and conclude there is not.

phrase follows a list of specifics, [*15] the general word or phrase will be interpreted to include only items of the same class as those listed." (Internal quotation marks omitted.) *State v. Terwilliger, 314 Conn. 618, 658, 104 A.3d 638 (2014)*.

Although it is true that the listed examples of catastrophes do not include the contagion of disease, the plaintiffs' argument fails to consider that the list is preceded by the phrase "*including, but not limited to . . . .*" (Emphasis added.) *General Statutes § 28-1 (2)*. **HN3**[↑] By including this phrase, the legislature evinced its intent that a "major disaster" not be limited in scope to the enumerated events, as the plaintiffs contend. [6] See *United States v. West, 671 F.3d 1195, 1200-1201 (10th Cir. 2012)* (citing cases holding that doctrine of ejusdem generis is inapplicable when statutory enumeration is preceded by phrase "including, but not limited to"); see

———————————————

[6] The Pennsylvania Supreme Court recently reached a similar conclusion under Pennsylvania law. See *Friends of Danny DeVito v. Wolf, 227 A.3d 872, 888-89 (Pa.)*, cert. denied, ___ **U.S. ___ , 141 S. Ct. 239, 208 L. Ed. 2d 17 (2020)**. Under state law, the governor of Pennsylvania is authorized to declare a disaster emergency "upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent." *35 Pa. Stat. and Cons. Stat. Ann. § 7301 (c)* (West Supp. 2020). The Pennsylvania Emergency Management Services Code defines "disaster" as "[a] man-made disaster, natural disaster or war-caused disaster." *35 Pa. Stat. and Cons. Stat. Ann. § 7102* (West Supp. 2020). Similar to the definition of "major disaster" in *§ 28-1 (2)*, the Pennsylvania Emergency Management Services Code defines "natural disaster" as "[a]ny hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, earthquake, landslide, mudslide, snowstorm, drought, fire, explosion *or other catastrophe which results in substantial damage to property, hardship, suffering or possible loss of life*." (Emphasis in original.) *35 Pa. Stat. and Cons. Stat. Ann. § 7102* (West Supp. 2020). The plaintiffs in *Friends of Danny DeVito* claimed that the COVID-19 pandemic was not a "natural disaster" because it was "not of the same type or kind" as those listed in the statutory definition in *§ 7102. Friends of Danny DeVito v. Wolf, supra, 888.* The Pennsylvania Supreme Court rejected this argument and concluded that the COVID-19 pandemic qualified as a natural disaster. Id. The court explained that the "specific disasters in the definition of 'natural disaster' themselves lack commonality"; id.; and, by "including the language 'other catastrophe which results in substantial damage to property, hardship, suffering or possible loss of life,' it [was] clear that the General Assembly intended to *expand* the list of disaster circumstances that would provide [the Pennsylvania governor] with the necessary powers to respond to exigencies involving vulnerability and loss of life." (Emphasis in original.) Id., 89.

also *Tomick v. United Parcel Service, Inc., 324 Conn. 470, 479, 153 A.3d 615 (2016)* ("[r]eading the phrase 'including but not limited to,' as expansive"); *Lusa v. Grunberg, 101 Conn. App. 739, 756, 923 A.2d 795 (2007)* ("the phrase [including but not limited to] convey[s] a clear intention that the items listed in the definition do not constitute an exhaustive or exclusive list" (internal quotation marks omitted)). Indeed, as Governor Lamont contends, an expansive reading is warranted in this context given that the General Assembly instructed him to exercise the powers delegated to him under *§ 28-9* broadly for "the protection [*16] of the public health"; *General Statutes § 28-9 (b) (1)*; and "to protect the health, safety and welfare of the people of the state . . . ." *General Statutes § 28-9 (b) (7)*. A narrow interpretation of the circumstances under which the governor would have authority to proclaim a civil preparedness emergency, as the plaintiffs contend, would frustrate this legislative intent.

Moreover, it would be absurd for the statutory scheme to be interpreted such that the governor could declare a civil preparedness emergency for an event such as a snowstorm, but not for the worst pandemic that has impacted the state in more than one century. We decline to construe the meaning of "major disaster" in such a manner. See, e.g., *Goldstar Medical Services, Inc. v. Dept. of Social Services, 288 Conn. 790, 803, 955 A.2d 15 (2008)* (**HN4**[↑]) "[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended" (internal quotation marks omitted)).

To the extent the meaning of "major disaster" is ambiguous given the tension between the enumerated list of catastrophes and the legislature's use of the phrase "including, but not limited to," we look to extratextual sources to gain [*17] further insight into whether the legislature intended that a global pandemic could constitute a major disaster. The legislative history of both *§§ 28-1 (2)* and *28-9* provides further support for the conclusion that the General Assembly did not intend the term "major disaster" to be limited only to catastrophes caused by weather conditions, seismic activity, fire, explosion and man-made conditions, as the plaintiffs contend. Under earlier versions of *§ 28-9*, the governor was authorized to proclaim a civil preparedness emergency "[i]n the event of serious natural disaster, enemy attack, sabotage or other hostile action or in the event of the imminence thereof . . . ." General Statutes (1958 Rev.) *§ 28-9*; see also General Statutes (1955 Supp.) *§ 1913d* (adding "serious natural

disaster" to list of events). At that time, Chapter 517 did not contain a definition of "disaster" or "serious national disaster." In 1975, however, the General Assembly inserted a definition of "disaster" into § 28-1. See Public Acts 1975, No. 75-643, § 1 (P.A. 75-643), codified at General Statutes (Rev. to 1977) § 28-1 (b). It provided in relevant part: " 'Disaster' means occurrence or imminent threat of widespread or severe damage, injury or loss of life or property resulting from any natural or [*18] manmade cause, including but not limited to, fire, flood, earthquake, wind, storm, wave action, oil spill or other water contamination . . . epidemic, air contamination, blight, drought, infestation, explosion, riot or hostile military or paramilitary action." (Emphasis added.) P.A. 75-643, § 1. Accordingly, at least as early as 1975, the General Assembly clearly anticipated that an epidemic could constitute a "disaster."

Since 1975, the General Assembly has amended the definitions in § 28-1 on several occasions in order to align state law with the federal Stafford Act. See Sena v. American Medical Response of Connecticut, Inc., supra, 333 Conn. 50 n.13. Specifically, in 1979, the General Assembly removed the definition of "disaster" from § 28-1 and added the definition of "major disaster" to better align state and federal law. Public Acts 1979, No. 79-417, § 1 (P.A. 79-417), codified at General Statutes (Rev. to 1981) § 28-1 (b); see 22 H.R. Proc., Pt. 5, 1979 Sess., p. 1648 ("The intent of this [b]ill is to align the [s]tate laws with the [f]ederal laws. . . . Further, [the bill] inserts two new definitions for major disasters and emergency, while repealing the old definition for disaster. Again, this is done to align [f]ederal and [s]tate legislation."). Public Act No. 79-417 defined "major disaster" in relevant part [*19] as "any hurricane, storm, flood, high water, wind driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, drought, fire, explosion, or other catastrophe in any part of this state which, in the determination of the president, causes damage of sufficient severity and magnitude to warrant major disaster assistance under the Federal Disaster Relief Act of 1974 . . . ." P.A. 79-417, § 1. This definition was nearly identical to the federal definition of "major disaster" in the federal Disaster Relief Act of 1974. See Disaster Relief Act of 1974, Pub. L. No. 93-288, § 102, 88 Stat. 143, 144, codified at 42 U.S.C. § 5122 (2) (Supp. IV 1974). Although the definition of "major disaster" did not list epidemic or pandemic, there is nothing in the legislative history to indicate that the General Assembly intended that an epidemic or pandemic of sufficient severity could not constitute a "major disaster," when, just four years earlier, it evinced

its intent that it could constitute a "disaster." The changes to the definition were merely intended to align state and federal law. [7]

The plaintiffs' contention that the term "major disaster" is limited to weather conditions, seismic activity, fire, [*20] explosion and man-made conditions is further belied by the legislature's changes to the definition of "major disaster" in Number 06-15 of the 2006 Public Acts (P.A. 06-15). In 1988, Congress amended the Disaster Relief Act of 1974 and changed the definition of "major disaster" to "any natural catastrophe (including any hurricane, tornado, storm, high water, winddriven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought) . . . ." (Emphasis added.) The Disaster Relief and Emergency Assistance Amendments of 1988, Pub. L. No. 100-707, § 103, 102 Stat. 4689, 4690, codified at 42 U.S.C. § 5122 (2) (1988). Rather than adopting the new federal definition, as the General Assembly had previously done, in P.A. 06-15, it enacted a broader definition of "major disaster" by omitting the word "natural" and adding the phrases "including, but not limited to" and "manmade disaster . . . ." P.A. 06-15, § 1, codified at General Statutes (Rev. to 2007) § 28-1 (2). Thus, the current statutory definition of "major disaster" under Connecticut law is broader than the federal definition, which is limited to "natural catastrophe[s]"; 42 U.S.C. § 5122 (2) (2018); and encompasses a wider category of catastrophes beyond those listed in the federal [*21] definition. See General Statutes § 28-1 (2). Significantly, however, although the federal definition of "major disaster" is narrower than the state definition, President Trump concluded that the impacts of the COVID-19 pandemic on Connecticut were "of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act] . . . ." (Emphasis added.) Federal Emergency Management Agency, supra, 85 Fed. Reg. 31,542. It would be illogical to conclude that the effects of the COVID-19 pandemic in this state were of sufficient severity to constitute a "major disaster" under the narrower federal definition of "major disaster" but not sufficient to satisfy the broader state definition of

---

[7] Indeed, we note that General Statutes § 28-9a, which sets forth additional actions the governor may take in the event of an emergency or major disaster, explicitly provides that " '[m]ajor disaster,' 'emergency' and 'temporary housing' as used in this section have the same meanings as the terms are defined, or used, in the [federal] Disaster Relief Act of 1974 . . . ." (Citation omitted.) General Statutes § 28-9a (d).

the same term. [8] We decline to construe the statute in such a manner. Accordingly, we conclude that the COVID-19 pandemic constitutes a "major disaster," as that term is defined in *§ 28-1 (2)*.

Logically, it would seem that the meaning of the term "major disaster" set forth in *§ 28-1 (2)* is substantially similar to the term "serious disaster" in *§ 28-9 (a)*. See Webster's Third New International Dictionary, supra, pp. 1363, 2073 (defining "major" as "involving grave risk: serious" and defining "serious" as "grave in disposition, appearance, or manner"). *HN5*[⬆] As this court has often explained, however, "we assume that the legislature has a different intent when it uses [*22] different terms in the same statutory scheme." *Southern New England Telephone Co. v. Cashman, 283 Conn. 644, 662, 931 A.2d 142 (2007)* (Katz, J., concurring). Thus, we must determine whether a major disaster also constitutes a serious disaster. This question is quickly resolved based on a review of the statutory scheme. *HN6*[⬆] *Section 28-1 (2)* provides that a "major disaster" includes "any catastrophe" that "(B) in the determination of the Governor, requires the declaration of a civil preparedness emergency pursuant to *section 28-9*." The General Assembly's reference to a civil preparedness emergency under *§ 28-9* in the definition of "major disaster" set forth in *§ 28-1 (2)* makes clear

_____

[8] Just as the federal government was faced with major logistical challenges in order to stem the spread of COVID-19, such as distributing supplies from a national stockpile, so, too, was this state. Chapter 517 contains various provisions that demonstrate the need for a civil preparedness emergency to address the logistical challenges posed by a pandemic of the magnitude presented by the COVID-19 pandemic. See *General Statutes § 28-1 (4)* (defining "civil preparedness" to include "all those activities and measures designed or undertaken (A) to minimize or control the effects upon the civilian population of major disaster or emergency" such as "the procurement and stockpiling of necessary materials and supplies"); *General Statutes § 28-11 (a)* (during civil preparedness emergency or public health emergency, governor may take possession "(3) of any antitoxins, pharmaceutical products, *vaccines* or other biological products" (emphasis added)); *General Statutes § 28-16* ("commissioner [of emergency services and public protection] is empowered, in anticipation of . . . any disaster, to purchase and maintain a stockpile of medical supplies . . . and any other supplies which in his opinion are necessary and desirable to afford relief and assistance to the people of the state in an emergency"). These provisions make clear that civil preparedness emergencies, under *§ 28-9*, and public health emergencies, under *§ 19a-131a*, are related and interconnected.

that it intended that any event that constitutes a "catastrophe" under *§ 28-1 (2)* also constitutes a "serious disaster" if the governor declares a civil preparedness emergency under *§ 28-9*. Put differently, if an event constitutes a "catastrophe" under *§ 28-1 (2)*, and the governor determines that the proclamation of a civil preparedness emergency under *§ 28-9* is required to address it, then the "catastrophe" necessarily is both a "major disaster" and a "serious disaster." [9] Because, as we have explained, the COVID-19 pandemic constitutes a "catastrophe," and Governor Lamont has declared a civil preparedness emergency under *§ 28-9*, we conclude that the COVID-19 pandemic constitutes [*23] a "serious disaster" under *§ 28-9 (a)*.

Having concluded that the COVID-19 pandemic constitutes a serious disaster and, therefore, that Governor Lamont was statutorily authorized to proclaim a civil preparedness emergency, we must determine whether such proclamation empowered him to issue the challenged executive orders. Relevant to this appeal, *subsection (b) of § 28-9* provides in relevant part that, "upon [a civil preparedness emergency] proclamation, the following provisions of this section and the provisions of *section 28-11* shall immediately become effective and shall continue in effect until the Governor proclaims the end of the civil preparedness emergency:

"(1) Following the Governor's proclamation of a civil preparedness emergency pursuant to *subsection (a)* of this section or declaration of a public health emergency pursuant to *section 19a-131a*, the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public

_____

[9] *Section 28-1 (2)* also provides that a "major disaster" includes "any catastrophe" that "(A) in the determination of the President, causes damage of sufficient severity and magnitude to warrant major disaster assistance under the [Stafford Act] . . . to supplement the efforts and available resources of this state . . . in alleviating the damage, loss, hardship, or suffering caused by such catastrophe . . . ." As we have explained, President Trump's determination that the impacts of the COVID-19 pandemic on this state were "of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act]"; *Federal Emergency Management Agency, supra, 85 Fed. Reg. 31,542*; provides further support for the conclusion that the COVID-19 pandemic constitutes a serious disaster.

health. The Governor shall specify in such order the reason [*24] or reasons therefor and any statute, regulation or requirement or part thereof to be modified or suspended and the period, not exceeding six months unless sooner revoked, during which such order shall be enforced. . . .

* * *

"(7) The Governor may take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and to minimize the effects of hostile action. . . ."

*HN7*[⬆] In short, following the proclamation of a civil preparedness emergency pursuant to *§ 28-9 (a)*, *subsection (b) (1)* empowers the governor to modify or suspend any statute, regulation or requirement that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. *Subsection (b) (7)* additionally empowers the governor to take other steps that are reasonably necessary in light of the emergency to protect the health, safety, and welfare of the people of the state. All of the challenged executive orders fall squarely within either or both of these provisions.

Executive Order Nos. 7D and 7G, which closed bars and restaurants to all on premise service of food and beverages, were [*25] promulgated as part of a series of community mitigation strategies that were designed to encourage social distancing and protect public health and safety and to "increase containment of the virus and to slow transmission of the virus . . . ." Executive Order No. 7G (March 19, 2020). As the trial court noted, it is "now common knowledge that COVID-19 is spread by people who are in close physical contact with each other, and it is also well known that people who are drinking alcohol in bars tend to gather in close proximity in order to socialize." Other executive orders similarly provided logistical guidance to bars and restaurants in an effort to limit the number of people within these establishments or otherwise effectuate Executive Order No. 7D. See Executive Order No. 7N (March 26, 2020) (directing businesses that remained open to serve food and drink for off premise consumption to "limit entrance of customers into their locations to the minimum extent necessary to pick up and/or pay for orders, use touchless payment systems, and require remote ordering and payment"); Executive Order No. 7T (April 2, 2020) (expanding list of sealed containers of alcohol

that liquor permit holders [*26] could sell under conditions set forth in Executive Order No. 7G); Executive Order No. 7X (April 10, 2020) (extending Executive Order No. 7D's limitations on bars and restaurants through May 20, 2020). Governor Lamont noted the importance of each executive order to "reduc[ing] [the] spread of COVID-19," "increas[ing] containment of the virus," and "slow[ing] transmission of the virus . . . ." Executive Order No. 7G (March 19, 2020); accord Executive Order No. 7T (April 2, 2020). These executive orders fell within Governor Lamont's authority under *§ 28-9 (b) (7)* to "take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state . . . ." Indeed, the plaintiffs do not contend that the restrictions Governor Lamont imposed on the pub were unreasonable or were not related to the public health, safety, and welfare of the people of this state.

Finally, Governor Lamont issued Executive Order Nos. 7MM and 7ZZ as the state began making progress in stemming the spread of COVID-19 in order to "[p]roactively protect public health and speed up the pace of economic, educational, and community recovery while resorting Connecticut's [*27] quality of life." *Reopen Connecticut, supra.* Executive Order No. 7MM permitted restaurants to serve food outside and ordered that "[a]lcoholic liquor . . . be served only in connection with outdoor dining . . . ." Executive Order No. 7MM (May 12, 2020). Governor Lamont explained in the executive order that, when on premise dining was first permitted, it was limited to outdoor service because "public health experts ha[d] determined that the risk of transmission of COVID-19 [was] reduced in outdoor areas, including where there is more sunlight, greater air movement, and greater space to maintain distance between people . . . ." Id. Thereafter, Governor Lamont issued Executive Order No. 7ZZ, which allowed the resumption of indoor dining except that the ban on "the sale of alcohol by certain permittees without the sale of food . . . [was to] remain in effect and [was] extended through July 20, 2020." Executive Order No. 7ZZ (June 16, 2020). As with his earlier executive orders restricting activities at bars and restaurants, Executive Order Nos. 7MM and 7ZZ also fell within Governor Lamont's authority under *§ 28-9 (b) (7)* to "take such other steps as are reasonably necessary in the light of the emergency to protect the health, [*28] safety and welfare of the people of the state . . . ." In each of the challenged executive orders, Governor Lamont explained the public health rationale that required the action in order to protect the health, safety, and welfare

of the people of this state.

*HN8*[⬆️] Moreover, Executive Order Nos. 7MM and 7ZZ are also authorized by the governor's authority under § 28-9 (b) (1) to modify or suspend a statute if it conflicts with "the efficient and expeditious execution of civil preparedness functions or the protection of the public health." Executive Order No. 7MM specifically provides that "[t]itle 30 of the . . . General Statutes, including *[§§]* 30-22 (a) and 30-22a (a) . . . are modified to the extent they conflict with, or create additional requirements [with respect to], the sale of alcoholic liquor . . . ." Executive Order No. 7MM (May 12, 2020). *General Statutes § 30-22a* sets forth the terms of café liquor permits for the sale of alcoholic liquor. Executive Order No. 7MM plainly modified *§ 30-22a (a)*, directing that, if a café intends to resume sales of alcoholic liquor for on premise consumption, such liquor may be consumed only outdoors and can be sold only in conjunction with the sale of food. Executive Order No. 7ZZ expanded on this modification of *§ 30-22a (a)* by also **[*29]** requiring that the sale of food be accompanied by the sale of alcoholic liquor upon the resumption of indoor dining. Executive Order No. 7ZZ also explicitly provides that "*[§]* 28-9 (b)* . . . authorizes the modification or suspension . . . of any statute . . . that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of public health . . . ." Executive Order No. 7ZZ (June 16, 2020). *HN9*[⬆️] Both executive orders are thus also supported by the governor's authority under § 28-9 (b) (1), which authorizes the governor to modify or suspend any statute, regulation or requirement, if it conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. Accordingly, we conclude that Governor Lamont did not exceed his statutory authority when he issued the challenged executive orders in an effort to contain the spread of COVID-19.

II

We now consider the plaintiffs' contention that § 28-9 (b) (1) and (7) is an unconstitutional delegation by the General Assembly of its legislative powers to the governor, in violation of the separation of power provision of the Connecticut constitution. See Conn. Const., art. II.

We begin with the relevant legal principles. **[*30]** *HN10*[⬆️] A challenge to "[t]he constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *Keane v. Fischetti, 300 Conn. 395, 402, 13 A.3d 1089 (2011).*

*HN11*[⬆️] "The [c]onstitution of this state provides for the separation of the governmental functions into three basic departments, legislative, executive and judicial, and it is inherent in this separation, since the law-making function is vested exclusively in the legislative department, that the [l]egislature cannot delegate the law-making power to any other department or agency." (Internal quotation marks omitted.) *University of Connecticut Chapter, AAUP v. Governor, 200 Conn. 386, 394, 512 A.2d 152 (1986).* We have explained that "[t]he primary purpose of [the separation of powers] doctrine **[*31]** is to prevent commingling of different powers of government in the same hands. . . . The constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers. . . . It is axiomatic that no branch of government organized under a constitution may exercise any power that is not explicitly bestowed by that constitution or that is not essential to the exercise thereof. . . . [Thus] [t]he separation of powers doctrine serves a dual function: it limits the exercise of power within each branch, yet ensures the independent exercise of that power." (Internal quotation marks omitted.) *Persels & Associates, LLC v. Banking Commissioner, 318 Conn. 652, 668-69, 122 A.3d 592 (2015).*

*HN12*[⬆️] Unlike the separation of powers doctrine that has developed under the federal constitution, "the historical evolution of Connecticut's governmental system [has] established a 'tradition of harmony' among the separate branches of government . . . ." *State v. McCleese, 33 Conn. 378, 419, 215 A.3d 1154 (2019).* "Recognizing that executive, legislative and judicial powers frequently overlap, we have consistently held that the doctrine of the separation of powers cannot be applied rigidly." *Bartholomew v. Schweizer, 217 Conn. 671, 676, 587 A.2d 1014 (1991).* As we have recognized, "the great functions of government are not divided in any **[*32]** such way that all acts of the nature of the function of one department can never be

2021 Conn. LEXIS 78, *32

exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative and judicial powers . . . of necessity overlap each other, and cover many acts which are in their nature common to more than one department." (Internal quotation marks omitted.) *Seymour v. Elections Enforcement Commission, 255 Conn. 78, 107, 762 A.2d 880 (2000),* cert. denied, *533 U.S. 951, 121 S. Ct. 2594, 150 L. Ed. 2d 752 (2001).* For example, the General Assembly does not have exclusive responsibility for legislating. Rather, the legislature and the governor work together to pass legislation. See, e.g., *Conn. Const., art. IV, § 15* ("Each bill which shall have passed both houses of the general assembly shall be presented to the governor. . . . If the governor shall approve a bill, he shall sign and transmit it to the secretary of the state, but if he shall disapprove, he shall transmit it to the secretary with his objections, and the secretary shall thereupon return the bill with the governor's objections to the house in which it originated.").

*HN13*[↑] A statute will be held unconstitutional on the ground that it violates the separation of powers only if it "(1) confers on one branch of government the duties which belong [*33] exclusively to another branch . . . or (2) if it confers the duties of one branch of government on another branch which duties significantly interfere with the orderly performance of the latter's essential functions." (Citation omitted.) *University of Connecticut Chapter, AAUP v. Governor, supra, 200 Conn. 394-95.* Applying these standards to *§ 28-9 (b) (1)* and *(7),* we conclude that the plaintiffs cannot meet their heavy burden of establishing that the statute is a violation of the separation of powers provision of article second of the Connecticut constitution on the basis that it impermissibly delegates legislative authority to the governor.

*HN14*[↑] *Section 28-9* sets forth the General Assembly's policy that the state must be able to mount a rapid and agile response to a "serious disaster," and the executive branch, namely, the governor, is most capable of carrying out that response. Significantly, although the "law-making power is in the legislative branch of our government and cannot constitutionally be delegated . . . the General Assembly may carry out its legislative policies within the police power of the state by delegating to an administrative agency the power to fill in the details." (Citation omitted; internal quotation marks omitted.) *New Milford v. SCA Services of Connecticut, Inc., 174 Conn. 146, 149, 384 A.2d 337 (1977).* Put differently, the General Assembly has "the

right to determine in the first instance what [*34] is the nature and extent of the danger to the public health, safety, morals and welfare and what are the measures best calculated to meet that threat." *Buxton v. Ullman, 147 Conn. 48, 55, 156 A.2d 508 (1959),* appeal dismissed sub nom. *Poe v. Ullman, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961).* Once the General Assembly has made that determination, it may carry out that policy by delegating to the executive branch the power to "fill in the details" in order to effectuate that policy. [10] *HN15*[↑] "In order to render admissible such delegation of legislative power, however, it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits . . . ." (Internal quotation marks omitted.) *Hogan v. Dept. of Children & Families, 290 Conn. 545, 572, 964 A.2d 1213 (2009).* As the United States Supreme Court has explained, "[s]o long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." (Internal quotation marks omitted.) *Mistretta v. United States, 488 U.S. 361, 372, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989);* see also *Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S. Ct. 863, 96 L. Ed. 1153, 62 Ohio Law Abs. 417 (1952)* [*35] (Jackson, J., concurring in the judgment and opinion of the court) ("[w]hen the [p]resident acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate"). That is,

---

[10] There are numerous statutory examples of the General Assembly's delegating to the governor the responsibility of protecting the people of this state. See, e.g., *General Statutes § 3-1* (governor shall "take any proper action concerning . . . the enforcement of the laws of the state and the protection of its citizens"); *General Statutes § 3-6a* (governor may restrict "movement of persons and vehicles upon the streets and highways of the state" during "extreme weather conditions or other acts of nature"); *General Statutes § 16a-11* (governor may declare "energy emergency" and order energy emergency plan); *General Statutes § 19a-70* (governor may proclaim emergency due to short supply of "antitoxin or other biologic product" during epidemic and appoint advisory committee to recommend "the priority of the supply, distribution and use of such biologic products in the interest of the health, welfare and safety of the people of the state").

"[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States, U.S. , 139 S. Ct. 2116, 2123, 204 L. Ed. 2d 522 (2019)* (plurality opinion). "[T]he answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." Id.

HN16[↑] In enacting *§ 28-9,* the General Assembly set forth the policy for the governor to follow in the event of a serious disaster. Specifically, through *§ 28-9 (b) (1),* the General Assembly's policy directs that, upon the proclamation of a civil preparedness emergency, or upon the declaration of a public health emergency under *§ 19a-131a,* the governor may "modify or suspend . . . any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, *is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health [*36]* ." (Emphasis added.) *Section 28-9 (b) (1)* further requires the governor to specify the reasons for suspending or modifying the statute, regulation or requirement and "the period, *not exceeding six months* unless sooner revoked, during which such order shall be enforced." (Emphasis added.) HN17[↑] The legislature set forth the standards that limit the governor's authority to act under *§ 28-9 (b) (1)* in three primary ways. First, the governor may act pursuant to *subsection (b) (1)* only after the governor has proclaimed a civil preparedness emergency or declared a public health emergency. Second, the governor's actions are limited to modifying or suspending—not repealing—statutes or other regulations only to the extent that they are in conflict with the execution of civil preparedness functions or are required to protect the public health, and the governor is required to specify the reasons for the modification or suspension. Finally, the governor's actions have temporal limitations, namely, the period of time the modification or suspension may be enforced is limited to six months. [11] Therefore, any actions the governor

takes under *subsection (b) (1)* are temporary, that is, he cannot modify or suspend any statutes or regulations permanently.

HN18[↑] *Section 28-9 (b) (7)* similarly makes clear that [*37] the governor may take other steps to address the serious disaster, only if they "are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and to minimize the effects of hostile action." In other words, the governor may act under *subsection (b) (7)* only after he has proclaimed a civil preparedness emergency, and his actions are limited to those that are *reasonably necessary* to protect the health, safety, and welfare of the people of this state. Moreover, the governor may act only to the extent that the health, safety, and welfare of the people are implicated by this *particular* serious disaster. The governor would not, for example, be able to issue an executive order forbidding restaurants from selling unhealthy foods during the COVID-19 pandemic. Although eating healthy foods is undoubtedly related to the health and welfare of the people of this state, such an action is not reasonably necessary to address the current pandemic. Likewise, should a hurricane of sufficient severity require the governor to proclaim a civil preparedness emergency, mandating that Connecticut citizens wear [*38] masks would not be a proper action under *subsection (b) (7)* merely because it might have the incidental health benefit of reducing the spread of the common cold. HN19[↑] Rather, the governor's actions under *subsection (b) (7)* must be reasonably necessary to address the specific serious disaster that warranted the civil preparedness emergency proclamation.

HN20[↑] Our case law supports the conclusion that *§ 28-9 (b) (1)* and *(7)* is not an unconstitutional delegation of legislative authority. In *University of Connecticut Chapter, AAUP v. Governor, supra, 200 Conn. 386,* this court upheld the constitutionality of General Statutes (Rev. to 1985) § 4-85 (b), which authorized the governor to "reduce budgetary allotments by up to 5 percent

---

[11] We acknowledge that the governor has twice renewed the civil preparedness emergency and, at the same time, declared new civil preparedness emergencies, and has renewed the executive orders modifying or suspending statutes and regulations. The statutory six month temporal limitation, however, requires the governor, at a minimum, to continuously evaluate the necessity of the executive orders and to justify their continued existence. As we discuss hereinafter, although this is a broad grant of authority, and there may well be instances in which a challenger to the governor's continued actions can demonstrate that they have lasted an improper

duration, that issue is not squarely before us, and nothing in this opinion should be construed as offering an opinion on that separate issue. Indeed, the plaintiffs do not challenge the governor's renewal of the emergencies. Similarly, the plaintiffs acknowledge that they "are not challenging the good intentions of [Governor Lamont] in issuing his executive orders" and "are not asking [this] court to second-guess the policy judgments of [Governor Lamont] or to determine whether his executive orders and the sector rules make sense or are fair."

2021 Conn. LEXIS 78, *38

under certain specified circumstances." *Id., 387*. The plaintiffs argued that the statute violated the separation of powers provision because it attempted to delegate a strictly legislative function, namely, budgeting. *Id., 393*. This court rejected that argument. We explained that, rather than interfering with a legislative function, § 4-85 (b) enabled the governor "to supervise the execution of the budget." *Id., 396*. We explained that this role was particularly suited to the executive branch, which is "most capable of having detailed and contemporaneous knowledge regarding finances. Under the constitutional separation of powers, the governor uses that knowledge in making [*39] such spending decisions and to see that the laws are faithfully executed." *Id., 397*. Here, the General Assembly similarly expressed its policy that the governor is most appropriately suited to use the expertise of the executive branch—particularly in this case, the Department of Public Health—to respond to a potentially, rapidly evolving serious disaster and to take the most appropriate steps to safeguard the people of this state. In *University of Connecticut Chapter, AAUP*, we also rejected the plaintiffs' argument that the standards " 'deems necessary' " and " 'a change of circumstances' " did not provide sufficient standards to the governor. *Id., 398*. We noted that requiring more specific standards "would hamper the flexibility needed for the governor to monitor and administer expenditures and to supervise the execution of the budget." *Id., 399*. The standards set forth in *subsection (b) (1)* and *(7)* similarly provide sufficient standards to guide the governor's exercise of his authority.

By contrast, in *State v. Stoddard, 126 Conn. 623, 633-34, 13 A.2d 586 (1940)*, this court reversed a defendant's criminal conviction and struck down a statute that authorized the milk administrator to set the minimum price for milk. The only guidance the General Assembly provided to the administrator in [*40] setting the price was to "take into consideration the type of container used and other cost factors [that] should influence the determination of such prices." (Internal quotation marks omitted.) *Id., 625*. This court concluded that this language did not provide "such prescribed standards or principles, courses of procedure, and rules of decision as is [required] to justify the delegation of powers attempted thereby . . . ." *Id., 633*. We conclude that, contrary to the plaintiffs' assertions, the standards imposed by *subsection (b) (1)* and *(7)* provide greater guidance to the governor than did the statute in *Stoddard*.

We acknowledge that *subsection (b) (1)* and *(7)* is a broad grant of authority from the General Assembly to

the governor. *HN21*[⬆] A broad grant of authority, however, is not the same as limitless or standardless authority. As we have explained, although the General Assembly may not delegate its "law-making" function, it may delegate "some *considerable* segment of its legislative authority." (Emphasis added.) *Salmon Brook Convalescent Home, Inc. v. Commission on Hospitals & Health Care, 177 Conn. 356, 363, 417 A.2d 358 (1979)*. The United States Supreme Court has similarly explained that, once the legislature has made a policy determination, "[i]t is no objection" that the legislation "call[s] for the exercise of judgment, and for the formulation of subsidiary [*41] administrative policy within the prescribed statutory framework." *Yakus v. United States, 321 U.S. 414, 425, 64 S. Ct. 660, 88 L. Ed. 834 (1944)*; see also *Whitman v. American Trucking Associations, Inc., 531 U.S. 457, 475, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001)* ("[a] certain degree of discretion, and thus of [law-making], inheres in most executive or judicial action" (internal quotation marks omitted)). In a recent concurrence in connection with the United States Supreme Court's denial of injunctive relief pertaining to the California governor's COVID-19 restrictions on the number of people permitted in houses of worship, Chief Justice John Roberts emphasized the need for elected leaders to have broad authority to respond to rapidly evolving emergencies. See *South Bay United Pentecostal Church v. Newsom, ___ U.S. ___, 140 S. Ct. 1613, 207 L. Ed. 2d 154 (2020)* (Roberts, C. J., concurring in denial of application for injunctive relief). He explained that "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. . . . When [elected] officials undertake . . . to act in areas fraught with medical and scientific uncertainties, *their latitude must be especially broad*." (Citation omitted; emphasis added; internal quotation marks omitted.) Id.

*HN22*[⬆] In enacting *§ 28-9 (b)*, the General Assembly was as precise as it could be in defining the contours of the governor's [*42] authority given that there are myriad serious disasters that could arise and the actions the governor would be required to take could vary significantly from one serious disaster to another. See, e.g., *University of Connecticut Chapter, AAUP v. Governor, supra, 200 Conn. 398* ("these standards are constitutionally sufficient under our law in that they are as definit[e] as is reasonably practicable under the circumstances" (internal quotation marks omitted)); see also *American Power & Light Co. v. Securities & Exchange Commission, 329 U.S. 90, 105, 67 S. Ct. 133, 91 L. Ed. 103 (1946)* ("[t]he legislative process would

frequently bog down if Congress were constitutionally required to appraise [beforehand] the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation"); *Hogan v. Dept. of Children & Families, supra, 290 Conn. 572* ("[i]n order to render admissible such delegation of legislative power . . . it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out . . . and *with such degree of certainty as the nature of the case permits*" (emphasis added; internal quotation marks omitted)). [12] What could be statutorily or constitutionally appropriate in one serious disaster may not be in another. As Senator Martin M. Looney explained during a special, statutorily created legislative committee's September 4, 2020 meeting to [*43] discuss Governor Lamont's public health emergency declaration, *§ 28-9* is broad because the governor must be able to quickly address the serious disaster. Declaration of a Public Health Emergency Committee Meeting (September 4, 2020), available at https://ct-n.com/ctnplayer.asp?odID=17659 (13:10 through 13:36) (last visited March 29, 2021). Requiring more specific standards "would hamper the flexibility needed" for the governor to respond to the myriad different circumstances that may constitute a serious disaster. *University of Connecticut Chapter, AAUP v. Governor, supra, 399*.

Moreover, it is reasonable for the legislature to conclude that the executive branch of government would be far better suited to respond to a serious disaster with the speed and flexibility needed to protect the public health and welfare. Specifically, the legislature itself is not in session continuously and would not be well positioned to mount a rapid response to a serious disaster, especially one that develops and evolves quickly or unpredictably, and thus requires an ongoing and agile response. Indeed, the former speaker of the House of Representatives, Joe Aresimowicz, noted during the September, 4, 2020 meeting of the Declaration of a Public Health Emergency Committee [*44] that, because the Connecticut legislature is part-time, they are "not structured to handle [a serious disaster]." Declaration of a Public Health Emergency Committee

---

[12] We note that "[o]nly twice in this country's history (and that in a single year) [has the United States Supreme Court] found a delegation excessive—in each case because Congress had failed to articulate *any* policy or standard to confine discretion." (Emphasis in original; internal quotation marks omitted.) *Gundy v. United States, supra, 139 S. Ct. 2129* (plurality opinion).

Meeting, supra, (17:56). Similarly, Senator Mary Daugherty Abrams, the senate chairperson of the Public Health Committee, explained there are times "we need to take swift, deliberate action as a government to protect the public's health, and the Executive Branch is best equipped to do that. . . . There are 187 members of the legislative body, and the thought that we could all come together swiftly and deliberately to respond to what's come up with the COVID . . . crisis is not realistic." Id., (1:09:19 through 1:09:54).

In rejecting a similar argument that emergency powers of the governor of Kentucky during the COVID-19 pandemic violated the separation of powers provision of that state's constitution, the Supreme Court of Kentucky explained that it was reasonable for the governor to have greater authority in times of emergency "given [the] government's tripartite structure *with a legislature that is not in continuous session*." (Emphasis added.) *Beshear v. Acree, 615 S.W.3d 780, 806 (Ky. 2020)*. The court further explained that "[h]aving a citizen legislature that meets part-time as opposed to a full-time legislative body that meets [*45] year-round, as some states have, generally leaves [the Kentucky] General Assembly without the ability to legislate quickly in the event of emergency unless the emergency arises during a regular legislative session." (Footnote omitted.) *Id., 807*. The same rationale applies here.

That having been said, we pause to note that the legislature chose not to include a mechanism for more direct legislative oversight of a declared civil preparedness emergency, as it did for a man-made disaster under *§ 28-9 (a)* or a public health emergency declaration under *§ 19a-131a*. See *General Statutes § 28-9 (a)* ("[a]ny such proclamation, or order issued pursuant thereto, issued by the Governor because of a disaster resulting from man-made cause may be disapproved by majority vote of a joint legislative committee"); see also *General Statutes § 19a-131a (b) (1)* ("[a]ny . . . declaration [of a public health emergency] issued by the Governor may be disapproved and nullified by majority vote of a committee consisting of the president pro tempore of the Senate, the speaker of the House of Representatives, the majority and minority leaders of both houses of the General Assembly and the cochairpersons and ranking members of the joint standing committee of the General Assembly having cognizance of matters [*46] relating to public health"). Several high courts of our sister states have noted the importance of such legislative oversight under similar statutory schemes. See, e.g., *Beshear v. Acree, supra, 615 S.W.3d 811-12* ("the [Kentucky] General Assembly

[is allowed] to make the determination itself if the [g]overnor has not declared an end to the emergency 'before the first day of the next regular session of the General Assembly' "); *Desrosiers v. Governor, 486 Mass. 369, 384, 158 N.E.3d 827 (2020)* ("the [Massachusetts] [l]egislature also has at its disposal a way to curb the [g]overnor's powers under the [Massachusetts Civil Defense Act], should it desire to do so"); *Elkhorn Baptist Church v. Brown, 366 Or. 506, 526, 466 P.3d 30 (2020)* ("the [Oregon] [g]overnor's emergency powers are limited in that they can be terminated by the [Oregon] legislature"). This observation does not alter our constitutional analysis in the present case but warrants mention.

Legislative oversight has not been altogether lacking. In the related context of considering Governor Lamont's public health emergency declaration, a legislative committee, namely, the Declaration of a Public Health Emergency Committee, formed pursuant to *§ 19a-131a (b) (1),* has met twice since Governor Lamont first declared the civil preparedness and public health emergencies. The committee, consisting of the president pro tempore **[*47]** of the Senate, the speaker of the House of Representatives, the majority and minority leaders of both houses, and the cochairpersons and ranking members of the Public Health Committee, met for the first time in the history of this state on March 11, 2020, just one day after the governor first declared the public health and civil preparedness emergencies. During that meeting, the committee met "to consider [Governor Lamont's] declaration of a public health emergency." Declaration of a Public Health Emergency Committee, Meeting Minutes (March 11, 2020) p. 1, available at https://www.cga.ct.gov/ph/tfs/20200311_Public%20Heal th%20Emergency%20Committee/20200311/Minutes_pd f (last visited March 29, 2021). Senator Looney explained to the committee that, "under the statutes, this committee has the right to veto the [g]overnor's plan within [seventy-two] hours of this taking action . . . ." *Id., p. 2.* When asked by Senator Leonard A. Fasano whether the committee would be required to reconvene if Governor Lamont decided to reinvoke his authority after six months, Senator Looney explained that, if the governor "wanted to extend it beyond that time, it would require a new order, and [the committee] would **[*48]** have a new opportunity to meet like [it] did this time." Id. Finally, Senator Looney closed the meeting by noting that "it is within the committee's capacity to convene again by Friday [March 13, 2020] at 2:25 p.m., but, barring some other emergency, the committee has met the statutory requirements." *Id., p. 4.* The committee did not meet again within seventy-two hours of the first proclamation.

Thereafter, the committee met again on September 4, 2020, three days after Governor Lamont's September 1, 2020 declarations. After discussion regarding the scope of Governor Lamont's authority under both a civil preparedness emergency and a public health emergency, [13] the committee took up a motion to disapprove of Governor Lamont's declaration of a public health emergency pursuant to *§ 19a-131a.* Declaration of a Public Health Emergency Committee Meeting, supra, (1:28:10 through 1:28:17). The motion failed, and the committee did not vote to disapprove of Governor Lamont's public health emergency declaration. Id., (1:43:29 through 1:44:11). We take this inaction as an indication of the committee's acquiescence in Governor Lamont's actions pursuant to his public health emergency authority. Although we most often employ this principle when "the legislature [fails] to take corrective **[*49]** action as manifesting the legislature's acquiescence in our construction of a statute"; (internal quotation marks omitted) *Spiotti v. Wolcott, 326 Conn. 190, 202, 163 A.3d 46 (2017);* the same principle is insightful here. In this case, the legislative committee with the statutory authority to disapprove of Governor Lamont's public health emergency declaration met on two occasions and declined to exercise its disapproval powers either time. Although not the equivalent of full legislative ratification, this procedure should significantly ameliorate concerns regarding legislative oversight. Should the plaintiffs seek to impose greater oversight of the governor's authority under the statutory scheme, whether in the context of a public health emergency or a civil preparedness emergency, the proper avenue is through an amendment to the statute through the legislature, not this court. See, e.g., *Castro v. Viera, 207*

---

[13] We note that several members of the committee, including Senator Fasano and Representative Aresimowicz, noted that the committee was not authorized to take any action with respect to Governor Lamont's actions pursuant to the civil preparedness emergency declaration. See, e.g., Declaration of a Public Health Emergency Committee Meeting, supra, (08:27 through 09:06), remarks of Senator Fasano; id., (09:13 through 09:42), remarks of Representative Aresimowicz. As we previously discussed in this opinion, we fail to see why the legislature chose not to include a provision for legislative oversight of a governor's proclaimed civil preparedness emergency, other than for a man-made disaster. Certainly, this could be addressed by the General Assembly in its current, or a future, legislative session, if the legislature deems it appropriate.

Conn. 420, 435, 541 A.2d 1216 (1988) ("[I]t is up to the legislatures, not courts, to decide on the wisdom and utility of legislation. . . . [C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, [whose members] are elected to pass laws." (Internal quotation marks omitted.)).

In sum, HN23[↑] § 28-9 sets forth the General Assembly's policy that, in the event of [*50] a serious disaster, the health, safety, and welfare of Connecticut's residents is of utmost importance. Section 28-9 (b) affords the governor considerable latitude to employ the "necessary means" for accomplishing that policy objective. Norwalk Street Railway Co.'s Appeal, 69 Conn. 576, 594, 37 A. 1080 (1897). But that latitude is neither standardless nor limitless. In addition to the limitations explicated previously, in the event an aggrieved party believes the governor has taken any particular action that exceeds his lawful authority or violates the state constitution, that party may seek redress from the courts. The legislature may also deem it proper to impose greater oversight of the governor's actions during a proclaimed civil preparedness emergency or otherwise amend or repeal § 28-9 to further limit the governor's authority.

Our conclusion that, although subsection (b) (1) and (7) represents a broad grant of authority to the governor, it is nonetheless constitutional finds support in the analysis of similar issues from the high courts of our sister states. For example, the Pennsylvania Supreme Court recently rejected a separation of powers challenge to that state's Emergency Management Services Code, which permits the governor of Pennsylvania to proclaim a disaster emergency and to take [*51] actions similar to those authorized by § 28-9. 35 Pa. Stat. and Cons. Stat. Ann. § 7301 (c) (West Supp. 2020);see Friends of Danny DeVito v. Wolf, 227 A.3d 872, 892-93 (Pa.), cert. denied, ___ U.S. ___ , 141 S. Ct. 239, 208 L. Ed. 2d 17 (2020); see also Wolf v. Scarnati, 233 A.3d 679, 705 (Pa. 2020) (recognizing that court had determined in Friends of Danny DeVito that Pennsylvania governor's exercise of authority delegated under Emergency Management Services Code did not violate separation of powers doctrine under Pennsylvania constitution). The court noted in Scarnati that the "[Pennsylvania] General Assembly, in enacting the statute, 'ma[de] the basic policy choices.' . . . The General Assembly decided that the [g]overnor should be able to exercise certain powers when he or she makes a 'finding that a disaster has occurred or that the occurrence of the threat of a disaster is imminent.' " (Citation omitted.) Wolf v. Scarnati, supra, 704. The

court also explained that "the [Pennsylvania] General Assembly . . . provided 'adequate standards which will guide and restrain' the [g]overnor's powers. . . . The General Assembly gave the [g]overnor specific guidance about what he can, and cannot, do in responding to a disaster emergency. . . . The powers delegated to the [g]overnor are admittedly [far reaching], but nonetheless are specific. For example, the [g]overnor can '[s]uspend the [*52] provisions of any regulatory statute . . . if strict compliance with the provisions . . . would in any way prevent, hinder or delay necessary action in coping with the emergency.' . . . Broad discretion and standardless discretion are not the same thing. Only those regulations that hinder action in response to the emergency may be suspended. It may be the case that the more expansive the emergency, the more encompassing the suspension of regulations. But this shows that it is the scope of the emergency, not the [g]overnor's arbitrary discretion, that determines the extent of the [g]overnor's powers under the statute. The General Assembly itself chose the words in [the Emergency Management Services Code]. The General Assembly, under its lawmaking powers, could have provided the [g]overnor with less expansive powers under the Emergency Management Services Code. It did not do so." (Citations omitted; emphasis altered.) Id., 704-705.

The Supreme Court of Oregon has similarly reasoned that, although the emergency powers of the governor of Oregon are broad under that state's statutory scheme, they are not unlimited. Elkhorn Baptist Church v. Brown, supra, 366 Or. 525. The court reasoned that the governor's actions must be "exercised in a manner consistent [*53] with the reason for which they are granted; that is, they must be exercised to address the declared emergency. . . . Second, the [g]overnor's emergency powers . . . may be exercised only during a declared state of emergency, [and Oregon's emergency powers law] requires the [g]overnor to terminate by proclamation when the emergency no longer exists, or when the threat of an emergency has passed." (Internal quotation marks omitted) Id., 525-26. Finally, the court noted that the courts may intervene if the governor's regulations exceed constitutional limits. Id., 526.

Likewise, the Supreme Court of Kentucky held that the extent of the Kentucky governor's authority during an emergency was not an unconstitutional delegation of legislative authority in violation of the separation of powers provisions of the Kentucky constitution. Beshear v. Acree, supra, 615 S.W. 3d 806, 812. The court acknowledged that the governor's authority is broad,

2021 Conn. LEXIS 78, *53

but, "[g]iven the wide variance of occurrences that can constitute an emergency, disaster or catastrophe, the criteria are necessarily broad and result-oriented, protect life and property . . . and . . . public . . . health . . . allowing the [g]overnor working with the executive branch and emergency management agencies **[*54]** to determine what is necessary for the specific crisis at hand. Floods, tornadoes and ice storms require different responses than threats from nuclear, chemical or biological agents or biological, etiological, or radiological hazards but the emergency powers are always limited by the legislative criteria, i.e., they must be exercised in the context of a declared state of emergency . . . designed to protect life, property, health and safety and to secure the continuity and effectiveness of government . . . and exercised to promote and secure the safety and protection of the civilian population." (Citations omitted; internal quotation marks omitted.) *Id., 811.*

The Supreme Judicial Court of Massachusetts also recently rejected a separation of powers challenge to the Massachusetts governor's authority to issue emergency orders. *Desrosiers v. Governor, supra, 486 Mass. 382, 384-85.* The court reasoned that, "because the [g]overnor's actions were carried out pursuant to the authority granted to the [g]overnor in the [Massachusetts Civil Defense Act], the emergency orders [did] not violate [the separation of powers provision of the Massachusetts constitution]." *Id., 382.* The court also noted that the act did not interfere with the functions of the legislature. **[*55]** *Id., 383.*

The plaintiffs, however, point to a recent decision of the Supreme Court of Michigan that they claim supports their contention that *§ 28-9 (b) (1)* and *(7)* is an unconstitutional delegation of legislative authority. In a divided opinion, the Michigan high court concluded that the governor of Michigan did not possess the authority to exercise emergency powers under the Michigan Emergency Powers of the Governor Act because that act was an unlawful delegation of legislative power to the executive branch in violation of the Michigan constitution. *In re Certified Questions from the United States District Court, Western District of Michigan, Southern Division, Docket No. 161492, 2020 Mich. LEXIS 1758, 2020 WL 5877599, *18 (Mich. October 20, 2020).* The court reasoned that the powers conferred by the act were "remarkably broad"; *2020 Mich. LEXIS 1758, [WL], *15*; and there were not sufficient standards in place to constrain the governor's actions. See *2020 Mich. LEXIS 1758, [WL], *16-18.* The plaintiffs in the present case contend that, as with the Michigan statute,

*subection (b) (1)* and *(7)* "impermissibly confers truly unlimited power on the governor . . . ." We are not persuaded. As the Chief Justice of the Michigan Supreme Court noted in her concurring and dissenting opinion in that case, the statute does not violate the separation of powers provision because "there are many ways to test the [g]overnor's response to this life-and-death **[*56]** pandemic." *2020 Mich. LEXIS 1758, [WL], *40* (McCormack, C. J., concurring in part and dissenting in part). Namely, "the statute allows a legal challenge to the [g]overnor's declaration that COVID-19, as a threshold matter, constitutes a 'great public crisis' that 'imperil[s]' 'public safety.' . . . For another example, any order issued under the statute could be challenged as not 'necessary' or 'reasonable' to 'protect life and property or to bring the emergency situation within the affected area under control.' . . . In these ways and others, the courts can easily be enlisted to assess the exercise of executive power, measuring the adequacy of its factual and legal bases against the statute's language." (Citations omitted.) Id. The Chief Justice also noted that the legislature itself might revisit its decision to have passed the statute in the first place. Id. Specifically, "[i]f the [l]egislature saw fit, it could repeal the statute. Or, the [l]egislature might amend the law to alter its standards or limit its scope. Changing the statute provides a ready mechanism for legislative balance." Id. The Chief Justice further explained that the governor is also politically accountable to voters, which serves as an additional **[*57]** check. Id. Finally, the Chief Justice noted that the majority had departed from one part of their long-standing test for delegation of legislative power, namely, that "the standard must be as reasonably precise as the subject matter requires or permits." *2020 Mich. LEXIS 1758, [WL], *41* (McCormack, C. J., concurring in part and dissenting in part). We find the reasoning of the Chief Justice's concurrence and dissent to be more persuasive.

As we noted in our per curiam ruling in the present case, we are mindful of the incredibly difficult economic situation that the plaintiffs and thousands of others across the state are in given the COVID-19 pandemic. Individuals and families have been economically upended as a result of the pandemic. We are also mindful of the more than 300,000 Connecticut residents who have been infected with COVID-19 and, most tragically, the nearly 8000 Connecticut citizens who have passed away in the more than yearlong pandemic. As we explained, the governor is charged with protecting the health, safety, and welfare of the citizens of this state, and the COVID-19 pandemic has presented a dynamic and unpredictable "serious

disaster." The question of when various restrictions imposed as a result [*58] of the pandemic should be lifted is a fact intensive inquiry that involves an understanding of ever evolving scientific guidance, including the effects and impacts of newly discovered strains of the virus and their resistance to recently approved vaccines. It is likely that reasonable minds may differ as to when each restriction should be lifted, but, as Chief Justice Roberts explained, "[w]hen [elected] officials undertake . . . to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." (Internal quotation marks omitted.) *South Bay United Pentecostal Church v. Newsom, supra, 140 S. Ct. 1613* (Roberts, C. J., concurring in denial of application for injunctive relief). As long as Governor Lamont is acting within this admittedly broad statutory and constitutional authority—which we conclude that he is—it is not the job of this court to second-guess those policy decisions.

The judgment is affirmed.

In this opinion the other justices concurred.

---

**End of Document**

CENTERS FOR DISEASE CONTROL AND PREVENTION
DEPARTMENT OF HEALTH AND HUMAN SERVICES

ORDER UNDER SECTION 361
OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)
AND 42 CODE OF FEDERAL REGULATIONS  70.2

TEMPORARY HALT IN RESIDENTIAL EVICTIONS TO
PREVENT THE FURTHER SPREAD OF COVID-19

SUMMARY

Subject to the limitations under "Applicability," a landlord, owner of a residential property, or other person[1] with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order.

DEFINITIONS

"*Available government assistance*" means any governmental rental or housing payment benefits available to the individual or any household member.

"*Available housing*" means any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate federal, state, or local occupancy standards and that would not result in an overall increase of housing cost to such individual.

"*Covered person*"[2] means any tenant, lessee, or resident of a residential property who provides to their landlord, the owner of the residential property, or other person with a legal right to pursue eviction or a possessory action,[3] a declaration under penalty of perjury indicating that:

---

[1] For purposes of this Order, "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

[2] This definition is based on factors that are known to contribute to evictions and thus increase the need for individuals to move into close quarters in new congregate or shared living arrangements or experience homelessness. Individuals who suffer job loss, have limited financial resources, are low income, or have high out-of-pocket medical expenses are more likely to be evicted for nonpayment of rent than others not experiencing these factors. See Desmond, M., Gershenson, C., Who gets evicted? Assessing individual, neighborhood, and network factors, *Soc Sci Res*. 2017;62:362-377. doi:10.1016/j.ssresearch.2016.08.017, (identifying job loss as a possible predictor of eviction because renters who lose their jobs experience not only a sudden loss of income but also the loss of predictable future income). According to one survey, over one quarter (26%) of respondents also identified job loss as the primary cause of homelessness. See *2019 San Francisco Homeless Count & Survey Comprehensive Report*, Applied Survey Research, at 22, https://hsh.sfgov.org/wp-content/uploads/2020/01/2019HIRDReport_SanFrancisco_FinalDraft-1.pdf. (last viewed Mar. 24, 2021).

[3] As used throughout this Order, this would include, without limitation, an agent or attorney acting on behalf of the landlord or the owner of the residential property.

Attachment 2

(1) The individual has used best efforts to obtain all available government assistance for rent or housing;

(2) The individual either (i) earned no more than $99,000 (or $198,000 if filing jointly) in Calendar Year 2020, or expects to earn no more than $99,000 in annual income for Calendar Year 2021 (or no more than $198,000 if filing a joint tax return),[4] (ii) was not required to report any income in 2020 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check).[5,6]

(3) The individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary[7] out-of-pocket medical expenses;

(4) The individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and

(5) Eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options.

"*Evict*" and "*Eviction*" means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, to remove or cause the removal of a covered person from a residential property. This definition also does not prohibit foreclosure on a home mortgage.

---

[4] According to one study, the national two-bedroom housing wage in 2020 was $23.96 per hour (approximately, $49,837 annually), meaning that an hourly wage of $23.96 was needed to afford a modest two-bedroom house without spending more than 30% of one's income on rent. The hourly wage needed in Hawaii (the highest cost U.S. State for rent) was $38.76 (approximately $80,621 annually). See *Out of Reach: How Much do you Need to Earn to Afford a Modest Apartment in Your State?*, National Low Income Housing Coalition, https://reports.nlihc.org/oor (last visited Mar. 23, 2021). As further explained herein, because this Order is intended to serve the critical public health goal of preventing evicted individuals from potentially contributing to the interstate spread of COVID-19 through movement into close quarters in new congregate, shared housing settings, or though homelessness, the higher income thresholds listed here have been determined to better serve this goal.

[5] "Stimulus check" includes payments made pursuant to Section 2201 of the CARES Act, to Section 9601 of the American Rescue Plan Act of 2021, or to any similar federally authorized payments made to individual natural persons in 2020 and 2021. Eligibility for the 2020 or 2021 stimulus checks has been based on an income that is equal to or lower than the income thresholds described above and does not change or expand who is a covered person under this Order since it was entered into on September 4, 2020.

[6] A person is likely to qualify for protection under this Order if they receive the following benefits:  a) Temporary Assistance for Needy Families (TANF); b) Supplemental Nutrition Assistance Program (SNAP); c) Supplemental Security Income (SSI); or d) Supplemental Security Disability Income (SSDI) to the extent that income limits for these programs are less than or equal to the income limits for this Order. However, it is the individual's responsibility to verify that their income is within the income limits described.

[7] Extraordinary expenses are defined as those that prevented you from paying some or all of your rent or providing for other basic necessities like food security. To qualify as an extraordinary medical expense, the unreimbursed medical expense is on that is likely to exceed 7.5% of one's adjusted gross income for the year.

"*Residential property*" means any property leased for residential purposes, including any house, building, mobile home or land in a mobile home park,[8] or similar dwelling leased for residential purposes, but shall not include any hotel, motel, or other guest house rented to a temporary guest or seasonal tenant as defined under the laws of the state, territorial, tribal, or local jurisdiction.

"*State*" shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

"*U.S. territory*" shall have the same definition as under 42 CFR 70.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

STATEMENT OF INTENT

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

- Mitigating the spread of COVID-19 within crowded, congregate or shared living settings, or through unsheltered homelessness;
- Mitigating the further spread of COVID-19 from one state or territory into any other state or territory;
- Mitigating the further spread of COVID-19 by temporarily suspending the eviction of covered persons from residential property for nonpayment of rent; and
- Supporting response efforts to COVID-19 at the federal, state, local, territorial, and tribal levels.

BACKGROUND

There is currently a pandemic of a respiratory disease ("COVID-19") caused by a novel coronavirus (SARS-COV-2) that has now spread globally, including cases reported in all fifty states within the United States, plus the District of Columbia and U.S. territories. As of March 25, 2021, there have been almost 125 million cases of COVID-19 globally, resulting in over 2,700,000 deaths.[9] Over 29,700,000 cases have been identified in the United States, with new cases reported daily, and over 540,000 deaths due to the disease.[10] Although transmission has decreased since a peak in January 2021, the current number of cases per day remains almost twice as high as the initial peak in April 2020 and transmission rates are similar to the second peak in July 2020.

The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. Individuals without symptoms can

---

[8] Mobile home parks may also be referred to as manufactured housing communities.
[9] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU),* Johns Hopkins Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited Mar. 25, 2021).
[10] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 25, 2021).

also spread the virus.[11] Among adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. Severe illness means that persons with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, and may be fatal. People of any age with certain underlying medical conditions (e.g. cancer, obesity, serious heart conditions, or diabetes) are at increased risk for severe illness from COVID-19.[12]

COVID-19 presents a historic threat to public health, and COVID-19 cases have been detected in every county in the continental United States.[13] Between December 2020 and January 2021, the number of deaths per day from COVID-19 consistently exceeded any other cause.[14] Although transmission levels have decreased since January, between February 25 and March 25, 2021, the daily incidence of COVID-19 remained comparable to the summer peak of transmission in July 2020, which is higher than the daily incidence when the Order initially took effect in September, 2020. Furthermore, 37% of counties in the United States are categorized as experiencing "high" transmission (over 100 cases per 100,000 people or greater than 10% test positivity) and an additional 30% of counties are categorized as experiencing "substantial" transmission (50-99.99 cases per 100,000 people or 8-9.99% test positivity).[15] No counties are currently considered free of spread, and only 8% of counties are considered to have low transmission.[16]

Two-dose mRNA COVID-19 vaccination became available in December 2020 and as of March 27, 2021 over 50 million people in the United States (more than 15% of the population) have been fully immunized.[17] In February 2021, a single dose COVID-19 vaccine also became available. CDC continues to update guidance for COVID-19 precautions among individuals who have been fully vaccinated; however, currently there are no recommended changes to COVID-19 prevention recommendations related to activities in public, such as avoiding crowded and poorly ventilated places. This is particularly important given continued transmission. Even as COVID-19 vaccines continue to be distributed, it remains critical to maintain COVID-19 precautions to avoid further rises in transmission and to guard against yet another increase in the rates of new infections. It is important to note that despite higher rates of vaccine coverage, the simultaneous roll-back of community mitigation efforts may continue to expose vulnerable populations, such as those targeted in this Order, to higher-than-average COVID-19 rates. It is important to note that despite higher rates of vaccine coverage, the simultaneous roll-back of community

---

[11] Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19 Symptoms. JAMA Netw Open. 2021;4(1):e2035057. doi:10.1001/jamanetworkopen.2020.35057
[12] *People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Mar. 15, 2021).
[13] *US COVID-19 cases and deaths by state*, USAFacts, https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/ (last visited Mar. 24, 2021).
[14] Woolf SH, Chapman DA, Lee JH. COVID-19 as the Leading Cause of Death in the United States. JAMA. 2021;325(2):123–124. doi:10.1001/jama.2020.24865
[15] *COVID-19 Integrated County View*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view (last visited Mar. 22, 2021).
[16] *Id*.
[17] *Id*.

mitigation efforts may continue to expose vulnerable populations, such as those targeted in this Order, to higher-than-average COVID-19 rates.[18]

In recent months, new variants of SARS-CoV-2 have also emerged globally.[19] Epidemiological evaluation of these variants shows increased transmissibility as well as possible increased mortality. The current substantial levels of transmission and the emergence of variants highlight the persistent and dynamic nature of the pandemic and the need for continued protections.

To respond to this public health threat, Federal, state, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria. In particular, the COVID-19 pandemic has triggered unprecedented restrictions on interstate and foreign travel. For example, many states require travelers arriving from other states to obtain negative test results and/or quarantine upon arrival.[20] For international travel, all passengers age two or older—including U.S. citizens—must obtain a negative test result or show proof of recovery before they may board a flight to the United States.[21] Despite the need for travel precautions, airport use has increased in recent weeks, leading to heightened concerns of interstate transmission.[22] SARS-CoV-2 transmission, behavior change, and travel restrictions have devastated industries that depend on the movement of people, such as the travel, leisure, and hospitality.[23] Ten months after the initial wave of closures due to COVID-19, over 16 percent of the hospitality and leisure sector's labor force was unemployed.[24]  The persistent spread of COVID-19 continues to necessitate preventive action.

In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease. Eviction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition. They also allow state and local authorities to more easily implement, as needed, stay-at-home and social distancing directives to mitigate the community spread of COVID-19.

Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116-136) to aid individuals and businesses adversely affected by COVID-19 in March 2020.

---

[18]  *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 25, 2021).
[19] Abdool Karim SS, de Oliveira T. New SARS-CoV-2 Variants - Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med*. 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362.
[20] *Travel During COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last updated Feb. 16, 2021).
[21] *Id.*
[22] Cecelia Smith-Schoenwalder, *CDC Urges Americans to Avoid Travel as Airport Screenings Approach Pandemic Peak*, U.S. News, https://www.usnews.com/news/health-news/articles/2021-03-22/cdc-urges-americans-to-avoid-travel-as-airport-screenings-approach-pandemic-peak (last visited Mar. 26, 2021).
[23] Aaron Klein & Ember Smith, *Explaining the economic impact of COVID-19: Core industries and the Hispanic workforce*, Brookings Institute, https://www.brookings.edu/research/explaining-the-economic-impact-of-covid-19-core-industries-and-the-hispanic-workforce/ (last visited Mar. 23, 2021).
[24] *Labor Force Statistics from the Current Population Survey*, U.S. Bureau of Labor Statistics, https://www.bls.gov/web/empsit/cpseea31.htm (last updated Mar. 5, 2021).

Section 4024 of the CARES Act provided a 120-day moratorium on eviction filings as well as other protections for tenants in certain rental properties with federal assistance or federally related financing. These protections helped alleviate the public health consequences of tenant displacement during the COVID-19 pandemic. The CARES Act eviction moratorium expired on July 24, 2020. The protections in the CARES Act supplemented temporary eviction moratoria and rent freezes implemented by governors and other local officials using emergency powers.

Researchers estimated that this temporary federal moratorium provided relief to a material portion of the nation's roughly 43 million renters.[25] The CARES act also provided funding streams for emergency rental assistance; surveys estimate that this assistance became available to the public through rental assistance programs by July 2020.[26]

The federal moratorium provided by the CARES Act, however, did not reach all renters. Many renters who fell outside the scope of the Federal moratorium were instead protected under state and local moratoria. In August, it was estimated that as many as 30-40 million people in America could be at risk of eviction.[27] In early March, 2021, the Census Household Pulse Survey estimated that over 4 million adults who are not current on rent perceive that they are at imminent risk of eviction.[28] A wave of evictions on that scale would be unprecedented in modern times.[29] A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus becoming at higher risk of COVID-19.

On September 4, 2020, the CDC Director issued an Order temporarily halting evictions in the United States for the reasons described therein. That Order was set to expire on December 31, 2020, subject to further extension, modification, or rescission. Section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 extended the Order until January 31, 2021. With the extension of the Order, Congress also provided $25 billion for emergency rental assistance for the payment of rent and rental arrears. Congress later provided an additional $21.55 billion in emergency rental assistance when it passed the American Rescue Plan.

On January 29, 2021, following an assessment of the ongoing pandemic, the CDC Director renewed the Order until March 31, 2021.This Order further extends and modifies the prior Eviction Moratoria until June 30, 2021, for the reasons described herein, subject to revision

---

[25] See *CARES Act Eviction Moratorium*, Congressional Research Service, https://crsreports.congress.gov/product/pdf/IN/IN11320 (last visited Mar. 23, 2021).
[26] Vincent Reina et al., *COVID-19 Emergency Rental Assistance: Analysis of a National Survey of Programs*, Research Brief, https://nlihc.org/sites/default/files/HIP_NLIHC_Furman_Brief_FINAL.pdf (last visited Mar. 26, 2021).
[27] See Emily Benfer et al., *The COVID-19 Eviction Crisis: An Estimated 30-40 Million People in America are at Risk*, Aspen Institute, https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/ (last visited Mar. 23, 2021).
[28] *Household Pulse Survey*, United States Census Bureau, https://www.census.gov/data-tools/demo/hhp/#/?measures=EVR (last visited Mar. 25, 2021).
[29] As a baseline, approximately 900,000 renters are evicted every year in the United States. Princeton University Eviction Lab. *National Estimates: Eviction in America,* The Eviction Lab: Princeton University, https://evictionlab.org/national-estimates/ (last visited Mar. 24, 2021).

based on the changing public health landscape. To the extent any provision of this Order conflicts with prior Orders, this Order is controlling.

Researchers estimate that, in 2020, Federal, state, and local eviction moratoria led to over one million fewer evictions than the previous year.[30] Additional research shows that, despite the CDC eviction moratorium leading to an estimated 50% decrease in eviction filings compared to the historical average, there have still been over 100,000 eviction filings since September, suggesting high demand and likelihood of mass evictions.[31]

EVICTION AND RISK OF COVID-19 TRANSMISSION

Evicted renters must move, which leads to multiple outcomes that increase the risk of COVID-19 spread. Specifically, many evicted renters move into close quarters in shared housing or other congregate settings. According to the Census Bureau American Housing Survey, 32% of renters reported that they would move in with friends or family members upon eviction, which would introduce new household members and potentially increase household crowding.  Studies show that COVID-19 transmission occurs readily within households. The secondary attack rate in households has been estimated to be 17%, and household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts. A study of pregnant women in New York City showed that women in large households (greater number of residents per household) were three times as likely to test positive for SARS-CoV-2 than those in smaller households, and those in neighborhoods with greater household crowding (>1 resident per room) were twice as likely to test positive.  Throughout the United States, counties with the highest proportion of crowded households have experienced COVID-19 mortality rates 2.6 times those of counties with the lowest proportion of crowded households.

Shared housing is not limited to friends and family. It includes a broad range of settings, including transitional housing and domestic violence and abuse shelters. Special considerations exist for such housing because of the challenges of maintaining social distance. Residents often gather closely or use shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators. Residents may have unique needs, such as disabilities, chronic health conditions, cognitive decline, or limited access to technology, and thus may find it more difficult to take actions to protect themselves from COVID-19. CDC recommends that shelters provide new residents with a clean mask, keep them isolated from others, screen for symptoms at entry, or arrange for medical evaluations as needed depending on symptoms.  Accordingly, an influx of new residents at facilities that offer support services could potentially overwhelm staff and, if recommendations are not followed, lead to exposures.

Preliminary modeling projections and observational data from COVID-19 incidence comparisons across states that implemented and lifted eviction moratoria indicate that evictions substantially contribute to COVID-19 transmission. In mathematical models where eviction led exclusively to sharing housing with friends or family, lifting eviction moratoria led to a 40%

---

[30] Pete Hepburn & Renee Louis, *Preliminary Analysis: Six Months of the CDC Eviction Moratorium*, The Eviction Lab: Princeton University, https://evictionlab.org/six-months-cdc/ (last visited Mar. 26, 2021).
[31] *Id*.

increased risk of contracting COVID-19 among people who were evicted and those with whom they shared housing after eviction (pre-peer review).  Compared to a scenario where no evictions occurred, the models also predicted a 5-50% increased risk of infection, even for those who did not share housing, as a result of increased overall transmission.  The authors estimated that anywhere from 1,000 to 100,000 excess cases per million population could be attributable to evictions depending on the eviction and infection rates.

An analysis of observational data from state-based eviction moratoria in the 43 states and the District of Columbia showed significant increases in COVID-19 incidence and mortality approximately 2-3 months after eviction moratoria were lifted (pre-peer review).  Specifically, the authors compared the COVID-19 incidence and mortality rates in states that lifted their moratoria with the rates in states that maintained their moratoria. In these models, the authors controlled for time-varying indicators of each state's test count as well as major public-health interventions including lifting stay-at-home orders, school closures, and mask mandates. After adjusting for these other changes, they found that the incidence of COVID-19 in states that lifted their moratoria was 1.6 times that of states that did not at 10 weeks post-lifting (95% CI 1.0, 2.3), a ratio that grew to 2.1 at ≥16 weeks (CI 1.1, 3.9). Similarly, they found that mortality in states that lifted their moratoria was 1.6 times that of states that did not at 7 weeks post-lifting (CI 1.2, 2.3), a ratio that grew to 5.4 at ≥16 weeks (CI 3.1, 9.3). The authors estimated that, nationally, over 433,000 cases of COVID-19 and over 10,000 deaths could be attributed to lifting state moratoria.[32]

Although data are limited, available evidence suggests evictions lead to interstate spread of COVID-19 in two ways. First, an eviction may lead the evicted members of a household to move across state lines. Of the 35 million Americans who move each year, 15% move to a new state. Second, even if a particular eviction, standing alone, would not always result in interstate displacement, the mass evictions that would occur in the absence of this Order would inevitably increase the interstate spread of COVID-19. This Order cannot effectively mitigate interstate transmission of COVID-19 without covering intrastate evictions, as the level of spread of SARS-CoV-2 resulting from these evictions can lead to SARS-CoV-2 transmission across state borders. Moreover, intrastate spread facilitates interstate spread in the context of communicable disease spread, given the nature of infectious disease. In the aggregate, the mass-scale evictions that will likely occur in the absence of this Order will inevitably increase interstate spread of COVID-19.

EVICTION, HOMELESSNESS, AND RISK OF SEVERE DISEASE FROM COVID-19

Evicted individuals without access to support or other assistance options may become homeless, including older adults or those with underlying medical conditions, who are more at risk for severe illness from COVID-19 than the general population.  In Seattle-King County, 5-15% of people experiencing homelessness between 2018 and 2020 cited eviction as the primary reason for becoming homeless.  Additionally, some individuals and families who are evicted may

---

[32] Leifheit, Kathryn M. and Linton, Sabriya L. and Raifman, Julia and Schwartz, Gabriel and Benfer, Emily and Zimmerman, Frederick J and Pollack, Craig, Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (November 30, 2020). Available at
SSRN:  https://ssrn.com/abstract=3739576 or http://dx.doi.org/10.2139/ssrn.3739576.

originally stay with family or friends, but subsequently seek homeless services. Among people who entered shelters throughout the United States in 2017, 27% were staying with family or friends beforehand.

People experiencing homelessness are at high risk for COVID-19. It may be more difficult for these persons to consistently access the necessary resources to adhere to public health recommendations to prevent COVID-19. For instance, it may not be possible to avoid certain congregate settings such as homeless shelters, or easily access facilities to engage in handwashing with soap and water.

Extensive outbreaks of COVID-19 have been identified in homeless shelters.  In Seattle, Washington, a network of three related homeless shelters experienced an outbreak that led to 43 cases among residents and staff members.  In Boston, Massachusetts, universal COVID-19 testing at a single shelter revealed 147 cases, representing 36% of shelter residents.  COVID-19 testing in a single shelter in San Francisco led to the identification of 101 cases (67% of those tested).  Data from 557 universal diagnostic testing events at homeless shelters in 21 states show an average of 6% positivity among shelter clients.  Data comparing the incidence or severity of COVID-19 among people experiencing homelessness directly to the general population are limited. However, during the 15-day period of the outbreak in Boston, MA, researchers estimated a cumulative incidence of 46.3 cases of COVID-19 per 1000 persons experiencing homelessness, as compared to 1.9 cases per 1000 among Massachusetts adults (pre-print).

CDC guidance recommends increasing physical distance between beds in homeless shelters.  To adhere to this guidance, shelters have limited the number of people served throughout the United States. In many places, considerably fewer beds are available to individuals who become homeless. Shelters that do not adhere to the guidance, and operate at ordinary or increased occupancy, are at greater risk for the types of outbreaks described above. The challenge of mitigating disease transmission in homeless shelters has been compounded because some organizations have chosen to stop or limit volunteer access and participation.

In the context of the current pandemic, large increases in evictions resulting in homelessness could have at least two potential negative consequences. One is if homeless shelters increase occupancy in ways that increase the exposure risk to COVID-19. The other is if homeless shelters limit new admissions, leading to increases in unsheltered homelessness, which is associated with significantly heightened risk of mortality generally.  Neither consequence is in the interest of the public health.

Additionally, research suggests that the population of persons who would be evicted and those experiencing homelessness may be at risk of severe disease from COVID-19. Five studies have shown an association between eviction and hypertension, which has been associated with more severe outcomes from COVID-19.  Also, people experiencing homelessness often have underlying conditions that increase their risk of severe outcomes of COVID-19.  Among patients with COVID-19, homelessness has been associated with increased likelihood of hospitalization.

In short, evictions threaten to increase the spread of COVID-19 as they force people to move, often into close quarters in new shared housing settings with friends or family, or congregate

settings such as homeless shelters. The ability of these settings to adhere to best practices, such as social distancing and other infection control measures, decreases as populations increase.

<u>MODIFICATIONS</u>

In addition to extending the effective period of the prior orders, this Order makes several modifications. A description of each modification follows:

CDC added a statement in the "Statement of Intent" section consistent with the clarification of the "Evict" and "Eviction" definitions. The statement now specifically clarifies that one intended purpose of this Order is to mitigate the spread of COVID-19 by temporarily suspending the eviction of covered persons from residential property for nonpayment of rent.

CDC modified the "Applicability" section to add the following points:

> A signed declaration submitted under a previous order remains valid notwithstanding the issuance of this extended and modified order, and covered persons do not need to submit a new declaration under this Order.

> Evictions for nonpayment of rent initiated prior to September 4, 2020, but not yet completed are subject to this Order, but those that were completed before September 4, 2020, are not subject to the Order.

> While the Order does not prohibit evictions for engaging in criminal activity while on the leased premises, covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense) where the underlying activity is a covered person remaining in a residential property despite nonpayment of rent.

> Individuals who are confirmed to have, who have been exposed to, or who might have COVID-19 and take reasonable precautions to not spread the disease should not be evicted on grounds that they pose a health or safety threat to other residents.

> Even if a particular eviction, standing alone, would not always result in interstate displacement, the mass evictions that would occur in the absence of this Order would inevitably increase the interstate spread of COVID-19. Moreover, increases in intrastate spread further facilitate interstate spread in the context of communicable disease spread.

> The "Background," "Eviction and Risk of COVID-19 Infection" and "Eviction, Homelessness, and Risk of Severe Disease from COVID-19" subsections have been revised to reflect updated epidemiological and other relevant information in support of this Order.

CDC added a new section titled "Declaration Forms" with the following points:

> To qualify as a covered person eligible for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of "Covered Person" to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed.

> Tenants, lessees, or residents of a residential property may use any written document in place of the Declaration Form if it includes the required information as in the Form, is signed, and includes a perjury statement.

> Tenants, lessees, or residents of a residential property can use a form translated into other Languages.

In some circumstances, it may be appropriate for one member of the residence to provide an executed declaration on behalf of the other adult residents who are party to the lease, rental agreement, or housing contract.

CDC modified the "Findings and Action" section to, among other things, further explain that this Order is not a rule within the meaning of the Administrative Procedure Act and, to the extent a court finds that the Order qualifies as a rule, there is good cause to dispense with prior public notice and comment.

<u>APPLICABILITY</u>

This Order does not apply in any state, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in this Order or to the extent its application is prohibited by federal court order. In accordance with 42 U.S.C. 264(e), this Order does not preclude state, local, territorial, and tribal authorities from imposing additional requirements that provide greater public-health protection and are more restrictive than the requirements in this Order.

This Order is a temporary eviction moratorium to prevent the further spread of COVID-19. This Order does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract. Nothing in this Order precludes the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

Nothing in this Order precludes evictions based on a tenant, lessee, or resident: (1) Engaging in criminal activity while on the premises; (2) threatening the health or safety of other residents;[33] (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance, or similar regulation relating to health and safety; or (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).

---

[33] Individuals who might have COVID-19 are advised to stay home except to get medical care. Accordingly, individuals who might have COVID-19 and take reasonable precautions to not spread the disease should not be evicted on the ground that they may pose a health or safety threat to other residents. See *What to Do if You are Sick,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (last updated Mar. 17, 2021).

A signed declaration submitted under a previous order remains valid notwithstanding the issuance of this extended and modified order, and covered persons do not need to submit a new declaration under this Order.

Any evictions for nonpayment of rent initiated prior to September 4, 2020, but not yet completed, are subject to this Order. Any tenant, lessee, or resident of a residential property who qualifies as a "Covered Person" and is still present in a rental unit is entitled to protections under this Order. Any eviction that was completed prior to September 4, 2020, is not subject to this Order.

Under this Order, covered persons may be evicted for engaging in criminal activity while on the premises. But covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense) where the underlying activity is a covered person remaining in a residential property for nonpayment of rent. Permitting such evictions would result in substantially more evictions overall, thus increasing the risk of disease transmission as otherwise covered persons move into congregate settings or experience homelessness. This result would be contrary to the stated objectives of this Order, and therefore would diminish their effectiveness. Moreover, to the extent such criminal trespass laws are invoked to establish criminal activity solely based on a tenant, lessee, or resident of a residential property remaining in a residential property despite the nonpayment of rent, such invocation conflicts with this Order and is preempted pursuant to 42 U.S.C. 264(e).

Individuals who are confirmed to have, who have been exposed to, or who might have COVID-19 and take reasonable precautions to not spread the disease may not be evicted on grounds that they may pose a health or safety threat to other residents.

The Order is extended through June 30, 2021, based on the current and projected epidemiological context of SARS-CoV-2 transmission throughout the United States. Although daily incidence of COVID-19 decreased and plateaued between January and March 25, 2021, widespread transmission continues at high levels, making the Order still necessary, especially given that previous plateaus have led to secondary and tertiary phases of acceleration. Furthermore, the number of deaths per day continues at levels comparable to or higher than when this Order was established in September 2020.[34] This 90-day extension will allow the assessment of natural changes to COVID-19 incidence, the influences of new variants, and the expansion of COVID-19 vaccine coverage to determine if there is a continued need for a national eviction moratorium.

DECLARATION FORMS

To qualify for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of "Covered person" to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed from where they live. To

---

[34] *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendsdeaths (last visited Mar. 22, 2021).

assist tenants and landlords, the CDC created a standardized declaration form that can be downloaded here: https://www.cdc.gov/coronavirus/2019-ncov/downloads/declaration-form.pdf.

Tenants, lessees, and residents of residential property are not obligated to use the CDC form. Any written document that an eligible tenant, lessee, or residents of residential property presents to their landlord will comply with this Order, as long as it contains the required elements of "Covered person" as described in this order. In addition, tenants, lessees, and residents of residential property are allowed to declare in writing that they meet the elements of covered person in other languages.

All declarations, regardless of form used, must be signed, and must include a statement that the tenant, lessee, or resident of a residential property understands that they could be liable for perjury for any false or misleading statements or omissions in the declaration. This Order does not preclude a landlord challenging the truthfulness of a tenant's, lessee's, or resident's declaration in court, as permitted under state or local law.

In certain circumstances, such as individuals filing a joint tax return, it may be appropriate for one member of the residence to provide an executed declaration on behalf of the other adult residents party to the lease, rental agreement, or housing contract. The declaration may be signed and transmitted either electronically or by hard copy.

FINDINGS AND ACTION

For the reasons described herein, I am extending and modifying the September 4, 2020 Order, as extended by section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 and further extended by the January 29, 2021 Order. I have determined that extending the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID-19 throughout the United States.  I have further determined that measures by states, localities, or territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19.[35]

Based on the convergence of COVID-19, household crowding and transmission, and the increased risk of individuals sheltering in close quarters in congregate settings such as homeless shelters, which may be unable to provide adequate social distancing as populations increase, I have determined that extending the temporary halt on evictions is appropriate.

Therefore, under 42 CFR 70.2, subject to the limitations under the "Applicability" section, the September 4, 2020 Order is hereby modified and extended through June 30, 2021.

Accordingly, a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential

[35] In the United States, public health measures are implemented at all levels of government, including the federal, state, local, and tribal levels. Publicly-available compilations of pending measures indicate that eviction moratoria and other protections from eviction have expired or are set to expire in many jurisdictions. *COVID-19 Housing Policy Scorecard*, The Eviction Lab: Princeton University, https://evictionlab.org/covid-policy-scorecard/ (last visited Mar. 23, 2021).

property in any state or U.S. territory in which there are documented cases of COVID-19 that provides a level of public-health protections below the requirements listed in this Order.

This Order is not a rule within the meaning of the Administrative Procedure Act (APA) but rather an emergency action taken under the existing authority of 42 C.F.R § 70.2. The purpose of section 70.2, which was promulgated through notice-and-comment rulemaking, is to enable CDC to take swift steps to prevent contagion without having to seek a second round of public comments and without a delay in effective date.[36]

In the event that this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and the opportunity to comment on this Order and the delay in effective date. See 5 U.S.C. 553(b)(3)(B). Considering the public health emergency caused by COVID-19, it would be impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of this Order.

In the September 4, 2020 Order, the previous CDC Director determined that good cause existed because the public health emergency caused by COVID-19 made it impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of the Order. The previous Director also found that a delay in the effective date of the Order would permit the occurrence of evictions—potentially on a mass scale—that would have potentially significant consequences. For these reasons, the previous Director concluded that the delay in the effective date of the Order would defeat the purpose of the Order and endanger the public health and, therefore, determined that immediate action was necessary. As a result, the previous Director issued the Order without prior notice and comment and without a delay in the effective date. I made similar findings in the January 29, 2021 Order.

As noted above, although transmission levels have decreased since January, between February 25, 2021 and March 25, 2021, the daily incidence of COVID-19 remained comparable to the summer peak of transmission in July 2020. Daily incidence in the last 30 days has remained consistently higher than the daily incidence when the Order took effect in September 2020. Furthermore, 37% of counties in the United States are categorized as experiencing "high" transmission (over 100 cases per 100,000 people or greater than 10% test positivity) and an additional 30% of counties are categorized as experiencing "substantial" transmission (50-99.99 cases per 100,000 people or 8-9.99% test positivity).  No counties are currently considered free of spread, and only 8% of counties are considered to have low transmission. Because of these reasons and because the current extension is set to expire on March 31, 2021, I hereby conclude that immediate action is again necessary without prior notice and comment and without a delay in the effective date.

The rapidly changing nature of the pandemic requires not only that CDC act swiftly, but also deftly to ensure that its actions are commensurate with the threat. This necessarily involves assessing evolving conditions that inform CDC's determinations.

---

[36] *Chambless Enters., LLC v. Redfield,* No. 20-1455, 2020 WL 7588849, (W.D. La. 2020).

Although the pandemic is dynamic and the situation evolves over time, the fundamental public health threat that existed on September 4, 2020, and January 29, 2021—the risk of large numbers of residential evictions contributing to the spread of COVID-19 throughout the United States—continues to exist. Without this Order, there is every reason to expect that evictions will increase. It is imperative that public health authorities act quickly to help ward off an unprecedented wave of evictions, which would threaten new spikes in SARS-CoV-2 transmission at a critical juncture in fight against COVID-19.  Such mass evictions and the attendant public-health consequences would be very difficult, if not impossible, to reverse.  It would be impracticable and contrary to the public interest to delay the issuance and effective date of the Order pending notice-and-comment rulemaking for the reasons described herein, and because of the ever-changing landscape of the pandemic and the uncertainty of whether Congress would grant another extension as it did in December 2020.

Similarly, if this Order qualifies as a rule under the APA, the Office of Information and Regulatory Affairs (OIRA) has determined that it would be an economically significant regulatory action pursuant to Executive Order 12866 and a major rule under the Congressional Review Act (CRA).  But there would not be a delay in its effective date.  CDC has determined that for the same reasons, there would be good cause under the CRA to make the requirements herein effective immediately. Thus, this action has been reviewed by OIRA.

If any provision of this Order, or the application of any provision to any persons, entities, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any persons, entities, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

This Order shall be enforced by federal authorities and cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18. However, this Order has no effect on the contractual obligations of renters to pay rent and shall not preclude charging or collecting fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

CRIMINAL PENALTIES

Under 18 U.S.C. 3559, 3571; 42 U.S.C.  271; and 42 CFR 70.18, a person violating this Order may be subject to a fine of no more than $100,000 or one year in jail, or both, if the violation does not result in a death, or a fine of no more than $250,000 or one year in jail, or both if the violation results in a death, or as otherwise provided by law. An organization violating this Order may be subject to a fine of no more than $200,000 per event if the violation does not result in a death or $500,000 per event if the violation results in a death or as otherwise provided by law. The U.S. Department of Justice may initiate criminal proceedings as appropriate seeking imposition of these criminal penalties.

NOTICE TO COOPERATING STATE AND LOCAL OFFICIALS

Under 42 U.S.C. 243, the U.S. Department of Health and Human Services is authorized to cooperate with and aid state and local authorities in the enforcement of their quarantine and other

health regulations and to accept state and local assistance in the enforcement of federal quarantine rules and regulations, including in the enforcement of this Order.

NOTICE OF AVAILABLE FEDERAL RESOURCES

While this Order to prevent eviction is effectuated to protect the public health, the states and units of local government are reminded that the Federal Government has deployed unprecedented resources to address the pandemic, including housing assistance.

The Department of Housing and Urban Development (HUD), the Department of Agriculture, and Treasury have informed CDC that unprecedented emergency resources have been appropriated through various Federal agencies that assist renters and landlords during the pandemic, including $46.55 billion to the Treasury through the Consolidated Appropriations Act of 2021 and the American Rescue Plan (ARP). Furthermore, in 2020 44 states and 310 local jurisdictions allocated about $3.9 billion toward emergency rental assistance, largely from funds appropriated to Treasury and HUD from the Coronavirus Aid, Relief, and Economic Security (CARES).[37] These three rounds of federal appropriations also provided substantial resources for homeless services, homeowner assistance, and supplemental stimulus and unemployment benefits that low income renters used to pay rent.

Visit https://home.treasury.gov/policy-issues/cares/state-and-local-governments for more information about the Coronavirus Relief Fund and https://home.treasury.gov/policy-issues/cares/emergency-rental-assistance-program for more information about the Emergency Rental Assistance Program. HUD has further informed CDC that forbearance policies for mortgages backed by the federal government are in effect until June 30, 2021, which provide many landlords, especially smaller landlords, with temporary relief as new emergency rental assistance programs are deployed.

HUD, USDA and Treasury grantees and partners play a critical role in prioritizing efforts to support this goal. As grantees decide how to deploy CDBG-CV and ESG-CV funds provided by the new funding from the CARES Act, Consolidated Appropriations Act of 2021, and ARP  all communities should assess what resources have already been allocated to prevent evictions and homelessness through temporary rental assistance and homelessness prevention, particularly to the most vulnerable households.

HUD stands at the ready to support American communities take these steps to reduce the spread of COVID-19 and maintain economic prosperity. For program support, including technical assistance, please visit www.hudexchange.info/program-support. For further information on HUD resources, tools, and guidance available to respond to the COVID-19 pandemic, state and local officials are directed to visit https://www.hud.gov/coronavirus. These tools include toolkits for Public Housing Authorities and Housing Choice Voucher landlords related to housing stability and eviction prevention, as well as similar guidance for owners and renters in HUD-

---

[37] Vincent Reina et al, *COVID-19 Emergency Rental Assistance: Analysis of a National Survey of Programs*, Research Brief, https://nlihc.org/sites/default/files/HIP_NLIHC_Furman_Brief_FINAL.pdf (last visited Mar. 26, 2021).

assisted multifamily properties. Furthermore, tenants can visit consumerfinance.gov/housing for up-to-date information on rent relief options, protections, and key deadlines.

EFFECTIVE DATE

This Order is effective on April 1, 2021, and will remain in effect through June 30, 2021, subject to revision based on the changing public health landscape.

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 28th day of March 2021.

_____

**Rochelle P. Walensky, M.D., M.P.H.**

**Director,**

**Centers for Disease Control and Prevention**



*House Bill No. 6672*

## *Special Act No. 21-2*

### *AN ACT CONCERNING PUBLIC HEALTH AND CIVIL PREPAREDNESS EMERGENCIES DECLARED AND RENEWED BY THE GOVERNOR.*

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. (*Effective from passage*) (a) The public health and civil preparedness emergencies declared by the Honorable Governor Ned Lamont on March 10, 2020, and declared and renewed by him on September 1, 2020, and January 26, 2021, in response to the COVID-19 pandemic, and in accordance with the provisions of sections 19a-131a and 28-9 of the general statutes, are hereby ratified. As used in this subsection, "COVID-19" means the respiratory disease designated by the World Health Organization on February 11, 2020, as coronavirus 2019, and any related mutation thereof recognized by said organization as a communicable respiratory disease.

(b) Notwithstanding the provisions of sections 19a-131a and 28-9 of the general statutes, from the effective date of this section and until May 20, 2021, the Governor is hereby authorized to renew said public health and civil preparedness emergency declarations through May 20, 2021. The provisions of this subsection shall not limit the Governor, or any department head, state agency or municipality from exercising any authority granted under said sections of the general statutes, from the

***House Bill No. 6672***

effective date of this section through May 20, 2021, provided the exercise of such authority is done in accordance with said sections of the general statutes. After May 20, 2021, nothing herein shall affect or limit any authority conveyed pursuant to section 19a-131a or 28-9 of the general statutes.

Approved March 31, 2021